Civil Case No. 18-cv-01454-MJD-KMM



# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

Civil Case No. 18-cv-01454-MJD-KMM

Yufan Zhang,

Plaintiff,

v.

UnitedHealth Group, Inc. and

Sujatha Duraimanickam,

Defendants.

**BRIEF**

IN SUPPORT OF MOTION TO

VACATE ARBITRATION

AWARDS

## APPELLANT'S BRIEF FOR VACATING ARBITRATION AWARDS



1

Civil Case No. 18-cv-01454-MJD-KMM

## Table of Contents

**TABLE OF AUTHORITIES** .................................................................................................9

**JURISDICTIONAL STATEMENT**.....................................................................................13

**STATEMENT OF THE ISSUES**........................................................................................14

1.   *Whether the Respondents knew "basecamp", "service-now", "codeHub"?* .....................................17

2.   *Whether the Respondents knew the functions of knew "basecamp", "service-now", "codeHub"?*.. 17

3.   *What malpresentation had the Respondents done when non-disclosed information in "basecamp",*
*"service-now", "codeHub"?*..............................................................................................17

4.   *Whether the Respondents made a false representation intentionally and knowingly*.....................17

5.   *Whether the Respondents knew what they did would mislead the arbitrator*................................17

6.   *Whether there were other choices for the Complainant not depending on the records in*
*"basecamp", "service-now", "codeHub" when he alleged the Respondents discriminated against him?*............17

7.   *Whether the Complainant could demonstrate Respondents' discrimination if assume the records*
*were available to the Complainant* ...................................................................................17

8.   *Whether the employer's reasons for terminating the Complainant job:*..........................................17

     have no basis in fact, or........................................................................................17

     even if based in fact, the employer was not motivated by these reasons, or .......................................17

     the reasons are insufficient to motivate an adverse employment decision ...........................................17

9.   *Whether the Complainant can prove that the Respondents told lie, and such lie made him losing*
*job.*        18

10.  *And whether the lie meets privilege standard*..............................................................18

**STATEMENT OF THE CASE AND THE FACTS**..............................................................**18**

11.  *Statement of Case* .....................................................................................18

12.  *The reasons for UHG to fire the Complainant*..................................................................20

13.  *The records from **BaseCamp**.com for year 2015 & 2016*.................................................23

2

14. The records from UHG **service-now** website for year 2015 & 2016 ................................. 24

15. The summary reports and history log information from Optum **"CodeHub"** ................................. 24

16. Sujatha's team was response for developing the components running on AEM environment ......... 25

17. AEM project development cycle ................................. 26

18. AEM deployment phase ................................. 27

19. Technology Development Program ................................. 28

20. On February 21, 2016, Kim Myers had year 2015 Common Review for Complainant ...................... 29

21. On July 10, 2016, Ms. Sujatha Duraimanickam had Interim Review for Complainant ..................... 29

22. Ms. Sujatha issued an initial "Corrective Action Form" to the Complainant ................................. 29

23. Ms. Sujatha issued a final "Corrective Action Form" to the Complainant ................................. 31

24. The Complainant disagreed with Ms. Sujatha negative comments about him, especially those examples written on "CAP" ................................. 31

25. On November 14, 2016, UHG terminated the Complainant's job, and did not allow him bring anything out from office building except his lunch box ................................. 33

26. On November 15, 2016, the Complainant contacted UHG HR to request the documents for why he got fired. UHG HR replied on December, 2016, and said ................................. 33

27. On December 2, 2016, the Complainant filed Internal Dispute Request with UHG HR. ................. 33

28. On January 29, 2020, the Complainant had a deposition meeting with UHG. ................................. 33

29. On February 11, 2020, Ms. Tanya Hughes, from UHG HR, had a deposition meeting with the Complainant's attorney ................................. 33

30. On February 23, 2020, Ms. Sujatha had a deposition meeting with the Complainant's attorney .... 33

31. On August 4-6, 18-19, 2020, arbitration meeting ................................. 33

32. On September 18, both parties submitted briefs, and Mr. Zhang sent a letter to arbitrator to express his concerning ................................. 33

33. On October 5, 2020, arbitrator, Hon. Jeffrey J. Keyes issued the final Arbitration Award ................ 33

Civil Case No. 18-cv-01454-MJD-KMM

34.     *In Arbitration procedures, there was no any arrangement or opportunity for Claimant, the Complainant, to directly ask any witnesses for more details on their testimony statements for the purpose of verifying whether those statements are accurate or not.* ................................................................................... 34

**SUMMARY OF THE ARGUMENT** ............................................................................................**34**

35.     *The Complainant belonged to the protected age group and suffered an adverse employment action* 35

36.     *The Complainant performed his job satisfactorily or was qualified to perform his job* ..................... 35

The Complainant received the company wide award, "MAKE IT HAPPEN", in recognition of his excellent performance and achievement in year 2015. Only about 160 employees among more than two hundred thousand UHG employees received this award ............................................................................. 35

The Complainant was recognized by his first manager for his excellent at documentation on what team did in 2015. It is not possible for someone to do excellent technical documentation without good experiences and all relevant knowledge and skills ........................................................................... 35

Many of Complainant's teammates gave him comment: "strong technical talent" ............................. 36

All of the technical professional witnesses from UHG acknowledged the Complainant was smart and had the technical knowledge and skills required for performing his job ......................................................... 36

Complainant's teammate testified saying "acknowledged that Mr. Zhang was a really smart person and admired how easily he could complete a task" ...................................................................................... 36

37.     *The Complainant had been treated differently from the younger team members. Substantially, the similarly situated employees, when younger, were treated more favorably* ......................................................... 36

It is an insufficient reason for employer to motivate an adverse employment decision about the Complainant because he did not feel confident of running a deployment tool developed by a younger developer Kathy Brzeinski with two reasons: (1) this tool was not completed, so had not been well tested yet. (2) This deployment tool done by Ms. Kathy had over 50% of failure rate in past. ................................. 36

The reason for Respondent to motivate an adverse employment decision about the Complainant have no basis in fact when it was not him, but some else fault ............................................................................. 37

The reason for Respondent to motivate an adverse employment decision about the Complainant have no basis in fact because Sujatha Duraimanickam should not blame the Complainant when the Complainant did not work on a task which was not on To-Do list ...................................................................................... 38

The reason for Respondent to motivate an adverse employment decision about the Complainant was not as what Sujatha Duraimanickam stated. It was common that the deadline might be changed if requirement was changed. ...................................................................................................................... 38

In "Pen test" assignments, Sujatha Duraimanickam requested the Complainant to complete the work in the time much less than youngers. And created hostile working environment to hinder(阻碍) the Complainant to work on project. For example, not grant him to accessing the development resources required for the job, and artificially caused the job delayed .......................................................... 38

When vHost project was assigned to the Complainant, Sujatha Duraimanickam did not grant him access to Linux development environment although it was required. The younger developers did have access. Such was not just to give hard time to the Complainant in work, but also to let other teammates feel different from the Complainant ...................................................................................................... 39

*38.* *The Respondents refused to disclose the develop daily status logs and other service tracking records, such like the records from "basecamp", "service-now", and "codeHub", etc. Such result in arbitrator, who has no basic IT knowledge, unable to have a clear picture about how development going within a Sprint or a development cycle. Plus Sujatha Duraimanickam and some other witness testified lying or providing some misleading information. All of these lead to the arbitrator made an award by fraud .......................................... 39*

**ARGUMENT** ..................................................................................................................................... **39**

*39.* *Standard of Review* ......................................................................................................... *39*

    1)    FAA Rules for vacating arbitration award .......................................................... 39

*40.* *Motion to vacate an arbitration award* .......................................................................... *40*

    Common elements for vacating an arbitration award ........................................................ 40

    Definition of fraud ............................................................................................................. 41

Civil Case No. 18-cv-01454-MJD-KMM

Common elements of civil fraud ............................................................................................... 41

Establish an age discrimination claim ...................................................................................... 42

The plaintiff was older than 40; ............................................................................................... 42

The plaintiff was discharged; ................................................................................................... 42

The plaintiff was qualified for the job and met the defendant's legitimate expectations; and ............ 42

The plaintiff position remained open or was filled by a similarly qualified individual who was

substantially younger. ............................................................................................................... 42

Standard for proving pretext .................................................................................................... 44

41.    Respondent engaged in fraudulent activity ..................................................................... 45

Based on what facts that UHG fired the Complainant ............................................................ 45

False Representation ................................................................................................................ 48

If the Respondents could provide "service-now" evidence, the records on "service-now" would

also show the deployment on 9/11/2016 was failed. .............................................................. 53

If the Respondents could provide "service-now" evidence, the records on "service-now" would

also show the release task was for the Complainant to ensure the deployment engineer backup the

files. It was not to validate those files. ................................................................................... 55

Respondents knew "basecamp", service-now", "codeHub" functions .................................... 61

Two CAPs and other evidences from Respondents must be presented in arbitration .......... 61

42.    The undisclosed evidences have effects on arbitration decisions ..................................... 61

How to prove UHG had age discrimination against Mr. Zhang .............................................. 61

There are no issues on the facts that Mr. Zhang is qualified for above element (a)(1) and (a)(3) since

Mr. Zhang was 56 years old when his job got terminated. .................................................... 62

Regarding above element (a)(2), following facts demonstrate Mr. Zhang was qualified to perform his

job: ......................................................................................................................................... 62

Regarding above element (a)(4), the records from basecamp, service-now, codeHub, and other

relevant work status documents as mentioned in section 19 must need to provide in arbitration in order to

determine whether Mr. Zhang had been treated different from younger developers in his team or Mr. Zhang had performance problems as mentioned in the two "Corrective Action Form" issued by Ms. Sujatha to the Complainant..................................................................................................................................... 66

What material evidences shall be disclosed in arbitration ..................................................... 67

UHG were asked to use the material evidences they had to verify what complainant said, but they did not. Instead, UHG just repeated Ms. Sujatha's averse or negative comments about Mr. Zhang without giving detail examples or descriptions of Mr. Zhang conducts ................................................................... 67

43.    Whether the arbitration award was procured by corruption, fraud, or undue means...................... 68

44.    Whether there was evident partiality or corruption in the arbitrators, or either of them ................ 68

The project management records had been entered in basecamp.com and backed up in the end of each development cycle. The website, basecamp.com, were used in Ms. Sujatha and Ms. Kimberly Myers teams to manage the work assignments, including detail requirements for each work task, and to keep track of everyday working status, including issues and blocks. ................................................................... 68

The service requests had been submitted to UHG service-now website, and were requested by Mr. Zhang or assigned to Mr. Zhang. The service-now website was UHG service management online tool used to manage UHG cross-team service requests, each service execution procedure, service status, and service time frames, etc. ........................................................................................................................................ 68

Arbitrator applied the law incorrectly .......................................................................... 69

Arbitrator denied the Complainant's documented evidence with bias .................................. 70

45.    The Respondents knew "basecamp", "service-now", "codeHub" and what they were used for, but they did not present their records for arbitration ..................................................................................... 73

46.    the Respondents knew the functions of knew "basecamp", "service-now", "codeHub".................. 73

47.    the Respondents presented malpresentation in arbitration when non-disclosed information in "basecamp", "service-now", "codeHub". Thus, led to below opinion as arbitrator said below:............................ 73

48.    The Respondents made a false representation intentionally and knowingly .................................... 74

49.     As mentioned in beginning, the Respondents controlled all of material evidence. They just disclosed the evidences good for them ................................................................................................................. 76

50.     Except using the evidences provided by the Respondents, the Complainant had no choice, but only the "MAKE IT HAPPEN" award with him. ......................................................................................... 76

51.     The records from "basecamp", "service-now", "codeHub" could help Complainant to demonstrate the Complainant had no-fault on the projects of four examples, vhost and "pen test". Also the records will show who made the issues. Once find out the root causes from which persons, then it will show Duraimanickam had blamed the wrong person. ............................................................................................................. 76

52.     The records from "service-now" and "codeHub" could show Duraimanickam told lie ..................... 77

53.     The qualified privilege standard does not apply in this case .......................................................... 77

ANALYSIS ....................................................................................................................................... **78**

CONCLUSION ................................................................................................................................. **79**

Civil Case No. 18-cv-01454-MJD-KMM

# TABLE OF AUTHORITIES

### Cases

*Burrage v. United States, 134 S. Ct. 881, 888-89 (2014)* ....................................................42

*Dawson v. Entek International, 630 F.3d 928 (9th Cir. 2011)* ...........................................45

*Dep't of Fair Employment & Housing v. Lucent Techs, Inc., 642 F.3d* ...........................45

*Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1113 (9th Cir. 2011)* ...................45

*Gross, 557 U. S., at 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119* ...........................................43

*Karppinen, 187 F.2d at 34-35* ...........................................................................................40

*Lewis v. City of Union City, Georgia, et al., No: 15-11362, (11th Cir. Mar. 21, 2019)* ...44

*McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)* ................................................44

*Nassar, 570 U. S., at 346, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503* ..................................43

*Odeon Capital Grp., 182 F. Supp. 3d at 128* .....................................................................40

*Renz v. Spokane Eye Clinic* .........................................................................................35, 44

*Sorghum Inv. Holdings Ltd. v China Commercial Credit, Inc. - 2019 NY Slip Op 31265*

    *(U)* ...............................................................................................................................41

Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000)...............16, 35, 43, 62

*Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258–59 (1981)* ...........................44

*Thompson v. Bacon, 245 Va. 107, 111 (1993.)* ..................................................................42

*Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993)* .............................................45

### Rules

*9 U.S. Code § 10 - Same; vacation; grounds; rehearing* .................................................39

Civil Case No. 18-cv-01454-MJD-KMM

9 U.S.C. § 10(a)(1)...........................................................................................40

*Act, 9 U.S.C. §§ 10 & 11*....................................................................................13

FAA Rules for vacating arbitration award.........................................................39

Rule 1002. Requirement of the Original.......................................................59, 71

*Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. §*

*1981*..................................................................................................................44

Civil Case No. 18-cv-01454-MJD-KMM

PREFACE

In this brief:

The Complainant, **YUFAN ZHANG**, will be referred to as ZHANG, or

FRANK ZHANG, or FRANK, or Complainant, or Claimant.

The Respondent, **UNITEDHEALTH GROUP**, will be referred to as UHG, or

OPTUM (UNITEDHEALTH GROUP has two divisions: UnitedHealthcare and

Optum), or Respondents, or Defendants

And the Respondent, **SUJATHA DURAIMANICKAM**, was the

Complainant's manager in UHG for year 2016. SUJATHA DURAIMANICKAM

will be referred to as SUJATHA, or DURAIMANICKAM

The following symbols will be used:

**basecamp** – basecamp.com website, an online tool used to manage work

requirement and daily work tasks, etc.

**codeHub** – codehub.optum.com website, an online source codes management

tool, which is similar to github.com and used in Optum for maintaining IT source

codes and their processing in check-in, check-out, submit, review, history check,

comparing, reports, etc.

**service-now** – UHG service-now website, an online service management tool

**CAF** – Corrective Action Form

Civil Case No. 18-cv-01454-MJD-KMM

**CAP** – Corrective Action Process or Corrective Action Plan. It is also referred to CAF file or the contents in CAF file.

**FAA** – Federal Arbitration Act

**IDR** – Internal Dispute Resolution

**IT** – Information Technology

**MAL** – Minnesota Arbitration Law

**(Ap.)** – Appendix

**(Ex.)** – Exhibit in Arbitration

Civil Case No. 18-cv-01454-MJD-KMM

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to *9 U.S.C. §§ 10 & 11* because it is an appeal of an order that vacate the arbitration awards, dated on October 5, 2020, issued by Hon. Jeffrey J. Keyes[1].

The Order from United States Magistrate Judge Katherine Menendez, issued on December 10, 2020, indicates that any motion to vacate, modify, or correct the arbitration award, pursuant to *9 U.S.C. §§ 10 & 11*, must be file on or before January 6, 2021.

---

[1] EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 2-5

Civil Case No. 18-cv-01454-MJD-KMM

## STATEMENT OF THE ISSUES

This appeal raises questions regarding the application of probable cause in arbitration.

In arbitration, there are two explanations for why the Complainant was fired: Respondents' and Complainant's. The Respondents claims that it was because the Complainant had poor performance; while the Complainant claims that the Respondents allegation is merely pretext; and actually, the Complainant was treated different from the younger teammates and had suffered from age discrimination, hostile working environment, and defamation.

In order for the Complainant to prove that he did suffer age discrimination, hostile working environment, and defamation, and finally got wrongful termination, the Complainant requested all relevant evidences which include any writing and digital records, any publishing and company policy, employment records, job records, performance records from any resources and individual as long as they are relevant to the Complainant, etc. However, in the end of arbitration discovering, the Respondents did not provide any original or material evidence which are related to the works that the Complainant had worked on, like the records from "basecamp", "service-now", "codeHub", requirements documents that related to the Complainant's job, internal service policy (like the policy on using service-now and media policy), team member respect policy or guideline, company common review

14

Civil Case No. 18-cv-01454-MJD-KMM

and interim review policy (including the employee rights on the reviews), and the policy or training that each employee need to review or take in each year, etc.

The respondents did not provide the records from "basecamp", "service-now", "codeHub" lead to the difficulty on verifying each party statement's authenticity and completeness. Missing those records would NOT ONLY made the Complainant had trouble, or spent more time, to explain the events, which also brought hard time to arbitrator, especially for the person without IT background, such like the arbitrator, BUT ALSO lead to mislead the arbitrator easily.

In UHG, anything digital records gotten from company internal resources or generated by company devices, and are considered as company intellectual property. Copying or taking the company intellectual property without permit in advanced might be considered as criminal. Thus, let the Complainant have to use the evidences provided by the Respondents to prove the Respondents did something inappropriately. In common senses, no one would voluntarily provide evidences against herself or himself. An arbitrator does not have enough power to compel a part to disclose material evidence when which is need in the basis of the best evidence rule. but courts have, for justice. That is why the Complainant wants the case comes back to trial. Would it be an issue?

According to UHG HR response, the Respondents terminated the Complainant's job in the basis of the reasons stated in two "Corrective Action Form" (CAP) issued by Sujatha Duraimanickam. In the two CAPs, Sujatha Duraimanickam listed four examples, some short averse or negative comments, and some assertions.

15

Civil Case No. 18-cv-01454-MJD-KMM

Because most of comments on the two CAPs are too general or lacking of details, this brief does not cover all the comments, but the items discussed more in arbitration. The argument issues are from: four examples, "penetration testing" ("pen test"), and virtual host configuration("vhost").

Under the disparate treatment theory, in order to establish a prima facie case of age discrimination, Complainant must establish that:

(1)  Complainant belonged to the protected age group; and

(2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

(3)  Complainant suffered an adverse employment action; and

(4)  Similarly situated, substantially younger employees were treated more favorably.

*See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).*

There are not issues on above elements (1) and (3) in arbitration award. The arbitrator made the arbitration decision saying the Complainant job got terminated because of his poor job performance. In order to vacate the arbitration award in the basis of *9 U.S.C. §§ 10 (a)* and *Sec. 572B.23 MN Statutes*, the Complainant need to demonstrate that the Respondents did not disclose the records from "basecamp", "service-now", "codeHub", and plus other actions, thus lead to the award procured by corruption, fraud, or undue means. If the records from "basecamp", "service-now", "codeHub", etc. were available, the Complainant could demonstrate the Respondents' age discriminations.

16

Civil Case No. 18-cv-01454-MJD-KMM

1.   Whether the Respondents knew "basecamp", "service-now", "codeHub"?

2.   Whether the Respondents knew the functions of knew "basecamp", "service-now", "codeHub"?

3.   What malpresentation had the Respondents done when non-disclosed information in "basecamp", "service-now", "codeHub"?

4.   Whether the Respondents made a false representation intentionally and knowingly

5.   Whether the Respondents knew what they did would mislead the arbitrator

6.   Whether there were other choices for the Complainant not depending on the records in "basecamp", "service-now", "codeHub" when he alleged the Respondents discriminated against him?

7.   Whether the Complainant could demonstrate Respondents' discrimination if assume the records were available to the Complainant

The Complainant should demonstrate he qualified to perform his job. And the reasons for the Respondents to terminate his job are pretext.

8.   Whether the employer's reasons for terminating the Complainant job:

have no basis in fact, or

even if based in fact, the employer was not motivated by these reasons, or

the reasons are insufficient to motivate an adverse employment decision

Civil Case No. 18-cv-01454-MJD-KMM

9.  Whether the Complainant can prove that the Respondents told lie, and such lie made him losing job.

10. And whether the lie meets privilege standard

## STATEMENT OF THE CASE AND THE FACTS

11. Statement of Case

The detail information about this case and facts can be found on EXHIBIT 51[2]. Here, only facts need to discuss in this brief are written down.

Since July 2016, The Respondent, Ms. Sujatha Duraimanickam, issued total two "Corrective Action Form" to the Complainant along with four examples to demonstrate the Complainant's performance issues; one document[3] issued on September 19, 2016, the other[4] issued on October 24, 2016. The Complainant disagreed Ms. Sujatha adverse comments on these two "Corrective Action Form", especially these four examples, but Ms. Sujatha did not want to listen the Complainant's explaining, and refuted to accept the Complainant explanations. Ms.

---

[2] EXHIBIT 51 - 2020-09-18 Zhang v. UHG - Claimant's Post-Hearing Brief

[3] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

[4] EXHIBIT 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant

18

Civil Case No. 18-cv-01454-MJD-KMM

Sujatha's testifying in the arbitration hearing meeting dated on August 19, 2020, could explain what she thought.

The Complainant, Mr. Zhang was hired as Application Consultant by UHG in December 2014, and he started working with UHG on January 09, 2015. And in the end of year 2015, Mr. Zhang was granted the award of "MAKE IT HAPPEN" in recognized his excellent performance and achievement in 2015.

On November 14, 2016, based on the information stated on these two "Corrective Action Form", the Respondents terminated the Complainant job with UHG by giving a reason saying "Unable to Meet Job Standards"[5]. And later, the Complainant's position was taken by a younger developer, Matthew Kinbaum (Ex. 64).

On December 02, 2016, the Complainant filed an Internal Dispute Resolution[6] appeal to UHG HR along with detail explanations to demonstrate all of Ms. Sujatha's examples stated in "Corrective Action Form" were in the basis of her partiality, false or partial facts.

UHG HR scheduled a meeting with the complainant on December 14, 2016. On the meeting, the complainant told UHG HR that the statements of facts on dispute letter could be verified by the records in "basecamp", "service-now", "codeHub",

---

[5] EXHIBIT 16 - 2016-11-28 UHG Employee Relations Letter to Claimant

[6] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

Civil Case No. 18-cv-01454-MJD-KMM

etc[7]. The Complainant also asked UHG HR to request Ms. Sujatha to provide more examples or details to demonstrate each of her adverse comments about the Complainant's job performance issues. On December 15, 2018, UHG HR replied an email to confirm that the Complainant was fired by the reasons stated on these two "Corrective Action Form".

12. The reasons for UHG to fire the Complainant

When the Complainant asked UHG HR for the reasons why the Respondents terminated his job, Tanya Hughes from UHG HR replied on her email dated on 12/15/2016:

*"I have attached copies of your Corrective Action Plans. I would like you to look at the "progress updates" section of your Final CAP which indicates performance concerns that existed after the final CAP was issued to you which is why the decision was made to terminate your employment. Managers are expected to set the performance expectations for the employees that report to them."*

The following are what Tanya Hughes said about the *"progress updates" section of your Final CAP*:

*"Progress Updates:*

---

[7] EXHIBIT 60 - C7 - 2016-12-14 Meeting Notes from Yufan Zhang -

Civil Case No. 18-cv-01454-MJD-KMM

10/31/2016    *Frank is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion. Met with him on Oct 31st and discussed about the lack of meeting all the expectations in a satisfactory manner.*

11/07/2016    *I've been meeting with Frank every week and providing very candid feedback. He is still unable to carry out an assignment with thoroughness, accuracy or attention to detail to deliver any task without issues. Eg. vhost config file task was assigned to Frank and he caused issues in one server and before resolving and closing the issue here, he wanted to move on to the next server. Another team member in Infra team had to spend more time troubleshooting the problem created by Frank thereby leading to negative impact for the rest of the team unnecessarily. He is still not paying enough attention to his task in hand nor is he able to understand the impact of his change and is unable to perform his job independently without causing issues. This has consumed a lot of time and energy from other team members to always solve the problems and issues caused by Frank and is causing negative impact to the team heavily.*

11/14/2016    *Had a discussion with HRDirect and as Frank has not met the performance expectations of this position and as outlined in the*

21

Civil Case No. 18-cv-01454-MJD-KMM

*Corrective action plan, we've determined to terminate him today*

*11/14/16."*

Since UHG HR narrowed down the scope of the reasons for terminating the

Complainant job, the arguments here focus on the matter stated on these two

documents:

(1). Initial "Corrective Action Form" issued by Sujatha Duraimanickam on

09/19/2016

(2). Final "Corrective Action Form" issued by Sujatha Duraimanickam on

10/24/2016

After that email, the complainant had sent several follow-up emails to UHG

HR with more explanations and his disputing arguments on Ms. Sujatha's

comments on these two "Corrective Action Form". However, the UHG HR did not

investigate Ms. Sujatha's adverse comments from different resources, especially

material evidence. Instead, refer to Mr. David, from UHG HR, response letter for

the Complainant dispute, Mr. David used the circular reasoning fallacy to

demonstrate that Ms. Sujatha's statements were true with Ms. Sujatha's

comments. (will discuss on ARGUMENT in detail).

Civil Case No. 18-cv-01454-MJD-KMM

After the Complainant's Internal Dispute Request was denied by UHG HR, the Complainant filed a discrimination charge in EEOC. During EEOC investigation, the Respondents first sent back their response[8] brief, on June 14, 2017, with the same reasons as Mr. David said in his response letter[9] about the Complainant's EEOC charge.

13. The records from **BaseCamp**.com for year 2015 & 2016

https://basecamp.com is an online project management tool. The records from BaseCamp.com can be used to track Mr. Zhang and his team members' date-to-date work performance. During the days when Mr. Zhang worked with UHG, Ms. Sujatha and Ms. Kim Myers used this online management tool to manage their teams' project requirements, daily work tasks and development status, which included tracking requirement change, each developer and tester daily work status, development and testing update, any issues or blocks found, etc. Ms. Sujatha asked each of her team's developers to update their work status daily. In the end of each development cycle, Ms. Sujatha or Ms. Kim Myers would back up the project management data, and stored them in company machines.

---

[8] UHG-to-EEOC - 2017-06-14 zhang pos stmt & UHG-to-EEOC - 2017-06-14 zhang pos stmt exhibits

[9] EXHIBIT 34 - 2017-02-07 UHG Letter to Claimant re IDR -

Civil Case No. 18-cv-01454-MJD-KMM

14. The records from UHG **service-now** website for year 2015 & 2016

UHG service-now website is an online service management tool. Many UHG project teams, included Ms. Sujatha's team and Ms. Kim Myers team, used service-now website to manage the services created by their team members, or assigned to their team members. UHG used service-now online tool to manage all service request processing steps, which included the "Submit", "Review", "Approve" or "Deny", and Work Status update, etc. The service-now website contained the details information for each service request about what to do before performing requests, during performing requests, after perform request, and what to do if performing requests failed, and what impacts might have, which existing services might be affected and affected level, and the timeframe for performing the requests, etc. UHG service management team required every service procedure must be done during the pre-approved timeframe, and starting the jobs before, or continuing the jobs after, the pre-approved time were not allowed. Once the jobs started before, or continued after, the pre-approved time, an alert would be trigged, and such conducts are considered as violating UHG policy.

15. The summary reports and history log information from Optum "**CodeHub**"

Optum "CodeHub" is resources management online tool, which is a kind of GitHub product, working similar to https://github.com/, and was used by the developers in Ms. Sujatha's team to manage their project source codes. Developers' contributions can be tracked on Optum "CodeHub". The "CodeHub" can be used to

Civil Case No. 18-cv-01454-MJD-KMM

generate many reports such like individual contribution reports, project development language reports, etc. Also, Optum policies do not allow web services application connecting to automatically source codes changed on Optum "CodeHub".

16. Sujatha's team was response for developing the components running on AEM environment

In year 2016, Ms. Sujatha's team was response for developing and testing the components running on Adobe Experience Manager (AEM) environments. And the development environments were initially built by Mr. Zhang in year 2015. Ms. Kim Myers team was response for project requirements and also owner of the AEM products developed by Ms. Sujatha's team. There was also an infrastructure team which response for maintaining the servers, which hosted the AEM applications developed by Ms. Sujatha's team. The infrastructure team was also response for deploying the AEM applications to servers, upgrading or migrating software on servers, managing the security and networking on server environments. In year 2016, there were five working environments for AEM servers: development environment, testing environment, stage environment, product environment, and OpenShift Cloud environment (which was instructed in year 2015, and continued enhancing and gradually used in developing and testing practice since year 2016). Before Mr. Zhang left UHG, The OpenShift Cloud environment was an alternate development and testing environment where developers could dynamically generate as many AEM servers as developers wanted.

Civil Case No. 18-cv-01454-MJD-KMM

17. AEM project development cycle

AEM project development cycle, also called "Sprint", contained two weeks on project development, and one week on project testing in year 2015 and year 2016. Sprint is a time-boxed iteration of a continuous development cycle. Each Sprint started with requirement review and estimation of development time, and ended with testing. Sometimes, the Sprint time might be longer than three weeks if development or testing could not be completed in the given time. During development, developers would do unit testing. When a project task was moved from development stage to "Ready for QA" stage, it means QA tester could start test the components done by developers. If problems or buggers were found by testers, the project task would be moved from "Ready for QA" back to "Development process" stage along with messages to provide the information about the errors. And those marks or information could be found on https://basecamp.com. The "Testing" stage would start after development completed, Also, when testing started, the development jobs, except fixing bugger, would be frozen until next Sprint (development cycle) started. The "Testing" stage is for developers and testers to do "Crossing-Test" which means a developers would test the AEM application components developed by another developer (not by himself or herself). The "Testing" done on development stage was more focused on "Functional Testing", while the testing on "Testing" stage was more focused on "End-to-End" testing, or say "integration testing". If any buggers were found during testing, the testing information would be entered to

Civil Case No. 18-cv-01454-MJD-KMM

https://basecamp.com, and the work tasks associated with the errors would be moved to "Issues Found" (or other similar word) stage. The UAT testing (User Acceptance Testing) and Demo might be taken place in the end of "Testing" stage.

18. AEM deployment phase

There was another week of deployment phase for every two "Sprint". The main jobs for deployment phase were to fully test AEM application components in stage environment until no issues found, then to deploy the AEM application from stage environment to production environment. The testing on stage environment was called UAT testing (User Acceptance Testing). UAT testing was done by Ms. Sujatha's team, and demo to Ms. Kim Myers team after pass UAT testing. The deployment phase might be longer that one week if need more time to fix issues or do testing, or had something blocked the UAT. For those application components which passed the UAT testing would be deployed to production environment. In order to have the AEM application deployed to production environment, the developer would take turn to document what and how to deploy with very details, then have all of team members from Ms. Sujatha's team, and some members from Ms. Kim Myers, to review the deployment steps, which might include pre-deployment, during-deployment, post-deployment, and rollback or restore if failed with any deployment steps. Once no concerning on deployment as described on documents, that developer would submit a service request over UHG "Service-now" website. The service requests had to be accepted and approved before actually starting deployment. If the

Civil Case No. 18-cv-01454-MJD-KMM

applications were deployed to non-production environment, or no impacts on production environment, then deployment instruction might be simple or concise.

19. Technology Development Program

In UnitedHealth Group, there is a career development program called Technology Development Program ("TDP"). UHG develops this program for the young people to get on-the-job training and build their hands-on experience by working on real projects. There are two types of "TDP" jobs, one is TDP interns; the other is TDP associate. TDP interns is for the students in college, while TDP associate is for the recent graduated people (graduated in less than 10 years). The on-the-job training for TDP associate is two years long (if participants were hired in year 2014 or earlier), or one year long (if participants were hired in year 2015 or later). Once TDP associates complete their one or two year on-the-job training, the TDP associates will be converted to normal employees if they get hired by project teams. After they have worked in UHG for two years, from the date they start to work as TDP associate, those TDP participant would be promoted to senior level position, like the TDP associates working on project development will be promoted to Senior Developers.

Any UHG project teams can invite the TDP associates hired by UHG HR to work in their projects. The TDP associate salaries are not counted in the project teams' budget. The TDP associate salaries are paid from company specific funding. If a project team needs to hire new team members, the UHG HR will let the hiring

28

Civil Case No. 18-cv-01454-MJD-KMM

managers first consider hiring the TDP associates, or internal transform if required stronger experiences.

20. On February 21, 2016, Kim Myers had year 2015 Common Review for Complainant[10]

21. On July 10, 2016, Ms. Sujatha Duraimanickam had Interim Review for Complainant[11]

22. Ms. Sujatha issued an initial "Corrective Action Form" to the Complainant

On Sep. 19, 2016, Ms. Sujatha issued an initial "Corrective Action Form" ("CAF", also called Corrective Action Process, "CAP") to the Complainant along with following four examples. Ms. Sujatha said:

"*Description of Performance Problem: Frank (Yufan) Zhang has consistently not been meeting the basic expectations of his role of developing and maintaining software applications. He has been given constant coaching, written mid-year review, timely candid feedback and regular weekly one on ones. He does not seem to take complete ownership of tasks or follow through on his tasks to meet the task deadline. All his deliverables seem to have issues and someone else in the team has*

---

[10] EXHIBIT - 2016-02-21 Common Review for Claimant by Kim Myers

[11] EXHIBIT - 2016-07-10 Interim Review for Claimant by Sujatha Duraimanickam

Civil Case No. 18-cv-01454-MJD-KMM

*to always pick up his unfinished tasks. This is highly disengaging for the rest of the team and is a big burden and is impacting the rest of the team negatively.*

*Example 1. While working on OMC 5. 1 release, Frank was assigned the task to deploy code in Production on Sept 11th; we discussed this 2 months before and he agreed to do it. Up until 2 days before the planned release date, he did not demonstrate the knowledge necessary to perform independently in spite of multiple reminders about the time sensitivity. So this had to be re-assigned to another team member to avoid risking Production.*

*Example 2: After reassigning the OMC 5.1 deployment to another employee, Frank was assigned validation task in Production on Sept 11th to ensure that the backup jobs ran successfully. Issues were encountered where we had to restore, found that the backup file was not actually there as he assumed that it ran and did NOT validate. This assumption cost the team of 6 people, 4 extra hours on a week-end unnecessarily.*

*Example 3: While launching BSL Center in Production on Aug 16th, he did not validate properly in Optum Developer despite indicating that he fully understood the validation tasks. A major problem was identified the next day and the rest of the team had to work on rolling back the changes in Production.*

*Example 4: With OMC Admin tool built in June and July, Frank did not deliver within the deadline even after the original date was moved back. It was delayed beyond acceptable date; another team member had to pick it up and redo the whole functionality on a week-end to make the release.*"

30

Civil Case No. 18-cv-01454-MJD-KMM

23. Ms. Sujatha issued a final "Corrective Action Form" to the Complainant

On October. 24, 2016, Ms. Sujatha issued a final "Corrective Action Form"[12]

("CAF", also called Corrective Action Process, "CAP") Ms. Sujatha said:

"Frank is unable to demonstrate all the competency skills necessary to perform

his job independently and timely in a consistent fashion."

24. The Complainant disagreed with Ms. Sujatha negative comments about him,

especially those examples written on "CAP"[13]

the Complainant told Ms. Sujatha that those examples were based on partial or

untrue facts. the Complainant wrote down his comments on employee comments

section. Due to the limit on word count, most of the comments could not be written

down[14]. the Complainant wished UHG HR could contact him to talk about

"Employee comments" on CAP because Ms. Sujatha told the Complainant that if

employee comments written by the Complainant had conflict with her comments,

HR would touch based with him[15].

---

[12] **EXHIBIT** x – Yufan (Frank) Zhang Final CAP 10-24-16

[13] The section of Employee Comments on EXHIBIT x – Yufan (Frank) Zhang Initial CAP 9-19-16

[14] **EXHIBIT** x – Yufan (Frank) Zhang testimony

[15] **EXHIBIT** x – Yufan (Frank) Zhang testimony

31

Civil Case No. 18-cv-01454-MJD-KMM

the Complainant had argued with Ms. Sujatha for many times about her

negative comments on "CAP". the Complainant's comments on CAP issued on

September 19, 2016 was ignored by HR.

Civil Case No. 18-cv-01454-MJD-KMM

25. On November 14, 2016, UHG terminated the Complainant's job, and did not allow him bring anything out from office building except his lunch box

26. On November 15, 2016, the Complainant contacted UHG HR to request the documents for why he got fired. UHG HR replied on December, 2016, and said

27. On December 2, 2016, the Complainant filed Internal Dispute Request with UHG HR.

28. On January 29, 2020, the Complainant had a deposition meeting with UHG.

29. On February 11, 2020, Ms. Tanya Hughes, from UHG HR, had a deposition meeting with the Complainant's attorney.

30. On February 23, 2020, Ms. Sujatha had a deposition meeting with the Complainant's attorney

31. On August 4-6, 18-19, 2020, arbitration meeting

32. On September 18, both parties submitted briefs, and Mr. Zhang sent a letter to arbitrator to express his concerning.

33. On October 5, 2020, arbitrator, Hon. Jeffrey J. Keyes issued the final Arbitration Award[16]

   The records in "basecamp", "service-now", and "codeHub" have been provided.

_____

[16] EXHIBIT 53 - 2020-10-05 - Final Arbitration Award

Civil Case No. 18-cv-01454-MJD-KMM

34. In Arbitration procedures, there was no any arrangement or opportunity for Claimant, the Complainant, to directly ask any witnesses for more details on their testimony statements for the purpose of verifying whether those statements are accurate or not.

## SUMMARY OF THE ARGUMENT

There are two explanations for why the Complainant was fired: Respondents' and Complainant's. The Respondents claims that it was because the Complainant had poor performance; while the Complainant claims that the Respondents allegation is merely pretext; and actually, the Complainant was treated different from the younger teammates and had suffered from age discrimination, hostile working environment, and defamation.

Age discrimination under the ADEA can be proven under two theories. One of these theories is called the disparate treatment theory. The other theory is called the disparate impact theory. These two theories may be applied in various legal claims, depending on the circumstances

Under the disparate treatment theory, in order to establish a prima facie case of age discrimination, Complainant must establish that:

(1)  Complainant belonged to the protected age group; and

(2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

(3)  Complainant suffered an adverse employment action; and

Civil Case No. 18-cv-01454-MJD-KMM

(4)  Similarly situated, substantially younger employees were treated more
favorably.

See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).

35. The Complainant belonged to the protected age group and suffered an adverse
employment action

The Complainant was 56 years old when his job got terminated.

36. The Complainant performed his job satisfactorily or was qualified to perform his job

Sujatha Duraimanickam said that *the Complainant is unable to demonstrate all
the competency skills necessary to perform his job independently*. That is defamation.
On July 22, 2016, Sujatha Duraimanickam still acknowledged that the Complainant
was technically a strong candidate. Sujatha Duraimanickam made such comment to
belittle the Complainant. That is merely to find a pretext. The respondents have no
basis in fact (See *Renz v. Spokane Eye Clinic*).

The Complainant received the company wide award, "MAKE IT
HAPPEN", in recognition of his excellent performance and achievement in
year 2015. Only about 160 employees among more than two hundred
thousand UHG employees received this award

The Complainant was recognized by his first manager for his excellent at
documentation on what team did in 2015. It is not possible for someone to

35

Civil Case No. 18-cv-01454-MJD-KMM

do excellent technical documentation without good experiences and all

relevant knowledge and skills

Many of Complainant's teammates gave him comment: "strong technical

talent"

All of the technical professional witnesses from UHG acknowledged the

Complainant was smart and had the technical knowledge and skills

required for performing his job

Complainant's teammate testified saying "acknowledged that Mr. Zhang

was a really smart person and admired how easily he could complete a

task"

37. The Complainant had been treated differently from the younger team members.

Substantially, the similarly situated employees, when younger, were treated more

favorably

It is an insufficient reason for employer to motivate an adverse

employment decision[17] about the Complainant because he did not feel

confident of running a deployment tool developed by a younger developer

Kathy Brzeinski with two reasons: (1) this tool was not completed, so had

---

[17] See Renz v. Spokane Eye Clinic case proving pretext: 3) the reasons are insufficient to motivate an adverse employment decision.

Civil Case No. 18-cv-01454-MJD-KMM

not been well tested yet. (2) This deployment tool done by Ms. Kathy had over 50% of failure rate in past.[18]

In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant different from younger teammate. If Sujatha Duraimanickam wanted to blame someone, she should blame the younger developer instead of the Complainant.

The reason[19] for Respondent to motivate an adverse employment decision about the Complainant have no basis in fact when it was not him, but some else fault[20]

In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant different from younger teammate. If Sujatha Duraimanickam wanted to blame someone, she should blame herself because it was Sujatha Duraimanickam let a younger engineer to install and uninstall AEM SP2 which, was not in To-Do list.

---

[18] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant, page "ZHANG1003", §3 (the Example 1 on initial CAP)

[19] See Renz v. Spokane Eye Clinic case proving pretext: 1) the employer's reasons have no basis in fact

[20] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant, page "ZHANG1003", §4 (the Example 2 on initial CAP)

Civil Case No. 18-cv-01454-MJD-KMM

The reason for Respondent to motivate an adverse employment decision about the Complainant have no basis in fact because Sujatha Duraimanickam should not blame the Complainant when the Complainant did not work on a task which was not on To-Do list

In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant different from younger teammate. If Sujatha Duraimanickam wanted to blame someone, she should blame the younger engineer whose job lead to the issue.

The reason for Respondent to motivate an adverse employment decision about the Complainant was not as what Sujatha Duraimanickam stated. It was common that the deadline might be changed if requirement was changed.

When the same thing happened to younger developers, Sujatha Duraimanickam had not said nothing.

In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant different from younger teammate.

In "Pen test" assignments, Sujatha Duraimanickam requested the Complainant to complete the work in the time much less than youngers. And created hostile working environment to hinder the Complainant to work on project. For example, not grant him to accessing the

Civil Case No. 18-cv-01454-MJD-KMM

development resources required for the job, and artificially caused the job delayed

When vHost project was assigned to the Complainant, Sujatha Duraimanickam did not grant him access to Linux development environment although it was required. The younger developers did have access. Such was not just to give hard time to the Complainant in work, but also to let other teammates feel different from the Complainant

38. The Respondents refused to disclose the develop daily status logs and other service tracking records, such like the records from "basecamp", "service-now", and "codeHub", etc. Such result in arbitrator, who has no basic IT knowledge, unable to have a clear picture about how development going within a Sprint or a development cycle. Plus Sujatha Duraimanickam and some other witness testified lying or providing some misleading information. All of these lead to the arbitrator made an award by fraud


## ARGUMENT

39. Standard of Review

    1)   FAA Rules for vacating arbitration award

        *9 U.S. Code § 10 - Same; vacation; grounds; rehearing*

Civil Case No. 18-cv-01454-MJD-KMM

*(a)  In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—*

*(1)  where the award was procured by corruption, fraud, or undue means;*

*(2)  where there was evident partiality or corruption in the arbitrators, or either of them;*

40. Motion to vacate an arbitration award

Common elements for vacating an arbitration award

Under 9 U.S.C. § 10(a)(1), an arbitration award may be vacated where it was "procured by fraud, corruption, or undue means".

A petitioner seeking to vacate an award on the ground of fraud must adequately plead that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration.

*See Karppinen, 187 F.2d at 34-35.* The district court here did not address the first two factors, basing its denial on Odeon's failure to demonstrate that the fraud at issue—Ackerman's alleged perjury—was material to the arbitration award. *Odeon Capital Grp., 182 F. Supp. 3d at 128.* As we did in Karppinen, "[w]e will assume . . . that an arbitration award may be set aside in a case of material perjured evidence furnished [to] the arbitrators by a prevailing party." 187 F.2d at 34.

40

Civil Case No. 18-cv-01454-MJD-KMM

*See Odeon Capital Group LLC v. Ackerman, No. 16-1545 (2d Cir. 2017)*

A petitioner seeking to vacate an arbitration award on the basis that it was procured by fraud must plead that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration.

*See Sorghum Inv. Holdings Ltd. v China Commercial Credit, Inc. - 2019 NY Slip Op 31265 (U)*

### Definition of fraud

*All multifarious means which human ingenuity can devise, and which are resorted to by one individual to get an advantage over another by false suggestions or suppression of the truth. It includes all surprises, tricks, cunning or dissembling, and any unfair way which another is cheated.*

*Source: Black's Law Dictionary, 5th ed., by Henry Campbell Black, West Publishing Co., St. Paul, Minnesota, 1979.*

### Common elements of civil fraud

A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a present, material fact, (3) made intentionally and knowingly,

Civil Case No. 18-cv-01454-MJD-KMM

(4) with intent to mislead, (5) reasonable reliance by the party misled, and (6)

resulting damage to him.

*See Thompson v. Bacon, 245 Va. 107, 111 (1993.)*


### Establish an age discrimination claim

To establish an age discrimination claim, the plaintiff must show that:

> The plaintiff was older than 40;

> The plaintiff was discharged;

> The plaintiff was qualified for the job and met the defendant's legitimate expectations; and

> The plaintiff position remained open or was filled by a similarly qualified individual who was substantially younger.

A plaintiff suing under the ADEA must show that "but for" age discrimination, the adverse employment action would not have occurred. "But for" caution is not tantamount to sole factor causation. See *Burrage v. United States, 134 S. Ct. 881, 888-89 (2014)* (an act is a "but-for" cause "[even if it] combines with other factors to produce the result, so long as the other factors alone would not have done so – if, so to speak, it was the straw that broke the camel's back."). In Bostock v. Clayton Cty., the Supreme Court clarified the burden of providing "but for" causation:

> *Title VII's "because of" test incorporates the "'simple'" and "traditional" standard of but-for causation. Nassar, 570 U. S., at 346, 360, 133 S. Ct. 2517, 186*

42

Civil Case No. 18-cv-01454-MJD-KMM

*L. Ed. 2d 503. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See Gross, 557 U. S., at 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.*

In order to establish a prima facie case of age discrimination, Complainant must establish that:

    (1)  Complainant belonged to the protected age group; and

    (2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

    (3)  Complainant suffered an adverse employment action; and

    (4)  Similarly situated, substantially younger employees were treated more favorably.

    *See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).*

The context in which **"similarly situated employee"** analysis arises is that, as the U.S. Court of Appeals for the 11th Circuit found, discrimination is often framed as "the act of 'treating like cases differently.'"  The question then becomes how similar must two employees be to be considered "like cases"?  Put another way, how does the court ensure it is comparing apples to apples rather than apples to oranges?

The 11th Circuit's Decision In Lewis

To answer this question, the appellate court summed up the issue presented as:

43

Civil Case No. 18-cv-01454-MJD-KMM

> *Faced with a defendant's motion for summary judgment, a plaintiff*
> *asserting an intentional-discrimination claim under Title VII of the Civil Rights*
> *Act of 1964, the Equal Protection Clause, or 42 U.S.C. § 1981 must make a*
> *sufficient factual showing to permit a reasonable jury to rule in her favor. She*
> *can do so in a variety of ways, one of which is by navigating the now-familiar*
> *three-part burden-shifting framework established by the Supreme Court in*
> *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that*
> *framework, the plaintiff bears the initial burden of establishing a prima facie*
> *case of discrimination by proving, among other things, that she was treated*
> *differently from another "similarly situated" individual—in court-speak, a*
> *"comparator." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258–59*
> *(1981) (citing McDonnell Douglas, 411 U.S. at 804). The obvious question: Just*
> *how "similarly situated" must a plaintiff and her comparator(s) be?*

See *Lewis v. City of Union City, Georgia, et al., No: 15-11362, (11th Cir. Mar. 21,*
*2019).*

### Standard for proving pretext

The court in *Renz v. Spokane Eye Clinic* case outlined the following standard for
proving pretext:

> *An employee can demonstrate that the reasons given by the employer are not worthy*
> *of belief with evidence that:*

44

Civil Case No. 18-cv-01454-MJD-KMM

*(1) the reasons have no basis in fact, or*

*(2) even if based in fact, the employer was not motivated by these reasons, or*

*(3) the reasons are insufficient to motivate an adverse employment decision.*

The other common ways to prove pretext:

(i). False reason/implausible business justification

　　　See *Dep't of Fair Employment & Housing v. Lucent Techs, Inc., 642 F.3d 728, 746 (9th Cir. 2011)*

*(ii).* Shifting reasons

　　　See *Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993)*

(iii). Comparative evidence

　　　See *Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1113 (9th Cir. 2011)*

(iv). Timing

　　See *Dawson v. Entek International, 630 F.3d 928 (9th Cir. 2011)*

41. Respondent engaged in fraudulent activity

　　　　Based on what facts that UHG fired the Complainant

　　　On December 15, 2016 when the Complainant asked UHG HR for the reasons why the Respondents terminated his job, Tanya Hughes from UHG HR replied:

Civil Case No. 18-cv-01454-MJD-KMM

*"I have attached copies of your Corrective Action Plans. I would like you to look at the "progress updates" section of your Final CAP which indicates performance concerns that existed after the final CAP was issued to you which is why the decision was made to terminate your employment. Managers are expected to set the performance expectations for the employees that report to them."[21]*

The followings are what Tanya Hughes said about *the "progress updates" section of your Final CAP[22]*:

*"**Progress Updates**:*

| | |
|---|---|
| *10/31/2016* | *Frank is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion. Met with him on Oct 31st and discussed about the lack of meeting all the expectations in a satisfactory manner.* |
| *11/07/2016* | *I've been meeting with Frank every week and providing very candid feedback. He is still unable to carry out an assignment with thoroughness, accuracy or attention to detail to deliver any task without issues. Eg. vhost config file task was assigned to Frank and he caused issues in one server and before resolving* |

---

[21] EXHIBIT 23 - 2016-12-15 Email from Tanya Hughes to Frank Zhang regarding the Reasons for terminating Frank job -

[22] EXHIBIT 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

*and closing the issue here, he wanted to move on to the next*

*server. Another team member in Infra team had to spend more*

*time troubleshooting the problem created by Frank thereby*

*leading to negative impact for the rest of the team unnecessarily.*

*He is still not paying enough attention to his task in hand nor is*

*he able to understand the impact of his change and is unable to*

*perform his job independently without causing issues. This has*

*consumed a lot of time and energy from other team members to*

*always solve the problems and issues caused by Frank and is*

*causing negative impact to the team heavily.*

*11/14/2016    Had a discussion with HRDirect and as Frank has not met the*

*performance expectations of this position and as outlined in the*

*Corrective action plan, we've determined to terminate him today*

*11/14/16."*


The two documents attached to Tanya Hughes's email are:

(1). Initial "Corrective Action Form"[23] issued by Sujatha Duraimanickam, dated

on 09/19/2016   (*Yufan (Frank) Zhang Initial CAP 9-19-16.pdf*)

---

[23] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

(2). Final "Corrective Action Form"[24] issued by Sujatha Duraimanickam, dated

on 10/24/2016   (*Yufan (Frank) Zhang Initial CAP 10-24-16.pdf*, or *Final **CAP***)

Since UHG HR narrowed down the scope of the reasons for terminating the

Complainant job, in this brief, the discussion will mainly focus on the matter stated

on these two documents.


    False Representation

The Complainant allege the Respondents had misrepresented the truth based on

followings:

(1). Sujatha Duraimanickam used the examples with lie, partial facts, or

    misleading to show the Complainant's unexpected or poor performances.

    On 09/19/2016, Ms. Sujatha Duraimanickam issued the initial

    "Corrective Action Form" (Initial CAP)[25] to the Complainant. In this CAP,

    Ms. Sujatha Duraimanickam wrote:

***Description of Performance Problem*** (the section on page 2):

    *"Frank (Yufan) Zhang has consistently not been meeting the basic*

    *expectations of his role of developing and maintaining software*

    *applications. He has been given constant coaching, written mid-year*

---

[24] EXHIBIT 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant

[25] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

review, timely candid feedback and regular weekly one on ones. He does not seem to take complete ownership of tasks or follow through on his tasks to meet the task deadline. All his deliverables seem to have issues and someone else in the team has to always pick up his unfinished tasks. This is highly disengaging for the rest of the team and is a big burden and is impacting the rest of the team negatively.

Example 1.

While working on OMC 5. 1 release, Frank was assigned the task to deploy code in Production on Sept 11th; we discussed this 2 months before and he agreed to do it. Up until 2 days before the planned release date, **he did not demonstrate the knowledge necessary to perform independently in spite of multiple reminders about the time sensitivity**. So this had to be re-assigned to another team member to avoid risking Production.

Example 2:

After reassigning the OMC 5.1 deployment to another employee, Frank was assigned validation task in Production on Sept 11th to ensure that the backup jobs ran successfully. Issues were encountered where we had to restore, **found that the backup file was not actually there as he assumed that it ran and did NOT validate**. This assumption cost the team of 6 people, 4 extra hours on a week-end unnecessarily.

Civil Case No. 18-cv-01454-MJD-KMM

*Example 3:*

*While launching BSL Center in Production on Aug 16th,* **he did not** **validate properly in Optum Developer despite indicating that he fully** **understood the validation tasks.** *A major problem was identified the next day and the rest of the team had to work on rolling back the changes in Production.*

*Example 4:*

*With OMC Admin tool built in June and July,* **Frank did not deliver within** **the deadline even after the original date was** *moved back. It was delayed beyond acceptable date;* **another team member had to pick it up and redo** **the whole functionality on a week-end to make the release.** *"*

...…

(Note: there are more comments on the other dates are not included here because those comments do not have detail explanations or additional evidences are required to be disclosed by the respondents in order to refute those comments)

Civil Case No. 18-cv-01454-MJD-KMM

The Complainant had refuted what Sujatha Duraimanickam said in his Internal Dispute Resolution appeal letter[26] and emails[27] to UHG HR.

The Sujatha Duraimanickam testimony in arbitration hearing meeting can demonstrate these four examples have following fraudulent misrepresentations

(i). On Example 1, Sujatha Duraimanickam wrote down following on initial CAP about the Complainant's performance:

> "*he did not demonstrate the knowledge necessary to perform independently in spite of multiple reminders about the time sensitivity*"

Here, Sujatha Duraimanickam actually asked the Complainant to run a deployment tool on deployment date (9/11/2016). However, this tool was not completed yet on the date when Sujatha Duraimanickam check with the Complainant to see whether he felt confident to run that tool. The Complainant replied: "No" because (1). The enhancement for that tool was not completed yet. (2). That tool had more than 50% failed rate in past. So, Sujatha Duraimanickam's comment is inappropriate. And she shall not use this example to demonstrate the Complainant had poor performance. The

---

[26] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

[27] EXHIBIT 19 - 2016-12-14 ~ 2016-12-21 Email Chain between Claimant and Tanya Hughes re IDR Meeting

Civil Case No. 18-cv-01454-MJD-KMM

Complainant had argued with Sujatha Duraimanickam about that issue in September 2016, but she still kept that example in CAP.

On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam testified with below conversation (Q: questioned by complainant's attorney. A: answered by Sujatha Duraimanickam)[28]:

Q: *Example 1, Mr. Zhang testified that he didn't do that because the failure rate of the program was 50 percent. What does that mean to you?*

A: **Let's just an excuse. Eventually we did release it successfully, right? So we did it. Somebody did it. He was not able to do it. Someone else within the team picked it up and worked on it, and it was successful. We did upgrade to 5.1. So it's just that he was not able to handle it.**

Q: *So when he failed to do the first task there under Example 1, you reassigned him the Example Number 2 where he was supposed to validate imperfections to make sure the backup job ran successfully; is that accurate?*

A: **Right.**

The above conversation had demonstrated Sujatha Duraimanickam told lie because here Sujatha Duraimanickam testified that "**Eventually we did release it**

---

[28] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 603, line 16 ~ page 604, line 8.

Civil Case No. 18-cv-01454-MJD-KMM

*successfully*", but on example 2, she wrote down "*Issues were encountered where we had to restore*". These two statements conflict with each other.

If the Respondents could provide "service-now" evidence, the records on "service-now" would also show the deployment on 9/11/2016 was failed.

(ii). On Example 2, Sujatha Duraimanickam wrote down following on initial CAP about the Complainant's performance:

**"*found that the backup file was not actually there as he assumed that it ran and did NOT validate*"**

On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam testified with below conversation (Q: questioned by complainant's attorney. A: answered by Sujatha Duraimanickam)[29]

*Q: What did he do wrong with that example?*

**A. He did not validate that. He assumed that the job ran successfully.**

*Q. Mr. Zhang testified that he was not the one who was doing the backup.*

---

[29] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 604, line 9 ~ 1 8.

Civil Case No. 18-cv-01454-MJD-KMM

***A. Correct. It was an automated job. His job -- Frank's role there was to just validate to make sure that the automated job was run successfully, and he did not validate that.***

Following facts can demonstrate that Sujatha Duraimanickam provided misleading information to arbitration

(1). Sujatha blamed "***He did not validate that …***". However, it is not possible to validate whether a backup file is working or not before the changing occurs. For example, you cannot affirm a stock price goes up or down before an event really occurs.

(2). If the backup file were not created, how could the system be restored successfully finally.

The true is that Sujatha Duraimanickam had system upgraded with additional software which had not been approved in advanced[30]. Thus, made restore take longer time.

Sujatha Duraimanickam's comment on Example 2 is inappropriate. And she shall not use this example to demonstrate the Complainant had poor performance. The Complainant had argued with Sujatha Duraimanickam about that issue in September 2016, but she still kept that example in CAP.

──────────────────

[30] It violates UHG service police for Making change in product environment without getting approval in advanced

Civil Case No. 18-cv-01454-MJD-KMM

If the Respondents could provide "service-now" evidence, the records on "service-now" would also show the release task was for the Complainant to ensure the deployment engineer backup the files. It was not to validate those files.

(iii). On Example 3, Sujatha Duraimanickam wrote down following on initial CAP about the Complainant's performance:

"*he did not validate properly in Optum Developer despite indicating that he fully understood the validation tasks*"

Here, Sujatha Duraimanickam blamed the Complainant did not validate something. However, Sujatha Duraimanickam knew that the Complainant was not requested to do that job. This can be proved by Sujatha Duraimanickam's testimony[31] below:

*On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam testified with below conversation (Q: questioned by complainant's attorney. A: answered by Sujatha Duraimanickam)*

---

[31] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 604, line 9 ~ 18

Civil Case No. 18-cv-01454-MJD-KMM

> *Q: Mr. Zhang testified that he didn't validate -- this is referring to Example*
> *Number 3 -- he didn't validate because it wasn't on the To Do list for the*
> *part --*
>
> **A: That was also -- yeah, that was also a developer's responsibility, to make**
> **sure that they understand what they have to do, and that he documented**
> **all the details in that change ticket, put in high-level validity, and use**
> **your brain at that time, and validate there's only hardly 10 Websites**
> **there. And as a developer, it's my responsibility to know what I'm**
> **supposed to validate. Those 10 Websites are key to make sure that the**
> **Websites are up and running. That's the basic requirement of any**
> **developer, basic expectation. So whether it's on the To Do list or not, it's**
> **the developer's responsibility. If the developer feels comfortable enough**
> **not to put it in the To Do list, that's up to that person.**

Here, Sujatha Duraimanickam blamed the Complainant had not done something which was not requested to do.

(iv). On Example 4, Sujatha Duraimanickam wrote down following on initial
CAP about the Complainant's performance:

*"With OMC Admin tool built in June and July, **Frank did not deliver within the***
***deadline even after the original date was** moved back. It was delayed beyond*

Civil Case No. 18-cv-01454-MJD-KMM

*acceptable date; **another team member had to pick it up and redo the whole**

**functionality on a week-end to make the release***

For this example, Sujatha Duraimanickam's testimony[32] is

"*he delivered something which was not meeting the requirement, so there*

*was constant delays and missing of deadlines. We had to push the release out,*

*and we kept committing to our customers saying we'll deliver it in this release,*

*and the next release, and the next release, and it. was going on forever.*

*And finally Shawn was like, I'll just do it. And he spent the weekend, and*

*he had to do it, because we committed so many times and missed so many*

*deadlines it was just reflecting very, very bad on the team. So he ended up doing*

*it on the weekend, and that was the situation at the time.*"

While the Complainant's testimony is

Q: Do you know what this example refers to?

A: **This tour is not a very complicated tour**(tool)**. It's not a very**

**complicated tour**(tool)[33]**, but the problem here is that it went through a**

---

[32] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 608, line 13 ~ 20.

[33] Misspelling. It should be "**tool**", not "**tour**"

Civil Case No. 18-cv-01454-MJD-KMM

**lot of changes. And so that is -- the changes make the method**

**complicated. So it was initially scheduled for one week, but it ended up**

**like due to multiple duration of changes, so that is extended for seven**

**weeks. And during the release of the scheduling, actually, I end up**

**complete the task before the revision deadline.**


Here, there are two versions for example 4, one from Complainant, the other from Respondents. Respondents said the developed product did not meet the requirements, while Complainant said the requirements had been changed for many times. The diagram[34] for requirement change and some development notes provided by the Complainant was excluded from evidences.

The Complainant requested the Respondents to provide "**basecamp**" records in order to verify which version was true, but the Respondents refused to provide them. And finally, the arbitrator believed what Sujatha said although she told lie in her testimony.

As mentioned in the section of "STATEMENT OF THE CASE AND FACTS", "basecamp" was used for tracking the requirement change and daily work status. So, the records from it can be considered as the best evidence. In the basis of Rule 1002.

---

[34] Appendix 2- the changes on Tenant Admin Tool requirement

Civil Case No. 18-cv-01454-MJD-KMM

Requirement of the Original, "basecamp" records should be presented to arbitration, but actually not.

(v). On initial CAP[35], Sujatha Duraimanickam wrote down following about the Complainant's performance:

*Progress Updates* (the section on page 4):

*"09/20/2016*

*1. This week he was supposed to have finished Pen test issue(no sniff) but missed the deadline again and delivered with issues. Team member had to follow up with him to complete his task.*

*2. **Frank updated a change ticket incorrectly to flag it as 'Out of compliance'.** So I had to ask him to follow up with Change management team to fix the issue. He tried doing it but only partially and I had to follow up with Frank again multiple times up until the task was completed to be back in compliance.*

> ***To summarize, he did not perform his task independently and with quality." ***

---

[35] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

The Complainant testimony[36] in the hearing meeting dated on August 18, 2020

Q. Would you turn to page 4 of this Exhibit 6. I'm looking at the Progress Updates notes on September 20, 2016. Do you see that?

*Q: Is it true you were supposed to have finished the pen test issue during the week of September 20?*

*THE WITNESS: So that thing is incorrect because I am supposed to be the one who assigns the task to the Infrastructure Team on September 20th. So the reason I joined into it is because they did not -- they did not accomplish the task so I have to jump in to help.*

In here, the Complainant just wanted to tell the "Pen test" work assignment took long time (about three months). And this was the assignment for infrastructure team. Before October 2016, it was infrastructure team working on this assignment, but later it was reassigned to the Complainant in early October 2016 due to infrastructure team having some difficulty. Because "pen test" subject requires some IT knowledge to understand it, the Complainant did not know what to ask.

However, after Complainant done with his testimony, the witnesses from Respondents started their second testimony. And their testimonies on "pen test"

---

[36] EXHIBIT 49 - 2020-08-18 Transcripts from the Arbitration Hearing Vol3_Condensed, page 463 line 24 ~

60

Civil Case No. 18-cv-01454-MJD-KMM

subject are different from the Complainant's. The "pen test" work status can be found in records "basecamp" and "service-now". however, the respondents did not disclose "basecamp" and "service-now" work information. Thus, it is unable to verify which descriptions are true. But the arbitrator did not take the Complainant's version due to no evidence to support it.

Respondents knew "basecamp", service-now", "codeHub" functions

Testified by Respondents

Two CAPs and other evidences from Respondents must be presented in arbitration

When the Complainant alleged the Respondents for discrimination or defamation, the two CAP and other evidences from the Respondents must be presented in arbitration at first. However, when the arbitration went to hearing, the last step before making award, the Complainant knew hard evidences

42. The undisclosed evidences have effects on arbitration decisions

The respondents' failure to disclose a series of correspondence which the applicant argued would have affected the arbitrator's decision.

How to prove UHG had age discrimination against Mr. Zhang

61

Civil Case No. 18-cv-01454-MJD-KMM

As UHG told EEOC[37], in order to establish a prima facie case of age discrimination, Mr. Zhang must establish that[38]:

(1) Mr. Zhang belonged to the protected age group; and

(2) Mr. Zhang performed his job satisfactorily or was qualified to perform his job; and

(3) Mr. Zhang suffered an adverse employment action; and

(4) Similarly situated, substantially younger employees were treated more favorably.

See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).

There are no issues[37] on the facts that Mr. Zhang is qualified for above element (a)(1)[39] and (a)(3)[40] since Mr. Zhang was 56 years old when his job got terminated.

Regarding above element (a)(2)[41], following facts demonstrate Mr. Zhang was qualified to perform his job:

---

[37] **EXHIBIT** - 2017-06-14 UHG response to EEOC, page 8, A. 1.

[38] Refer to section 0 (b), (c), and (d) for the facts of establishment

[39] Refer to section 0 (a)(1) "Mr. Zhang belonged to the protected age group"

[40] Refer to section 0 (a)(3) "Mr. Zhang suffered an adverse employment action"

[41] Refer to section 0(a)(2) "Mr. Zhang performed his job satisfactorily or was qualified to perform his job"

Civil Case No. 18-cv-01454-MJD-KMM

(1). Mr. Zhang received the company wide award, "MAKE IT HAPPEN 2015"[42]. This award was in recognition of Mr. Zhang's excellent achievements in developing "Optum Developer Hub" application from scratch in year 2015, and such was also in recognition of Mr. Zhang skills qualified to perform his job. Only about 160 employees among more than two hundred thousand UHG employees received this award. Mr. Zhang, as development lead, received this award[42], and not every of his team members received this award[42]. If Mr. Zhang could not performed his job satisfactorily, he should not be granted the award[42] for company-wide recognized accomplishment.

(2). In Mr. Zhang performance review his manager, Ms. Kim Myers said[43] that Mr. Zhang was excellent at documenting what he did and how to do further development on OMC[44] and Optum Developer[45]. If Mr. Zhang did not have the required knowledge and skills for performing his job, he would not be able to write down development documents with details.

---

[42] **EXHIBIT** - 2015 Optum year 2015 award for Excellent Achievement

[43] **EXHIBIT** - 2016-02-21 Common Review for Claimant by Kim Myers, page 1, the 1st paragraph on Comments section

[44] Note: OMC – stand for Optum Marketing Cloud which was a web content management system developed and maintained by Sujatha's team, and used by external members

[45] Note: "Optum Developer" was another web content management system developed and maintained by Sujatha's team. "Optum Developer" contained everything that OMC had, plus some internal components used only within company. In year 2016, "Optum Developer" was merged with OMC.

Civil Case No. 18-cv-01454-MJD-KMM

(3). In Mr. Zhang performance review dated on February 21, 2016, his manager, Ms. Kim Myers, said that Mr. Zhang was a strong technical talent[46], and the code that he produced tended to be high quality[47]. That means Mr. Zhang had strong knowledge and skills required for his job.

(4). In Ms. Jennifer testimony, she acknowledged that Mr. Zhang was a really smart person and admired how easily he could complete a task[48]. If Mr. Zhang was not qualified for his job position, no one would think he could complete a task easily.

(5). In Mr. Shawn Woods testimony, he stated that Mr. Zhang was a sharp, technically-minded person, and he didn't back away from deeply complex issues[49]. That means that Mr. Shawn Woods, as the technical lead, acknowledged Mr. Zhang was qualified for his job position from his viewpoint in year 2015.

(6). All of the technical witnesses from UHG acknowledged Mr. Zhang was smart and had the technical knowledge and skills required for performing his job in general. Those testimonies are opposed to what Ms. Sujatha said "Frank (Mr. Zhang)

------

[46] **EXHIBIT** - 2016-02-21 Common Review for Claimant by Kim Myers, page 1, "Comments" section, paragraph 3.

[47] **EXHIBIT** - 2016-02-21 Common Review for Claimant by Kim Myers, page 6, paragraph 7.

[48] **EXHIBIT** - 2016-10-18 Interim Review for Claimant by Jennifer Viveros Aguilar, page 1, section 2
Also see **EXHIBIT** - 2020-08-04 Transcripts from the Arbitration Hearing Vol1_Condensed, page 141 line 18~25, and page 145 line 25 ~ page 146 line 4

[49] **EXHIBIT** - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 728, line 9~11

Civil Case No. 18-cv-01454-MJD-KMM

was unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion"[51]

(7). Although the Complainant's supervisor was changed to Ms. Sujatha in year 2016, his primary job function was not changed, and still worked on developing and maintaining AEM (Adobe Experience Manager) components. Ms. Sujatha acknowledged that the Complainant was technically a strong candidate on July 22, 2016[50]. However, on October 31, 2016, Mr. Sujatha's comment about the Complainant had become "*Frank was unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion*"[51]. And in the arbitration hearing meeting dated on August 19, Ms. Sujatha said "basically, he has always run into repeated issues for not validating things thoroughly.  He's always been very careless". There are so many conflict statements between Ms. Sujatha's and the Complainant's. In the basis on Fed.R.Ev. Rule 1002, BaseCamp records[52] and service-now records[53] are the best evidences to prove whether Ms. Sujatha or the Complainant told lie. "basecamp" records are daily

---

[50] **EXHIBIT** - 2016-07-10 Internal Review for Claimant by Sujatha Duraimanickam, page 2, Comments on 7/22. This document was created on 5/19/2017

[51] **EXHIBIT** - 2016-10-24 Final Corrective Action Form Issued to Claimant, page 3, Progress Updates: 10/31/2016.

[52] The evidences from baseCamp records are described on section 11

[53] The evidences from service-now records are described on section 14

Civil Case No. 18-cv-01454-MJD-KMM

development status records used to keep tracking each developer everyday work tasks include the requirements for works, and developers' work status[54].  However, UHG did not disclose the information from these two resources no matter who requested. Without disclosed complete information from basecamp records and service-now records, arbitrator certainly would get misleading and make wrong arbitration decisions.

Regarding above element (a)(4)[55], the records from basecamp, service-now, codeHub, and other relevant work status documents as mentioned in section 0 must need to provide in arbitration in order to determine whether Mr. Zhang had been treated different from younger developers in his team or Mr. Zhang had performance problems as mentioned in the two "Corrective Action Form"[56] issued by Ms. Sujatha to the Complainant.

(1). During arbitration, except those examples already mentioned by Ms. Sujatha in her initial issued "Corrective Action Form"56, but refuted by Mr. Zhang

---

[54] **EXHIBIT** - 2020-08-04 Transcripts from the Arbitration Hearing Vol1_Condensed, from page 134 line 7 to page 135 line 4.

[55] Refer to section 0 (a)(4) "Similarly situated, substantially younger employees were treated more favorably"

[56]    (1). **EXHIBIT** - 2016-09-19 Corrective Action Form Issued to Claimant, and

Civil Case No. 18-cv-01454-MJD-KMM

in his "Internal Dispute Resolution Appeal Form"[57] and his emails[58] to UHG HR, UHG did not provide any more examples to demonstrate that Mr. Zhang was not able to perform his job and to complete his works in time.

Above arguments also present the facts that contradicts what Ms. Sujatha said that "Frank is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion"[59].

What material evidences shall be disclosed in arbitration

UHG were asked to provide solid evidences to prove their averse or negative comments on Mr. Zhang

UHG were asked to use the material evidences they had to verify what complainant said, but they did not. Instead, UHG just repeated Ms. Sujatha's averse or negative comments about Mr. Zhang without giving detail examples or descriptions of Mr. Zhang conducts

---

(2). **EXHIBIT** - 2016-10-24 Final Corrective Action Form Issued to Claimant

[57] **EXHIBIT** - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

[58] **EXHIBIT** - 2016-12-14 ~ 2016-12-21 Email Chain between Claimant and Tanya Hughes re IDR Meeting

[59] **EXHIBIT** - 2016-10-24 Final Corrective Action Form Issued to Claimant, Page 3, "Progress Updates" on 10/31/2016

Civil Case No. 18-cv-01454-MJD-KMM

43. Whether the arbitration award was procured by corruption, fraud, or undue means

On Sep. 19, 2016, Ms. Sujatha issued the initial "Corrective Action Form" which contains

44. Whether there was evident partiality or corruption in the arbitrators, or either of them

Mr. Zhang attorney told Mr. Zhang that the arbitration did not allow both attorney and claimant (or respondent) from the same party together to ask a witness questions. In such situation, when a witness tells lie or hides some important facts, the attorney will not know whether the statement of fact is accurate, or can lead to misleading, when the details about these facts are not provided to the attorney by claimant (or respondent) in advance. It is clearly evident that UHG did not make disclosures in the arbitration to provide the original evidences listed below, but not limit to below

The project management records had been entered in basecamp.com and backed up in the end of each development cycle. The website, basecamp.com, were used in Ms. Sujatha and Ms. Kimberly Myers teams to manage the work assignments, including detail requirements for each work task, and to keep track of everyday working status, including issues and blocks.

The service requests had been submitted to UHG service-now website, and were requested by Mr. Zhang or assigned to Mr. Zhang. The service-now website was UHG service management online tool used to manage UHG

Civil Case No. 18-cv-01454-MJD-KMM

cross-team service requests, each service execution procedure, service status, and service time frames, etc.

Arbitrator applied the law incorrectly

In the award of arbitration, the arbitrator made following conclusion[60]:

"The statement that Claimant was not meeting the performance requirements of his position was made as part of a performance review and such subject to a qualified privilege and cannot lead to liability absent a finding of malice."

And based on such, the arbitrator denied the evidence in defamation.

However, See W. Prosser, supra, § 15 at 786. See also Houston Belt Terminal Ry. v. Wherry, 548 S.W.2d 743 (Tex.Civ.App. 1976), appeal dismissed 434 U.S. 962, 98 S.Ct. 497, 54 L.Ed.2d 447 (1977). In the context of employment recommendations, the courts generally recognize a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose.

In this case, the privilege demonstrated by the arbitrator has been abused because:

(1). the false statements made by Ms. Sujatha were not in good faith but for a purpose for making up the reasons to terminate Claimant job.

_____

[60] Refer to **EXHIBIT** - 2020-10-05 - Final Arbitration Award, page 4, the last paragraph.

69

Civil Case No. 18-cv-01454-MJD-KMM

(2). those false statements were not just provided to UHG HR, but also had been presented to some team members, such can be seen in some team members' review for the Claimant and testimony. And based on those false statements, the Defendants demonstrated the Claimant had performance issues61.

(3). after Claimant refuted those false statements with detail information, The Defendants refused to admit those statements were false. And Defendants still used those statements as the evidences to provide them to EEOC and arbitration, and in basis on them to prove the Claimant had performance issues.

In arbitration hearing meeting, the witnesses said they found Claimant

Arbitrator denied the Complainant's documented evidence with bias

Before arbitrator made the arbitration award, the Complainant believed he could use the job logs he wrote down as one of his evidences. This document evidence was submitted during the discovering phase. And it is for sure that the Respondents must saw it during hearing meeting. If there are any malpresentation, the respondents could be very easy to find out because the respondents have all of the original records. The arbitrator denied it by the reason (Ex. 53 P3)[62]

---

[61] Refer to **EXHIBIT** - 2020-09-18 Zhang v. UHG Respondent's Post-Hearing Brief

[62] EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 3, last paragraph

70

Civil Case No. 18-cv-01454-MJD-KMM

*"Claimant's typed compilation of notes does not constitute reliable evidence supporting the claim. It was not clear when Claimant created the compilation of notes, and he did not come forward with the original documents that he relied upon in compiling the notes to prove that he recorded the content of the compilation at or near the time when Duraimanickam allegedly made the comments"*

However, when arbitrator was thinking of original document, he should also need to know the best evidence rule. From arbitration award, we can see there are a lot of conflict. The Complainant already warned[63] the arbitrator on September 18, 2020. In the Complainant brief, the complainant already stated the lies were found in Sujatha Duraimanickam testimony, but the arbitrator still relies on the information originally from Sujatha Duraimanickam.

Let us first see below facts:

According to David's testimony, Mr. David just forwarded the Complainant letter and emails to Sujatha Duraimanickam (Ex. 30), and asked him to look at the peer review comments (Ex. 31). However, only according to these peer review comment, it cannot be concluded whether the Complainant alleging are not true or not.

---

[63] EXHIBIT B – 2020-09-18 letter to arbitrator

Civil Case No. 18-cv-01454-MJD-KMM

Mr. David did not verify what Complainant asked in his submitted dispute letter and emails. And even did not talk to others except managers.

(Exhibit. 47, P3:9-12)

*Q. Did you talk to any other individuals other than Sujatha and Frank's former supervisor, Kim Myers?*

*A. No.*

Also, John Zimmerman, Sujatha Duraimanickam former supervisor, testified that he relied on Sujatha Duraimanickam to know how the Complainant performed his job. (Ex. 48 P269:13-P270:7)

Shawn Woods testify that he wrote the review based on the information from system and emails. Normally, people writing review is based on what they feel and what are in their memory unless they want to write something special. From Woods behaviors, seems he tried to write something that manager asked for. (Ex. P119:3-21).

And Shawn testified that he knew "codeHub", but did not know "basecamp" (Ex. P122:21-123:10). And actually the "basecamp" is the tool used by all developers and product owner for daily tracking developments process.

Kim Myers testified that the Complainant needed implement html, CSS, and Java Script (Ex. 50 P733:20-P734:3). But if anyone could check "codeHub", it should be seen the Complainant had more contribution on html, CSS, and Java Script than most developers in the team in year 2015 and 2016. Kim already testified html,

Civil Case No. 18-cv-01454-MJD-KMM

CSS, and Java Script are required coding language in AEM development (Ex. 50 P733:20-24). Without being good at html, CSS, and Java Script, the Complainant should not receive the company award (Ex. K) for 2015.

45. The Respondents knew "basecamp", "service-now", "codeHub" and what they were used for, but they did not present their records for arbitration

   Sujatha Duraimanickam knew "basecamp" & "'service-now" (Ex. 50 P669:11-P670:19)

46. the Respondents knew the functions of knew "basecamp", "service-now", "codeHub"

   Sujatha Duraimanickam knew "basecamp" & "'service-now" (Ex. 50 P669:11-P670:19)

   Shawn testified that he knew "codeHub", but did not know "basecamp" (Ex. P122:21-123:10)

47. the Respondents presented malpresentation in arbitration when non-disclosed information in "basecamp", "service-now", "codeHub". Thus, led to below opinion as arbitrator said below:

   *"Claimant contends that, motivated by are bias, Sujatha Duraimanickam, team manager, targeted him for close scrutiny, unfair criticism, and deliberately set him up for failure. Claimant says that Duraimanickam created an inaccurate and*

73

Civil Case No. 18-cv-01454-MJD-KMM

*misleading record of his performance in order to build a case against him and to*

*ultimately terminate his employment. (Ex. 53, page 2, 3rd paragraph)*

*However, the record in this case shows that there were numerous instances of*

*poor performance on Claimant's part. That led to Claimant's co-workers having to*

*expend significant time correcting his mistakes and redoing assigned tasks. The*

*documented performance problems included: missing deadlines; failing to complete*

*tasks thus causing delays and reworks; failing to demonstrate an understanding of*

*the requirements of team projects; working on irrelevant tasks; and failing to*

*communicate with other team members." (EXHIBIT 53 - 2020-10-05 - Final*

*Arbitration Award, page 2, last paragraph)*

When take a close look, the Complainant finds none of those evidences are

material evidence. Because except the comments, no original logging records found.

This just like circular reasoning, or saying "Repeat a lie often enough and it becomes

the truth" (*Appendix 1*).


48. The Respondents made a false representation intentionally and knowingly

The arguments occurred for many times, Internal Dispute, EEOC, and during

the Complainant still worked in UHG. But arbitrator did not know that. When he saw

that comments, he just believed those repeating more.

*"Although Claimant contends that in each of these instances he was not at*

*fault; there was sufficient evidence to support Duraimanickam's critique of*

Civil Case No. 18-cv-01454-MJD-KMM

*Claimant's performance as fair and not simply a pretext for ago discrimination. This*
*evidence included not only Duraimanickam's evaluation of Claimant's poor*
*performance but also the evaluations of his cod-workers, including lead developer*
*Shawn Woods who described how Claimant's delays and mistakes adversely affected*
*the whole team."* (EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 3, first
paragraph)

As already proven above, Duraimanickam told lie, while Kim Myers and Shawn
Woods said something misleading.

Sujatha said:

*"Right. He needed a lot of improvement because he was never telling the truth,*
*he was always lying in his commitment. He was not keeping up with words. He was*
*not trustworthy. He was not credible."* (Ex. 47 38:1-5)

*"When you say it's all done, specifically his outcome is always flawed, he*
*always has issues." (*Ex. 50 P622:6-8)

But so far, she did not provide any material evidence. If the Complainant was
always lying, she should very easily find many examples. The Complainant had
argued with the Respondents about that for many times already knew saying so what
result would be. Since "codeHub" was used to manage codes, Duraimanickam
should find the coding issues from "codeHub" easily, or find the error or bugger
reports on "basecamp" every easily.

Civil Case No. 18-cv-01454-MJD-KMM

49. As mentioned in beginning, the Respondents controlled all of material evidence. They just disclosed the evidences good for them

    If there are any malpresentation in the Complainant claims, the Respondents should find out already.

50. Except using the evidences provided by the Respondents, the Complainant had no choice, but only the "MAKE IT HAPPEN" award with him.

    The Complainant had to use the evidences from the Respondents to demonstrate his points, otherwise, other he could say. If the Complainant has on the records in "basecamp", "service-now", "codeHub", he would find out the material evidence to demonstrate he alleging discrimination with real examples. The notes show on EXHIBIT 57 – "C4 - 2016 Yufan Zhang's Notes" would be the good resources to find the material evidence from the disclosed records in "basecamp", "service-now", "codeHub", ect.

51. The records from "basecamp", "service-now", "codeHub" could help Complainant to demonstrate the Complainant had no-fault on the projects of four examples, vhost and "pen test". Also the records will show who made the issues. Once find out the root causes from which persons, then it will show Duraimanickam had blamed the wrong person.

    Right now, Duraimanickam claims something the Complainant should have done something. However, it is not a good reason to motivate an adverse

Civil Case No. 18-cv-01454-MJD-KMM

employment action to the Complainant only because he has not done something which he has not been asked to do but manager expects him do.

The complainant's notes show many developers had missed deadline, and Duraimanickam had said they all good. Thus, it could be demonstrated that only the older developer had been treated different.

The Complainant clearly know that the reasons for terminating his job: (1) have no basis in fact, or (2) even if based in fact, the employer was not motivated by these reasons, or (3) the reasons are insufficient to motivate an adverse employment decision

52. The records from "service-now" and "codeHub" could show Duraimanickam told lie.

53. The qualified privilege standard does not apply in this case

At first, the Complainant alleged Sujatha Duraimanickam. The second, in a 2012 case, the 4th Circuit Court of Appeals ruled against a plaintiff who said that qualified privilege didn't apply, in part, because of the alleged malice of the employer.

(1) Tell the truth

But, Sujatha Duraimanickam told lie

(2) No personal comments

But, Sujatha Duraimanickam's comments were personal. Her purpose is to fire the Complainant. While "Qualified

(3) The comments should be fair, accurate, published without malice, or

subject to the right of reply in the form of a letter that gives explanation

or contradiction. But, none of these apply to Sujatha Duraimanickam

## ANALYSIS

The arbitrator should seek to use the best evidentiary rule to determine the

ultimate facts and truth of the claims presented. In applying the rules to the

admission of evidence, the arbitrator should seek to find the evidence that will reach

the merits and truth of the claims, and defenses to those claims, in a way that will

require the parties to be precise in their offers of proof.

As both the fact-finder and law-giver, the arbitrator has accepted broad powers

in the consideration, admission of or exclusion of evidence. However, the arbitrator

has no power to compel a party to present the evidences which are not in favor of

itself, but courts have. This court should make a motion order to compel respondents

to disclose the records in "basecamp", "service-now", "codeHub", and all relevant

development logs in order to make justice equal for all parties.

In this case, the employer tried to hide the unfavorable evidences, while at the

meantime

(1) If the Complainant possesses the evidences, it could be charged for

stealing intelligent property

(2) If the Complainant does not possess the evidences, the Respondent could

tell lie since no penalty in arbitration or arbitrator(s) unable to identify lies

Civil Case No. 18-cv-01454-MJD-KMM

The law should protest justice.

## CONCLUSION

Based on the facts and evidences, it could be concluded that the arbitration award was procured by fraud.

Pursuant to 9 U.S.C. §§ 10 (a) and Sec. 572B.23 MN Statutes, this Court should vacate the Award which is rendered in favor of respondents on all claims in arbitration, *Case Number: 01-19-0001-0069*. This Court should grant new trial motions when the Arbitration Award is vacated.

Date:  January 6, 2021

Respectfully submitted,

/s/ Yufan Zhang

**Yufan Zhang**

Plaintiff

Civil Case No. 18-cv-01454-MJD-KMM

# Index

**B**

basecamp...........11, 19, 23, 26, 39, 58, 61, 66, 68, 79

**C**

codeHub....................................11, 19, 39, 61, 66, 79

**L**

lie 2, 6, 18, 48, 52, 58, 65, 68, 74, 75, 77, 78, 79

lies ...............................................................2, 71, 79

**S**

service-now..12, 19, 24, 39, 53, 55, 61, 65, 66, 68, 79