

RECEIVED

JAN 0 6 2021

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

EXHIBIT 62

C9 - 2020-02-11 Tanya Hughes UHG Deposition Transcript



SCANNED

JAN 0 7 2021

U.S. DISTRICT COURT MPLS

1

2    AMERICAN ARBITRATION ASSOCIATION

3

4    - - - - - - - - - - - - - -

5    In the Matter of the Arbitration between:

6    RE:  Case No.:  01-19-0001-0069

7    Yufan Zhang
8    And
     UnitedHealth Group, Inc.
9    and Sujatha Duraimanickam

10   Case Manager:  Carol A. Placella

11   - - - - - - - - - - - - - -

12            DEPOSITION

13        The following is the deposition of

14   TANYA HUGHES taken before Jolynn Graham, RPR, Notary

15   Public, pursuant to Notice of Taking Deposition,

16   at 120 South 6th Street, Suite 2600, Minneapolis,

17   Minnesota, commencing at approximately 9:09 a.m.,

18   February 11, 2020.

19

20

21

22

23

24

25

            JOLYNN GRAHAM REPORTING

---

1    APPEARANCES:
2    On Behalf of the Claimant, Yufan Zhang:
3        Kaitlyn L. Dennis, Esquire
              &
4        Daniel J. Nordin, Esquire
         Gustafson Gluek PLLC
5        120 South 6th Street
         Suite 2600
6        Minneapolis, Minnesota 55402
         Kdennis@gustafsongluek.com
7

8    On Behalf of UnitedHealth Group, Inc. and
     Sujatha Duraimanickam:
9
         Sandra Jezierski, Esquire
10       Nilan Johnson Lewis
         120 South 6th Street
11       Suite 400
         Minneapolis, Minnesota 55402
12       Sjezierski@nilanjohnson.com

13

14

15   **DEPOSITION REFERENCE INDEX**

16

     Examination by Ms. Dennis: 4

17

18

19        **OBJECTIONS**

20   By Ms. Jezierski: 31, 36, 37, 41, 43, 44, 48, 49,
     50, 52, 68, 71, 72, 73, 76, 87, 89, 92, 94, 98,
21   104, 105, 107, 108, 111, 112, 113, 114, 115, 116,
     117, 119, 120, 121

22

23

24

25

            JOLYNN GRAHAM REPORTING

---

C9

1            **EXHIBITS**
     MARKED:
2
     Exhibit 1 - 30(b)(6) Notice................. 8
3
     Exhibit 2 - Notice for Tanya Hughes......... 8
4
     Exhibit 3 - IDR Appeal Form................ 75
5
     Exhibit 4 - Email re Colleague feedback..... 81
6
     Exhibit 5 - Colleague feedback............. 82
7
     Exhibit 6 - Email re age discrimination
8            allegations.................. 84
9    Exhibit 7 - Email re IDR response........... 95
10   Exhibit 8 - 2/7/2017 lettre to Mr. Zhang.... 97
11   Exhibit 9 - Demand for Arbitration......... 108
12   Exhibit 10 - List of co-workers, .......... 113
13
14
15
16
17
18
19
20
21
22
23
24
25

            JOLYNN GRAHAM REPORTING

---

1            P R O C E E D I N G S

2        (The deposition of **TANYA HUGHES** was commenced

3    at 9:32 a.m. as follows:)

4            **TANYA HUGHES,**

5        after having been first duly sworn,

6        deposes and says under oath as follows:

7                    ***

8

9        MS. DENNIS:  Kaitlyn Dennis from

09:32:56 10  Gustafson Gluek representing Claimant, Yufan

11   Zhang.

12       MR. NORDIN:  Daniel Nordin, Gustafson

13   Gluek, also on behalf of the Claimant.

14       MS. JEZIERSKI:  Sandra Jezierski on

09:33:05 15  behalf of UnitedHealth.

16       THE WITNESS:  Tanya Hughes on behalf

17   of UnitedHealth.

18            **EXAMINATION**

19   BY MS. DENNIS:

09:33:15 20   Q.   So I was going to ask you to state

21   your name for the record but you already did that.

22       So I'll be asking a series of

23   questions today related to Mr. Yufan Zhang's

24   claims in this arbitration.  And for the sake of

09:33:29 25  clarity, I know he's referred to in a lot of the

            JOLYNN GRAHAM REPORTING

1     documents as Frank, so I will refer to him as
2     Frank; does that make sense?
3        **A.**    **Yes.**
4        **Q.**    Have you been deposed before?
09:33:40 5       **A.**    **I have not.**
6        **Q.**    Okay. So I'll just go over kind of
7     the basic ground rules. And for her any
8     questions, please let me know. So today I'll be
9     asking you a series of questions, like I said. We
09:33:53 10     have a court reporter here who's taking down
11     everything that we say. And for her sake it's
12     best if you wait for me to finish a question
13     before beginning the answer just so we have a
14     clear record, because she can't get down what both
09:34:12 15     of us are saying at the same time; does that make
16     sense?
17        **A.**    **Yes.**
18        **Q.**    And on a similar note, if you could
19     avoid answering questions with things like um-hmm
09:34:22 20     or uh-huh, it's just hard for -- or it's difficult
21     to transcribe those for the record as well. So if
22     you would give a clear verbal answer, that would
23     help make the record clear; does that make sense?
24        **A.**    **Yes.**
09:34:33 25        **Q.**    Thank you. If you don't understand

1     a question, let me know and I will do my best to
2     rephrase it. But if you do answer a question I am
3     going to assume that you understood it; is that
4     fair?
09:34:48 5       **A.**    **Yes.**
6        **Q.**    From time to time your attorney
7     might make objections to questions I ask. Unless
8     she specifically tells you not to answer, please
9     answer the question; do you understand?
09:34:58 10      **A.**    **Yes.**
11        **Q.**    Any time you need a break you can
12     let me know and we can go off the record. If you
13     need some more water or a bathroom break, or just
14     need to walk around, that's fine. I may ask you
09:35:14 15     to finish asking a question if I have asked one,
16     or I may ask you to let me finish my line of
17     questioning before we take a break; is that fair?
18        **A.**    **Yes.**
19        **Q.**    Have you ever been a plaintiff or a
09:35:38 20     defendant in any other lawsuits?
21        **A.**    **No.**
22        **Q.**    Are you taking any medication that
23     may affect your memory or ability to testify
24     truthfully today?
09:35:48 25       **A.**    **No.**

1        **Q.**    Can you please describe your
2     educational background?
3        **A.**    **I have a bachelor's degree in**
4     **business management with a focus on human**
09:35:59 5     **resources.**
6        **Q.**    And when did you get that degree?
7        **A.**    **I graduated in 2002.**
8        **Q.**    Where was that degree from?
9        **A.**    **That was at the University of**
09:36:12 10     **Wisconsin-River Falls.**
11        **Q.**    Okay. Do you have any other
12     professional certifications or credentials?
13        **A.**    **No.**
14        **Q.**    What is your current position at
09:36:38 15     UnitedHealth?
16        **A.**    **I'm employee relations case manager.**
17        **Q.**    Is that your official title?
18        **A.**    **Yes.**
19        **Q.**    Have you held any other positions
09:36:47 20     while at UnitedHealth?
21        **A.**    **Yes.**
22        **Q.**    What?
23        **A.**    **Prior to this I was a senior**
24     **employee relations analyst.**
09:36:54 25        **Q.**    And have you held any other titles

1     besides that at UnitedHealth?
2        **A.**    **No.**
3        **Q.**    And when did you change job titles
4     at UnitedHealth?
09:37:09 5     **A.**    **April of 2014.**
6        (Exhibit Nos. 1 & 2 were
7        marked for identification.)
8     BY MS. DENNIS:
9        **Q.**    Do you understand you are here today
09:38:37 10     testifying as a representative of UnitedHealth?
11        **A.**    **Yes.**
12        **Q.**    And do you understand today you're
13     also here to testify in your personal capacity as
14     well?
09:38:46 15     **A.**    **Yes.**
16        **Q.**    Can you take a look at what has been
17     marked Exhibit 1. Can you take a minute to look
18     at that and tell me if you recognize this
19     document.
09:39:07 20       MS. JEZIERSKI: She asked if you
21     recognized it.
22        THE WITNESS: Oh, I'm sorry. I do.
23     Sorry about that.
24     BY MS. DENNIS:
09:39:18 25        **Q.**    That's okay. So what do you

1  understand this document to be?
2      **A.**  **I understand that this is the**
3  **arbitration document, or the deposition document I**
4  **guess.**
09:39:27  5      **Q.**  You understand this is the
6  deposition notice to UnitedHealth Group as a
7  corporation?
8      **A.**  Yes.
9      **Q.**  If you turn to page 4 of this
09:39:48  10  document, titled Schedule A at the top.  Sorry, I
11  meant actually page 6, under the heading Topics.
12  Have you reviewed the numbered items under the
13  heading Topics on page 6?
14      **A.**  Yes.
09:40:20  15      **Q.**  And have you reviewed the Topics
16  continuing on to pages 7 and 8?
17      **A.**  Yes.
18      **Q.**  When was the first time that you saw
19  this document?
09:40:36  20      **A.**  **I believe it was on -- I'm not sure,**
21  **Thursday maybe.  Just trying to think of the date,**
22  **so it might have been, like, the 4 or 5th.**
23      **Q.**  That's fine.  An approximation is
24  fine.  So I just am going to go through each topic
09:41:05  25  before we jump into the questions and just make

1  sure, or confirm whether or not you are prepared
2  to testify on each topic; is that okay?
3      **A.**  Yes.
4      MS. JEZIERSKI:  For the record,
09:41:19  5  Tanya is not testifying as to Topic 9.
6      MS. DENNIS:  Are you going to
7  instruct her not to answer?
8      MS. JEZIERSKI:  She's not prepared
9  for that.  We're trying to find someone who can
09:41:34  10  testify to that.
11      MS. DENNIS:  Okay.
12      MS. JEZIERSKI:  We can talk about
13  that during break.
14      MS. DENNIS:  All right.
09:41:41  15  BY MS. DENNIS:
16      **Q.**  So I'll go through the other
17  deposition topics.  So Topic 1 reads, the
18  approximate number of people respondent employed
19  during the relevant period; are you prepared to
09:41:59  20  testify on this topic today?
21      **A.**  Yes.
22      **Q.**  And did you review any documents to
23  prepare to testify on this topic?
24      **A.**  Yes.
09:42:07  25      **Q.**  And what documents did you review?

1      **A.**  **It was a report.**
2      **Q.**  Do you remember anything else about
3  the report?
4      **A.**  **No.  It was an Excel spreadsheet**
09:42:22  5  **with the number of employees.**
6      MS. DENNIS:  Sorry, I didn't realize
7  how loud it would be out there.
8  BY MS. DENNIS:
9      **Q.**  So Topic 2 reads, respondent's
09:42:33  10  corporate or official procedures and actual
11  practices for investigating and addressing reports
12  or complaints of age discrimination; are you
13  prepared today to testify on this topic?
14      **A.**  Yes.
09:42:47  15      **Q.**  And did you review any documents to
16  prepare to testify on this topument?  Sorry, I
17  combined the words topic and document.
18      Did you refer to any documents to
19  prepare to testify on this topic?
09:43:01  20      **A.**  **No.**
21      **Q.**  Did you do anything to prepare to
22  testify on this topic today?
23      **A.**  **I'm very familiar with the topic so**
24  **I just refreshed my own memory, or made sure that**
09:43:17  25  **I recalled, or made sure to recall each step.  But**

1  **it's a daily situation that I'm --**
2      **Q.**  So you just relied on your personal
3  recollection; is that correct?
4      **A.**  Yes.
09:43:34  5      **Q.**  Topic 3 reads, respondent's policy
6  and procedures for conducting and collecting
7  performance reviews; are you prepared to testify
8  on this topic today?
9      **A.**  Yes.
09:43:48  10      **Q.**  And did you do anything to prepare
11  to testify on this topic?
12      **A.**  Yes.
13      **Q.**  What?  What did you do to prepare?
14      **A.**  **I reviewed our common review**
09:43:59  15  **process.**
16      **Q.**  And how did you review that common
17  review process?
18      **A.**  **On our employee intranet site.**
19      **Q.**  Did you do anything else to prepare
09:44:17  20  to testify on that topic?
21      **A.**  **No.**
22      **Q.**  To clarify, you did not meet with
23  anyone to prepare to testify on this topic?
24      **A.**  **I met with Sandra.**
09:44:37  25      **Q.**  Anyone else?

**13**

1      **A.   I spoke with our internal attorney,**

2  **Jennifer Service.**

3      Q.   And just your attorneys?

4      **A.   Yes.**

09:44:51  5      Q.   Okay.  Topic 4 reads, any formal or

6  informal complaints, reports, grievances, concerns

7  or discussion of discrimination, retaliation,

8  harassment, or disparate treatment based on age,

9  that any of the respondent's current, former, or

09:45:16  10  potential employees, applicants, trainees, or job

11  candidates (including Claimant) made regarding

12  Respondent Duraimanickam during the relevant

13  period; are you prepared today to testify on this

14  topic?

09:45:32  15      **A.   Yes.**

16      Q.   Did you do anything to prepare to

17  testify on this topic today?

18      **A.   Yes.**

19      Q.   What did you do?

09:45:37  20      **A.   I reviewed our case submission**

21  **database.**

22      Q.   And did you do anything else to

23  prepare to testify on this topic?

24      **A.   No.**

09:45:56  25      Q.   Did you meet with anyone to prepare

**14**

1  to testify on this topic other than your

2  attorneys?

3      **A.   No.**

4      Q.   So I'm going to read the next topic

09:46:20  5  on page 7.  It's listed as Topic 5, employee

6  performance policies, rules, and disciplinary

7  procedures applicable to team members, employees,

8  or trainees under current or former supervision or

9  management of Respondent Duraimanickam; are you

09:46:37  10  prepared today to testify on this topic?

11      **A.   Yes.**

12      Q.   Did you do anything to prepare to

13  testify on this topic?

14      **A.   Yes.**

09:46:46  15      Q.   What did you do?

16      **A.   I reviewed our common review**

17  **process.**

18      Q.   And did you do anything else to prepare

19  to testify on this topic?

09:46:59  20      **A.   No.**

21      Q.   Did you speak to anyone other than

22  your attorneys to prepare?

23      **A.   No.**

24      Q.   Topic 6 reads, Respondent's

09:47:22  25  initiatives, practices, or programs related to age

**15**

1  discrimination policy, as applied to employee

2  recruitment, diversity and work assignments; are

3  you prepared to testify on this topic today?

4      **A.   Yes.**

09:47:35  5      Q.   Did you do anything to prepare to

6  testify on this topic?

7      **A.   Yes.**

8      Q.   What did you do?

9      **A.   I reviewed our company internet**

09:47:44  10  **site.**

11      Q.   What did you review specifically on

12  the --

13      **A.   Under the careers section.  I also**

14  **reviewed our company's Equal Employment**

09:48:15  15  **Opportunity Policy.**

16      Q.   Did you review anything else?

17      **A.   No.**

18      Q.   And did you speak with anyone else

19  to prepare, other than your attorneys?

09:48:22  20      **A.   No.**

21      Q.   Topic 7 reads, Respondent's

22  investigation and/or assessment of Claimant's age

23  discrimination claims, including communication

24  with Claimant's former coworkers and supervisors,

09:48:38  25  collection and recording of statements, creation

**16**

1  of reports, and any resulting action taken by

2  Respondent; are you prepared to testify on this

3  topic today?

4      **A.   Yes.**

09:48:47  5      Q.   Did you do anything to prepare to

6  testify on this topic today?

7      **A.   Yes.**

8      Q.   What did you do?

9      **A.   I reviewed the internal dispute**

09:48:57  10  **resolution documents for Mr. Zhang; I reviewed**

11  **Mr. Zhang's common review, interim review and**

12  **colleague reviews associated with those, as well**

13  **as email correspondence between myself and**

14  **Mr. Zhang; and Mr. Zhang's internal dispute**

09:49:28  15  **resolution filing, corrective action plans, and**

16  **case notes related to the internal dispute**

17  **resolution case, and his other internal dispute**

18  **resolution case.**

19      Q.   Is that everything you reviewed?

09:50:05  20      **A.   I believe so, yes.**

21      Q.   Did you speak with anyone other than

22  your attorneys to prepare to testify on this

23  topic?

24      **A.   No.**

09:50:11  25      Q.   Topic 8 reads, Respondent's

1  investigation and/or assessment of Claimant's job
2  performance, including communication of
3  Complaint's former coworkers and supervisors,
4  collection and recording of statements, creation
09:50:34 5  of reports, and any resulting actions taken by
6  Respondent; are you prepared to testify on this
7  topic today?
8      A.    Yes.
9      Q.    Did you do anything to prepare to
09:50:47 10 testify on this topic?
11     A.    Yes.
12     Q.    What did you do?
13     A.    **I reviewed Mr. Zhang's corrective**
14 **action plan, common review, interim review, the**
09:50:57 15 **colleague reviews associated with those. I**
16 **reviewed his internal dispute resolution filing,**
17 **his corrective action plans, and the notes**
18 **associated with his internal dispute resolution**
19 **case.**
09:51:17 20    Q.    So these would be the same documents
21 you reviewed to prepare for the previous topic?
22     A.    Yes.
23     Q.    Would there be any difference in the
24 documents that you referred to to prepare yourself
09:51:30 25 to testify on either of these topics?

1      A.    No.
2      Q.    And did you speak with anyone other
3  than your attorneys --
4      A.    No.
09:51:37 5      Q.    -- to prepare to testify on this
6  topic?
7      A.    No.
8      Q.    So, counsel indicated that you're
9  not prepared to testify on Topic No. 9; is that
09:51:57 10 correct?
11     A.    Yes.
12     Q.    And with the understanding that
13 UnitedHealth will designate another witness to
14 testify on this topic, I will not be asking
09:52:20 15 questions today in your capacity as a
16 representative for UnitedHealth. But I may ask
17 questions in your personal capacity, and I will be
18 clear when I'm asking those questions, and I'll do
19 it at a separate time to avoid confusion; is that
09:52:46 20 fair?
21     A.    Yes.
22     Q.    Let's turn to the last page of this
23 document, page 8. Topic 10 reads, content of
24 documents and/or statements relied upon or
09:53:04 25 discovered in any investigation or research

1  Respondents undertook to verify or deny
2  Respondents' specific factual allegations
3  reflected in paragraphs 34 to 39 of Claimant's
4  Demand for Arbitration; are you prepared to
09:53:19 5  testify on this topic today?
6      A.    Yes.
7      Q.    Did you do anything to prepare --
8  sorry, did you do anything to prepare to testify
9  on this topic today?
09:53:28 10    A.    Yes.
11     Q.    What did you do?
12     A.    **I reviewed his common reviews,**
13 **Mr. Zhang's common review, rather, interim review,**
14 **colleague reviews, the internal dispute resolution**
09:53:46 15 **documents, and the notes associated with his**
16 **internal dispute resolution filing, and emails**
17 **between Mr. Zhang and I related to his internal**
18 **dispute resolution.**
19     Q.    And would these be the same
09:54:05 20 documents you referred to to prepare to answer
21 Topics 7 and 8?
22     A.    Yes.
23     Q.    Are there any additional documents
24 you referred to to prepare to answer questions
09:54:20 25 related to Topic 10?

1      A.    No.
2      Q.    And it appears that Topics 11 and 12
3  are identical, so I'm just going to ask about one
4  of them.
09:54:42 5         So Topic 11 reads, content of
6  documents and/or statements relied upon or
7  discovered in any investigation or research
8  Respondents undertook to verify or deny
9  Respondents' specific factual allegations
09:54:55 10 reflected in paragraph 43 of Claimant's Demand for
11 Arbitration; are you prepared to testify on this
12 topic today?
13     A.    Yes.
14     Q.    And did you do anything to prepare
09:55:07 15 to testify on this topic?
16     A.    Yes.
17     Q.    And did you rely on the same
18 documents that you referred to to prepare for
19 Topics 7, 8 and 10?
09:55:23 20    A.    Yes.
21     Q.    Did you refer to any additional
22 documents?
23     A.    No.
24     Q.    Topic 13 is identical to 11 but it
09:55:39 25 asks about paragraphs 46 to 47. Did you review

1 any additional documents that you haven't
2 identified to prepare to testify on Topic 13?
3 Sorry, I can rephrase that.
4     A.     Sure.  Thank you.
09:56:05 5     Q.     I asked that in a different way than
6 everything else, so I will just go through it.
7         So 13 reads, content of documents
8 and/or statements relied upon or discovered in any
9 investigation or research Respondents undertook to
09:56:20 10 verify or deny Respondents' specific factual
11 allegations reflected in paragraphs 46 to 47 of
12 Claimant's Demand for Arbitration; are you
13 prepared to testify on Topic 13 today?
14     A.     Yes.
09:56:34 15     Q.     And did you refer to any documents
16 to prepare to testify on Topic 13 today?
17     A.     **I reviewed the documents that I**
18 **reviewed for Topics 7, 8, 10 and 11, which were**
19 **the common review, interim review, emails**
09:56:57 20 **associated with the internal dispute resolution**
21 **filing, the internal dispute resolution documents.**
22 **I'm not sure if I said this, the colleague reviews**
23 **if associated with the internal dispute, and the**
24 **common and interim reviews as well as the**
09:57:17 25 **corrective action plans.**

1     Q.     And did you speak to anyone other
2 than your attorneys to prepare for -- to testify
3 on Topic 13?
4     A.     No.
09:57:27 5     Q.     Okay.  Besides the documents you've
6 identified that you relied on to prepare yourself
7 to testify on these topics today, did you do
8 anything else to prepare to testify on these
9 topics today?
09:57:49 10     A.     No.
11     Q.     Did you meet with Ms. Jezierski --
12         MS. DENNIS:  Am I saying that
13 correct?
14         MS. JEZIERSKI:  Mm-hmm.
15 BY MS. DENNIS:
16     Q.     -- to prepare for today's
17 deposition?
18     A.     Yes.
19     Q.     And approximately how long did you
09:58:08 20 meet with her?  And I'm not interested in any of
21 the substance, just kind of an estimate of how
22 much time.
23     A.     **About three hours.**
24     Q.     And when was this?
09:58:21 25     A.     **Thursday, February 6th.**

1     Q.     Okay.  And have you met with her at
2 any other time to prepare to testify today?
3     A.     No.
4     Q.     Did you speak to anyone else other
09:58:45 5 than your attorneys to prepare to testify today on
6 any topic?
7     A.     No.
8         MS. DENNIS:  Can we go off the
9 record for just a moment.
09:59:07 10         (Off-the-record discussion.)
11         MS. DENNIS:  Let's go back on the
12 record.
13 BY MS. DENNIS:
14     Q.     What is the approximate number of
10:01:24 15 people UnitedHealth employed during 2016?
16     A.     **Nationally, around 144,000;**
17 **internationally, around 175,000.**
18     Q.     Thank you.
19         MS. JEZIERSKI:  Just for the record,
10:01:46 20 it appears we're doing the 30(b)(6) deposition
21 first; is that correct?
22         MS. DENNIS:  Yes.  Sorry, I should
23 have been clear.
24         MS. JEZIERSKI:  Okay.
10:01:55 25 BY MS. DENNIS:

1     Q.     Whenever -- during this first part
2 of the deposition, I'm going to be asking you
3 questions in your capacity as a representative for
4 UnitedHealth.  And when -- later when I ask you
10:02:10 5 questions in your personal capacity, I will make
6 it clear when that division begins so we don't --
7 so everything is kept clear who you're testifying
8 on behalf of; is that fair?
9     A.     Yes.
10:02:23 10     Q.     Does UnitedHealth have a policy on
11 age discrimination?
12     A.     Yes.
13     Q.     What's the general purpose of that
14 policy?
10:02:39 15     A.     **That discrimination against any**
16 **individual for their age, in addition to multiple**
17 **other items, is prohibited.**
18     Q.     Does that policy specify a certain
19 age?
10:03:01 20     A.     **The policy itself does not specify**
21 **an age.**
22     Q.     Why was that policy enacted?
23     A.     **Because of the Civil Rights Act of**
24 **1964.**
10:03:16 25     Q.     Is there any other reason why

1　UnitedHealth has that policy?
2　　　　A.　To ensure that all employees are
3　treated based on their merit and not as a result
4　of their age, race, religion, gender, ethnicity,
5　or health condition.
6　　　　Q.　And does UnitedHealth enforce this
7　anti-age discrimination policy?
8　　　　A.　Yes.
9　　　　Q.　How does UnitedHealth enforce this
10　policy?
11　　　　A.　We provide training for managers; we
12　provide training for employees; we have an
13　HRdirect number for employees to report any
14　concerns related to discrimination or any other
15　concerns related to their employment.
16　　　　Q.　Does UnitedHealth enforce this
17　policy in any other ways?
18　　　　A.　We also have an anonymous compliance
19　and ethics line where people can report concerns
20　related to their employment, including age
21　discrimination.
22　　　　Q.　Are there any other ways this policy
23　is enforced?
24　　　　A.　Not that I can recall.
25　　　　Q.　Who is primarily responsible for

1　enforcing UnitedHealth's antidiscrimination
2　policies?
3　　　　A.　All employees at UnitedHealth Group
4　are responsible for enforcing UnitedHealth Group's
5　policy on discrimination.
6　　　　Q.　Is there anyone -- sorry, let me
7　back up.
8　　　　　　Is the responsibility shared equally
9　among all employees?
10　　　　A.　Yes.
11　　　　Q.　Besides the training for managers,
12　training for employees, the HRdirect number for
13　employees to report discrimination, and the
14　anonymous ethics line, are there any other
15　company-wide measures to address age
16　discrimination in the workplace?
17　　　　A.　Not that I'm aware of.
18　　　　Q.　How are allegations of age
19　discrimination reported to UnitedHealth?
20　　　　A.　They can be reported to the HRdirect
21　team; they can be reported through the compliance
22　and ethics line; and they can be reported to any
23　level of management, or any other leader of the
24　organization.
25　　　　Q.　Are there any other ways age

1　discrimination can be reported to UnitedHealth?
2　　　　A.　Not that I'm aware of.
3　　　　Q.　So let's talk about the HRdirect
4　line; can you tell me generally how that works?
5　　　　A.　Yes.  It is a 1-800 number that is
6　available to employees and former employees, that
7　people can contact.  And there are various areas
8　within HRdirect that an employee would possibly
9　utilize:  Payroll, benefits, recruitment, employee
10　relations.  And if it's an employee relations
11　claim, somebody will reach out to the employee who
12　reported the issue to discuss the issue and
13　document in our case system.  And depending on
14　where it goes from there, you know, possibly begin
15　an investigation.
16　　　　Q.　And can you tell me generally how
17　the anonymous ethics line works?
18　　　　A.　Yes.  Anyone can report through an
19　email or through a phone number, either
20　anonymously or not.  And they would report to
21　somebody within the compliance and ethics line.
22　　　　Q.　And would the next step after
23　someone used the anonymous ethics line be the same
24　as the HRdirect, in that it would be documented in
25　the case system and an investigation would

1　possibly be begun?
2　　　　A.　Yes, it's the same.
3　　　　Q.　Is the difference between the two,
4　it's just that one is anonymous?
5　　　　A.　Yes.  And one of them comes through
6　the compliance and ethics line.  And if it is an
7　HR concern versus what we would consider a
8　compliance issue, they will pass the case on to
9　our team --
10　　　　Q.　Okay.
11　　　　A.　-- to begin that same process.
12　　　　Q.　And when you say our team, what do
13　you mean?
14　　　　A.　Employee relations.
15　　　　Q.　And what does employee relations do?
16　　　　A.　Employee relations is responsible
17　for speaking with employees on employee
18　complaints, speaking with managers with relation
19　to concerns about employees, responsible for
20　investigating or facilitating investigations into
21　employee complaints.  We're also responsible for
22　facilitating internal dispute resolutions.
23　　　　Q.　In your particular office, how
24　many -- just approximately how many people are on
25　the employee relations?  Is it a department?

1    **A.   Yes.**

2    Q.   How many -- presently how many

3    people are in the employee relations department?

4    **A.   70.**

10:12:07 5    Q.   And are these employees all in one

6    geographic office?

7    **A.   No.**

8    Q.   So is that -- is the approximately

9    70 people, is that throughout the entirety of the

10:12:28 10    UnitedHealth Group?

11    **A.   Actually I was speaking to the US.**

12    **There are international employee relations people**

13    **as well, so I would have to add a few onto that.**

14    **It's not nearly the same kind of number, but...**

10:12:43 15    Q.   Yeah.  So just for ease of clarity,

16    if I ask a question I will assume you're answering

17    for the United States instead of international.

18    **A.   Thank you.**

19    Q.   So how is employees relations,

10:13:06 20    what's kind of the -- how is it structured

21    internally?

22    **A.   Sure.  There are employee relations**

23    **analysts which handle more basic cases, or policy**

24    **questions.  There are senior employee relations**

10:13:28 25    **analysts that handle more complex cases for**

---

1    **employees that are salary grade 28 or below.  And**

2    **there are employee relations consultants that**

3    **handle employee cases for 28 and below, also help**

4    **manage the senior employee relations analyst.**

10:13:52 5    There are employee relation case

6    managers who handle complex cases, and cases

7    related to employees of grade 29 and above.

8    And then we have our leadership team

9    that manage the case managers and the senior

10:14:14 10    employee relations analysts.  We also have an area

11    for compliance; that's in employee relations but

12    separate.

13    Q.   And can you remind me, what is your

14    current job title?

10:14:32 15    **A.   I'm an employee relations case**

16    **manager.**

17    Q.   And what are the main

18    responsibilities in that role?

19    **A.   Employee relations case managers**

10:14:50 20    **work on cases about employees grade 29 and above.**

21    **We work on downsizing cases as well.  And that's**

22    **mainly the administration of that.  We work with**

23    **employee complaints of discrimination, harassment,**

24    **or otherwise.  We perform trainings and provide**

10:15:29 25    **counsel to managers and employees across the**

---

1    organization.

2    Q.   Have you provided training to

3    managers on UnitedHealth's age discrimination

4    policy?

10:15:58 5    MS. JEZIERSKI:  Objection as to

6    form.  Are you asking her as a 30(b)(6) witness or

7    personal?  Sounded personal.

8    MS. DENNIS:  I think it is covered

9    under either.

10:16:12 10    THE WITNESS:  No.

11    BY MS. DENNIS:

12    Q.   So has UnitedHealth Group, as a

13    company, provided training to UnitedHealth

14    managers on age discrimination?

10:16:37 15    **A.   Yes.**

16    Q.   What is that?  Is that training

17    separate from other types of antidiscrimination

18    training?

19    **A.   No.**

10:16:44 20    Q.   Can you describe generally the type

21    of training provided to managers on

22    antidiscrimination policies?

23    **A.   Sure.  We have a learned source tool**

24    **which is an electronic Just-In Time based**

10:16:59 25    **training, which managers are responsible for**

---

1    **taking; that goes through expectations of**

2    **leadership, including, you know, understanding of**

3    **our discrimination policies as well as other**

4    **policies.**

10:17:16 5    In addition, we have a yearly code

6    of conduct attestation for all employees that

7    discusses this subject matter.

8    Q.   Can you tell me more about that code

9    of context [sic] attestation?

10:17:36 10    **A.   Yes, it is a computer-based**

11    **attestation, and it goes through our policies, our**

12    **code of conduct, including discrimination topics,**

13    **and we are then required to take a little quiz at**

14    **the end to make sure that we are understanding the**

10:17:54 15    **topics.  And once we have completed the training**

16    **we will receive a -- we'll attest that we**

17    **understand, and that happens on a yearly basis.**

18    Q.   So I just want to go back to talking

19    about your role as an employee relations case

10:18:37 20    manager.  Can you walk me through what course

21    of action would happen after an employee made a

22    claim of age discrimination?

23    **A.   Yes.  There are two separate**

24    **processes.  If they contact the HRdirect number to**

10:19:36 25    **file a complaint, employee relations will reach**

---

1    out, after speaking with the employee, reach out
2    to the appropriate level of Human Capital or
3    leadership to discuss the concern and to ask them
4    to investigate the allegations, while we provide
10:20:00    5    them with guidance, facilitation of questions, and
6    discussion of resolution.
7        The second process is what's called
8    the internal dispute resolution process, which
9    typically is filed as a result of an action. An
10:20:10    10    employee has a choice to file an internal dispute
11    resolution, and in that particular process, we
12    reach out to the third level manager if the
13    employee is disputing a determination.
14        Q.    What do you mean by third level
10:20:39    15    manager?
16        A.    The employee's manager's manager's
17    manager. And if that person was not involved in
18    the action taken that the employee is disputing,
19    such as a termination, where they've also brought
10:20:55    20    in an age discrimination or other type of claim,
21    we will reach out to try to locate a neutral
22    party.
23        We also help that party through the
24    process of the internal dispute resolution serving
10:21:17    25    as a neutral party between employee and manager,

1    or human capital member if we're not able to find
2    a manager that has not been involved in the
3    decision.
4        Q.    And both of these tracks require an
10:21:47    5    investigator? Let me rephrase that.
6        Do either of these tracks require an
7    investigation of the discrimination claim?
8        A.    Depending on what the employee has
9    alleged. If they have provided any type of
10:22:04    10    information to help to contribute to their claim
11    of age discrimination, yes, they both require an
12    investigation. But the internal dispute
13    resolution process, regardless, requires an
14    investigation.
10:22:22    15        Q.    Is there a specific procedure that
16    UnitedHealth follows when investigating these
17    claims?
18        A.    Yes.
19        Q.    Could you describe that in general
10:22:42    20    terms for me.
21        A.    Yes. Employee relations will reach
22    out to the appropriate leader, we will discuss the
23    concern with the leader, and ask the leader to
24    speak with certain individuals to try to determine
10:22:59    25    if there's any validity to the claim.

1        Q.    Can I ask a quick question. When
2    you say an appropriate leader, what do you mean by
3    that?
4        A.    A leader that is not involved in the
10:23:14    5    complaint.
6        Q.    So does that mean -- sorry, I will
7    let you finish.
8        A.    A neutral -- a leader that is in a
9    neutral position, so not involved in any of the
10:23:26    10    accusations, and/or any part of the employee's
11    complaint.
12        Q.    So, you said employee relations
13    reaches out to an appropriate leader to discuss
14    with the leader the allegations; is that right?
10:23:45    15        A.    Yes.
16        Q.    And what happens next?
17        A.    We have the leader investigate the
18    claims by either speaking with witnesses, if that
19    is part of the claim, or reviewing anything that
10:24:02    20    has been brought forward as support to the claim.
21    And we also have the leader speak with the accused
22    individual and try to understand what can be
23    substantiated of the employee's claims.
24        Q.    And when you say leader, would you
10:24:27    25    speak to witnesses if they're a specific category

1    of witnesses that the procedure requires them to
2    reach out to?
3        MS. JEZIERSKI: Object to form.
4        MS. DENNIS: You can answer if you
5    understand the question.
6        THE WITNESS: No, because the
7    employee would typically provide the witnesses, or
8    at least state that there are witnesses, and that
9    is the situation in which they would speak with
10:24:54    10    witnesses.
11    BY MS. DENNIS:
12        Q.    So it depends on the
13    circumstances --
14        A.    Yes.
10:24:56    15        Q.    -- of the allegations?
16        A.    Yes.
17        Q.    And when the leader is reaching out
18    to the witnesses, is it done in person?
19        A.    It depends. We have a large
10:25:23    20    telecommuting population, so if that's the case,
21    then no, it would be on the telephone. If they
22    are in the same location, then yes, they will
23    typically speak with the witnesses on-site.
24        Q.    Is there a circumstance where a
10:25:49    25    leader would rely on one witness to provide --

1 sorry, I will start that question again.

2 Would there be any circumstances in

3 which a leader would request that one witness

4 gather information from another witness?

10:26:16 5 A. Yes. If a witness is a leader,

6 another leader -- if the witness is another

7 leader, they may have that leader ask their direct

8 reports to provide information, if appropriate.

9 Q. Okay. Would the accused individual

10:26:34 10 be asked to provide witness testimony on behalf of

11 anyone else other than themselves?

12 MS. JEZIERSKI: Objection; form.

13 MS. DENNIS: Do you understand the

14 question?

10:26:51 15 THE WITNESS: Can you repeat it,

16 please.

17 MS. DENNIS: Sure.

18 BY MS. DENNIS:

19 Q. Would there be a circumstance where

10:26:58 20 the person being accused of discrimination would

21 be asked to provide testimony on behalf of another

22 witness?

23 A. There may be. Um, I can't think of

24 examples right now, but I definitely think there

10:27:22 25 are situations, because so many situations depend

1 on the details, that there's definitely a

2 possibility that that -- an accused individual can

3 also be a witness in other allegations, or that it

4 would require them to provide information from

10:27:41 5 other people.

6 Q. Okay. Would witnesses that a leader

7 talked to have the option of providing their

8 feedback anonymously?

9 A. No.

10:28:03 10 Q. So would the accused individual know

11 the substance of what the testimony was that the

12 witnesses provided?

13 A. I'm sorry, I'm not sure if I am

14 understanding.

10:28:18 15 Q. Sorry, I can rephrase that.

16 Would the accused individual be

17 aware of the statements other witnesses were

18 making regarding the reported age discrimination?

19 A. Typically, no. So if we're speaking

10:28:39 20 of age discrimination, and the accused is accused

21 of age discrimination, and we're asking if that

22 accused individual would collect information about

23 age discrimination from themselves, collect the

24 information from other witnesses, typically that

10:29:02 25 is not part of the process, and therefore there

1 would not be information disclosed to the accused

2 individual.

3 Q. Is there a reason why that would be

4 kept separately from the accused individual?

10:29:23 5 A. Well, the accused individual

6 wouldn't have any reason to know about the witness

7 conversations if there's an investigation into the

8 an accused individual's -- into something that the

9 accused individual has allegedly done, especially

10:29:41 10 if it relates to a particular specific claim of

11 discrimination.

12 Q. Is this process set up in a way to

13 prevent retaliation from the accused individual on

14 anyone who would provide testimony?

10:30:02 15 A. Absolutely.

16 Q. How is it set up to achieve that?

17 A. Well, as I stated, they're typically

18 not aware of who's provided the information as it

19 relates to an age discrimination claim or

10:30:18 20 something similar. They are typically not

21 involved in the investigation related to an

22 accusation made of themselves, or about

23 themselves. And they're also a non-retaliation

24 policy and information provided to all witnesses

10:30:35 25 at the time of speaking with them that retaliation

1 is prohibited, and what to do if they feel like

2 they have been retaliated against for being part

3 of the process.

4 Q. Okay. Is that it?

10:30:47 5 A. Yes.

6 Q. Okay. Besides speaking to

7 witnesses, does the leader investigating a claim

8 do anything else as part of the investigation?

9 A. They speak with the accused

10:31:13 10 individual, and if there are witnesses, again, but

11 if they're not witnesses, then they would not be

12 speaking with witnesses. And they would at times,

13 depending on if it is the internal dispute

14 resolution process, or the complaint process I

10:31:31 15 mentioned earlier, they may speak with the

16 complainant.

17 Q. Would the leader look at any

18 specific documents as part of this investigative

19 process?

10:31:45 20 A. If there were documents related to

21 age discrimination, they may look at those

22 documents.

23 Q. How does a leader -- how would they

24 determine whether or not there would be documents

10:32:02 25 related to age discrimination?

1      A.   Well, the employee, the complainant,
2 would possibly indicate that there were particular
3 documents related to age discrimination. And if
4 so they would review those documents.

5      Q.   Generally what type of evidence
6 would be enough to substantiate a claim of age
7 discrimination in this investigative process?

8      MS. JEZIERSKI: Objection; form.

9      THE WITNESS: If there is -- sorry,
10 could you repeat the question, please.

11      MS. DENNIS: Sure.

12 BY MS. DENNIS:

13      Q.   What type of evidence in this
14 investigative process would be enough to
15 substantiate a claim of age discrimination?

16      A.   It's highly dependent on what the
17 complainant has reported at the beginning of
18 evidence. So, for example, if a complainant has
19 indicated that they were discriminated against as
20 a part of a conversation between another
21 individual, and that other individual denies the
22 claim, then we would consider that to be
23 unsubstantiated. If the individual admits to the
24 claim, they -- we would consider it to be
25 substantiated.

1      Q.   Are there any other ways a claim of
2 age discrimination could be substantiated?

3      A.   Yes. If there were witnesses that
4 supported the claim, that would be a way to
5 substantiate that there was a particular -- that
6 there might have been something inappropriate,
7 whether it be age discrimination or otherwise.

8      Q.   And in the scenario where it
9 involved one individual's words against the other,
10 as part of the investigative process, would a
11 leader seek out other witnesses on their own?

12      A.   That's highly dependent on the
13 situation. If it was a conversation between two
14 individuals, they would not seek out other
15 witnesses to ask about a conversation they were
16 not aware of, or that they may or may not have
17 known about.

18      Q.   If a discrimination allegation was
19 based on more than a conversation, would the
20 leader do further investigation beyond -- sorry,
21 let me figure out a way to rephrase that.

22      So if a claim of age discrimination
23 involved something other than a single
24 conversation -- sorry, that's not a better way to
25 say it either.

1      If an allegation was about a pattern
2 of age discrimination, beyond a one-on-one
3 conversation, would the investigator speak to
4 other witnesses?

5      MS. JEZIERSKI: Objection; form.

6      THE WITNESS: If there were --

7      MS. DENNIS: I can try to figure out
8 a better way to phrase that.

9      THE WITNESS: Thank you.

10 BY MS. DENNIS:

11      Q.   Would it be accurate to say that
12 sometimes age discrimination allegations involve
13 more than a one-on-one conversation involving age
14 discrimination?

15      A.   They definitely could.

16      Q.   Do some age discrimination claims
17 involve kind of a pattern or practice of age
18 discrimination?

19      A.   Yes, they definitely could.

20      Q.   Do some age discrimination claims
21 involve -- sorry, do some age discrimination
22 claims --

23      If an age discrimination claim
24 alleged a pattern of age discrimination, would a
25 leader investigating that claim seek out

1 additional witnesses besides the accused?

2      A.   Only if that individual gave more
3 context to the pattern they're alleging occurred.
4 Simply indicating there's a pattern but with no
5 information to know what to look for, would not
6 necessarily be -- would not necessarily require
7 the investigator to reach out to random witnesses.

8      Q.   So if the person making an
9 allegation of age discrimination pointed to
10 something specific, that would generally be
11 investigated?

12      A.   Yes.

13      Q.   Is there any type of evidence in an
14 investigation that would definitively rule out age
15 discrimination?

16      MS. JEZIERSKI: Objection; form.

17      THE WITNESS: Not -- I'm not sure.

18 BY MS. DENNIS:

19      Q.   So there would not be one specific
20 type of evidence that you would look -- that an
21 investigator would look to and rely on that to
22 determine there was age discrimination; is that
23 right?

24      A.   I need just a minute to try to
25 process what hypothetical -- sorry, could you just

1  repeat the question one more time for me, please.
2  　　　　MS. DENNIS:  Sure.  Could you read
3  back the question.
4  　　　　(Requested portion of testimony was read
5  　　by the court reporter.)
6  　　　　THE WITNESS:  Well, if the accused
7  individual admitted to discriminating against
8  somebody based on their age, then that would
9  definitely be something that they could look to to
10:40:55 10  substantiate that there had been age
11  discrimination.
12  　　　　MS. DENNIS:  I think there was a
13  slight transcription error, at least to how I
14  understand I asked the question, was if there's a
10:41:06 15  specific type of information that would
16  definitively rule out age discrimination in an
17  investigation.
18  　　　　THE WITNESS:  Not that I'm aware of.
19  BY MS. DENNIS:
10:41:21 20  　　Q.　Okay.  It's all case specific?
21  　　A.　Yes.
22  　　Q.　Does a leader performing an
23  investigation rely on an employee's performance
24  reviews to determine whether a claim of age
10:41:47 25  discrimination would have merit?

1  　　A.　It depends on if they're associating
2  an action as a result of age discrimination.  And
3  if they are, they would investigate that act or
4  action taken, and if that is related to their
10:42:11 5  performance, they would definitely review their
6  performance reviews and try to understand that
7  action that's being associated by the complainant
8  as part of an age discrimination claim.
9  　　Q.　I see.  Does the weight of that
10:42:37 10  performance review -- does the weight in the
11  investigation of that performance review change if
12  the person who wrote the review is the person
13  accused of age discrimination?
14  　　A.　Could you repeat the question,
10:42:59 15  please.
16  　　　　MS. DENNIS:  Could you read that
17  back, please.
18  　　　　(Requested portion of testimony was read
19  　　by the court reporter.)
10:43:18 20  　　　　THE WITNESS:  No.
21  BY MS. DENNIS:
22  　　Q.　Does an investigator do anything to
23  independently substantiate the accuracy of a
24  performance review?
10:43:36 25  　　A.　Yes.

1  　　Q.　What do they do?
2  　　A.　If appropriate, it may not be
3  appropriate in all cases, but if appropriate they
4  may review colleague feedback submitted as part of
10:43:48 5  that review.  They may review previous reviews
6  submitted by previous managers that are not part
7  of that accusation.
8  　　　　They may, depending on the
9  situation, speak with other individuals.  And they
10:44:05 10  may review or speak with individuals about any
11  particular action that the employee is claiming is
12  part of the age discrimination complaint.
13  　　Q.　Does an investigator -- would there
14  be a circumstances in which an investigator would
10:44:41 15  look at any of the work performed by an employee
16  directly?
17  　　A.　In the internal dispute resolution
18  process, it is not typically the responsibility of
19  the investigator at that point to review each
10:44:55 20  individual assignment.  It is to make a
21  determination of whether the action the employee
22  is disputing, for example, termination, was an
23  appropriate and warranted decision.
24  　　Q.　Would there be any circumstances
10:45:23 25  where an investigator would look at the work

1  performed by an employee directly as part of an
2  investigation?
3  　　A.　Because there's such a wide variety
4  of allegations and types of allegations, it's
10:45:45 5  difficult to say no to any kind of question like
6  that, so I guess I can't say no.  But it is not
7  typical as part of the internal dispute resolution
8  process for the investigator to get into the
9  minutiae of the particular projects of the
10:46:01 10  employee.
11  　　Q.　I see.  Is the investigative process
12  any different for a current employee bringing age
13  discrimination claim compared to an employee who
14  has been terminated?
10:46:32 15  　　A.　No.
16  　　Q.　So either way the claim would be
17  investigated just as thoroughly?
18  　　A.　Yes.
19  　　Q.　Are there certain documents that
10:46:46 20  would have been available -- are there certain
21  documents that would have been available in an
22  investigation for a current employee that would no
23  longer be available if the employee bringing the
24  claim had been terminated?
10:47:09 25  　　　　MS. JEZIERSKI:  Objection; form.

1  THE WITNESS:  Not that I'm aware of.
2  BY MS. DENNIS:
3  Q.  For example, let me clarify that
4  question.  When an employee is terminated --
10:47:40  5  sorry, strike that.
6  In an investigation for a current
7  employee who brings a claim of age discrimination,
8  could that employee provide notes about the
9  alleged age discrimination that they put onto
10:48:14  10  their work computer?
11  A.  Yes.
12  Q.  And for an employee who has been
13  terminated that is alleging age discrimination,
14  would those documents on their previous work
10:48:42  15  computer also be available as part of the
16  investigation?
17  MS. JEZIERSKI:  Objection; form.
18  THE WITNESS:  Typically, no.
19  BY MS. DENNIS:
10:48:53  20  Q.  Why is that?
21  A.  **Because the computer is typically**
22  **wiped when an employee is no longer employed in**
23  **order to repurpose the computer.**
24  Q.  So there would be no backup for the
10:49:22  25  documents contained on an employee's work

1  computer?
2  A.  **If it is -- if we're talking about**
3  **something on a hard drive, then, no, there's not a**
4  **backup that I'm on aware of.  I'm not a technology**
10:49:39  5  **person, so I can't say with 100 percent certainty**
6  **to my knowledge that there's any type of access to**
7  **any backup documents.**
8  Q.  Okay.  So if a current employee
9  claims that they are being discriminated against
10:49:59  10  by a supervisor due to my age, and after an
11  investigation UnitedHealth concludes there was no
12  age discrimination, what would happen after that?
13  A.  **In the case of an internal dispute**
14  **resolution, the employee would receive a response**
10:50:19  15  **in writing indicating the findings of the -- the**
16  **allegations made.**
17  Q.  Is that it?
18  A.  Yes.
19  Q.  Typically would -- sorry.
10:50:46  20  After UnitedHealth found that there
21  was no age discrimination, would that employee
22  remain under the same supervisor typically?
23  MS. JEZIERSKI:  Objection; form.
24  THE WITNESS:  Typically, yes.  If
10:51:07  25  they were a current employee, of course.

1  BY MS. DENNIS:
2  Q.  What would happen if a claim of age
3  discrimination by a current employee is
4  substantiated?
10:51:37  5  A.  **If we substantiated that there was**
6  **age discrimination, there would be typically some**
7  **disciplinary action taken on the accused.**
8  Q.  What does that mean?
9  A.  **Depending on the severity of the**
10:51:51  10  **situation, it could possibly lead to termination.**
11  **For a less egregious substantiated allegation, it**
12  **might result in a final warning.**
13  MS. JEZIERSKI:  Is this a good time
14  to take a break?
10:52:17  15  MS. DENNIS:  Sure.
16  (Short break.)
17  MS. DENNIS:  Let's go back on the
18  record.
19  BY MS. DENNIS:
11:01:25  20  Q.  So I think before we went off the
21  record we were talking about what would happen to
22  a person accused of age discrimination if that
23  claim was substantiated.  And let me know if this
24  is correct.  If it was substantiated it could lead
11:01:52  25  to -- possibly lead to termination, or if it was

1  less egregious could result in a final Corrective
2  Action Form; is that right?
3  A.  Yes.
4  Q.  In the last four years have any
11:02:28  5  claims of age discrimination -- let me strike
6  that.
7  Is the scenario you discussed about
8  if the person accused of age discrimination was
9  found to have engaged -- sorry, I'm not making
11:03:10  10  sense there.
11  In the last four years at
12  UnitedHealth, has any claim of age discrimination
13  been substantiated?
14  MS. JEZIERSKI:  Objection.  That's
11:03:29  15  beyond the scope of the topics listed.
16  MS. DENNIS:  Okay.
17  BY MS. DENNIS:
18  Q.  Do you know?
19  A.  **I can't speak to that specifically.**
11:03:43  20  Q.  So is that -- I understand your
21  counsel has objected to it being outside of the
22  deposition topics, but you can still answer if you
23  know.
24  A.  **I do not know.**
25  Q.  Okay.  You don't know.
11:04:05

1         Do you know if UnitedHealth's
2 antidiscrimination policy has changed or been
3 revised since 2016?
4       **A.**   **I do not believe there's been any**
5 **material changes to the policy. It is possible**
6 **that they have made graphic updates to, you know,**
7 **the intranet policy. But there's no material**
8 **change to the policy.**
9       **Q.**   Who makes -- when there are changes
10 to make, who is responsible for updating or
11 advising the anti-age discrimination policy?
12       **A.**   **There are various people involved in**
13 **updating any type of policy. So employee**
14 **relations is responsible for owning policy for the**
15 **organization.**
16       But there are people in the HR
17 analytic department that would be responsible for
18 posting it. There would be people in the employee
19 relations compliance department to make sure that
20 it's in compliance with any state or federal laws
21 that it might intersect with. And so there are
22 various parties. But typically the majority are
23 employee relations personnel.
24       **Q.**   So there would be no changes in the
25 last few years that would affect how

1 investigations are conducted --
2       **A.**   **No.**
3       **Q.**   -- is that right?
4       So I would like to switch gears a
5 little bit and talk about performance reviews at
6 UnitedHealth.
7       Does UnitedHealth have a policy
8 related to employee performance reviews?
9       **A.**   **There's not a policy. There is a**
10 **procedure with procedure documents out there, but**
11 **I'm not aware of an official policy.**
12       **Q.**   So would these procedure documents
13 you referred to be a part of an employee handbook?
14       **A.**   **Yes.**
15       **Q.**   Would they be reflected anywhere
16 else?
17       **A.**   **Well, our employee handbook is on**
18 **our company intranet site, and that's where they**
19 **would be reflected. They're also reflected in the**
20 **people soft tool that we have available, where the**
21 **actual reviews are completed. There's documents**
22 **for employees and managers.**
23       **Q.**   Can you give me kind of a general
24 overview of what that procedure for performance
25 reviews entail?

1       **A.**   **Yes. There are performance reviews**
2 **that are what's considered a common review, which**
3 **is a proactive review given yearly regardless of**
4 **performance deficiencies. And that procedure**
5 **involves typically the employee being asked for a**
6 **self-evaluation, the manager collecting colleague**
7 **feedback, and the manager providing their**
8 **assessment based on their consideration of those**
9 **things as well as their own knowledge and**
10 **information to produce their common review.**
11       **For the second type of review, it's**
12 **what's called an interim review, and we consider**
13 **interim reviews to be both proactive and reactive,**
14 **meaning they can be done just dictated by the**
15 **business, the part of the business requires**
16 **perhaps. But more commonly they're done when**
17 **there are concerns with performance that need to**
18 **be addressed.**
19       And in that process there are -- the
20 only requirement in that process, is to have the
21 manager complete the interim review. But a
22 typical part of that process would also be to
23 collect colleague feedback to assist the manager
24 in making the proper assessment.
25       **Q.**   And when you say collect colleague

1 feedback, is that -- is that done informally by
2 the manager?
3       **A.**   **It can be. Typically it is done in**
4 **the system. They send a request through the**
5 **people's soft tool for a person to complete a**
6 **colleague review.**
7       **Q.**   And you said that's part of the
8 common review process as well?
9       **A.**   **Yes.**
10       **Q.**   So is that, reaching out for
11 colleague feedback, is that a requirement for
12 these reviews -- for the common review?
13       **A.**   **No.**
14       **Q.**   So is that done at the discretion of
15 the manager?
16       **A.**   **Yes.**
17       **Q.**   If the manager does seek out
18 colleague feedback for an employee's review, does
19 the manager select the colleagues to provide
20 feedback on that employee's performance?
21       **A.**   **It depends. Some managers ask the**
22 **employee to provide names that they can request**
23 **feedback from, and some managers will request**
24 **feedback from everyone on the team depending on**
25 **how large the team is. And some will request**

1  feedback from those that interact regularly with
2  the individual, so that would have the most
3  information on the individual's performance.
4      Q.    Okay.  So it's discretionary?
11:10:50 5      A.    Yes.
6      Q.    And you said there's common review
7  and the interim review, are there other types of
8  performance reviews?
9      A.    No.
11:11:11 10      Q.    For the colleague feedback, would
11  they be -- well, I'll back up.
12          Is there a standard form used for
13  common reviews?
14      A.    Yes.
11:11:34 15      Q.    When colleagues are asked to provide
16  feedback on an employee, is that feedback -- does
17  it track the form with the common review format?
18      A.    Yes.
19      Q.    So the colleagues are asked to
11:12:11 20  provide feedback on the same criteria that are
21  present in the common review; is that right?
22      A.    No.
23      Q.    Okay.  How is it different?
24      A.    There are questions for colleague
11:12:22 25  feedback to, first of all, identify the

1  relationship between the colleague and the person
2  they're getting feedback on.  And then the request
3  is for -- to determine -- the request is what
4  could they do better, what are they doing well.
11:12:39 5          So in essence, that's not a quote,
6  but it is the -- so there's approximately four
7  questions that are asked.  So it is not the same
8  format.
9      Q.    Okay.  And are those colleague
11:12:52 10  reviews used for any other purposes other than
11  informing the, either the common review or the
12  interim review?
13      A.    Not -- not as I am understanding the
14  question.  So no, I don't think so.
11:13:18 15      Q.    For the colleague feedback on common
16  reviews and interim reviews, would a person -- the
17  employee being evaluated be provided with their
18  colleagues' feedback?
19      A.    They may in general be provided with
11:13:49 20  some information.  But they're not provided with
21  the actual review -- colleague reviews themselves,
22  and they're not necessarily given -- and typically
23  given the identity of the person giving the
24  feedback.
11:14:02 25          So the manager may give a sentence

1  or two during the review to assist with
2  performance conversations, but there's no specific
3  identifying information provided.
4      Q.    Okay.  But the -- is it correct that
11:14:18 5  the manager can identify who -- which colleagues
6  provided what feedback?
7      A.    Yes.
8      Q.    What is a Corrective Action Form?
9      A.    A corrective action plan actually is
11:14:47 10  what we refer to it as, and it is what other
11  organizations may call a write-up or some sort of
12  document to document that there is a concern,
13  whether it be for performance, inappropriate
14  behavior, policy violation, something like that.
11:15:09 15  So it is a document utilized to address a
16  performance or behavioral conduct issue.
17      Q.    And are there -- is there a
18  particular policy at UnitedHealth that governs how
19  these corrective action plans are used?
11:15:40 20      A.    There's not a policy.  There is a
21  procedure.
22      Q.    And is this procedure similar to the
23  performance review procedure?
24      A.    No.
11:16:00 25      Q.    Okay.  I'll back up.  Is there --

1  would this procedure be documented in any
2  UnitedHealth documents?
3      A.    There are UnitedHealth Group
4  documents that have information on the corrective
11:16:19 5  action process, yes.
6      Q.    What would those documents be?
7      A.    In the employee intranet site there
8  are -- there's a document for managers that is for
9  corrective action guidance.  There are corrective
11:16:45 10  action plan examples to assist the manager in how
11  to write one, and there's also documents to help
12  them in the system to create the actual form
13  itself.
14      Q.    Is there a procedure for an employee
11:17:24 15  to dispute the substance of a corrective action
16  plan?
17      A.    Yes.
18      Q.    And what is that procedure?
19      A.    The internal dispute resolution
11:17:37 20  procedure.
21      Q.    Can you explain to me how that -- if
22  an employee took -- was just disputing the
23  substance of a corrective action plan, how they
24  would initiate the internal dispute resolution
11:18:07 25  process?

1       A.    The first step to dispute a
2 corrective action would be to enter employee
3 comments, if they choose to go through the
4 internal dispute resolution process. They can
5 enter comments regardless; but part of the process
6 is to have them enter comments and speak with
7 their manager about those comments.
8       Q.    What would the next step be in the
9 IDR process?
10      A.    The employee would -- if they're not
11 able to get resolution from the manager's
12 conversation about their comments, then they would
13 submit what's called an internal dispute
14 resolution form to employee relations indicating
15 what they're disputing, why.
16      Q.    So if an employee didn't submit the
17 IDR form and they just disputed a corrective
18 action plan through their comments, the IDR
19 process wouldn't be initiated?
20      A.    No.
21      Q.    So it requires the employee to
22 affirmatively reach out to the --
23      A.    Yes.
24      Q.    So are there various levels within
25 the corrective action plan framework?

JOLYNN GRAHAM REPORTING

1       A.    Yes.
2      Q.    Can you explain to me about those?
3      A.    There is an initial level, what's
4 called an elevated level, and what's called a
5 final level. They are not required to be
6 progressive, or there's no particular level that a
7 manager is required to use.
8          The initial level is for maybe a
9 first -- typically can be used for a first time
10 corrective action for a kind of less egregious
11 violation, or a performance concern that's not
12 been documented through the corrective action
13 process.
14          The elevated could also be used for
15 similar reasons, but may be considered to be more
16 of a serious performance issue, or a more serious
17 violation of policy or behavior. But it's at the
18 manager's discretion.
19          And then the final level would be
20 considered the level used for the most severe
21 of -- performance issues that have been either
22 previously documented or extremely egregious, and
23 also egregious policy violations or inappropriate
24 behavior.
25      Q.    And for the final level of a

JOLYNN GRAHAM REPORTING

1 corrective action plan, at that point, typically,
2 is that -- is the final corrective action plan
3 filed immediately prior to termination typically?
4      A.    No. Typically it is filed -- well,
5 I guess I'm not sure what immediately means. But
6 typically the final level is issued, and then the
7 employee would be terminated should they continue
8 to have an issue.
9      Q.    So generally there is still an
10 opportunity for an employee to correct --
11      A.    Yes.
12      Q.    -- their behavior or performance?
13          Is there any circumstance in which an
14 employee would not be able to provide their own
15 comments or feedback on a corrective action plan?
16      A.    Not that I am aware of. Once the
17 corrective action is submitted, the employee gets
18 an email notifying them that there is a corrective
19 action, and they can provide comments if they
20 choose to.
21      Q.    Just going back to the performance
22 reviews for a moment. We've discussed the common
23 review and the interim review. Would there be any
24 reason why a performance review would be submitted
25 after an employee was terminated?

JOLYNN GRAHAM REPORTING

1       A.    Timing, typically. The performance
2 review process is a little extensive, so managers
3 start completing them in the fall. And typically,
4 then, they're making decisions on -- financial
5 decisions, following that. So it's kind of this
6 long process, so it is possible that an employee
7 could be terminated in between those timeframes
8 and that the corrective action would be in the
9 system.
10      Q.    Sorry, I'm not talking about the
11 corrective action plan.
12      A.    Sorry about that.
13      Q.    The common review.
14      A.    Yes. The common review would be in
15 the system.
16      Q.    Okay. I'd like to shift gears again
17 and talk more generally about UnitedHealth's
18 employee handbook and other policies.
19          You said before that UnitedHealth
20 has an employee handbook available on its intranet
21 site, correct?
22      A.    Yes. It's -- we call it -- the
23 intranet essentially -- the policy area of our
24 intranet is the handbook.
25      Q.    So what other policies are included

JOLYNN GRAHAM REPORTING

1   on the intranet?
2        A.   There's an attendance policy,
3   there's a policy on -- there's a code of conduct.
4   There's a policy on personal conduct.  There's a
5   policy on workplace violence.  And there's a
6   policy on harassment, retaliation.  So there's a
7   non-retaliation policy, harassment policy.  There
8   are a lot of policies.  So I can keep going.  Do
9   you want me to keep going?  I can if you want.
10       Q.   I think that's fine.
11       A.   Okay.
12       Q.   Besides the corrective action plan
13  procedures, does UnitedHealth have other policies
14  governing termination of employees?
15       A.   There's a -- there are various
16  policies that address things that could result in
17  termination.  So, for example, the attendance
18  policy, within that attendance policy it talks
19  about how many unplanned absences might result in
20  a termination, so...
21            And then there's also a document in
22  our intranet site that I wouldn't consider a
23  policy, but it talks about employee termination.
24  Primarily how to enter it, what to do if it's an
25  involuntary situation, who to call, things like

1   that.
2        Q.   And could you walk me through the
3   process of what would happen if a supervisor
4   indicated their employee hadn't met the criteria
5   for their corrective action plan, and what they
6   would do to initiate the termination procedure?
7        A.   Yes.  The manager would contact
8   employee relations through HRdirect and open a
9   case, and one of our employees would contact the
10  manager to discuss the concerns to kind of
11  understand what the manager is indicating is, you
12  know -- what the employee is not performing.  The
13  employee relations person would review all the
14  documents previously issued to the employee to
15  ensure that the employee was -- or just kind of
16  understand what the employee was being asked to do
17  and understand the history of the employee.  And
18  if they are -- they will provide a recommendation.
19  But it is the manager's discretion as to whether
20  or not they take that termination action.
21            But employee relations typically
22  will provide their recommendation on that.  And
23  then the manager will communicate the termination
24  to the employee if the decision is to terminate
25  the employee's employment.

1            And then they let employee relations
2   know the conversation had been held, and the
3   employee relations will enter the termination into
4   the system.
5        Q.   And are there any circumstances
6   after a termination in which an employee would be
7   reinstated into their position?
8        A.   Yes.
9        Q.   What would those circumstance be?
10       A.   If an employee was successful in
11  proving their internal dispute resolution case, or
12  if during that review of the internal dispute
13  resolution -- through the internal dispute
14  resolution process, it was determined that maybe
15  there weren't -- that the termination was not
16  warranted, or that a different decision could have
17  been made, there may be a recommendation to
18  reinstate the individual.
19       Q.   So you say a recommendation; who has
20  the final say on that?
21       A.   There should -- I should have said
22  decision.  The decision is with the leader that
23  reviews the internal -- that is responsible for
24  the internal dispute resolution, and they may
25  decide to reinstate the employee.

1        Q.   And in the last four years do you
2   know if UnitedHealth has reinstated an employee
3   after that employee's manager has terminated them?
4            MS. JEZIERSKI:  I am going to
5   object.  This is beyond the scope of the topics
6   listed in the 30(b)(6) Notice.
7            MS. DENNIS:  You can answer if you
8   understood the question.
9            THE WITNESS:  Yes.
10  BY MS. DENNIS:
11       Q.   And what were those circumstances?
12            MS. JEZIERSKI:  Same objection.
13            THE WITNESS:  I'm not aware of the
14  particular circumstances from a company
15  representative standpoint.  I'm aware of my own
16  cases and experiences, and I would say within the
17  last four years I do not know of any specifics.
18  However, I do know that there has been
19  reinstatements.
20  BY MS. DENNIS:
21       Q.   Okay.  Have there been any formal or
22  informal complaints regarding Sujatha
23  Duraimanickam related to age discrimination
24  excluding Frank Zhang's allegations?
25       A.   Not that I'm aware of.

1    Q.    Are there any documents you could
2  refer to that would show if there were any formal
3  or informal complaints against Ms. Duraimanickam?
4        A.    There -- there are documents that I
11:32:09  5  could internally review to see if there were
6  complaints filed with HRdirect, which --
7        Q.    Did you review those --
8        A.    Yes.
9        Q.    Sorry.  So are there any other
11:32:21 10  documents that would reflect complaints or reports
11  of age discrimination made regarding Ms.
12  Duraimanickam?
13        A.    Not that I'm aware of.  Any
14  complaints that are filed, or made I should say,
11:32:45 15  would -- should be in the HR case system unless it
16  wasn't reported.
17        Q.    Can you tell me a little bit about
18  how the HR case system works?
19        A.    Yes.  It is a database that we all
11:33:06 20  have access to.  When I say we all, I mean people
21  in HRdirect.  Employee relations has kind of a
22  heightened access, so to speak, so that we can
23  review confidential notes and such.  And within
24  that system it is documented what the employee is
11:33:20 25  complaining about, or the manager, if they're

1  contacting us about an employee.  There's
2  documentation about conversations between the
3  manager and/or employee with the employee
4  relations person, email correspondence between the
11:33:34  5  two, if necessary, not always, but if relevant or
6  if the employee relations case manager thinks that
7  it's something that should be added.
8        And it's a -- it's a system of
9  records that we have the ability to look into
11:33:50 10  history with.
11        Q.    And are those documents -- sorry.
12        Once an investigation has concluded,
13  are those documents kept in the HR case system?
14        A.    It depends.
11:34:10 15        Q.    What does it depend on?
16        A.    If we're talking about internal
17  dispute resolution, that's a process of in and of
18  itself where the leader is highly responsible and
19  contains their documents and their decision.
11:34:23 20        If it's something that we have more
21  involvement in, we as an employee relations
22  professional, we may decide to add documents in to
23  the case system if we think it's relevant to the
24  situation.  We will, you know, document the
11:34:39 25  conversation with the employee, et cetera.

1        There wouldn't be a need to document
2  any type of corrective action things because we
3  have access to that in a different system.
4        Q.    So, if a leader who is performing an
11:35:00  5  investigation for a claim of age discrimination
6  spoke with a witness, would that generally be
7  reflected in the HR system?
8        A.    If it is a regular employee
9  complaint and not an internal dispute resolution.
11:35:23 10        Q.    And for the internal dispute
11  resolution, are documents related to those kept in
12  a different system?
13        A.    There are -- the employee -- the
14  internal dispute resolution process requires that
11:35:44 15  we provide a written response to the employee, and
16  contained within that response typically it is
17  documented what was reviewed, and who was spoken
18  with.
19        Q.    Does the IDR process require any
11:36:04 20  other documents other than the written response
21  and that document, what was reviewed and who was
22  spoken to?
23        MS. JEZIERSKI:  Objection to form.
24        THE WITNESS:  The employee's
11:36:16 25  internal dispute resolution filing.  And both of

1  those items, I should mention, are contained
2  within our HR system as well, so I may have been
3  unclear on that.  So the response to the employee
4  as well as the employee's initial filing are
11:36:32  5  contained within our HR system.
6        Q.    Okay.  If a leader investigating a
7  claim of age discrimination spoke to a witness, is
8  there any requirement in the IDR process that
9  would require written notes of that -- sorry,
11:37:04 10  strike that.
11        Do you know if the documents created
12  in the IDR process are -- are kept after an
13  investigation is concluded?
14        A.    Documents such as the employee's IDR
11:37:48 15  filing and the IDR response are kept in our case
16  system.
17        Q.    Would there be any documents that
18  would be discarded after the conclusion of the IDR
19  process?
11:38:04 20        MS. JEZIERSKI:  Objection; beyond
21  the scope of the notice.
22        THE WITNESS:  Uh, I'm not sure if I
23  understand that question.
24  BY MS. DENNIS:
11:38:14 25        Q.    Are there any documents that are --

1   that are part of the IDR process that would not be
2   retained after the IDR process concluded?
3           MS. JEZIERSKI:  Same objection.
4           THE WITNESS:  The leader that is
5   investigating it may keep their records; that's
6   kind of up to them unless there's a requirement to
7   do so per legal hold.  But outside of that, they
8   may or may not retain their notes.  And so I can't
9   really speak to that because it's their
10  discretion.
11  BY MS. DENNIS:
12          Q.   Okay.  So the leader performing the
13  investigation may have the documents but you don't
14  know for sure?
15          A.   Yes.
16          MS. DENNIS:  This is a good time to
17  take a break and take a slightly longer break for
18  lunch.  We can go off the record.
19          (Lunch break.)
20          MS. DENNIS:  Back on the record.
21  BY MS. DENNIS:
22          Q.   So I would like to ask you some
23  questions regarding Frank Zhang's report of age
24  discrimination to UnitedHealth.
25          Do you know if Yufan Zhang ever made

1   a report of age discrimination to UnitedHealth?
2           A.   The internal dispute resolution was
3   the first time that I am aware that he had made a
4   claim of age discrimination.
5           Q.   Do you know if he made claims of age
6   discrimination outside of that internal dispute
7   resolution process, either before or after?
8           A.   Not outside of the process.  He
9   made -- if I remember correctly, he submitted his
10  internal dispute filing, and then after we had the
11  formal conference call between myself, Mr. Zhang
12  and Mr. Drysdale, he sent me an email with another
13  alleged comment that hadn't been brought up
14  before.
15          But prior to that, I'm not aware of
16  any complaint that he had filed with relation to
17  that at all.
18          Q.   Okay.  You said you had a formal
19  conference call with Frank and David Drysdale; is
20  that right?
21          A.   Yes.
22          Q.   And in that call did Frank raise his
23  claim of age discrimination?
24          A.   I honestly don't know if it was
25  during that call, for a few reasons:  One, I was

1   was having a difficult time understanding what was
2   being said during the call.  I know that it was
3   brought up in the initial conversations with me,
4   and I know that it was brought up in the follow-up
5   emails that he sent to us after the meeting.  But
6   my recollection of the meeting was that he
7   wasn't -- he didn't get through what he wanted to,
8   and I was having a difficult time understanding
9   exactly what was being said.  So I can't say for
10  certain.  But I guess, if I had to guess, I would
11  say yes, he probably did say something.
12          Q.   We can back up before we talk about
13  a specific call.
14          (Deposition Exhibit No. 3
15          was marked for identification.)
16  BY MS. DENNIS:
17          Q.   You've just been handed a document
18  marked Exhibit 3; do you recognize this document?
19          A.   Yes.
20          Q.   What is this document?
21          A.   This is an internal dispute
22  resolution filing from Yufan Zhang.
23          Q.   And was this the first filing for
24  the internal dispute resolution process filed by
25  Mr. Zhang?

1           A.   Yes.
2           Q.   And do you know what this dispute
3   resolution appeal form -- sorry, let me back up.
4           At the top of this document it's
5   marked Internal Dispute Resolution Appeal Form; is
6   that correct?
7           A.   Yes.
8           Q.   What is this form appealing?
9           A.   This form is appealing his
10  termination.
11          Q.   And what specific facts do you
12  understand this Internal Dispute Resolution Appeal
13  Form to be disputing?
14          MS. JEZIERSKI:  Objection; form.
15          THE WITNESS:  As I understand it,
16  Mr. Zhang, through this form, was disputing the
17  reasons for his termination, indicating he did not
18  have the performance issues that were reported in
19  his corrective actions that preceded his
20  termination.  And he provided responses to the
21  items that were within that corrective action
22  plan, and talked about specific projects that he
23  had performed in and why they -- he shouldn't have
24  been held accountable for them.
25  BY MS. DENNIS:

1     **Q.**   So when Frank filed this form, who
2  was the first person to see it?
3     **A.**   Well, technically it would have been
4  whoever receives our faxes and attaches them to
12:45:29  5  the cases. And then it would have been seen,
6  just -- not reviewed, but seen quickly by the
7  person who assigns cases to us. So those would be
8  the first two people and then myself would have
9  been the third.
12:45:43  10     **Q.**   Do you know who else would have seen
11  this particular form?
12     **A.**   In this case the third level manager
13  was first contacted, which is our process, to hear
14  his IDR, and so he did get a copy of this. I
12:46:05  15  assume he reviewed it, but I don't know if he did.
16     **Q.**   Did anyone else see this form?
17     **A.**   And then David Drysdale received a
18  copy of this form.
19     **Q.**   And who is David Drysdale?
12:46:25  20     **A.**   He is the vice-president of Optum
21  Human Capital, and he was chosen to hear
22  Mr. Zhang's IDR.
23     **Q.**   Who chose him to hear?
24     **A.**   I did.
12:46:42  25     **Q.**   Did Mr. Drysdale have any personal

1  or professional connection to Mr. Zhang other than
2  working -- also working at Optum?
3     **A.**   He did not.
4     **Q.**   Okay. So is that everyone who would
12:47:04  5  have received a copy of this particular form?
6     **A.**   I'm just thinking to make sure. So,
7  there's a person that would have been -- oh,
8  there's a person that peer reviewed the internal
9  dispute resolution response, and as part of that
12:47:30  10  we supply them with the filing so they know what
11  the response should be speaking to. That would
12  have been somebody in employee relations on my
13  team.
14       And then our employment attorney
12:47:42  15  also received a copy of this at the time of the
16  response being reviewed for the same reason.
17     **Q.**   And so you said peer reviewed; is
18  that right?
19     **A.**   Yes.
12:47:56  20     **Q.**   And that's just to make sure it --
21  everything is -- sorry, can you just explain that
22  one more time so I'm clear.
23     **A.**   Sure. It's just to make sure, and
24  it's more of a glance at this, and then make sure
12:48:13  25  that the response doesn't have any typos or

1  grammatical errors, and make sure that it at least
2  speaks to the primary issues that the employee
3  raised in the -- in the response --
4     **Q.**   I see.
12:48:25  5     **A.**   -- in the dispute.
6     **Q.**   Is there any sort of timeline or
7  deadline to provide a response to an IDR Appeal
8  Form?
9     **A.**   Are you speaking of the response to
12:48:41  10  the employee, I am assuming?
11     **Q.**   Yes.
12     **A.**   Yes. The typical timeframe to
13  receive a response after the meeting has been
14  held, the conference call that was mentioned, is
12:48:56  15  30 days.
16     **Q.**   Okay. And so after you received the
17  IDR Appeal Form, was the next step to schedule
18  that conference call?
19     **A.**   The next step was for me to identify
12:49:12  20  who was going to hear his internal dispute
21  resolution, and then to schedule the conference
22  call.
23     **Q.**   And what was the purpose of the
24  conference call?
12:49:29  25     **A.**   The purpose of the conference call

1  is to give the employee a chance to raise any
2  additional issues that they may have. But the
3  primary purpose -- and so that they can verbally
4  communicate the concerns that have already been
12:49:47  5  typically submitted through the IDR, but it's also
6  for that person who investigates to ask questions,
7  so they understand what should be looked into and
8  investigated.
9     **Q.**   I see. So there wouldn't have
12:50:01  10  been -- the investigation wouldn't have started
11  before that conference call?
12     **A.**   Correct.
13     **Q.**   Okay. What happens after the
14  conference call?
12:50:20  15     **A.**   After the conference call I send the
16  investigator a template for the response; I give
17  him a deadline to send it back to me, with it
18  filled out after they have investigated, so we can
19  try to stay on track in terms of timing. So it's
12:50:41  20  an email to the investigator with the template
21  attached.
22     **Q.**   What does the template include?
23     **A.**   The template typically includes the
24  employee's name and address, the future dated, you
12:50:59  25  know, assuming their date -- future date that it

1  supposed to be returned to the employee.  The
2  dates that the internal dispute resolution was
3  filed, as well as the date that we had the
4  meeting.  And then typically I will start them out
12:51:14  5  with bullets that indicate what the employee is --
6  what are the main allegations the employee has
7  alleged so that -- to make sure that the
8  investigator knows what direction they should be
9  beginning the investigation in.
12:51:27  10       Q.    Okay.
11            (Deposition Exhibit No. 4
12  was marked for identification.)
13  BY MS. DENNIS:
14       Q.    So you are being handed a document
12:52:04  15  marked Exhibit 4; do you recognize this document?
16       A.    Yes.
17       Q.    What is this document?
18       A.    This is an email from Mr. Drysdale,
19  and this is him requesting the colleague reviews
12:52:21  20  from his review -- excuse me, Frank's review, and
21  apologizing for the delay in getting this
22  investigation closed out.
23            And then my response with the copied
24  and pasted colleague reviews, because I wasn't
12:52:38  25  able to pull it from the original form.

1            MS. DENNIS:  Let's mark this.
2            (Deposition Exhibit No. 5
3  was marked for identification.)
4  BY MS. DENNIS:
12:53:12  5       Q.    You've been handed a document marked
6  Exhibit 5; do you recognize this document?
7       A.    Yes.
8       Q.    What is this?
9       A.    This is the copied and pasted
12:53:21  10  colleague reviews from Frank's review.
11       Q.    And where did -- where were these
12  reviews copied and pasted from?
13       A.    From our internal review system, we
14  call it MAP.
12:53:44  15       Q.    And so these reviews were initially
16  part of the colleague reviews requested by
17  Ms. Duraimanickam?
18       A.    Yes.
19       Q.    And all of the reviews included in
12:54:01  20  this document --
21       A.    Yes.
22       Q.    -- were from those?  Do you know the
23  dates where these were -- when these were
24  collected?
12:54:14  25       A.    I don't.

1       Q.    But these colleague reviews were not
2  collected after the investigative process had
3  started for this IDR; is that right?
4       A.    No, they were not collected after.
12:54:32  5  I know an approximate date, if that's something
6  that you would like me to say.
7       Q.    Sure.
8       A.    Approximately, it was, like, June of
9  2016-ish, if I am remembering correctly, is when
12:54:46  10  they were collected.
11       Q.    Okay.  And were these reviews edited
12  in any way from their original source?
13       A.    Formatting, yes.  Otherwise, no.  No
14  content, no material information, just truly the
12:55:09  15  format.
16       Q.    Okay.  As part of this investigative
17  process, did David Drysdale seek out any other
18  feedback from Mr. Zhang's colleagues?
19       A.    Not that I'm aware of, aside from
12:55:29  20  Kim Myers, who was his colleague at the time,
21  because -- on some level, because she was no
22  longer his manager.  And they still worked
23  together because she was a product owner of the
24  tools or the applications that he was responsible
12:55:49  25  for.

1       Q.    And can you explain a little bit
2  more about how Kim Myers was part of this
3  investigative process?
4       A.    As I understand it, David spoke with
12:56:05  5  Kim to get her take on or -- to get an
6  understanding of Frank's performance deficiencies
7  that were reported as they related to his previous
8  performance when she was his manager, and to talk
9  about the current performance deficiencies related
12:56:35  10  to the products that she was an owner of.
11       Q.    And are there any documents
12  reflecting this communication with Kim Meyers?
13       A.    Not that I'm aware of.
14       Q.    So your understanding is that it was
12:56:53  15  just -- David Drysdale just reported his
16  conversation --
17       A.    Yes.
18       Q.    -- and summarized --
19       A.    Yes.
20       Q.    Thanks.
21            (Deposition Exhibit No. 6
22  was marked for identification.)
23  BY MS. DENNIS:
24       Q.    So you were just handed a document
12:57:55  25  marked Exhibit 6; do you recognize this document?

1    A.    Yes.

2    Q.    What is this document?

3    A.    This is an email exchange or -- an
4 email exchange between Frank and I, and then my
12:58:15 5 forwarding it to David for his investigation.

6    Q.    And in the first full paragraph on
7 the first page of this document, you indicate that
8 Frank has alleged that Sujatha made statements
9 comparing young developers to old developers; is
12:58:47 10 that correct?

11    A.    Yes.

12    Q.    And you say, this clearly needs to
13 be investigated. We will need to add it to the
14 allegations listed on his IDR response; is that
12:58:55 15 accurate?

16    A.    Yes.

17    Q.    So when you sent this email to David
18 Drysdale, do you know if it changed how the
19 investigation was being conducted?

12:59:15 20    A.    I do not think that it changed the
21 way the investigation was being conducted, except
22 for that it was an added allegation to
23 investigate.

24    Q.    And would this type of investigation
12:59:31 25 -- would there be different types of evidence that

1 David would need to look for as part of the
2 investigation?

3    A.    It depends on what's being alleged.
4 In Frank's case he alleged that two statements
12:59:48 5 were made that led him to believe that he was
6 being discriminated against by his age, and
7 therefore his age -- and so therefore those two
8 statements were investigated.

9    Q.    In the part of the first page of
13:00:08 10 this document -- or part of this email chain from
11 Frank, and the paragraph that begins, at first; do
12 you see that?

13    A.    Yes.

14    Q.    So do you see the sentence that
13:00:43 15 begins, if you had chances? About three lines
16 down in this paragraph (indicating).

17    A.    Yes, I do.

18    Q.    So this sentence reads, if you had
19 chances to review my explanation about these five
13:01:05 20 examples at first, which I sent to HR along with
21 my dispute form, you should see that Sujatha said,
22 on purpose, something not good for me, and hide
23 the real situations and background stories which
24 tell what were the real root causes about the
13:01:20 25 issues, especially Sujatha always ignored the

1 errors caused by her. This is typical
2 discrimination behavior. The same discrimination
3 occurred to the other examples stated by Sujatha.
4 I can explain those examples later.

13:01:39 5        Is that an accurate reading of that
6 paragraph?

7    A.    Yes.

8    Q.    Okay. So do those sentences
9 indicate that there was more -- his allegations of
13:01:55 10 age discrimination encompassed more than a
11 conversation that he had with her?

12        MS. JEZIERSKI: Objection; form.

13        THE WITNESS: My interpretation of
14 what he was saying, is that he was pointing to
13:02:13 15 discrimination as a reason for the performance
16 discrepancies being reported. That does not to me
17 indicate that there was any indication that this
18 had anything to do with anything besides what was
19 being reported.

13:02:29 20        So he's providing an assumption that
21 he believes is typical for somebody to give a
22 wrong -- provide incorrect information about
23 someone if they're discriminating against them.

24 BY MS. DENNIS:

13:02:48 25    Q.    I see. So going to the last

1 paragraph on this first page of Exhibit 6 that
2 begins with, during; do you see that paragraph?

3    A.    Yes.

4    Q.    Okay. So that paragraph begins,
13:03:21 5 during my last two months in Optum each time when
6 Sujatha met me in one-on-one meeting, Sujatha
7 always said I had negative values to the team
8 without giving examples. But just saying how good
9 the other young teammates did. Did I read that
13:03:41 10 correctly?

11    A.    Yes.

12    Q.    Is it your understanding that is the
13 only direct allegation of age discrimination that
14 Frank made?

13:03:55 15    A.    My recollection is that he made an
16 allegation that she said -- that she said it
17 differently, that young people don't give as good
18 of -- I'm trying to think of it verbatim and it's
19 not going to come to me, but I'm sure I have it,
13:04:14 20 I'm sure it's in one of these documents. But old
21 people don't have as much values as young people,
22 is my recollection of his allegation.

23        And then there was a -- I thought,
24 if I remember correctly, that there was a second
13:04:29 25 comment that he alleged that she had made about

1    age, so it wasn't actually -- and in this
2    statement it doesn't seem to me like he is saying
3    she is saying anything about age, but that she's
4    talking about how good the other teammates did
13:04:50 5    that were young.
6        Q.    I see.  Was it your understanding
7    that Frank was making allegations of age
8    discrimination beyond statements made by Ms.
9    Duraimanickam in their one-on-one meetings?
13:05:14 10        MS. JEZIERSKI:  Objection; form.
11        MS. DENNIS:  Sorry, I can rephrase.
12    BY MS. DENNIS:
13        Q.    Aside from the comments that you
14    identified that Frank alleged Sujatha had made --
13:05:30 15    let me just start over.
16        My understanding is -- is it correct
17    that Frank reported a few instances of Sujatha and
18    one-on-one meetings making comments that were
19    discriminatory based on age?
13:05:57 20        A.    I would say two.
21        Q.    Okay.  Is it your understanding that
22    he was making any allegations of age
23    discrimination beyond one-on-one meetings that he
24    had held with Sujatha?
13:06:11 25        A.    I know that Frank was saying he felt

1    that this was all -- all of this was drummed up as
2    a result of her not wanting somebody of his age to
3    be on the team.  I know that was his conjecture.
4        Q.    Going back to this last paragraph,
13:06:36 5    do you see about three lines up from the bottom,
6    the beginning, if you have chances?
7        A.    Yes, I do see that.
8        Q.    Okay.  So this sentence reads, if
9    you have chances to talk to my teammates, Brady or
13:06:57 10    Mary on Kim's team, you should know I am most
11    experienced and technical developer in my team; is
12    that an accurate reading of that sentence?
13        A.    Yes.
14        Q.    As part of this investigation, was
13:07:13 15    -- well, let me back up.
16        Do you know who Brady is as referred
17    to in this sentence?
18        A.    I think that Brady is a member of
19    the team, that he's one of the developers.
13:07:30 20        Q.    Okay.  Is that Brady Grimm?
21        A.    Yes, that's my understanding of who
22    Brady is.
23        Q.    And do you know who Mary is as
24    referred to in that sentence?
13:07:42 25        A.    That is Mary Zuelke perhaps.  I know

1    at the time, I'm sure that I looked at it.  But my
2    understanding now, three years later, would be
3    that it's Mary Zuelke.
4        Q.    And as part of this investigation,
13:07:58 5    were either Brady or Mary spoken with as part of
6    the investigation?
7        A.    Not to my knowledge.  But I do know
8    that they -- at least Mary supplied Exhibit 5, a
9    colleague review.  If I'm -- if I remember
13:08:25 10    correctly, I could be mixing that up.  Maybe --
11    there's a lot of names here.  No, right here,
12    okay.  Yeah.
13        Q.    Do you see what page on Exhibit 5
14    that -- that Mary's review appears on?
13:08:45 15        A.    It's the page labeled
16    UHG-Zhang000921.  It starts on that page and
17    continues to Zhang000922.
18        Q.    On the page marked UHG-Zhang00092,
19    Exhibit 5, do you see the last full paragraph on
13:09:30 20    that page?
21        A.    The paragraph at the bottom of the
22    page?
23        Q.    Yes.
24        A.    Yes, I do.
13:09:39 25        Q.    Okay.  Do you see the sentence three

1    lines down on that paragraph that begins with,
2    with the group?
3        A.    Yes.
4        Q.    That sentence reads, with the group
13:10:00 5    becoming much bigger and the makeup of members is
6    much younger, the collaboration of team members
7    seems to be in a fashion that is not comfortable
8    to Frank.  Is that an accurate reading of that
9    sentence?
13:10:10 10        A.    Yes.
11        Q.    As part of the investigation into
12    Frank's claim of age discrimination, was that --
13    was that part of Mary's colleague review referred
14    to?
13:10:30 15        MS. JEZIERSKI:  Objection; form.
16        THE WITNESS:  Referred to where?
17        MS. DENNIS:  Sorry, I can rephrase
18    that.
19    BY MS. DENNIS:
13:10:40 20        Q.    As part of the investigation, was
21    this particular part of Mary's colleague review
22    looked into in any way?
23        A.    Not to my knowledge.  But Mr.
24    Drysdale was responsible for the investigation, so
13:11:02 25    I can only speak to what I know.  But not to my

1   knowledge.
2       Q.   Just to clarify, I am still asking
3   you questions as a representative of UnitedHealth.
4       A.   Thank you.
13:11:17 5       Q.   Could you turn, on the same exhibit,
6   to the page marked UHG-Zhang000917.  Do you see
7   the top of the page, the name Jennifer Viveros?
8       A.   Yes.
9       Q.   So what follows from that name, a
13:12:13 10  colleague review prepared by Jennifer Viveros
11  Aguilar regarding Frank Zhang?
12      A.   Yes.
13      Q.   So do you see what's marked number 3
14  underneath the name Jennifer Viveros Aguilar?
13:13:15 15  Sorry, let me be more clear because there's a
16  couple of these.
17          So there is a heading that is labeled
18  number 3, what could he or she have done better;
19  do you see that?
13:13:30 20      A.   Yes.
21      Q.   Okay.  I will just read this out
22  loud so we have it on the record.  Underneath that
23  it reads, Frank could work on his communication
24  skills, and not been afraid to ask questions when
13:13:52 25  something is not fully understood.  Over the past

1   months we had many changes in the team and have
2   noticed Frank has struggled with this.  For
3   example, when developing the admin tool, we went
4   over a couple phases and he was reporting to be on
13:14:13 5   track to completing, but then during testing
6   encounter he had not fully understood the task.
7   In my opinion it was a communication issue on all
8   sides since we went through many iterations of the
9   design of the tool but I think Frank should have
13:14:32 10  stopped at the point of confusion and asked before
11  continuing; is that an accurate reading?
12      A.   Yes.
13      Q.   As part of the investigation into
14  Frank's claims of age discrimination, was Jennifer
13:14:52 15  Aguilar's colleague review taken into account?
16      A.   Yes.
17      Q.   Was the particular statement she
18  made regarding in her opinion it was a
19  communication issue on all sides since we went
13:15:11 20  through many iterations of the design of the, tool
21  was that specifically investigated?
22          MS. JEZIERSKI:  Objection; form.
23          THE WITNESS:  Not to my knowledge.
24  BY MS. DENNIS:
13:15:31 25      Q.   So did David Drysdale, as part of

1   the investigation, speak to anyone else besides
2   Kim Myers?
3       A.   Yes, he spoke with Sujatha.
4       Q.   And what did he speak to Sujatha
13:15:51 5   about?
6       A.   My understanding is he spoke to
7   Sujatha about the allegations and comments made
8   about age, and he spoke to Sujatha about the
9   overall termination decision and why she made the
13:16:08 10  decision to terminate.  And talked about the
11  specific items that were mentioned -- sorry, let
12  me just take a step back, I'm thinking at the same
13  time.
14          So he spoke with her about the
13:16:33 15  age-related comments that Mr. Zhang alleged.  And
16  he spoke with her about the review that she gave
17  him about the corrective actions that she gave
18  him, and about the ultimate decision to terminate.
19      Q.   Is that everything?
13:16:55 20      A.   Yes.
21      Q.   Okay.
22          (Deposition Exhibit No. 7
23          was marked for identification.)
24  BY MS. DENNIS:
13:17:47 25      Q.   You were just handed a document

1   marked Exhibit 7; do you recognize this document?
2       A.   Yes.
3       Q.   What is this document?
4       A.   This is an email exchange between
13:17:57 5   David and I regarding the status of the internal
6   dispute resolution response.
7       Q.   And in the email from David Drysdale
8   to you, sent January 24, 2017 at 1:51 p.m., does
9   that reflect a conversation Mr. Drysdale had with
13:18:29 10  Kim Myers?
11      A.   Yes.
12      Q.   And what does that indicate about
13  that conversation?
14      A.   That she was the final person he was
13:18:39 15  looking to speak with before making a
16  determination of whether or not he should deem the
17  termination warranted.
18      Q.   So besides this email, is there
19  anything that records his conversation with Kim
13:18:58 20  Myers?
21      A.   He may have taken notes.  I do not
22  have access to those notes or know if he did take
23  notes.  I just know that he spoke with her and
24  there's nothing formal that I'm aware of.
13:19:15 25      Q.   And so between the conference call

1 that you held with Frank and David Drysdale, and
2 -- sorry, let me strike that.
3          (Deposition Exhibit No. 8
4     was marked for identification.)
13:20:22 5 BY MS. DENNIS:
6     **Q.** You were just handed a document
7 marked Exhibit 8; do you recognize this document?
8     **A.** Yes.
9     **Q.** What is this document?
13:20:32 10    **A. The first page -- actually this is**
11 **the employee's response for his -- to his IDR.**
12    **Q.** You said it's the employee's
13 response to his IDR?
14    **A. Response to the employee.**
13:20:49 15    **Q.** Okay, sorry. And was this the last
16 document that Mr. Zhang received as part of the
17 IDR process?
18    **A. Yes, I believe so.**
19    **Q.** So this would be the final closing
13:21:09 20 out step of this process?
21    **A.** Yes.
22    **Q.** Okay. And does this letter reflect
23 everything that UnitedHealth relied on to reach
24 its conclusion that his termination, Mr. Zhang's
13:21:31 25 termination, should stand?
JOLYNN GRAHAM REPORTING

1    **A.** Yes.
2    **Q.** Can you turn to the second page of
3 this letter. Do you see the second full paragraph
4 from the bottom that begins, with respect to your
13:22:15 5 claim?
6    **A.** Yes.
7    **Q.** I'll read that out loud. With
8 respect to your claim that Ms. Duraimanickam made
9 a comment that young people made more
13:22:28 10 contributions and old people were not worthy of
11 what company pays for and that, quote, "old people
12 have less values than young," end quote, people, I
13 was unable to substantiate your claim. I spoke
14 with Ms. Duraimanickam who denied making any
13:22:45 15 statements related to age. Is that a correct
16 reading?
17    **A.** Yes.
18    **Q.** So does that paragraph indicate that
19 that was -- that Mr. Drysdale's conversation with
13:23:05 20 Ms. Duraimanickam was the only basis for him
21 finding that he was unable to substantiate
22 Mr. Zhang's claim?
23    MS. JEZIERSKI: Objection; form.
24    THE WITNESS: My understanding of
13:23:25 25 what he's saying here, is that he was unable to
JOLYNN GRAHAM REPORTING

1 substantiate the claims that she made two comments
2 that are in the paragraph related to age.
3 BY MS. DENNIS:
4    **Q.** Does this letter indicate that Mr.
13:23:44 5 Drysdale spoke to anyone else in an attempt to
6 substantiate this claim?
7    **A. No.**
8    **Q.** Can you look at the paragraph right
9 above that that begins, with respect to your
13:24:03 10 contention; do you see that?
11    **A.** Yes.
12    **Q.** The last sentence of that paragraph
13 reads, I found that your final CAP was an
14 objective reflection of your performance; is that
13:24:18 15 an accurate reading?
16    **A.** Yes.
17    **Q.** Based on -- strike that.
18          Was this finding that Mr. Zhang's
19 final CAP was an objective reflection of his
13:24:57 20 performance based on any evidence that was not
21 collected from -- sorry, I will go back on that
22 too.
23          Does this paragraph indicate what
24 evidence Mr. Drysdale relied upon to reach his
13:25:29 25 conclusion that his -- that Mr. Zhang's final CAP
JOLYNN GRAHAM REPORTING

1 was an objective reflection of Mr. Zhang's
2 performance?
3    **A. I'm sorry, would you be able to**
4 **repeat the question.**
13:25:42 5    MS. DENNIS: Sure. Can you read
6 that back.
7          (The requested portion was read by
8     the court reporter.)
9          THE WITNESS: Yes.
10 BY MS. DENNIS:
11    **Q.** And what evidence was that?
12    **A. Feedback from his former supervisor,**
13 **peers, and the client, as well as -- or I**
14 **shouldn't say as well as, those items, so he**
13:26:31 15 **indicates that he reviewed information from his**
16 **supervisor, peers and the client.**
17    **Q.** And as far as feedback from peers as
18 referred to here, is that reflecting only the
19 colleague feedback that was reflected in
13:26:59 20 Exhibit 6?
21    **A. That's my understanding.**
22    **Q.** Okay. And as far as feedback from
23 the client, does that only refer to the
24 conversation that Mr. Drysdale had with Kim Myers
13:27:18 25 as a part of this investigation?
JOLYNN GRAHAM REPORTING

1    A.    I would venture to say that some of
2  the information was from Kim, as well as the
3  information that was provided in the peer feedback
4  about his work product, as a result -- or as part
5  of -- and how it impacted the client too.
6         So to me it says that he reviewed --
7  or that there was feedback from his previous
8  supervisor, peers and the client, but the peers
9  also in the colleague feedback provided
10  information about the impact to the client as
11  well, so it could have been --
12    Q.    And who is the client?
13    A.    My understanding of the client is
14  Kim Myers.
15    Q.    And in this document when Mr.
16  Drysdale refers to the client, that's referring to
17  Kim Myers; is that your understanding?
18    A.    Actually Kim Myers is the owner of
19  the product, that impacts the client.  So I guess
20  I don't know her end-user is, because I'm not
21  within the technology department.  But the client
22  would have been the end-user of Kim Myers'
23  products.
24    Q.    Okay.  And in this paragraph, 'your
25  former supervisor' refers to Ms. Duraimanickam; is

1  that correct?
2    A.    Yes.
3    Q.    So, the first paragraph of this
4  page, it's not a full paragraph, but, do you see
5  the last sentence that begins, I found that the
6  termination --
7    A.    Yes.
8    Q.    So that sentence reads, I found that
9  the termination of your employment was appropriate
10  based on a thorough assessment of your
11  performance; is that a correct reading?
12    A.    Yes.
13    Q.    So when Mr. Drysdale refers to a
14  thorough assessment of Frank's performance, is it
15  your understanding that that did not include
16  looking at -- sorry, let me back up.
17         When Mr. Drysdale refers to a
18  thorough assessment of Frank's performance, what
19  do you understand that to refer to?
20    A.    I understand that to be referring to
21  David's review of all of the documents that were
22  taken into consideration when determining his
23  termination -- determining that termination would
24  be the decision based on his performance.
25    Q.    And those documents -- did those

1  documents taken into consideration include any
2  documents that were not -- sorry, let me back up.
3         So those documents included
4  performance reviews created by Ms. Duraimanickam;
5  is that correct?
6    A.    They did include that, yes.
7    Q.    And those documents taken into
8  consideration included colleague reviews put
9  together by Mr. Zhang's colleagues; is that
10  correct?
11    A.    Yes.
12    Q.    And what another documents besides
13  those were taken into consideration?
14    A.    His corrective actions, his initial
15  corrective action, and his final corrective
16  action.
17    Q.    And were those documents prepared by
18  Ms. Duraimanickam?
19    A.    To my knowledge, yes, they were.
20    Q.    Were there any other documents taken
21  into consideration as part of this investigation?
22    A.    Not to my knowledge.  Oh, his
23  internal dispute resolution filing and all the
24  subsequent emails, too.
25    Q.    So would it be correct to say that

1  the specific documents related to a particular
2  work task were not reviewed?  Sorry, that was kind
3  of a vague way of saying that.
4         So is it safe to say that Mr.
5  Drysdale did not look at particular task-related
6  documents that were disputed in Mr. Zhang's IDR
7  letter?
8         MS. JEZIERSKI:  Objection; form.
9         THE WITNESS:  Yes.  Mr. Drysdale,
10  first of all, isn't responsible for Mr. Zhang's
11  work product, so he would have a difficult time
12  having any access or ability to interpret those
13  tasks, especially when they are heavily technology
14  -- technological.  And also part of the internal
15  dispute resolution process, part of the
16  interviewer's responsibility, is to look over what
17  was assessed when making that initial decision to
18  terminate, to see if those items warranted
19  termination, not to look at the specific tasks
20  that the individual brought forward as part of
21  their disagreement.
22    Q.    Okay.  So what happened after
23  Mr. Zhang was sent this letter?
24         MS. JEZIERSKI:  Objection; form.
25  BY MS. DENNIS:

1  Q.  After this letter was sent to
2  Mr. Zhang, was there any remaining procedures left
3  to follow up within the IDR procedural framework?
4  A.  David would have sent me a copy of
13:34:28  5  the signed response.  I would have attached it to
6  the case.  I would have added any final notes into
7  the case, and I would have closed the case in our
8  internal HR system.
9  Those would be the process steps
13:34:43  10  that follow the employee receiving, or being sent
11  the internal dispute resolution response.
12  Q.  Were you aware that Mr. Zhang filed
13  a complaint with the EEOC?
14  MS. JEZIERSKI:  Objection; form.
13:35:08  15  And outside the scope of the notice.
16  MS. DENNIS:  You can answer if you
17  understand the question.
18  THE WITNESS:  Yes, I was aware that
19  he filed a claim with the EEOC.
13:35:32  20  BY MS. DENNIS:
21  Q.  Did you have any role in responding
22  to the EEOC charge?
23  MS. JEZIERSKI:  Objection; form.
24  THE WITNESS:  No.
13:35:48  25  MS. DENNIS:  Can we go off the

1  record for a few minutes.  Why don't we take a
2  quick break.
3  (Short break.)
4  BY MS. DENNIS:
13:45:47  5  Q.  Before we went off the record I had
6  asked if you were aware of the claim Mr. Zhang had
7  filed with the EEOC, and your counsel objected to
8  that topic being outside of the 30(b)(6) topics.
9  Is it your understanding that --
13:46:15  10  actually, could you find Exhibit 1 in front of you
11  -- or do you have --
12  A.  Oh, the first one?
13  Q.  Yep.
14  A.  Got it.
13:46:55  15  Q.  Can you turn to page 7 of this
16  document.
17  A.  Yes.
18  Q.  Do you see the paragraph marked with
19  the number 7?
13:47:07  20  A.  Yes.
21  Q.  And that paragraph reads,
22  Respondent's investigation and/or assessment of
23  Claimant's age discrimination claims, including
24  communication with Claimant's former co-workers
13:47:18  25  and supervisors, collection and recording of

1  statements, creation of reports, and any resulting
2  actions taken by Respondent.
3  And earlier today you said that you
4  were prepared to testify about this topic; is that
13:47:32  5  right?
6  A.  Yes.
7  Q.  Okay.  Is it your understanding that
8  this topic does not include any investigation
9  taken as a result of Mr. Zhang's EEOC claim?
13:47:50  10  MS. JEZIERSKI:  Objection; form.
11  THE WITNESS:  Can I ask a clarifying
12  question?
13  MS. DENNIS:  Sure.
14  THE WITNESS:  Is number 7 about his
13:48:06  15  EEOC claim, or is it about his allegations of age
16  discrimination, because I'm not --
17  MS. DENNIS:  I think his age
18  discrimination claims were a part of his EEOC
19  claim.
13:48:22  20  THE WITNESS:  I would not be
21  prepared to speak about his EEOC claim as that's
22  not something I was involved in, except for that I
23  have knowledge of it.
24  BY MS. DENNIS:
13:48:34  25  Q.  Okay.  And who would have knowledge

1  of Mr. Zhang's EEOC claim?
2  A.  Our attorney.
3  Q.  You mean --
4  A.  Jen Service.
13:48:50  5  Q.  Can you spell that name.
6  A.  J-E-N-N-I-F-E-R.  S-E-R-V-I-C-E.
7  Q.  Would anyone besides an attorney
8  have knowledge about Mr. Zhang's EEOC claim, to
9  your knowledge?
13:49:14  10  MS. JEZIERSKI:  Objection; form.
11  THE WITNESS:  Not to my knowledge.
12  (Deposition Exhibit No. 9
13  was marked for identification.)
14  BY MS. DENNIS:
13:49:55  15  Q.  You're being handed a document
16  marked Exhibit 9.  Do you recognize this document?
17  You can take a moment to look at it to see what
18  this is.
19  A.  Yes, I do.
13:50:13  20  Q.  What is this document?
21  A.  This is his Demand for Arbitration.
22  Q.  When was the first time you saw this
23  document?
24  A.  About a week and a half ago.
13:50:38  25  Q.  Are you familiar with the content of

1 this document?
2     A.   Yes.
3     Q.   And you understand that this
4 document reflects Mr. Zhang's claims of age
13:51:05 5 discrimination?
6     A.   Yes.
7     Q.   Can you turn to page 8 of this
8 document. Do you see the paragraph numbered 34?
9     A.   Yes.
13:51:38 10     Q.   Did UnitedHealth do any
11 investigation or research to verify or deny the
12 specific factual allegations reflected in this
13 paragraph?
14     **A.   Can I refer to the internal dispute**
13:52:24 15 **resolution form?**
16     Q.   Sure.
17     A.   The response.
18     Q.   Is that marked Exhibit 8?
19     **A.   Yes, Exhibit 8. Thank you. I just**
13:53:16 20 **wanted to review the paragraph regarding his --**
21 **Mr. Drysdale's response to his allegation about**
22 **the termination being warranted.**
23     Q.   So with regard to paragraph 34 of
24 Exhibit 9, was there any investigation aside from
13:53:53 25 what was reflected in Exhibit 8 to verify or deny

1 the factual allegations of this paragraph?
2     **A.   If this project that's being**
3 **referred to in number 34, which is very vague and**
4 **difficult for me to understand which project this**
13:54:15 5 **might be talking about, especially, you know,**
6 **having little IT knowledge. But if this is**
7 **addressed in his corrective action, likely in the**
8 **progress update section of his elevated corrective**
9 **action, which we haven't taken a look at yet here,**
13:54:34 10 **but then, yes, it was reviewed.**
11     I can only speak to my assumption
12 that this item was addressed in either the initial
13 or the final level corrective actions, which would
14 have been reviewed by Mr. Drysdale.
13:54:51 15     Q.   Do you see the paragraph marked 36
16 on page 8 of Exhibit 9?
17     A.   Yes.
18     Q.   You can take a couple of minutes to
19 just read through that. I just know we need to
13:55:16 20 read it out loud. Just let me know when you've
21 had an opportunity to do that.
22     A.   Okay.
23     Q.   Do you know if there was any
24 investigation to verify or deny the facts in
13:56:07 25 paragraph 36, aside from the investigation Mr.

1 Drysdale engaged as part of the IDR process?
2     MS. JEZIERSKI: Objection; form.
3     THE WITNESS: I don't believe there
4 was an investigation, per se, outside of the IDR
13:56:29 5 -- actually, I don't know anything about the EEOC
6 claim. I'm sure there was something going on
7 there. But in terms of my knowledge, the internal
8 dispute resolution process was the investigation.
9 BY MS. DENNIS:
13:57:00 10     Q.   Okay. Can you look at page 9 of
11 Exhibit 9, and look at paragraphs 37, 38 and 39,
12 and just let me know when you've had an
13 opportunity to read through those.
14     A.   Okay.
13:58:23 15     Q.   So I understand you aren't able to
16 testify as to if there was an investigation done
17 related to EEOC claim. But aside from that, and
18 the investigation undertaken by Mr. Drysdale as
19 part of the IDR process, do you know if there was
13:58:53 20 any investigation to verify or deny any of the
21 factual allegations in these paragraphs?
22     MS. JEZIERSKI: Objection; form.
23     THE WITNESS: There's -- to my
24 knowledge, again outside of the EEOC claim, like
13:59:11 25 you stated, and outside of the IDR process, there

1 would not be an investigation because there were
2 no claims made -- there were no claims made
3 outside of those processes.
4 BY MS. DENNIS:
13:59:24 5     Q.   Okay. Could you turn to page 10 of
6 this Deposition Exhibit 9. Do you see the
7 paragraph numbered 43 on that page?
8     A.   Yes.
9     Q.   Can you just read through that and
14:00:01 10 let me know when you've had an opportunity to do
11 so.
12     **A.   Was it just paragraph 43?**
13     Q.   Just paragraph 43.
14     A.   Okay.
14:00:24 15     Q.   So aside from any potential
16 investigation as part of the EEOC claim, and
17 outside of the IDR investigation, did UnitedHealth
18 undergo any investigation to verify or deny any of
19 the facts in paragraph 43?
14:00:43 20     MS. JEZIERSKI: Objection; form.
21     THE WITNESS: Not outside of the IDR
22 process that I'm aware of.
23 BY MS. DENNIS:
24     Q.   And I just have that same question
14:01:04 25 for paragraphs 46 and 47.

1      A.     I'm unaware of any investigation
2  outside of, again, my knowledge of the EEOC claim,
3  and the internal dispute resolution process, which
4  would have been the official investigation into
5  his termination.
6            (Deposition Exhibit No. 10
7       was marked for identification.)
8  BY MS. DENNIS:
9       Q.     You were just handed a document
10 marked Exhibit 10; do you recognize this document?
11      A.     Yes.
12      Q.     What is this document?
13      A.     This is a list of employees that
14 were on the team that Mr. Zhang was on, in
15 addition to their hire dates and their birth dates
16 as well as their titles.
17      Q.     And where would this document have
18 been produced?
19            MS. JEZIERSKI:  Objection; beyond
20 the scope of the 30(b)(6) notice.
21            MS. DENNIS:  You can answer if you
22 know the answer to the question.
23            THE WITNESS:  I don't know the
24 answer.
25 BY MS. DENNIS:

1       Q.     Do you recognize the format of this
2  document?
3            MS. JEZIERSKI:  Same objection.
4            THE WITNESS:  It looks like an Excel
5  document.
6            MS. DENNIS:  I don't have any more
7  questions about that document.
8  BY MS. DENNIS:
9       Q.     I would like to shift gears and ask
10 you questions in your personal capacity rather
11 than in your capacity as the representative for
12 UnitedHealth.
13      A.     Okay.
14      Q.     How long have you worked at
15 UnitedHealth?
16      A.     Eight and a half years I believe.
17      Q.     And can you approximate, like, over
18 the last year, how many claims of age
19 discrimination you've been involved with in a
20 professional capacity?
21      A.     In the last year?
22      Q.     Yes.
23      A.     Um, maybe two.
24      Q.     Is that pretty typical as far as,
25 like, how often they come up in a year?

1            MS. JEZIERSKI:  Objection; form.
2            THE WITNESS:  Yeah.  Yes.
3  BY MS. DENNIS:
4       Q.     So would it be fair to say in the
5  last eight years you've seen kind of in the
6  ballpark about 15 age discrimination claims?
7       A.     I did not, in the first -- I didn't
8  start investigating age discrimination claims
9  until April 2014.  So I would not have had
10 exposure in UnitedHealth Group in that capacity.
11 So just maybe like 10 to 12 specifically related
12 to age.
13      Q.     Okay.  Have any of the age
14 discrimination claims you've dealt with since 2014
15 been substantiated?
16            MS. JEZIERSKI:  Objection; form.
17            THE WITNESS:  I don't recall.  We
18 work about 1,000 cases a year, so I'm not --
19 between 500 and 1,000 cases a year, so I can only
20 guess.  I -- I can't give a straight answer.
21 BY MS. DENNIS:
22      Q.     So what would you guess?
23            MS. JEZIERSKI:  Objection; form.
24            THE WITNESS:  I would guess that the
25 majority of them were not substantiated, but that

1  there may have been substantiation to some claims
2  within the allegations.  But I really don't know.
3  BY MS. DENNIS:
4       Q.     Are there other types of
5  discrimination claims that you deal with more
6  commonly?
7       A.     Yes.
8       Q.     What are those?
9       A.     More common allegations of
10 discrimination would be discrimination based on
11 race and based on medical condition.
12      Q.     With regard to the claims you deal
13 with related to race discrimination, about how
14 many of those per year would you, roughly, say
15 that you see?
16            MS. JEZIERSKI:  Objection; form.
17            THE WITNESS:  With the exception of
18 the last year, maybe -- maybe five, six a year
19 each -- that's probably overestimating.  Maybe
20 four a year.  In the last year my primary
21 responsibilities have been focused on other
22 activities not related to that particular case
23 type.
24 BY MS. DENNIS:
25      Q.     Since 2014, have any of the

1  complaints of race discrimination you've had
2  involvement with, have any of those been
3  substantiated?
4          MS. JEZIERSKI:  Objection; form.
14:08:14  5          THE WITNESS:  Not to my knowledge.
6  BY MS. DENNIS:
7          Q.    Have you ever been involved in an
8  IDR process where the manager accused of
9  discrimination has faced disciplinary action?
14:08:51  10          A.    I'm going to have to think about
11  this, because the distinction of the IDR process
12  is what I'm having to try to make sure that's
13  -- my memories are of that particular type of
14  investigation.
14:09:03  15          Q.    Well, I can expand the question just
16  so I'm clear.  So there's the HRdirect process and
17  the IDR process; is that right?
18          A.    Yes.
19          Q.    And those are done through different
14:09:18  20  procedures; is that right?
21          A.    Yes.
22          Q.    And in either HRdirect -- well, you
23  can just answer them separately in a -- have you
24  ever, at any case you've worked on involving race
14:09:41  25  discrimination -- let me start at the beginning of

1  that.
2          Are you aware of any supervisor that
3  has had a claim of race discrimination
4  substantiated with regard to -- sorry, that was
14:10:12  5  also not a very clear way of describing that.
6          Since 2014, in your experience with
7  the IDR process, has an employee's claim of racial
8  discrimination ever been substantiated?
9          A.    No.
14:10:38  10          Q.    Since 2014, in your experience in
11  the HRdirect process, has an employee's claim of
12  race discrimination ever been substantiated?
13          A.    Claim, I'm going to say no.  And can
14  I give a caveat?
14:11:07  15          Q.    Sure.
16          A.    Okay.  No.  But discrimination is
17  typically a motive versus an act, so if there is a
18  -- you know, if an employee alleges a slew of
19  examples of things that have occurred, and things
14:11:26  20  within those allegations have been substantiated,
21  let's say they're based on race, we have
22  substantiated items within complaints that have
23  alleged discrimination.
24          Q.    Have any managers been disciplined
14:11:49  25  as the result of an allegation of race

1  discrimination?
2          A.    We have had managers disciplined for
3  events that have occurred that were alleged to be
4  race discrimination.
14:12:14  5          Q.    And what -- how were these managers
6  disciplined?
7          MS. JEZIERSKI:  Objection; form.
8          THE WITNESS:  Typically it would be
9  termination depending on the egregiousness of
14:12:32  10  whatever was substantiated.
11  BY MS. DENNIS:
12          Q.    So there have been managers who have
13  been terminated as a result of allegations of race
14  discrimination?
14:12:47  15          A.    Allegations of a particular event.
16  So there's not -- again when -- you know, trying
17  to understand the motive for somebody's behavior
18  isn't necessarily what somebody would be
19  terminated for.  It would be somebody's specific
14:13:04  20  action.  And there have been managers terminated,
21  you know, a few, very rarely.
22          But managers who have -- we have
23  substantiated incidents that are considered
24  inappropriate behavior or a violation of our
14:13:19  25  policies, as it relates to any type of racial

1  comments or actions, have been terminated.
2          Q.    Are you familiar with a program
3  called the technology development program?
4          A.    I am familiar with the terminology,
14:13:49  5  yes.
6          Q.    What do you understand the
7  technology development program to mean?
8          A.    My outside view of the TDP program
9  is that there are employees fresh out of school
14:14:07  10  that go through some sort of program.  I'm not
11  sure of the details of how that works, if they,
12  like, go into several jobs or -- it's some sort of
13  track in the organization to, I believe -- if my
14  understanding is correct, I think they're in
14:14:35  15  different types of technical roles at different
16  times.  But I can't be sure.
17          Q.    Has -- in any investigation you've
18  participated in the last -- well, since 2014,
19  has any investigation you've participated in
14:14:59  20  involved the technology development program in any
21  way?
22          MS. JEZIERSKI:  Objection; form.
23          THE WITNESS:  Yes, I think -- I'm
24  pretty sure that there's one case that I can think
14:15:30  25  of, but --

BY MS. DENNIS:

Q. Can you tell me about that case and how it involves the technology development program?

14:15:41 MS. JEZIERSKI: Objection to the extent it calls for attorney-client privileged communication. So don't talk about any communications with attorneys.

THE WITNESS: I'm trying really hard 14:16:00 to remember, and it was a long time ago, so just give me a second here to try to recall the details of that.

The investigation, as I recall, was involving two leaders within the TDP program that 14:16:24 were over the program itself, and their interaction with staff that were a part of the program develop -- or the recruitment of people within the program. It wasn't about people that are actually in the TDP program.

14:16:44 Q. I see. So it was an issue related to recruitment rather than --

A. Correct.

Q. -- kind of the program itself?

Do you know if people who are 14:17:05 participants in the TDP are subject to different

policies compared to non-TDP, UnitedHealth employees?

A. To my -- I mean with relation to standard company policies, no, they would not be 14:17:25 subject to different company policies.

In terms of job expectations and things like that, I imagine there probably are in the initial stages of that program. I really don't know. But there could be different 14:17:39 expectations based on how the program is designed.

Q. Okay.

MS. DENNIS: Could we go off the record.

(Short break.)

14:25:36 MS. DENNIS: I'm done. I have no further questions.

MS. JEZIERSKI: No questions, and we'll read and sign.

I, **TANYA HUGHES**, do hereby certify that I have read the foregoing deposition and found the same to be true and correct except as follows, (noting the page and line number of the change or addition as desired and the reason why):

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____

Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____
Page No._____Line No._____Change To:_____
_____
Reason for change:_____

_____
**TANYA HUGHES**
Please send Original Errata sheet to:
Kaitlyn Dennis, Esquire
Gustafson Gluek PLLC
120 South 6th Street
Suite 2600
Minneapolis, Minnesota 55402

```
 1   STATE OF MINNESOTA:
                    :    CERTIFICATE
 2   COUNTY OF HENNEPIN:

 3

       BE IT KNOWN, that I, Jolynn Graham, took the
 4   foregoing deposition of **TANYA HUGHES**;

 5       That the witness, before testifying, was by me
     first duly sworn to testify the whole truth and
 6   nothing but the truth relative to said cause;

 7

 8       That the testimony of said witness was recorded
     in shorthand by me and was reduced to typewriting
 9   under my direction;

10       That the foregoing deposition is a true record
     of the testimony given by said witness;
11

12       That the reading and signing of the
     foregoing deposition by the said witness **WAS NOT**
13   **WAIVED** by the witness and respective counsel;

14

15       That I am not related to any of the parties
     hereto, nor an employee of them, nor interested in
16   the outcome of the action;

17       That the cost of the original has been charged
     to the party who noticed the deposition, and that
18   all parties who ordered copies have been charged
     at the same rate for such copies;
19

20       WITNESS MY HAND AND SEAL this 24th DAY of
     FEBRUARY, 2020.
21

22

             Jolynn Graham, RPR
23           Notary Public

24
25
              JOLYNN GRAHAM REPORTING
```

'your [1] - 101:24
000922 [1] - 91:17
01-19-0001-0069 [1] - 1:6
1 [5] - 3:2, 8:6, 8:17, 10:17, 106:10
1,000 [2] - 115:18, 115:19
1-800 [1] - 27:5
10 [9] - 3:11, 18:23, 19:25, 20:19, 21:18, 112:5, 113:6, 113:10, 115:11
100 [1] - 50:5
11 [5] - 1:18, 20:2, 20:5, 20:24, 21:18
12 [2] - 20:2, 115:11
120 [4] - 1:16, 2:5, 2:10, 124:22
13 [6] - 20:24, 21:2, 21:7, 21:13, 21:16, 22:3
144,000 [1] - 23:16
15 [1] - 115:6
175,000 [1] - 23:17
1964 [1] - 24:24
1:51 [1] - 96:8
2 [3] - 3:3, 8:6, 11:9
2002 [1] - 7:7
2014 [7] - 8:5, 115:9, 115:14, 116:25, 118:6, 118:10, 120:18
2016 [2] - 23:15, 53:3
2016-ish [1] - 83:9
2017 [1] - 96:8
2020 [2] - 1:18, 125:20
24 [1] - 96:8
24th [1] - 125:20
2600 [3] - 1:16, 2:5, 124:22
28 [2] - 30:1, 30:3
29 [2] - 30:7, 30:20
3 [6] - 3:4, 12:5, 75:14, 75:18, 93:13, 93:18
30 [1] - 79:15
30(b)(6 [5] - 23:20, 31:6, 68:6, 106:8, 113:20
34 [4] - 19:3, 109:8, 109:23, 110:3
36 [2] - 110:15, 110:25
37 [1] - 111:11
38 [1] - 111:11
39 [2] - 19:3, 111:11
4 [7] - 2:16, 3:5, 9:9, 9:22, 13:5, 81:11, 81:15
400 [1] - 21:2
43 [5] - 20:10, 112:7,

112:12, 112:13, 112:19
46 [3] - 20:25, 21:11, 112:25
47 [3] - 20:25, 21:11, 112:25
5 [7] - 3:6, 14:5, 82:2, 82:6, 91:8, 91:13, 91:19
500 [1] - 115:19
55402 [3] - 2:6, 2:11, 124:23
5th [1] - 9:22
6 [8] - 3:7, 9:11, 9:13, 14:24, 84:21, 84:25, 88:1, 100:20
6th [5] - 1:16, 2:5, 2:10, 22:25, 124:22
7 [12] - 3:8, 9:16, 14:5, 15:21, 19:21, 20:19, 21:18, 95:22, 96:1, 106:15, 106:19, 107:14
70 [2] - 29:4, 29:9
8 [14] - 3:9, 9:16, 16:25, 18:23, 19:21, 20:19, 21:18, 97:3, 97:7, 109:7, 109:18, 109:19, 109:25, 110:16
9 [10] - 3:10, 10:5, 18:9, 108:12, 108:16, 109:24, 110:16, 111:10, 111:11, 112:6
9:09 [1] - 1:17
9:32 [1] - 4:3
a.m [2] - 1:17, 4:3
ability [3] - 6:23, 70:9, 104:12
able [6] - 34:1, 61:11, 63:14, 81:25, 100:3, 111:15
absences [1] - 65:19
absolutely [1] - 39:15
access [6] - 50:6, 69:20, 69:22, 71:3, 96:22, 104:12
account [1] - 94:15
accountable [1] - 76:24
accuracy [1] - 46:23
accurate [7] - 43:11, 85:15, 87:5, 90:12, 92:8, 94:11, 99:15
accusation [2] - 39:22, 47:7
accusations [1] - 35:10
accused [23] - 35:21,

37:9, 37:20, 38:2, 38:10, 38:16, 38:20, 38:22, 39:1, 39:4, 39:5, 39:8, 39:9, 39:13, 40:9, 44:1, 45:6, 46:13, 51:7, 51:22, 52:8, 117:8
achieve [1] - 39:16
Act [1] - 24:23
act [2] - 46:3, 118:17
Action [2] - 52:2, 59:8
action [45] - 16:1, 16:15, 17:14, 17:17, 21:25, 32:21, 33:9, 33:18, 46:2, 46:4, 46:7, 47:11, 47:21, 51:7, 59:9, 59:19, 60:5, 60:9, 60:10, 60:15, 60:23, 61:2, 61:18, 61:25, 62:10, 62:12, 63:1, 63:2, 63:15, 63:17, 63:19, 64:8, 64:11, 65:12, 66:5, 66:20, 71:2, 76:21, 103:15, 103:16, 110:7, 110:9, 117:9, 119:20, 125:15
actions [7] - 17:5, 76:19, 95:17, 103:14, 107:2, 110:13, 120:1
activities [1] - 116:22
actual [4] - 11:10, 54:21, 58:21, 60:12
add [3] - 29:13, 70:22, 85:13
added [3] - 70:7, 85:22, 105:6
addition [4] - 24:16, 32:5, 113:15, 123:5
additional [5] - 19:23, 20:21, 21:1, 44:1, 80:2
address [4] - 26:15, 59:15, 65:16, 80:24
addressed [2] - 55:18, 110:7, 110:12
addressing [1] - 11:11
admin [1] - 94:3
administration [1] - 30:22
admits [1] - 41:23
admitted [1] - 45:7
advising [1] - 53:11
affect [2] - 6:23, 53:25
affirmatively [1] - 61:22
afraid [1] - 93:24
age [100] - 11:12, 13:8,

14:25, 15:22, 24:11, 24:16, 24:19, 24:21, 25:4, 25:7, 25:20, 26:15, 26:18, 26:25, 31:3, 31:14, 32:22, 33:20, 34:11, 38:18, 38:20, 38:21, 38:23, 39:19, 40:21, 40:25, 41:3, 41:6, 41:15, 42:2, 42:7, 42:22, 43:2, 43:12, 43:13, 43:16, 43:17, 43:20, 43:21, 43:23, 43:24, 44:9, 44:14, 44:22, 45:8, 45:10, 45:16, 45:24, 46:2, 46:8, 46:13, 47:12, 48:12, 49:7, 49:9, 49:13, 50:10, 50:12, 50:21, 51:2, 51:6, 51:22, 52:5, 52:8, 52:12, 53:11, 68:23, 69:11, 71:5, 72:7, 73:23, 74:1, 74:4, 74:5, 74:23, 86:6, 86:7, 87:10, 88:13, 89:1, 89:3, 89:7, 89:19, 89:22, 90:2, 92:12, 94:14, 95:8, 95:15, 98:15, 99:2, 106:23, 107:15, 107:17, 109:4, 114:18, 115:6, 115:8, 115:12, 115:13
age-related [1] - 95:15
ago [2] - 108:24, 121:10
Aguilar [2] - 93:11, 93:14
Aguilar's [1] - 94:15
allegation [10] - 42:18, 43:1, 44:9, 51:11, 85:22, 88:13, 88:16, 88:22, 109:21, 118:25
allegations [28] - 19:2, 20:9, 21:11, 26:18, 33:4, 35:14, 36:15, 38:3, 43:12, 48:4, 50:16, 68:24, 81:6, 85:14, 87:9, 89:7, 89:22, 95:7, 107:15, 109:12, 110:1, 111:21, 116:2, 116:9, 118:20, 119:13, 119:15
alleged [13] - 34:9, 43:24, 49:9, 74:13, 81:7, 85:8, 86:3, 86:4, 88:25, 89:14,

95:15, 118:23, 119:3
allegedly [1] - 39:9
alleges [1] - 118:18
alleging [2] - 44:3, 49:13
AMERICAN [1] - 1:2
analyst [2] - 7:24, 30:4
analysts [3] - 29:23, 29:25, 30:10
analytic [1] - 53:17
AND [1] - 125:20
anonymous [5] - 25:18, 26:14, 27:17, 27:23, 28:4
anonymously [2] - 27:20, 38:8
answer [17] - 5:13, 5:22, 6:2, 6:8, 6:9, 10:7, 19:20, 19:24, 36:4, 52:22, 68:7, 105:16, 113:21, 113:22, 113:24, 115:20, 117:23
answering [2] - 5:19, 29:16
anti [2] - 25:7, 53:11
anti-age [2] - 25:7, 53:11
antidiscrimination [4] - 26:1, 31:17, 31:22, 53:2
apologizing [1] - 81:21
appeal [1] - 76:3
Appeal [4] - 76:5, 76:12, 79:7, 79:17
appealing [2] - 76:8, 76:9
APPEARANCES [1] - 2:1
applicable [1] - 14:7
applicants [1] - 13:10
applications [1] - 83:24
applied [1] - 15:1
appropriate [10] - 33:2, 34:22, 35:2, 35:13, 37:8, 47:2, 47:3, 47:23, 102:9
approximate [4] - 10:18, 23:14, 83:5, 114:17
approximation [1] - 9:23
April [2] - 8:5, 115:9
arbitration [2] - 4:24, 9:3
ARBITRATION [1] - 1:2
Arbitration [5] - 1:5,

19:4, 20:11, 21:12, 108:21
**area** [2] - 30:10, 64:23
**areas** [1] - 27:7
**aside** [6] - 83:19, 89:13, 109:24, 110:25, 111:17, 112:15
**assessed** [1] - 104:17
**assessment** [8] - 15:22, 17:1, 55:8, 55:24, 102:10, 102:14, 102:18, 106:22
**assignment** [1] - 47:20
**assignments** [1] - 15:2
**assigns** [1] - 77:7
**assist** [3] - 55:23, 59:1, 60:10
**associated** [7] - 16:12, 17:15, 17:18, 19:15, 21:20, 21:23, 46:7
**associating** [1] - 46:1
**ASSOCIATION** [1] - 1:2
**assume** [3] - 6:3, 29:16, 77:15
**assuming** [2] - 79:10, 80:25
**assumption** [2] - 87:20, 110:11
**attached** [2] - 80:21, 105:5
**attaches** [1] - 77:4
**attempt** [1] - 99:5
**attendance** [3] - 65:2, 65:17, 65:18
**attest** [1] - 32:16
**attestation** [3] - 32:6, 32:9, 32:11
**attorney** [6] - 6:6, 13:1, 78:14, 108:2, 108:7, 121:6
**attorney-client** [1] - 121:6
**attorneys** [9] - 13:3, 14:2, 14:22, 15:19, 16:22, 18:3, 22:2, 23:5, 121:8
**available** [7] - 27:6, 48:20, 48:21, 48:23, 49:15, 54:20, 64:20
**avoid** [2] - 5:19, 18:19
**aware** [24] - 26:17, 27:2, 38:17, 39:18, 42:16, 45:18, 49:1, 50:4, 54:11, 63:16,

68:13, 68:15, 68:25, 69:13, 74:3, 74:15, 83:19, 84:13, 96:24, 105:12, 105:18, 106:6, 112:22, 118:2
**bachelor's** [1] - 7:3
**background** [2] - 7:2, 86:23
**backup** [3] - 49:24, 50:4, 50:7
**ballpark** [1] - 115:6
**based** [16] - 13:8, 25:3, 31:24, 32:10, 42:19, 45:8, 55:8, 89:19, 99:17, 99:20, 102:10, 102:24, 116:10, 116:11, 118:21, 122:10
**basic** [2] - 5:7, 29:23
**basis** [2] - 32:17, 98:20
**bathroom** [1] - 6:13
**BE** [1] - 125:3
**becoming** [1] - 92:5
**begin** [2] - 27:14, 28:11
**beginning** [5] - 5:13, 41:17, 81:9, 90:6, 117:25
**begins** [9] - 24:6, 86:11, 86:15, 88:2, 88:4, 92:1, 98:4, 99:9, 102:5
**begun** [1] - 28:1
**Behalf** [2] - 2:2, 2:8
**behalf** [6] - 4:13, 4:15, 4:16, 24:8, 37:10, 37:21
**behavior** [7] - 59:14, 62:17, 62:24, 63:12, 87:2, 119:17, 119:24
**behavioral** [1] - 59:16
**believes** [1] - 87:21
**below** [2] - 30:1, 30:3
**benefits** [1] - 27:9
**best** [2] - 5:12, 6:1
**better** [4] - 42:24, 43:8, 58:4, 93:18
**between** [16] - 1:5, 16:13, 19:17, 28:3, 33:25, 41:20, 42:13, 58:1, 64:7, 70:2, 70:4, 74:11, 85:4, 96:4, 96:25, 115:19
**beyond** [8] - 42:20, 43:2, 52:15, 68:5, 72:20, 89:8, 89:23, 113:19
**bigger** [1] - 92:5
**birth** [1] - 113:15

**bit** [3] - 54:5, 69:17, 84:1
**bottom** [3] - 90:5, 91:21, 98:4
**Brady** [6] - 90:9, 90:16, 90:18, 90:20, 90:22, 91:5
**break** [12] - 6:11, 6:13, 6:17, 10:13, 51:14, 51:16, 73:17, 73:19, 106:2, 106:3, 122:14
**bringing** [2] - 48:12, 48:23
**brings** [1] - 49:7
**brought** [6] - 33:19, 35:20, 74:13, 75:3, 75:4, 104:20
**bullets** [1] - 81:5
**business** [3] - 7:4, 55:15
**but..** [1] - 29:14
**BY** [57] - 4:19, 8:8, 8:24, 10:15, 11:8, 22:15, 23:13, 23:25, 31:11, 36:11, 37:18, 41:12, 43:10, 44:18, 45:19, 46:21, 49:2, 49:19, 51:1, 51:19, 52:17, 68:10, 68:20, 72:24, 73:11, 73:21, 75:16, 76:25, 81:13, 82:4, 84:23, 87:24, 89:12, 92:19, 94:24, 95:24, 97:5, 99:3, 100:10, 104:25, 105:20, 106:4, 107:24, 108:14, 111:9, 112:4, 112:23, 113:8, 113:25, 114:8, 115:3, 115:21, 116:3, 116:24, 117:6, 119:11, 121:1
**candidates** [1] - 13:11
**CAP** [3] - 99:13, 99:19, 99:25
**capacity** [9] - 8:13, 18:15, 18:17, 24:3, 24:5, 114:10, 114:11, 114:20, 115:10
**Capital** [2] - 33:2, 77:21
**capital** [1] - 34:1
**careers** [1] - 15:13
**Carol** [1] - 1:10
**case** [35] - 7:16, 13:20, 16:16, 16:17, 16:18, 17:19, 27:13, 27:25, 28:8, 30:5, 30:9,

30:15, 30:19, 32:19, 36:20, 45:20, 50:13, 66:9, 67:11, 69:15, 69:18, 70:6, 70:13, 70:23, 71:7, 72:15, 77:12, 86:4, 105:6, 105:7, 116:22, 117:24, 120:24, 121:2
**Case** [2] - 1:6, 1:10
**cases** [13] - 29:23, 29:25, 30:3, 30:6, 30:20, 30:21, 47:3, 68:16, 77:5, 77:7, 115:18, 115:19
**category** [1] - 35:25
**caused** [1] - 87:1
**causes** [1] - 86:24
**caveat** [1] - 118:14
**certain** [5] - 24:18, 34:24, 48:19, 48:20, 75:10
**certainty** [1] - 50:5
**CERTIFICATE** [1] - 125:1
**certifications** [1] - 7:12
**certify** [1] - 123:1
**cetera** [1] - 70:25
**chain** [1] - 86:10
**chance** [1] - 80:1
**chances** [4] - 86:15, 86:19, 90:6, 90:9
**change** [15] - 8:3, 46:11, 53:8, 123:4, 123:10, 123:13, 123:16, 123:19, 123:22, 123:25, 124:3, 124:7, 124:10, 124:13, 124:16
**changed** [3] - 53:2, 85:18, 85:20
**changes** [4] - 53:5, 53:9, 53:24, 94:1
**charge** [1] - 105:22
**charged** [2] - 125:17, 125:18
**choice** [1] - 33:10
**choose** [2] - 61:3, 63:20
**chose** [1] - 77:23
**chosen** [1] - 77:21
**circumstance** [4] - 36:24, 37:19, 63:13, 67:9
**circumstances** [7] - 36:13, 37:2, 47:14, 47:24, 67:5, 68:11, 68:14

**Civil** [1] - 24:23
**claim** [56] - 27:11, 32:22, 33:20, 34:7, 34:10, 34:25, 35:19, 35:20, 39:10, 39:19, 40:7, 41:6, 41:15, 41:22, 41:24, 42:1, 42:4, 42:22, 43:23, 43:25, 45:24, 46:8, 48:13, 48:16, 48:24, 49:7, 51:2, 51:23, 52:12, 71:5, 72:7, 74:4, 74:23, 92:12, 98:5, 98:8, 98:13, 98:22, 99:6, 105:19, 106:6, 107:9, 107:15, 107:19, 107:21, 108:1, 108:8, 111:6, 111:17, 111:24, 112:16, 113:2, 118:3, 118:7, 118:11, 118:13
**Claimant** [4] - 2:2, 4:10, 4:13, 13:11
**Claimant's** [8] - 15:22, 15:24, 17:1, 19:3, 20:10, 21:12, 106:23, 106:24
**claiming** [1] - 47:11
**claims** [25] - 4:24, 15:23, 34:17, 35:18, 35:23, 43:16, 43:20, 43:22, 50:9, 52:5, 74:5, 94:14, 99:1, 106:23, 107:18, 109:4, 112:2, 114:18, 115:6, 115:8, 115:14, 116:1, 116:5, 116:12
**clarify** [3] - 12:22, 49:3, 93:2
**clarifying** [1] - 107:11
**clarity** [2] - 4:25, 29:15
**clear** [11] - 5:14, 5:22, 5:23, 18:18, 23:23, 24:6, 24:7, 78:22, 93:15, 117:16, 118:5
**clearly** [1] - 85:12
**client** [12] - 100:13, 100:16, 100:23, 101:5, 101:8, 101:10, 101:12, 101:13, 101:16, 101:19, 101:21, 121:6
**closed** [2] - 81:22, 105:7
**closing** [1] - 97:19
**co** [1] - 106:24

**co-workers** [1] - 106:24

**code** [4] - 32:5, 32:8, 32:12, 65:3

**collaboration** [1] - 92:6

**colleague** [31] - 16:12, 17:15, 19:14, 21:22, 47:4, 55:6, 55:23, 55:25, 56:6, 56:11, 56:18, 57:10, 57:24, 58:1, 58:9, 58:15, 58:21, 81:19, 81:24, 82:10, 82:16, 83:1, 83:20, 91:9, 92:13, 92:21, 93:10, 94:15, 100:19, 101:9, 103:8

**colleagues** [6] - 56:19, 57:15, 57:19, 59:5, 83:18, 103:9

**colleagues'** [1] - 58:18

**collect** [4] - 38:22, 38:23, 55:23, 55:25

**collected** [5] - 82:24, 83:2, 83:4, 83:10, 99:21

**collecting** [2] - 12:6, 55:6

**collection** [3] - 15:25, 17:4, 106:25

**combined** [1] - 11:17

**comfortable** [1] - 92:7

**commenced** [1] - 4:2

**commencing** [1] - 1:17

**comment** [3] - 74:13, 88:25, 98:9

**comments** [14] - 61:3, 61:5, 61:6, 61:7, 61:12, 61:18, 63:15, 63:19, 89:13, 89:18, 95:7, 95:15, 99:1, 120:1

**common** [23] - 12:14, 12:16, 14:16, 16:11, 17:14, 19:12, 19:13, 21:19, 21:24, 55:2, 55:10, 56:8, 56:12, 57:6, 57:13, 57:17, 57:21, 58:11, 58:15, 63:22, 64:13, 64:14, 116:9

**commonly** [2] - 55:16, 116:6

**communicate** [2] - 66:23, 80:4

**communication** [8] - 15:23, 17:2, 84:12, 93:23, 94:7, 94:19, 106:24, 121:7

**communications** [1] - 121:8

**company** [4] - 15:9, 26:15, 31:13, 54:18, 68:14, 98:11, 122:4, 122:5

**company's** [1] - 15:14

**company-wide** [1] - 26:15

**compared** [2] - 48:13, 122:1

**comparing** [1] - 85:9

**complainant** [5] - 40:16, 41:1, 41:17, 41:18, 46:7

**complaining** [1] - 69:25

**complaint** [8] - 32:25, 35:5, 35:11, 40:14, 47:12, 71:9, 74:16, 105:13

**Complaint's** [1] - 17:3

**complaints** [12] - 11:12, 13:6, 28:18, 28:21, 30:23, 68:22, 69:3, 69:6, 69:10, 69:14, 117:1, 118:22

**complete** [2] - 55:21, 56:5

**completed** [2] - 32:15, 54:21

**completing** [2] - 64:3, 94:5

**complex** [2] - 29:25, 30:6

**compliance** [8] - 25:18, 26:21, 27:21, 28:6, 28:8, 30:11, 53:19, 53:20

**computer** [6] - 32:10, 49:10, 49:15, 49:21, 49:23, 50:1

**computer-based** [1] - 32:10

**concern** [5] - 28:7, 33:3, 34:23, 59:12, 62:11

**concerns** [8] - 13:6, 25:14, 25:15, 25:19, 28:19, 55:17, 66:10, 80:4

**concluded** [3] - 70:12, 72:13, 73:2

**concludes** [1] - 50:11

**conclusion** [3] - 72:18, 97:24, 99:25

**condition** [2] - 25:5, 116:11

**conduct** [5] - 32:6, 32:12, 59:16, 65:3,
65:4

**conducted** [3] - 54:1, 85:19, 85:21

**conducting** [1] - 12:6

**conference** [11] - 74:11, 74:19, 79:14, 79:18, 79:21, 79:24, 79:25, 80:11, 80:14, 80:15, 96:25

**confidential** [1] - 69:23

**confirm** [1] - 10:1

**confusion** [2] - 18:19, 94:10

**conjecture** [1] - 90:3

**connection** [1] - 78:1

**consider** [5] - 28:7, 41:22, 41:24, 55:12, 65:22

**consideration** [6] - 55:8, 102:22, 103:1, 103:8, 103:13, 103:21

**considered** [4] - 55:2, 62:15, 62:20, 119:23

**consultants** [1] - 30:2

**contact** [4] - 27:7, 32:24, 66:7, 66:9

**contacted** [1] - 77:13

**contacting** [1] - 70:1

**contained** [4] - 49:25, 71:16, 72:1, 72:5

**contains** [1] - 70:19

**content** [5] - 18:23, 20:5, 21:7, 83:14, 108:25

**contention** [1] - 99:10

**context** [2] - 32:9, 44:3

**continue** [1] - 63:7

**continues** [1] - 91:17

**continuing** [2] - 9:16, 94:11

**contribute** [1] - 34:10

**contributions** [1] - 98:10

**conversation** [17] - 41:20, 42:13, 42:15, 42:19, 42:24, 43:3, 43:13, 61:12, 67:2, 70:25, 84:16, 87:11, 96:9, 96:13, 96:19, 98:19, 100:24

**conversations** [4] - 39:7, 59:2, 70:2, 75:3

**copied** [3] - 81:23, 82:9, 82:12

**copies** [2] - 125:18, 125:18

**copy** [5] - 77:14, 77:18, 78:5, 78:15, 105:4

**corporate** [1] - 11:10

**corporation** [1] - 9:7

**correct** [21] - 12:3, 18:10, 22:13, 23:21, 51:24, 59:4, 63:10, 64:21, 76:6, 80:12, 85:10, 89:16, 98:15, 102:1, 102:11, 103:5, 103:10, 103:25, 120:14, 121:22, 123:3

**Corrective** [2] - 52:1, 59:8

**corrective** [35] - 16:15, 17:13, 17:17, 21:25, 59:9, 59:19, 60:4, 60:9, 60:15, 60:23, 61:2, 61:17, 61:25, 62:10, 62:12, 63:1, 63:2, 63:15, 63:17, 63:18, 64:8, 64:11, 65:12, 66:5, 71:2, 76:19, 76:21, 95:17, 103:14, 103:15, 110:7, 110:8, 110:13

**correctly** [5] - 74:9, 83:9, 88:10, 88:24, 91:10

**correspondence** [2] - 16:13, 70:4

**cost** [1] - 125:17

**counsel** [5] - 18:8, 30:25, 52:21, 106:7, 125:13

**COUNTY** [1] - 125:2

**couple** [3] - 93:16, 94:4, 110:18

**course** [2] - 32:20, 50:25

**court** [4] - 5:10, 45:5, 46:19, 100:8

**covered** [1] - 31:8

**coworkers** [2] - 15:24, 17:3

**create** [1] - 60:12

**created** [2] - 72:11, 103:4

**creation** [3] - 15:25, 17:4, 107:1

**credentials** [1] - 7:12

**criteria** [2] - 57:20, 66:4

**current** [11] - 7:14, 13:9, 14:8, 30:14, 48:12, 48:22, 49:6, 50:8, 50:25, 51:3,
84:9

**daily** [1] - 12:1

**Daniel** [2] - 2:4, 4:12

**database** [3] - 13:21, 69:19

**date** [5] - 9:21, 80:25, 81:3, 83:5

**dated** [1] - 80:24

**dates** [4] - 81:2, 82:23, 113:15

**David** [14] - 74:19, 77:17, 77:19, 83:17, 84:4, 84:15, 85:5, 85:17, 86:1, 94:25, 96:5, 96:7, 97:1, 105:4

**David's** [1] - 102:21

**DAY** [1] - 125:20

**days** [1] - 79:15

**deadline** [2] - 79:7, 80:17

**deal** [2] - 116:5, 116:12

**dealt** [1] - 115:14

**decide** [2] - 67:25, 70:22

**decision** [12] - 34:3, 47:23, 66:24, 67:16, 67:22, 70:19, 95:9, 95:10, 95:18, 102:24, 104:17

**decisions** [2] - 64:4, 64:5

**deem** [1] - 96:16

**defendant** [1] - 6:20

**deficiencies** [3] - 55:4, 84:6, 84:9

**definitely** [6] - 37:24, 38:1, 43:15, 43:19, 45:9, 46:5

**definitively** [2] - 44:14, 45:16

**degree** [3] - 7:3, 7:6, 7:8

**delay** [1] - 81:21

**Demand** [4] - 19:4, 20:10, 21:12, 108:21

**denied** [1] - 98:14

**denies** [1] - 41:21

**Dennis** [4] - 2:3, 2:16, 4:9, 124:21

**DENNIS** [93] - 4:9, 4:19, 8:8, 8:24, 10:6, 10:11, 10:14, 10:15, 11:6, 11:8, 22:12, 22:15, 23:8, 23:11, 23:13, 23:22, 23:25, 31:8, 31:11, 36:4, 36:11, 37:13, 37:17, 37:18, 41:11, 41:12,

43:7, 43:10, 44:18, 45:2, 45:12, 45:19, 46:16, 46:21, 49:2, 49:19, 51:1, 51:15, 51:17, 51:19, 52:16, 52:17, 68:7, 68:10, 68:20, 72:24, 73:11, 73:16, 73:20, 73:21, 75:16, 76:25, 81:13, 82:1, 82:4, 84:23, 87:24, 89:11, 89:12, 92:17, 92:19, 94:24, 95:24, 97:5, 99:3, 100:5, 100:10, 104:25, 105:16, 105:20, 105:25, 106:4, 107:13, 107:17, 107:24, 108:14, 111:9, 112:4, 112:23, 113:8, 113:21, 113:25, 114:6, 114:8, 115:3, 115:21, 116:3, 116:24, 117:6, 119:11, 121:1, 122:12, 122:15

**deny** [8] - 19:1, 20:8, 21:10, 109:11, 109:25, 110:24, 111:20, 112:18

**department** [5] - 28:25, 29:3, 53:17, 53:19, 101:21

**dependent** [2] - 41:16, 42:12

**deposed** [1] - 5:4

**deposes** [1] - 4:6

**DEPOSITION** [3] - 1:12, 2:15, 123:7

**deposition** [14] - 1:13, 4:2, 9:3, 9:6, 10:17, 22:17, 23:20, 24:2, 52:22, 123:2, 125:4, 125:10, 125:12, 125:17

**Deposition** [11] - 1:15, 8:6, 75:14, 81:11, 82:2, 84:21, 95:22, 97:3, 108:12, 112:6, 113:6

**describe** [3] - 7:1, 31:20, 34:19

**describing** [1] - 118:5

**design** [2] - 94:9, 94:20

**designate** [1] - 18:13

**designed** [1] - 122:10

**desired** [1] - 123:5

**details** [3] - 38:1,

120:11, 121:11

**determination** [3] - 33:13, 47:21, 96:16

**determine** [5] - 34:24, 40:24, 44:22, 45:24, 58:3

**determined** [1] - 67:14

**determining** [2] - 102:22, 102:23

**develop** [1] - 121:17

**developer** [1] - 90:11

**developers** [3] - 85:9, 90:19

**developing** [1] - 94:3

**development** [4] - 120:3, 120:7, 120:20, 121:3

**dictated** [1] - 55:14

**difference** [2] - 17:23, 28:3

**different** [13] - 21:5, 48:12, 57:23, 67:16, 71:3, 71:12, 85:25, 117:19, 120:15, 121:25, 122:5, 122:9

**differently** [1] - 88:17

**difficult** [6] - 5:20, 48:5, 75:1, 75:8, 104:11, 110:4

**direct** [2] - 37:7, 88:13

**direction** [2] - 81:8, 125:8

**directly** [2] - 47:16, 48:1

**disagreement** [1] - 104:21

**discarded** [1] - 72:18

**disciplinary** [3] - 14:6, 51:7, 117:9

**disciplined** [3] - 118:24, 119:2, 119:6

**disclosed** [1] - 39:1

**discovered** [3] - 18:25, 20:7, 21:8

**discrepancies** [1] - 87:16

**discretion** [4] - 56:14, 62:18, 66:19, 73:10

**discretionary** [1] - 57:4

**discriminated** [3] - 41:19, 50:9, 86:6

**discriminating** [2] - 45:7, 87:23

**discrimination** [112] - 11:12, 13:7, 15:1, 15:23, 24:11, 24:15, 25:7, 25:14, 25:21, 26:5, 26:13, 26:16, 26:19, 27:1, 30:23,

31:3, 31:14, 32:3, 32:12, 32:22, 33:20, 34:7, 34:11, 37:20, 38:18, 38:20, 38:21, 38:23, 39:11, 39:19, 40:21, 40:25, 41:3, 41:7, 41:15, 42:2, 42:7, 42:18, 42:22, 43:2, 43:12, 43:14, 43:16, 43:18, 43:20, 43:21, 43:23, 43:24, 44:9, 44:15, 44:22, 45:11, 45:16, 45:25, 46:2, 46:8, 46:13, 47:12, 48:13, 49:7, 49:9, 49:13, 50:12, 50:21, 51:3, 51:6, 51:22, 52:5, 52:8, 52:12, 53:11, 68:23, 69:11, 71:5, 72:7, 73:24, 74:1, 74:4, 74:6, 74:23, 87:2, 87:10, 87:15, 88:13, 89:8, 89:23, 92:12, 94:14, 106:23, 107:16, 107:18, 109:5, 114:19, 115:6, 115:8, 115:14, 116:5, 116:10, 116:13, 117:1, 117:9, 117:25, 118:3, 118:8, 118:12, 118:16, 118:23, 119:1, 119:4, 119:14

**discriminatory** [1] - 89:19

**discuss** [5] - 27:12, 33:3, 34:22, 35:13, 66:10

**discussed** [2] - 52:7, 63:22

**discusses** [1] - 32:7

**discussion** [3] - 13:7, 23:10, 33:6

**disparate** [1] - 13:8

**Dispute** [2] - 76:5, 76:12

**dispute** [54] - 16:9, 16:14, 16:16, 16:17, 17:16, 17:18, 19:14, 19:16, 19:18, 21:20, 21:21, 21:23, 28:22, 33:8, 33:10, 33:24, 34:12, 40:13, 47:17, 48:7, 50:13, 60:15, 60:19, 60:24, 61:1, 61:4, 61:13, 67:11, 67:12, 67:13, 67:24, 70:17, 71:9, 71:10,

71:14, 71:25, 74:2, 74:6, 74:10, 75:21, 75:24, 76:2, 78:9, 79:5, 79:20, 81:2, 86:21, 96:6, 103:23, 104:15, 105:11, 109:14, 111:8, 113:3

**disputed** [2] - 61:17, 104:6

**disputing** [7] - 33:13, 33:18, 47:22, 60:22, 61:15, 76:13, 76:16

**distinction** [1] - 117:11

**diversity** [1] - 15:2

**division** [1] - 24:6

**document** [55] - 8:19, 9:1, 9:3, 9:10, 9:19, 11:17, 18:23, 27:13, 59:12, 59:15, 60:8, 65:21, 70:24, 71:1, 71:21, 75:17, 75:18, 75:20, 76:4, 81:14, 81:15, 81:17, 82:5, 82:6, 82:20, 84:24, 84:25, 85:2, 85:7, 86:10, 95:25, 96:1, 96:3, 97:6, 97:7, 97:9, 97:16, 101:15, 106:16, 108:15, 108:16, 108:20, 108:23, 109:1, 109:4, 109:8, 113:9, 113:10, 113:12, 113:17, 114:2, 114:5, 114:7

**documentation** [1] - 70:2

**documented** [6] - 27:24, 60:1, 62:12, 62:22, 69:24, 71:17

**documents** [67] - 5:1, 10:22, 10:25, 11:15, 11:18, 16:10, 17:20, 17:24, 18:24, 19:15, 19:20, 19:23, 20:6, 20:18, 20:22, 21:1, 21:7, 21:15, 21:17, 21:21, 22:5, 40:18, 40:20, 40:22, 40:24, 41:3, 41:4, 48:19, 48:21, 49:14, 49:25, 50:7, 54:10, 54:12, 54:21, 60:2, 60:4, 60:6, 60:11, 66:14, 69:1, 69:4, 69:10, 70:11, 70:13, 70:19, 70:22, 71:11, 71:20, 72:11, 72:14, 72:17, 72:25, 73:13, 84:11,

88:20, 102:21, 102:25, 103:1, 103:2, 103:3, 103:7, 103:12, 103:17, 103:20, 104:1, 104:6

**done** [11] - 36:18, 39:9, 55:14, 55:16, 56:1, 56:3, 56:14, 93:18, 111:16, 117:19, 122:15

**down** [4] - 5:10, 5:14, 86:16, 92:1

**downsizing** [1] - 30:21

**drive** [1] - 50:3

**drummed** [1] - 90:1

**Drysdale** [25] - 74:12, 74:19, 77:17, 77:19, 77:25, 81:18, 83:17, 84:15, 85:18, 92:24, 94:25, 96:7, 96:9, 97:1, 99:5, 99:24, 100:24, 101:16, 102:13, 102:17, 104:5, 104:9, 110:14, 111:1, 111:18

**Drysdale's** [2] - 98:19, 109:21

**due** [1] - 50:10

**duly** [2] - 4:5, 125:5

**Duraimanickam** [15] - 1:8, 2:8, 13:12, 14:9, 68:23, 69:3, 69:12, 82:17, 89:9, 98:8, 98:14, 98:20, 101:25, 103:4, 103:18

**during** [12] - 10:13, 10:19, 13:12, 23:15, 24:1, 59:1, 67:12, 74:25, 75:2, 88:2, 88:5, 94:5

**ease** [1] - 29:15

**edited** [1] - 83:11

**educational** [1] - 7:2

**EEOC** [15] - 105:13, 105:19, 105:22, 106:7, 107:9, 107:15, 107:18, 107:21, 108:1, 108:8, 111:5, 111:17, 111:24, 112:16, 113:2

**egregious** [5] - 51:11, 52:1, 62:10, 62:22, 62:23

**egregiousness** [1] - 119:9

**eight** [2] - 114:16,

115:5
**either** [13] - 17:25, 27:19, 31:9, 34:6, 35:18, 42:25, 48:16, 58:11, 62:21, 74:7, 91:5, 110:12, 117:22
**electronic** [1] - 31:24
**elevated** [3] - 62:4, 62:14, 110:8
**email** [14] - 16:13, 27:19, 63:18, 70:4, 74:12, 80:20, 81:18, 85:3, 85:4, 85:17, 86:10, 96:4, 96:7, 96:18
**emails** [4] - 19:16, 21:19, 75:5, 103:24
**employed** [3] - 10:18, 23:15, 49:22
**employee** [125] - 7:16, 7:24, 12:18, 14:5, 15:1, 27:8, 27:9, 27:10, 27:11, 28:14, 28:15, 28:16, 28:17, 28:21, 28:25, 29:3, 29:12, 29:22, 29:24, 30:2, 30:3, 30:4, 30:5, 30:10, 30:11, 30:15, 30:19, 30:23, 32:19, 32:21, 32:25, 33:1, 33:10, 33:13, 33:18, 33:25, 34:8, 34:21, 35:12, 36:7, 41:1, 47:11, 47:15, 47:21, 48:1, 48:10, 48:12, 48:13, 48:22, 48:23, 49:4, 49:7, 49:8, 49:12, 49:22, 50:8, 50:14, 50:21, 50:25, 51:3, 53:13, 53:18, 53:23, 54:8, 54:13, 54:17, 55:5, 56:22, 57:16, 58:17, 60:7, 60:14, 60:22, 61:2, 61:10, 61:14, 61:16, 61:21, 63:7, 63:10, 63:14, 63:17, 63:25, 64:6, 64:18, 64:20, 65:23, 66:4, 66:8, 66:12, 66:13, 66:14, 66:15, 66:16, 66:17, 66:21, 66:24, 67:1, 67:3, 67:6, 67:10, 67:25, 68:2, 69:24, 70:1, 70:3, 70:6, 70:21, 70:25, 71:8, 71:13, 71:15, 72:3, 78:12, 79:2, 79:10, 80:1, 81:1, 81:5, 81:6, 97:14,
105:10, 118:18, 125:15
**Employee** [1] - 69:21
**employee's** [17] - 33:16, 35:10, 35:23, 45:23, 49:25, 56:18, 56:20, 66:25, 68:3, 71:24, 72:4, 72:14, 80:24, 97:11, 97:12, 118:7, 118:11
**employees** [27] - 11:5, 13:10, 14:7, 25:2, 25:12, 25:13, 26:3, 26:9, 26:12, 26:13, 27:6, 28:17, 28:19, 29:5, 29:19, 30:1, 30:7, 30:20, 30:25, 32:6, 54:22, 65:14, 66:9, 113:13, 120:9, 122:2
**employment** [5] - 25:15, 25:20, 66:25, 78:14, 102:9
**Employment** [1] - 15:14
**enacted** [1] - 24:22
**encompassed** [1] - 87:10
**encounter** [1] - 94:6
**end** [4] - 32:14, 98:12, 101:20, 101:22
**end-user** [2] - 101:20, 101:22
**enforce** [3] - 25:6, 25:9, 25:16
**enforced** [1] - 25:23
**enforcing** [2] - 26:1, 26:4
**engaged** [2] - 52:9, 111:1
**ensure** [2] - 25:2, 66:15
**entail** [1] - 54:25
**enter** [5] - 61:2, 61:5, 61:6, 65:24, 67:3
**entirety** [1] - 29:9
**Equal** [1] - 15:14
**equally** [1] - 26:8
**ERRATA** [1] - 123:7
**Errata** [1] - 124:20
**error** [1] - 45:13
**errors** [2] - 79:1, 87:1
**especially** [4] - 39:9, 86:25, 104:13, 110:5
**Esquire** [4] - 2:3, 2:4, 2:9, 124:21
**essence** [1] - 58:5
**essentially** [1] - 64:23
**estimate** [1] - 22:21
**et** [1] - 70:25
**ethics** [7] - 25:19, 26:14, 26:22, 27:17, 27:21, 27:23, 28:6
**ethnicity** [1] - 25:4
**evaluated** [1] - 58:17
**evaluation** [1] - 55:6
**event** [1] - 119:15
**events** [1] - 119:3
**evidence** [9] - 41:5, 41:13, 41:18, 44:13, 44:20, 85:25, 99:20, 99:24, 100:11
**exactly** [1] - 75:9
**examination** [1] - 2:16
**EXAMINATION** [1] - 4:18
**example** [4] - 41:18, 47:22, 49:3, 65:17, 94:3
**examples** [7] - 37:24, 60:10, 86:20, 87:3, 87:4, 88:8, 118:19
**Excel** [2] - 11:4, 114:4
**except** [3] - 85:21, 107:22, 123:3
**exception** [1] - 116:17
**exchange** [3] - 85:3, 85:4, 96:4
**excluding** [1] - 68:24
**excuse** [1] - 81:20
**exhibit** [1] - 93:5
**Exhibit** [41] - 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 8:6, 8:17, 75:14, 75:18, 81:11, 81:15, 82:2, 82:6, 84:21, 84:25, 88:1, 91:8, 91:13, 91:19, 95:22, 96:1, 97:3, 97:7, 100:20, 106:10, 108:12, 108:16, 109:18, 109:19, 109:24, 109:25, 110:16, 111:11, 112:6, 113:6, 113:10
**EXHIBITS** [1] - 3:1
**expand** [1] - 117:15
**expectations** [3] - 32:1, 122:6, 122:10
**experience** [2] - 118:6, 118:10
**experienced** [1] - 90:11
**experiences** [1] - 68:16
**explain** [5] - 60:21, 62:2, 78:21, 84:1, 87:4
**explanation** [1] -
86:19
**exposure** [1] - 115:10
**extensive** [1] - 64:2
**extent** [1] - 121:6
**extremely** [1] - 62:22
**faced** [1] - 117:9
**facilitating** [2] - 28:20, 28:22
**facilitation** [1] - 33:5
**facts** [3] - 76:11, 110:24, 112:19
**factual** [6] - 19:2, 20:9, 21:10, 109:12, 110:1, 111:21
**fair** [5] - 6:4, 6:17, 18:20, 24:8, 115:4
**fall** [1] - 64:3
**Falls** [1] - 7:10
**familiar** [4] - 11:23, 108:25, 120:2, 120:4
**far** [3] - 100:17, 100:22, 114:24
**fashion** [1] - 92:7
**faxes** [1] - 77:4
**FEBRUARY** [1] - 125:20
**February** [2] - 1:18, 22:25
**federal** [1] - 53:20
**feedback** [30] - 38:8, 47:4, 55:7, 55:23, 56:1, 56:11, 56:18, 56:20, 56:23, 56:24, 57:1, 57:10, 57:16, 57:20, 57:25, 58:2, 58:15, 58:18, 58:24, 59:6, 63:15, 83:18, 100:12, 100:17, 100:19, 100:22, 101:3, 101:7, 101:9
**felt** [1] - 89:25
**few** [6] - 29:13, 53:25, 74:25, 89:17, 106:1, 119:21
**figure** [2] - 42:21, 43:7
**file** [2] - 32:25, 33:10
**filed** [12] - 33:9, 63:3, 63:4, 69:6, 69:14, 74:16, 75:24, 77:1, 81:3, 105:12, 105:19, 106:7
**filing** [12] - 16:15, 17:16, 19:16, 21:21, 71:25, 72:4, 72:15, 74:10, 75:22, 75:23, 78:10, 103:23
**filled** [1] - 80:18
**final** [16] - 51:12, 52:1, 62:5, 62:19, 62:25, 63:2, 63:6, 67:20,
96:14, 97:19, 99:13, 99:19, 99:25, 103:15, 105:6, 110:13
**financial** [1] - 64:4
**findings** [1] - 50:15
**fine** [4] - 6:14, 9:23, 9:24, 65:10
**finish** [4] - 5:12, 6:15, 6:16, 35:7
**first** [26] - 4:5, 9:18, 23:21, 24:1, 57:25, 61:1, 62:9, 74:3, 75:23, 77:2, 77:8, 77:13, 85:6, 85:7, 86:9, 86:11, 86:20, 88:1, 97:10, 102:3, 104:10, 106:12, 108:22, 115:7, 125:5
**five** [2] - 86:19, 116:18
**focus** [1] - 7:4
**focused** [1] - 116:21
**follow** [3] - 75:4, 105:3, 105:10
**follow-up** [1] - 75:4
**following** [2] - 1:13, 64:5
**follows** [5] - 4:3, 4:6, 34:16, 93:9, 123:3
**foregoing** [4] - 123:2, 125:4, 125:10, 125:12
**Form** [6] - 52:2, 59:8, 76:5, 76:13, 79:8, 79:17
**form** [49] - 31:6, 36:3, 37:12, 41:8, 43:5, 44:16, 48:25, 49:17, 50:23, 57:12, 57:17, 60:12, 61:14, 61:17, 71:23, 76:3, 76:8, 76:9, 76:14, 76:16, 77:1, 77:11, 77:16, 77:18, 78:5, 81:25, 86:21, 87:12, 89:10, 92:15, 94:22, 98:23, 104:8, 104:24, 105:14, 105:23, 107:10, 108:10, 109:15, 111:2, 111:22, 112:20, 115:1, 115:16, 115:23, 116:16, 117:4, 119:7, 120:22
**formal** [6] - 13:5, 68:21, 69:2, 74:11, 74:18, 96:24
**format** [4] - 57:17, 58:8, 83:15, 114:1
**formatting** [1] - 83:13

**former** [8] - 13:9, 14:8, 15:24, 17:3, 27:6, 100:12, 101:25, 106:24
**forward** [2] - 35:20, 104:20
**forwarding** [1] - 85:5
**four** [6] - 52:4, 52:11, 58:6, 68:1, 68:17, 116:20
**framework** [2] - 61:25, 105:3
**Frank** [21] - 5:1, 5:2, 68:24, 73:23, 74:19, 74:22, 77:1, 85:4, 85:8, 86:11, 88:14, 89:7, 89:14, 89:17, 89:25, 92:8, 93:11, 93:23, 94:2, 94:9, 97:1
**Frank's** [8] - 81:20, 82:10, 84:6, 86:4, 92:12, 94:14, 102:14, 102:18
**fresh** [1] - 120:9
**front** [1] - 106:10
**full** [4] - 85:6, 91:19, 98:3, 102:4
**fully** [2] - 93:25, 94:6
**future** [2] - 80:24, 80:25
**gather** [1] - 37:4
**gears** [3] - 54:4, 64:16, 114:9
**gender** [1] - 25:4
**general** [4] - 24:13, 34:19, 54:23, 58:19
**generally** [8] - 27:4, 27:16, 31:20, 41:5, 44:10, 63:9, 64:17, 71:6
**geographic** [1] - 29:6
**given** [4] - 55:3, 58:22, 58:23, 125:10
**glance** [1] - 78:24
**Gluek** [4] - 2:4, 4:10, 4:13, 124:21
**governing** [1] - 65:14
**governs** [1] - 59:18
**grade** [3] - 30:1, 30:7, 30:20
**graduated** [1] - 7:7
**Graham** [3] - 1:14, 125:3, 125:22
**grammatical** [1] - 79:1
**graphic** [1] - 53:6
**grievances** [1] - 13:6
**Grimm** [1] - 90:20
**ground** [1] - 5:7
**group** [2] - 92:2, 92:4

**Group** [8] - 1:8, 2:8, 9:6, 26:3, 29:10, 31:12, 60:3, 115:10
**Group's** [1] - 26:4
**guess** [9] - 9:4, 48:6, 63:5, 75:10, 101:19, 115:20, 115:22, 115:24
**guidance** [2] - 33:5, 60:9
**Gustafson** [4] - 2:4, 4:10, 4:12, 124:21
**half** [2] - 108:24, 114:16
**HAND** [1] - 125:20
**handbook** [5] - 54:13, 54:17, 64:18, 64:20, 64:24
**handed** [8] - 75:17, 81:14, 82:5, 84:24, 95:25, 97:6, 108:15, 113:9
**handle** [4] - 29:23, 29:25, 30:3, 30:6
**harassment** [4] - 13:8, 30:23, 65:6, 65:7
**hard** [3] - 5:20, 50:3, 121:9
**heading** [3] - 9:11, 9:13, 93:17
**health** [1] - 25:5
**hear** [4] - 77:13, 77:21, 77:23, 79:20
**heavily** [1] - 104:13
**heightened** [1] - 69:22
**held** [7] - 7:19, 7:25, 67:2, 76:24, 79:14, 89:24, 97:1
**help** [5] - 5:23, 30:3, 33:23, 34:10, 60:11
**HENNEPIN** [1] - 125:2
**hereby** [1] - 123:1
**hereto** [1] - 125:15
**hide** [1] - 86:22
**highly** [3] - 41:16, 42:12, 70:18
**hire** [1] - 113:15
**history** [2] - 66:17, 70:10
**hmm** [2] - 5:19, 22:14
**hold** [1] - 73:7
**honestly** [1] - 74:24
**hours** [1] - 22:23
**HR** [10] - 28:7, 53:16, 69:15, 69:18, 70:13, 71:7, 72:2, 72:5, 86:20, 105:8
**HRdirect** [13] - 25:13, 26:12, 26:20, 27:3, 27:8, 27:24, 32:24,

66:8, 69:6, 69:21, 117:16, 117:22, 118:11
**Hughes** [1] - 4:16
**HUGHES** [6] - 1:14, 4:2, 4:4, 123:1, 124:19, 125:4
**Human** [2] - 33:2, 77:21
**human** [2] - 7:4, 34:1
**hypothetical** [1] - 44:25
**identical** [2] - 20:3, 20:24
**identification** [9] - 8:7, 75:15, 81:12, 82:3, 84:22, 95:23, 97:4, 108:13, 113:7
**identified** [3] - 21:2, 22:6, 89:14
**identify** [3] - 57:25, 59:5, 79:19
**identifying** [1] - 59:3
**identity** [1] - 58:23
**IDR** [33] - 61:9, 61:17, 61:18, 71:19, 72:8, 72:12, 72:14, 72:15, 72:18, 73:1, 73:2, 77:14, 77:22, 79:7, 79:17, 80:5, 83:3, 85:14, 97:11, 97:13, 97:17, 104:6, 105:3, 111:1, 111:4, 111:19, 111:25, 112:17, 112:21, 117:8, 117:11, 117:17, 118:7
**ignored** [1] - 86:25
**imagine** [1] - 122:7
**immediately** [2] - 63:3, 63:5
**impact** [1] - 101:10
**impacted** [1] - 101:5
**impacts** [1] - 101:19
**inappropriate** [4] - 42:6, 59:13, 62:23, 119:24
**Inc** [2] - 1:8, 2:8
**incidents** [1] - 119:23
**include** [5] - 80:22, 102:15, 103:1, 103:6, 107:8
**included** [4] - 64:25, 82:19, 103:3, 103:8
**includes** [1] - 80:23
**including** [3] - 13:11, 15:23, 17:2, 25:20, 32:2, 32:12, 106:23
**incorrect** [1] - 87:22
**independently** [1] -

46:23
**INDEX** [1] - 2:15
**indicate** [9] - 41:2, 81:5, 85:7, 87:9, 87:17, 96:12, 98:18, 99:4, 99:23
**indicated** [3] - 18:8, 41:19, 66:4
**indicates** [1] - 100:15
**indicating** [5] - 44:4, 50:15, 61:14, 66:11, 76:17
**indicating)** [1] - 86:16
**indication** [1] - 87:17
**individual** [22] - 24:16, 35:22, 37:9, 38:2, 38:10, 38:16, 38:22, 39:2, 39:4, 39:5, 39:9, 39:13, 40:10, 41:21, 41:23, 44:2, 45:7, 47:20, 57:2, 67:18, 104:20
**individual's** [3] - 39:8, 42:9, 57:3
**individuals** [4] - 34:24, 42:14, 47:9, 47:10
**informal** [3] - 13:6, 68:22, 69:3
**informally** [1] - 56:1
**information** [22] - 34:10, 37:4, 37:8, 38:4, 38:22, 38:24, 39:1, 39:18, 39:24, 44:5, 45:15, 55:10, 57:3, 58:20, 59:3, 60:4, 83:14, 87:22, 100:15, 101:2, 101:3, 101:10
**informing** [1] - 58:11
**initial** [8] - 62:3, 62:8, 72:4, 75:3, 103:14, 104:17, 110:12, 122:8
**initiate** [2] - 60:24, 66:6
**initiated** [1] - 61:19
**initiatives** [1] - 14:25
**instances** [1] - 89:17
**instead** [1] - 29:17
**instruct** [1] - 10:7
**interact** [1] - 57:1
**interaction** [1] - 121:16
**interested** [2] - 22:20, 125:15
**interim** [12] - 16:11, 17:14, 19:13, 21:19, 21:24, 55:12, 55:13, 55:21, 57:7, 58:12,

58:16, 63:23
**internal** [53] - 13:1, 16:9, 16:14, 16:16, 16:17, 17:16, 17:18, 19:14, 19:16, 19:17, 21:20, 21:21, 21:23, 28:22, 33:8, 33:10, 33:24, 34:12, 40:13, 47:17, 48:7, 50:13, 60:19, 60:24, 61:4, 61:13, 61:17, 67:12, 67:13, 67:23, 67:24, 70:16, 71:9, 71:10, 71:14, 71:25, 74:2, 74:6, 74:10, 75:21, 75:24, 78:8, 79:20, 81:2, 82:13, 96:5, 103:23, 104:14, 105:8, 105:11, 109:14, 111:7, 113:3
**Internal** [2] - 76:5, 76:12
**internally** [2] - 29:21, 69:5
**international** [2] - 29:12, 29:17
**internationally** [1] - 23:17
**internet** [1] - 15:9
**interpret** [1] - 104:12
**interpretation** [1] - 87:13
**intersect** [1] - 53:21
**interviewer's** [1] - 104:16
**intranet** [9] - 12:18, 53:7, 54:18, 60:7, 64:20, 64:23, 64:24, 65:1, 65:22
**investigate** [4] - 33:4, 35:17, 46:3, 85:23
**investigated** [7] - 44:11, 48:17, 80:8, 80:18, 85:13, 86:8, 94:21
**investigates** [1] - 80:6
**investigating** [8] - 11:11, 28:20, 34:16, 40:7, 43:25, 72:6, 73:5, 115:8
**investigation** [66] - 15:22, 17:1, 18:25, 20:7, 21:9, 27:15, 27:25, 34:7, 34:12, 34:14, 39:7, 39:21, 40:8, 42:20, 44:14, 45:17, 45:23, 46:11, 48:2, 48:22, 49:6, 49:16, 50:11, 70:12, 71:5, 72:13, 73:13,

80:10, 81:9, 81:22, 85:5, 85:19, 85:21, 85:24, 86:2, 90:14, 91:4, 91:6, 92:11, 92:20, 92:24, 94:13, 95:1, 100:25, 103:21, 106:22, 107:8, 109:11, 109:24, 110:24, 110:25, 111:4, 111:8, 111:16, 111:18, 111:20, 112:1, 112:16, 112:17, 112:18, 113:1, 113:4, 117:14, 120:17, 120:19, 121:13
**investigations** [2] - 28:20, 54:1
**investigative** [8] - 40:18, 41:7, 41:14, 42:10, 48:11, 83:2, 83:16, 84:3
**investigator** [13] - 34:5, 43:3, 44:7, 44:21, 46:22, 47:13, 47:14, 47:19, 47:25, 48:8, 80:16, 80:20, 81:8
**involuntary** [1] - 65:25
**involve** [3] - 43:12, 43:17, 43:21
**involved** [12] - 33:17, 34:2, 35:4, 35:9, 39:21, 42:9, 42:23, 53:12, 107:22, 114:19, 117:7, 120:20
**involvement** [2] - 70:21, 117:2
**involves** [2] - 55:5, 121:3
**involving** [3] - 43:13, 117:24, 121:14
**issue** [9] - 27:12, 28:8, 59:16, 62:16, 63:8, 94:7, 94:19, 121:20
**issued** [2] - 63:6, 66:14
**issues** [5] - 62:21, 76:18, 79:2, 80:2, 86:25
**IT** [2] - 110:6, 125:3
**item** [1] - 110:12
**items** [8] - 9:12, 24:17, 72:1, 76:21, 95:11, 100:14, 104:18, 118:22
**iterations** [2] - 94:8, 94:20

**itself** [5] - 24:20, 60:13, 70:18, 121:15, 121:23
**J-E-N-N-I-F-E-R** [1] - 108:6
**January** [1] - 96:8
**Jen** [1] - 108:4
**Jennifer** [5] - 13:2, 93:7, 93:10, 93:14, 94:14
**Jezierski** [4] - 2:9, 2:20, 4:14, 22:11
**JEZIERSKI** [50] - 4:14, 8:20, 10:4, 10:8, 10:12, 22:14, 23:19, 23:24, 31:5, 36:3, 37:12, 41:8, 43:5, 44:16, 48:25, 49:17, 50:23, 51:13, 52:14, 68:4, 68:12, 71:23, 72:20, 73:3, 76:14, 87:12, 89:10, 92:15, 94:22, 98:23, 104:8, 104:24, 105:14, 105:23, 107:10, 108:10, 111:2, 111:22, 112:20, 113:19, 114:3, 115:1, 115:16, 115:23, 116:16, 117:4, 119:7, 120:22, 121:5, 122:17
**job** [5] - 8:3, 13:10, 17:1, 30:14, 122:6
**jobs** [1] - 120:12
**Johnson** [1] - 2:10
**Jolynn** [3] - 1:14, 125:3, 125:22
**jump** [1] - 9:25
**June** [1] - 83:8
**Just-In** [1] - 31:24
**Kaitlyn** [5] - 2:3, 4:9, 124:21
**kdennis@ gustafsongluek. com** [1] - 2:6
**keep** [3] - 65:8, 65:9, 73:5
**kept** [6] - 24:7, 39:4, 70:13, 71:11, 72:12, 72:15
**Kim** [13] - 83:20, 84:2, 84:5, 84:12, 95:2, 96:10, 96:19, 100:24, 101:2, 101:14, 101:17, 101:18, 101:22
**Kim's** [1] - 90:10
**kind** [16] - 5:6, 22:21,

29:14, 29:20, 43:17, 48:5, 54:23, 62:10, 64:5, 66:10, 66:15, 69:21, 73:6, 104:2, 115:5, 121:23
**knowledge** [18] - 50:6, 55:9, 91:7, 92:23, 93:1, 94:23, 103:19, 103:22, 107:23, 107:25, 108:8, 108:9, 108:11, 110:6, 111:7, 111:24, 113:2, 117:5
**known** [1] - 42:17
**KNOWN** [1] - 125:3
**knows** [1] - 81:8
**labeled** [2] - 91:15, 93:17
**large** [2] - 36:19, 56:25
**last** [19] - 18:22, 52:4, 52:11, 53:25, 68:1, 68:17, 87:25, 88:5, 90:4, 91:19, 97:15, 99:12, 102:5, 114:18, 114:21, 115:5, 116:18, 116:20, 120:18
**laws** [1] - 53:20
**lawsuits** [1] - 6:20
**lead** [3] - 51:10, 51:24, 51:25
**leader** [33] - 26:23, 34:22, 34:23, 35:2, 35:4, 35:8, 35:13, 35:14, 35:17, 35:21, 35:24, 36:17, 36:25, 37:3, 37:5, 37:6, 37:7, 38:6, 40:7, 40:17, 40:23, 42:11, 42:20, 43:25, 45:22, 67:22, 70:18, 71:4, 72:6, 73:4, 73:12
**leaders** [1] - 121:14
**leadership** [3] - 30:8, 32:2, 33:3
**learned** [1] - 31:23
**least** [4] - 36:8, 45:13, 79:1, 91:8
**led** [1] - 86:5
**left** [1] - 105:2
**legal** [1] - 73:7
**less** [4] - 51:11, 52:1, 62:10, 98:12
**letter** [6] - 97:22, 98:3, 99:4, 104:7, 104:23, 105:1
**level** [16] - 26:23, 33:2, 33:12, 33:14, 62:3, 62:4, 62:5, 62:6,

62:8, 62:19, 62:20, 62:25, 63:6, 77:12, 83:21, 110:13
**levels** [1] - 61:24
**Lewis** [1] - 2:10
**likely** [1] - 110:7
**line** [10] - 6:16, 25:19, 26:14, 26:22, 27:4, 27:17, 27:21, 27:23, 28:6, 123:4
**lines** [3] - 86:15, 90:5, 92:1
**list** [1] - 113:13
**listed** [4] - 14:5, 52:15, 68:6, 85:14
**locate** [1] - 33:21
**location** [1] - 36:22
**look** [20] - 8:16, 8:17, 40:17, 40:21, 44:5, 44:20, 44:21, 45:9, 47:15, 47:25, 70:9, 86:1, 99:8, 104:5, 104:16, 104:19, 108:17, 110:9, 111:10, 111:11
**looked** [3] - 80:7, 91:1, 92:22
**looking** [2] - 96:15, 102:16
**looks** [1] - 114:4
**loud** [4] - 11:7, 93:22, 98:7, 110:20
**lunch** [1] - 73:18
**Lunch** [1] - 73:19
**main** [2] - 30:17, 81:6
**majority** [2] - 53:22, 115:25
**makeup** [1] - 92:5
**manage** [2] - 30:4, 30:9
**management** [3] - 7:4, 14:9, 26:23
**Manager** [1] - 1:10
**manager** [33] - 7:16, 30:16, 32:20, 33:12, 33:15, 33:17, 33:25, 34:2, 55:6, 55:7, 55:21, 55:23, 56:2, 56:15, 56:17, 56:19, 58:25, 59:5, 60:10, 61:7, 62:7, 66:7, 66:10, 66:11, 66:23, 68:3, 69:25, 70:3, 70:6, 77:12, 83:22, 84:8, 117:8
**manager's** [5] - 33:16, 61:11, 62:18, 66:19
**managers** [23] - 25:11, 26:11, 28:18, 30:6, 30:9, 30:19, 30:25,

31:3, 31:14, 31:21, 31:25, 47:6, 54:22, 56:21, 56:23, 60:8, 64:2, 118:24, 119:2, 119:5, 119:12, 119:20, 119:22
**MAP** [1] - 82:14
**mark** [1] - 82:1
**MARKED** [1] - 3:1
**marked** [25] - 8:7, 8:17, 75:15, 75:18, 76:5, 81:12, 81:15, 82:3, 82:5, 84:22, 84:25, 91:18, 93:6, 93:13, 95:23, 96:1, 97:4, 97:7, 106:18, 108:13, 108:16, 109:18, 110:15, 113:7, 113:10
**Mary** [6] - 90:10, 90:23, 90:25, 91:3, 91:5, 91:8
**Mary's** [3] - 91:14, 92:13, 92:21
**material** [3] - 53:5, 53:7, 83:14
**matter** [1] - 32:7
**Matter** [1] - 1:5
**mean** [9] - 28:13, 33:14, 35:2, 35:6, 51:8, 69:20, 108:3, 120:7, 122:3
**meaning** [1] - 55:14
**means** [1] - 63:5
**meant** [1] - 9:11
**measures** [1] - 26:15
**medical** [1] - 116:11
**medication** [1] - 6:22
**meet** [4] - 12:22, 13:25, 22:11, 22:20
**meeting** [5] - 75:5, 75:6, 79:13, 81:4, 88:6
**meetings** [3] - 89:9, 89:18, 89:23
**member** [2] - 34:1, 90:18
**members** [3] - 14:7, 92:5, 92:6
**memories** [1] - 117:13
**memory** [2] - 6:23, 11:24
**mention** [1] - 72:1
**mentioned** [3] - 40:15, 79:14, 95:11
**merit** [2] - 25:3, 45:25
**merit** [4] - 12:24, 23:1, 66:4, 88:6
**Meyers** [1] - 84:12
**might** [7] - 6:7, 9:22,

42:6, 51:12, 53:21, 65:19, 110:5
**Minneapolis** [4] - 1:16, 2:6, 2:11, 124:23
**MINNESOTA** [1] - 125:1
**Minnesota** [4] - 1:17, 2:6, 2:11, 124:23
**minute** [2] - 8:17, 44:24
**minutes** [2] - 106:1, 110:18
**minutiae** [1] - 48:9
**mixing** [1] - 91:10
**moment** [3] - 23:9, 63:22, 108:17
**months** [2] - 88:5, 94:1
**most** [3] - 57:2, 62:20, 90:10
**motive** [2] - 118:17, 119:17
**MR** [1] - 4:12
**MS** [143] - 4:9, 4:14, 4:19, 8:8, 8:20, 8:24, 10:4, 10:6, 10:8, 10:11, 10:12, 10:14, 10:15, 11:6, 11:8, 22:12, 22:14, 22:15, 23:8, 23:11, 23:13, 23:19, 23:22, 23:24, 23:25, 31:5, 31:8, 31:11, 36:3, 36:4, 36:11, 37:12, 37:13, 37:17, 37:18, 41:8, 41:11, 41:12, 43:5, 43:7, 43:10, 44:16, 44:18, 45:2, 45:12, 45:19, 46:16, 46:21, 48:25, 49:2, 49:17, 49:19, 50:23, 51:1, 51:13, 51:15, 51:17, 51:19, 52:14, 52:16, 52:17, 68:4, 68:7, 68:10, 68:12, 68:20, 71:23, 72:20, 72:24, 73:3, 73:11, 73:16, 73:20, 73:21, 75:16, 76:14, 76:25, 81:13, 82:1, 82:4, 84:23, 87:12, 87:24, 89:10, 89:11, 89:12, 92:15, 92:17, 92:19, 94:22, 94:24, 95:24, 97:5, 98:23, 99:3, 100:5, 100:10, 104:8, 104:24, 104:25, 105:14, 105:16, 105:20, 105:23,

105:25, 106:4, 107:10, 107:13, 107:17, 107:24, 108:10, 108:14, 111:2, 111:9, 111:22, 112:4, 112:20, 112:23, 113:8, 113:19, 113:21, 113:25, 114:3, 114:6, 114:8, 115:1, 115:3, 115:16, 115:21, 115:23, 116:3, 116:16, 116:24, 117:4, 117:6, 119:7, 119:11, 120:22, 121:1, 121:5, 122:12, 122:15, 122:17
**multiple** [1] - 24:16
**MY** [1] - 125:20
**Myers** [9] - 83:20, 84:2, 95:2, 96:10, 96:20, 100:24, 101:14, 101:17, 101:18
**Myers'** [1] - 101:22
**name** [6] - 4:21, 80:24, 93:7, 93:9, 93:14, 108:5
**names** [2] - 56:22, 91:11
**nationally** [1] - 23:16
**nearly** [1] - 29:14
**necessarily** [4] - 44:6, 58:22, 119:18
**necessary** [1] - 70:5
**need** [9] - 6:11, 6:13, 6:14, 44:24, 55:17, 71:1, 85:13, 86:1, 110:19
**needs** [1] - 85:12
**negative** [1] - 88:7
**neutral** [4] - 33:21, 33:25, 35:8, 35:9
**next** [6] - 14:4, 27:22, 35:16, 61:8, 79:17, 79:19
**Nilan** [1] - 2:10
**No._____Change** [11] - 123:8, 123:11, 123:14, 123:17, 123:20, 123:23, 124:1, 124:5, 124:8, 124:11, 124:14
**No._____Line** [11] - 123:8, 123:11, 123:14, 123:17, 123:20, 123:23, 124:1, 124:5, 124:8,

124:11, 124:14
**non** [3] - 39:23, 65:7, 122:1
**non-retaliation** [2] - 39:23, 65:7
**non-TDP** [1] - 122:1
**NORDIN** [1] - 4:12
**Nordin** [2] - 2:4, 4:12
**Nos** [1] - 8:6
**NOT** [1] - 125:12
**Notary** [2] - 1:14, 125:23
**note** [1] - 5:18
**notes** [11] - 16:16, 17:17, 19:15, 49:8, 69:23, 72:9, 73:8, 96:21, 96:22, 96:23, 105:6
**nothing** [2] - 96:24, 125:6
**notice** [4] - 9:6, 72:21, 105:15, 113:20
**Notice** [2] - 1:15, 68:6
**noticed** [2] - 94:2, 125:17
**notifying** [1] - 63:18
**noting** [1] - 123:4
**number** [15] - 10:18, 11:5, 23:14, 25:13, 26:12, 27:5, 27:19, 29:14, 32:24, 93:13, 93:18, 106:19, 107:14, 110:3, 123:4
**numbered** [3] - 9:12, 109:8, 112:7
**oath** [1] - 4:6
**object** [2] - 36:3, 68:5
**objected** [2] - 52:21, 106:7
**objection** [38] - 31:5, 37:12, 41:8, 43:5, 44:16, 48:25, 49:17, 50:23, 52:14, 68:12, 71:23, 72:20, 73:3, 76:14, 87:12, 89:10, 92:15, 94:22, 98:23, 104:8, 104:24, 105:14, 105:23, 107:10, 108:10, 111:2, 111:22, 112:20, 113:19, 114:3, 115:1, 115:16, 115:23, 116:16, 117:4, 119:7, 120:22, 121:5
**objections** [1] - 6:7
**OBJECTIONS** [1] - 2:19
**objective** [3] - 99:14, 99:19, 100:1

**occurred** [4] - 44:3, 87:3, 118:19, 119:3
**OF** [2] - 125:1, 125:2
**Off-the-record** [1] - 23:10
**office** [2] - 28:23, 29:6
**official** [4] - 7:17, 11:10, 54:11, 113:4
**often** [1] - 114:25
**old** [4] - 85:9, 88:20, 98:10, 98:11
**on-site** [1] - 36:23
**once** [3] - 32:15, 63:16, 70:12
**one** [30] - 6:15, 20:3, 28:4, 28:5, 29:5, 36:25, 37:3, 42:9, 43:2, 43:13, 44:19, 45:1, 60:11, 66:9, 74:25, 78:22, 88:6, 88:20, 89:9, 89:18, 89:23, 90:19, 106:12, 120:24
**one-on-one** [6] - 43:2, 43:13, 88:6, 89:9, 89:18, 89:23
**open** [1] - 66:8
**opinion** [2] - 94:7, 94:18
**opportunity** [4] - 63:10, 110:21, 111:13, 112:10
**Opportunity** [1] - 15:15
**option** [1] - 38:7
**Optum** [3] - 77:20, 78:2, 88:5
**order** [1] - 49:23
**ordered** [1] - 125:18
**organization** [4] - 26:24, 31:1, 53:15, 120:13
**organizations** [1] - 59:11
**original** [3] - 81:25, 83:12, 125:17
**Original** [1] - 124:20
**otherwise** [3] - 30:24, 42:7, 83:13
**outcome** [1] - 125:15
**outside** [14] - 52:21, 73:7, 74:6, 74:8, 105:15, 106:8, 111:4, 111:24, 111:25, 112:3, 112:17, 112:21, 113:2, 120:8
**overall** [1] - 95:9
**overestimating** [1] - 116:19

**overview** [1] - 54:24
**own** [5] - 11:24, 42:11, 55:9, 63:14, 68:15
**owner** [3] - 83:23, 84:10, 101:18
**owning** [1] - 53:14
**p.m** [1] - 96:8
**Page** [11] - 123:8, 123:11, 123:14, 123:17, 123:20, 123:23, 124:1, 124:5, 124:8, 124:11, 124:14
**page** [27] - 9:9, 9:11, 9:13, 14:5, 18:22, 18:23, 85:7, 86:9, 88:1, 91:13, 91:15, 91:16, 91:18, 91:20, 91:22, 93:6, 93:7, 97:10, 98:2, 102:4, 106:15, 109:7, 110:16, 111:10, 112:5, 112:7, 123:4
**pages** [1] - 9:16
**paragraph** [34] - 20:10, 85:6, 86:11, 86:16, 87:6, 88:1, 88:2, 88:4, 90:4, 91:19, 91:21, 92:1, 98:3, 98:18, 99:2, 99:8, 99:12, 99:23, 101:24, 102:3, 102:4, 106:18, 106:21, 109:8, 109:13, 109:20, 109:23, 110:1, 110:15, 110:25, 112:7, 112:12, 112:13, 112:19
**paragraphs** [6] - 19:3, 20:25, 21:11, 111:11, 111:21, 112:25
**part** [50] - 24:1, 35:10, 35:19, 38:25, 40:2, 40:8, 40:18, 41:20, 42:10, 46:8, 47:4, 47:6, 47:12, 48:1, 48:7, 49:15, 54:13, 55:15, 55:22, 56:7, 61:5, 73:11, 78:9, 82:16, 83:16, 84:2, 86:1, 86:9, 86:10, 90:14, 91:4, 91:5, 92:11, 92:13, 92:20, 92:21, 94:13, 94:25, 97:16, 100:25, 101:4, 103:21, 104:14, 104:15, 104:20, 107:18,

111:1, 111:19, 112:16, 121:16
**participants** [1] - 121:25
**participated** [2] - 120:18, 120:19
**particular** [19] - 28:23, 33:11, 39:10, 41:2, 42:5, 47:11, 48:9, 59:18, 62:6, 68:14, 77:11, 78:5, 92:21, 94:17, 104:1, 104:5, 116:22, 117:13, 119:15
**parties** [3] - 53:22, 125:14, 125:18
**party** [4] - 33:22, 33:23, 33:25, 125:17
**pass** [1] - 28:8
**past** [1] - 93:25
**pasted** [3] - 81:24, 82:9, 82:12
**pattern** [5] - 43:1, 43:17, 43:24, 44:3, 44:4
**payroll** [1] - 27:9
**pays** [1] - 98:11
**peer** [3] - 78:8, 78:17, 101:3
**peers** [5] - 100:13, 100:16, 100:17, 101:8
**people** [25] - 10:18, 23:15, 25:19, 27:7, 28:24, 29:3, 29:9, 29:12, 38:5, 53:12, 53:16, 53:18, 54:20, 69:20, 77:8, 88:17, 88:21, 98:9, 98:10, 98:11, 98:12, 121:17, 121:18, 121:24
**people's** [1] - 56:5
**per** [3] - 73:7, 111:4, 116:14
**percent** [1] - 50:5
**perform** [1] - 30:24
**performance** [42] - 12:7, 14:6, 17:2, 45:23, 46:5, 46:6, 46:10, 46:11, 46:24, 54:5, 54:8, 54:24, 55:1, 55:4, 55:17, 56:20, 57:3, 57:8, 59:2, 59:13, 59:16, 59:23, 62:11, 62:16, 62:21, 63:12, 63:21, 63:24, 64:1, 76:18, 84:6, 84:8, 84:9, 87:15, 99:14, 99:20,

100:2, 102:11, 102:14, 102:18, 102:24, 103:4
**performed** [3] - 47:15, 48:1, 76:23
**performing** [4] - 45:22, 66:12, 71:4, 73:12
**perhaps** [2] - 55:16, 90:25
**period** [2] - 10:19, 13:13
**person** [21] - 33:17, 36:18, 37:20, 44:8, 46:12, 50:5, 51:22, 52:8, 56:5, 58:1, 58:16, 58:23, 66:13, 70:4, 77:2, 77:7, 78:7, 78:8, 80:6, 96:14
**personal** [9] - 8:13, 12:2, 18:17, 24:5, 31:7, 65:4, 77:25, 114:10
**personnel** [1] - 53:23
**phases** [1] - 94:4
**phone** [1] - 27:19
**phrase** [1] - 43:8
**Placella** [1] - 1:10
**plaintiff** [1] - 6:19
**plan** [14] - 17:14, 59:9, 60:10, 60:16, 60:23, 61:18, 61:25, 63:1, 63:2, 63:15, 64:11, 65:12, 66:5, 76:22
**plans** [4] - 16:15, 17:17, 21:25, 59:19
**PLLC** [2] - 2:4, 124:21
**point** [3] - 47:19, 63:1, 94:10
**pointed** [1] - 44:9
**pointing** [1] - 87:14
**policies** [7] - 14:6, 26:2, 31:22, 32:3, 32:4, 32:11, 64:18, 64:25, 65:8, 65:13, 65:16, 119:25, 122:1, 122:4, 122:5
**policy** [24] - 12:5, 15:1, 24:10, 24:14, 24:18, 24:20, 24:22, 25:1, 25:7, 25:10, 25:17, 25:22, 26:5, 29:23, 31:4, 39:24, 53:2, 53:5, 53:7, 53:8, 53:11, 53:13, 53:14, 54:7, 54:9, 54:11, 59:14, 59:18, 59:20, 62:17, 62:23, 64:23, 65:2, 65:3,

65:4, 65:5, 65:6, 65:7, 65:18, 65:23
**Policy** [1] - 15:15
**population** [1] - 36:20
**portion** [3] - 45:4, 46:18, 100:7
**position** [3] - 7:14, 35:9, 67:7
**positions** [1] - 7:19
**possibility** [1] - 38:2
**possible** [2] - 53:5, 64:6
**possibly** [6] - 27:8, 27:14, 28:1, 41:2, 51:10, 51:25
**posting** [1] - 53:18
**potential** [2] - 13:10, 112:15
**practice** [1] - 43:17
**practices** [2] - 11:11, 14:25
**preceded** [1] - 76:19
**prepare** [36] - 10:23, 11:16, 11:19, 11:21, 12:10, 12:13, 12:19, 12:23, 13:16, 13:23, 13:25, 14:12, 14:18, 14:22, 15:5, 15:19, 16:5, 16:22, 17:9, 17:21, 17:24, 18:5, 19:7, 19:8, 19:20, 19:24, 20:14, 20:18, 21:2, 21:16, 22:2, 22:6, 22:8, 22:16, 23:2, 23:5
**prepared** [18] - 10:1, 10:8, 10:19, 11:13, 12:7, 13:13, 14:10, 15:3, 16:2, 17:6, 18:9, 19:4, 20:11, 21:13, 93:10, 103:17, 107:4, 107:21
**present** [1] - 57:21
**presently** [1] - 29:2
**president** [1] - 77:20
**pretty** [2] - 114:24, 120:24
**prevent** [1] - 39:13
**previous** [6] - 17:21, 47:5, 47:6, 49:14, 84:7, 101:7
**previously** [2] - 62:22, 66:14
**primarily** [2] - 25:25, 65:24
**primary** [3] - 79:2, 80:3, 116:20
**privileged** [1] - 121:6
**proactive** [1] - 55:3,

55:13
**procedural** [1] - 105:3
**procedure** [15] - 34:15, 36:1, 54:10, 54:12, 54:24, 55:4, 59:21, 59:22, 59:23, 60:1, 60:14, 60:18, 60:20, 66:6
**procedures** [6] - 11:10, 12:6, 14:7, 65:13, 105:2, 117:20
**process** [68] - 12:15, 12:17, 14:17, 28:11, 33:7, 33:8, 33:11, 33:24, 34:13, 38:25, 39:12, 40:3, 40:14, 40:19, 41:7, 41:14, 42:10, 44:25, 47:18, 48:8, 48:11, 55:19, 55:20, 55:22, 56:8, 60:5, 60:25, 61:4, 61:5, 61:9, 61:19, 62:13, 64:2, 64:6, 66:3, 67:14, 70:17, 71:14, 71:19, 72:8, 72:12, 72:19, 73:1, 73:2, 74:7, 74:8, 75:24, 77:13, 83:2, 83:17, 84:3, 97:17, 97:20, 104:15, 105:9, 111:1, 111:8, 111:19, 111:25, 112:22, 113:3, 117:8, 117:11, 117:16, 117:17, 118:7, 118:11
**processes** [2] - 32:24, 112:3
**produce** [1] - 55:10
**produced** [1] - 113:18
**product** [4] - 83:23, 101:4, 101:19, 104:11
**products** [2] - 84:10, 101:23
**professional** [4] - 7:12, 70:22, 78:1, 114:20
**program** [15] - 120:2, 120:3, 120:7, 120:8, 120:10, 120:20, 121:4, 121:14, 121:15, 121:17, 121:18, 121:19, 121:23, 122:8, 122:10
**programs** [1] - 14:25
**progress** [1] - 110:8
**progressive** [1] - 62:6
**prohibited** [1] - 24:17,

40:1
**project** [2] - 110:2, 110:4
**projects** [2] - 48:9, 76:22
**proper** [1] - 55:24
**provide** [23] - 25:11, 25:12, 30:24, 33:4, 36:7, 36:25, 37:8, 37:10, 37:21, 38:4, 39:14, 49:8, 56:19, 56:22, 57:15, 57:20, 63:14, 63:19, 66:18, 66:22, 71:15, 79:7, 87:22
**provided** [15] - 31:2, 31:13, 31:21, 34:9, 38:12, 39:18, 39:24, 58:17, 58:19, 58:20, 59:3, 59:6, 76:20, 101:3, 101:9
**providing** [3] - 38:7, 55:7, 87:20
**proving** [1] - 67:11
**Public** [2] - 1:15, 125:23
**pull** [1] - 81:25
**purpose** [5] - 24:13, 79:23, 79:25, 80:3, 86:22
**purposes** [1] - 58:10
**pursuant** [1] - 1:15
**put** [2] - 49:9, 103:8
**questioning** [1] - 6:17
**questions** [24] - 4:23, 5:8, 5:9, 5:19, 6:7, 9:25, 18:15, 18:17, 18:18, 19:24, 24:3, 24:5, 29:24, 33:5, 57:24, 58:7, 73:23, 80:6, 93:3, 93:24, 114:7, 114:10, 122:16, 122:17
**quick** [2] - 35:1, 106:2
**quickly** [1] - 77:6
**quiz** [1] - 32:13
**quote** [3] - 58:5, 98:11, 98:12
**race** [11] - 25:4, 116:11, 116:13, 117:1, 117:24, 118:3, 118:12, 118:21, 118:25, 119:4, 119:13
**racial** [2] - 118:7, 119:25
**raise** [2] - 74:22, 80:1
**raised** [1] - 79:3
**random** [1] - 44:7
**rarely** [1] - 119:21

**rate** [1] - 125:18
**rather** [3] - 19:13, 114:10, 121:21
**RE** [1] - 1:6
**reach** [11] - 27:11, 32:25, 33:1, 33:12, 33:21, 34:21, 36:2, 44:7, 61:22, 97:23, 99:24
**reaches** [1] - 35:13
**reaching** [2] - 36:17, 56:10
**reactive** [1] - 55:13
**read** [16] - 14:4, 45:2, 45:4, 46:16, 46:18, 88:9, 93:21, 98:7, 100:5, 100:7, 110:19, 110:20, 111:13, 112:9, 122:18, 123:2
**reading** [8] - 87:5, 90:12, 92:8, 94:11, 98:16, 99:15, 102:11, 125:12
**reads** [17] - 10:17, 11:9, 12:5, 13:5, 14:24, 15:21, 16:25, 18:23, 20:5, 21:7, 86:18, 90:8, 92:4, 93:23, 99:13, 102:8, 106:21
**real** [2] - 86:23, 86:24
**realize** [1] - 11:6
**really** [4] - 73:9, 116:2, 121:9, 122:8
**reason** [8] - 24:25, 39:3, 39:6, 63:24, 78:16, 87:15, 123:5, 124:3
**Reason** [10] - 123:10, 123:13, 123:16, 123:19, 123:22, 123:25, 124:7, 124:10, 124:13, 124:16
**reasons** [3] - 62:15, 74:25, 76:17
**recalled** [1] - 11:25
**receive** [3] - 32:16, 50:14, 79:13
**received** [5] - 77:17, 78:5, 78:15, 79:16, 97:16
**receives** [1] - 77:4
**receiving** [1] - 105:10
**recognize** [2] - 8:18, 75:18, 81:15, 82:6, 84:25, 96:1, 97:7, 108:16, 113:10, 114:1

**recognized** [1] - 8:21
**recollection** [4] - 12:3, 75:6, 88:15, 88:22
**recommendation** [4] - 66:18, 66:22, 67:17, 67:19
**record** [19] - 4:21, 5:14, 5:21, 5:23, 6:12, 10:4, 23:9, 23:10, 23:12, 23:19, 51:18, 51:21, 73:18, 73:20, 93:22, 106:1, 106:5, 122:13, 125:10
**recorded** [1] - 125:7
**recording** [3] - 15:25, 17:4, 106:25
**records** [3] - 70:9, 73:5, 96:19
**recruitment** [4] - 15:2, 27:9, 121:17, 121:21
**reduced** [1] - 125:8
**refer** [9] - 5:1, 11:18, 20:21, 21:15, 59:10, 69:2, 100:23, 102:19, 109:14
**REFERENCE** [1] - 2:15
**referred** [12] - 4:25, 17:24, 19:20, 19:24, 20:18, 54:13, 90:16, 90:24, 92:13, 92:16, 100:18, 110:3
**referring** [2] - 101:16, 102:20
**refers** [4] - 101:16, 101:25, 102:13, 102:17
**reflect** [3] - 69:10, 96:9, 97:22
**reflected** [10] - 19:3, 20:10, 21:11, 54:15, 54:19, 71:7, 100:19, 109:12, 109:25
**reflecting** [2] - 84:12, 100:18
**reflection** [3] - 99:14, 99:19, 100:1
**reflects** [1] - 109:4
**refreshed** [1] - 11:24
**regard** [3] - 109:23, 116:12, 118:4
**regarding** [9] - 13:11, 38:18, 68:22, 69:11, 73:23, 93:11, 94:18, 96:5, 109:20
**regardless** [3] - 34:13, 55:3, 61:5
**regular** [1] - 71:8
**regularly** [1] - 57:1

**reinstate** [2] - 67:18, 67:25
**reinstated** [2] - 67:7, 68:2
**reinstatements** [1] - 68:19
**related** [30] - 4:23, 14:25, 16:16, 19:17, 19:25, 25:14, 25:15, 25:20, 30:7, 39:21, 40:20, 40:25, 41:3, 46:4, 54:8, 68:23, 71:11, 84:7, 84:9, 95:15, 98:15, 99:2, 104:1, 104:5, 111:17, 115:11, 116:13, 116:22, 121:20, 125:14
**relates** [3] - 39:10, 39:19, 119:25
**relation** [4] - 28:18, 30:5, 74:16, 122:3
**relations** [37] - 7:16, 7:24, 27:10, 28:14, 28:15, 28:16, 28:25, 29:3, 29:12, 29:19, 29:22, 29:24, 30:2, 30:4, 30:10, 30:11, 30:15, 30:19, 32:19, 32:25, 34:21, 35:12, 53:14, 53:19, 53:23, 61:14, 66:8, 66:13, 66:21, 67:1, 67:3, 69:21, 70:4, 70:6, 70:21, 78:12
**relationship** [1] - 58:1
**relative** [1] - 125:6
**relevant** [4] - 10:19, 13:12, 70:5, 70:23
**relied** [7] - 12:2, 18:24, 20:6, 21:8, 22:6, 97:23, 99:24
**religion** [1] - 25:4
**rely** [4] - 20:17, 36:25, 44:21, 45:23
**remain** [1] - 50:22
**remaining** [1] - 105:2
**remember** [5] - 11:2, 74:9, 88:24, 91:9, 121:10
**remembering** [1] - 83:9
**remind** [1] - 30:13
**repeat** [5] - 37:15, 41:10, 45:1, 46:14, 100:4
**rephrase** [7] - 6:2, 21:3, 34:5, 38:15, 42:21, 89:11, 92:17
**report** [11] - 11:1, 11:3,

25:13, 25:19, 26:13, 27:18, 27:20, 73:23, 74:1
**reported** [15] - 26:19, 26:20, 26:21, 26:22, 27:1, 27:12, 38:18, 41:17, 69:16, 76:18, 84:7, 84:15, 87:16, 87:19, 89:17
**reporter** [4] - 5:10, 45:5, 46:19, 100:8
**reporting** [1] - 94:4
**reports** [7] - 11:11, 13:6, 16:1, 17:5, 37:8, 69:10, 107:1
**representative** [6] - 8:10, 18:16, 24:3, 68:15, 93:3, 114:11
**representing** [1] - 4:10
**repurpose** [1] - 49:23
**request** [7] - 37:3, 56:4, 56:22, 56:23, 56:25, 58:2, 58:3
**requested** [4] - 45:4, 46:18, 82:16, 100:7
**requesting** [1] - 81:19
**require** [7] - 34:4, 34:6, 34:11, 38:4, 44:6, 71:19, 72:9
**required** [3] - 32:13, 62:5, 62:7
**requirement** [4] - 55:20, 56:11, 72:8, 73:6
**requires** [5] - 34:13, 36:1, 55:15, 61:21, 71:14
**research** [4] - 18:25, 20:7, 21:9, 109:11
**resolution** [49] - 16:10, 16:15, 16:17, 16:18, 17:16, 17:18, 19:14, 19:16, 19:18, 21:20, 21:21, 33:6, 33:8, 33:11, 33:24, 34:13, 40:14, 47:17, 48:7, 50:14, 60:19, 60:24, 61:4, 61:11, 61:14, 67:11, 67:13, 67:14, 67:24, 70:17, 71:9, 71:11, 71:14, 71:25, 74:2, 74:7, 75:22, 75:24, 76:3, 78:9, 79:21, 81:2, 96:6, 103:23, 104:15, 105:11, 109:15, 111:8, 113:3
**Resolution** [2] - 76:5, 76:12

**resolutions** [1] - 28:22
**resources** [1] - 7:5
**respect** [3] - 98:4, 98:8, 99:9
**respective** [1] - 125:13
**respondent** [1] - 10:18
**Respondent** [5] - 13:12, 14:9, 16:2, 17:6, 107:2
**respondent's** [3] - 11:9, 12:5, 13:9
**Respondent's** [4] - 14:24, 15:21, 16:25, 106:22
**Respondents** [3] - 19:1, 20:8, 21:9
**Respondents'** [3] - 19:2, 20:9, 21:10
**responding** [1] - 105:21
**response** [25] - 50:14, 71:15, 71:16, 71:20, 72:3, 72:15, 78:9, 78:11, 78:16, 78:25, 79:3, 79:7, 79:9, 79:13, 80:16, 81:23, 85:14, 96:6, 97:11, 97:13, 97:14, 105:5, 105:11, 109:17, 109:21
**responses** [1] - 76:20
**responsibilities** [2] - 30:18, 116:21
**responsibility** [3] - 26:8, 47:18, 104:16
**responsible** [14] - 25:25, 26:4, 28:16, 28:19, 28:21, 31:25, 53:10, 53:14, 53:17, 67:23, 70:18, 83:24, 92:24, 104:10
**result** [12] - 25:3, 33:9, 46:2, 51:12, 52:1, 65:16, 65:19, 90:2, 101:4, 107:9, 118:25, 119:13
**resulting** [3] - 16:1, 17:5, 107:1
**retain** [1] - 73:8
**retained** [1] - 73:2
**retaliated** [1] - 40:2
**retaliation** [6] - 13:7, 39:13, 39:23, 39:25, 65:6, 65:7
**returned** [1] - 81:1
**review** [73] - 10:22, 10:25, 11:15, 12:14, 12:16, 12:17, 14:16,

15:11, 15:16, 16:11,
17:14, 19:13, 20:25,
21:19, 41:4, 46:5,
46:10, 46:11, 46:12,
46:24, 47:4, 47:5,
47:10, 47:19, 55:2,
55:3, 55:10, 55:11,
55:12, 55:21, 56:6,
56:8, 56:12, 56:18,
57:6, 57:7, 57:17,
57:21, 58:11, 58:12,
58:21, 59:1, 59:23,
63:23, 63:24, 64:2,
64:13, 64:14, 66:13,
67:12, 69:5, 69:7,
69:23, 81:20, 82:10,
82:13, 86:19, 91:9,
91:14, 92:13, 92:21,
93:10, 94:15, 95:16,
102:21, 109:20

reviewed [28] - 9:12,
9:15, 12:14, 13:20,
14:16, 15:9, 15:14,
16:9, 16:10, 16:19,
17:13, 17:16, 17:21,
19:12, 21:17, 21:18,
71:17, 71:21, 77:6,
77:15, 78:8, 78:16,
78:17, 100:15,
101:6, 104:2,
110:10, 110:14

reviewing [1] - 35:19

reviews [36] - 12:7,
16:12, 17:15, 19:12,
19:14, 21:22, 21:24,
45:24, 46:6, 47:5,
54:5, 54:8, 54:21,
54:25, 55:1, 55:13,
56:12, 57:8, 57:13,
58:10, 58:16, 58:21,
63:22, 67:23, 81:19,
81:24, 82:10, 82:12,
82:15, 82:16, 82:19,
83:1, 83:11, 103:4,
103:8

revised [1] - 53:3

Rights [1] - 24:23

River [1] - 7:10

role [3] - 30:18, 32:19,
105:21

roles [1] - 120:15

root [1] - 86:24

roughly [1] - 116:14

RPR [2] - 1:14, 125:22

rule [2] - 44:14, 45:16

rules [2] - 5:7, 14:6

S-E-R-V-I-C-E [1] -
108:6

safe [1] - 104:4

sake [2] - 4:24, 5:11

salary [1] - 30:1

Sandra [2] - 2:9, 12:24

sandra [1] - 4:14

saw [2] - 9:18, 108:22

scenario [2] - 42:8,
52:7

schedule [2] - 79:17,
79:21

Schedule [1] - 9:10

school [1] - 120:9

scope [5] - 52:15,
68:5, 72:21, 105:15,
113:20

se [1] - 111:4

SEAL [1] - 125:20

second [6] - 33:7,
55:11, 88:24, 98:2,
98:3, 121:11

section [2] - 15:13,
110:8

see [32] - 46:9, 48:11,
69:5, 77:2, 77:16,
79:4, 80:9, 86:12,
86:14, 86:21, 87:25,
88:2, 89:6, 90:5,
90:7, 91:13, 91:19,
91:25, 93:6, 93:13,
93:19, 98:3, 99:10,
102:4, 104:18,
106:18, 108:17,
109:8, 110:15,
112:6, 116:15,
121:20

seek [5] - 42:11,
42:14, 43:25, 56:17,
83:17

seem [1] - 89:2

select [1] - 56:19

self [1] - 55:6

self-evaluation [1] -
55:6

send [4] - 56:4, 80:15,
80:17, 124:20

senior [4] - 7:23,
29:24, 30:4, 30:9

sense [4] - 5:2, 5:16,
5:23, 52:10

sent [9] - 74:12, 75:5,
85:17, 86:20, 96:8,
104:23, 105:1,
105:4, 105:10

sentence [13] - 58:25,
86:14, 86:18, 90:8,
90:12, 90:17, 90:24,
91:25, 92:4, 92:9,
99:12, 102:5, 102:8

sentences [1] - 87:8

separate [4] - 18:19,
30:12, 31:17, 32:23

separately [2] - 39:4,

117:23

series [2] - 4:22, 5:9

serious [2] - 62:16

Service [2] - 13:2,
108:4

serving [1] - 33:24

set [2] - 39:12, 39:16

several [1] - 120:12

severe [1] - 62:20

severity [1] - 51:9

shared [1] - 26:8

SHEET [1] - 123:7

sheet [1] - 124:20

shift [2] - 64:16, 114:9

Short [3] - 51:16,
106:3, 122:14

shorthand [1] - 125:8

show [1] - 69:2

sic [1] - 32:9

sides [2] - 94:8, 94:19

sign [1] - 122:18

signed [1] - 105:5

signing [1] - 125:12

similar [4] - 5:18,
39:20, 59:22, 62:15

simply [1] - 44:4

single [1] - 42:23

site [7] - 12:18, 15:10,
36:23, 54:18, 60:7,
64:21, 65:22

situation [7] - 12:1,
36:9, 42:13, 47:9,
51:10, 65:25, 70:24

situations [3] - 37:25,
86:23

six [1] - 116:18

sjezierski@
nilanjohnson.com
[1] - 2:12

skills [1] - 93:24

slew [1] - 118:18

slight [1] - 45:13

slightly [1] - 73:17

so.. [1] - 65:20

soft [2] - 54:20, 56:5

someone [3] - 10:9,
27:23, 87:23

sometimes [1] - 43:12

sorry [40] - 8:22, 8:23,
9:10, 11:6, 11:16,
19:8, 21:3, 23:22,
26:6, 35:6, 37:1,
38:13, 38:15, 41:9,
42:20, 42:24, 43:21,
44:25, 49:5, 50:19,
52:9, 64:10, 64:12,
69:9, 70:11, 72:9,
76:3, 78:21, 89:11,
92:17, 93:15, 95:11,
97:2, 97:15, 99:21,

100:3, 102:16,
103:2, 104:2, 118:4

sort [4] - 59:11, 79:6,
120:10, 120:12

sounded [1] - 31:7

source [2] - 31:23,
83:12

South [4] - 1:16, 2:5,
2:10, 124:22

speaking [11] - 28:17,
28:18, 29:11, 33:1,
35:18, 38:19, 39:25,
40:6, 40:12, 78:11,
79:9

speaks [1] - 79:2

specific [20] - 19:2,
20:9, 21:10, 34:15,
35:25, 39:10, 40:18,
44:10, 44:19, 45:15,
45:20, 59:2, 75:13,
76:11, 76:22, 95:11,
104:1, 104:19,
109:12, 119:19

specifically [5] - 6:8,
15:11, 52:19, 94:21,
115:11

specifics [1] - 68:17

specify [2] - 24:18,
24:20

spell [1] - 108:5

spoken [3] - 71:17,
71:22, 91:5

spreadsheet [1] - 11:4

staff [1] - 121:16

stages [1] - 122:8

stand [1] - 97:25

standard [2] - 57:12,
122:4

standpoint [1] - 68:15

start [6] - 37:1, 64:3,
81:4, 89:15, 115:8,
117:25

started [2] - 80:10,
83:3

starts [1] - 91:16

STATE [1] - 125:1

state [3] - 4:20, 36:8,
53:20

statement [2] - 89:2,
94:17

statements [12] -
15:25, 17:4, 18:24,
20:6, 21:8, 38:17,
85:8, 86:4, 86:8,
89:8, 98:15, 107:1

States [1] - 29:17

status [1] - 96:5

stay [1] - 80:19

step [8] - 11:25, 27:22,
61:1, 61:8, 79:17,

79:19, 95:12, 97:20

steps [1] - 105:9

still [4] - 52:22, 63:9,
83:22, 93:2

stopped [1] - 94:10

stories [1] - 86:23

straight [1] - 115:20

Street [4] - 1:16, 2:5,
2:10, 124:22

strike [5] - 49:5, 52:5,
72:10, 97:2, 99:17

structured [1] - 29:20

struggled [1] - 94:2

subject [3] - 32:7,
121:25, 122:5

submission [1] -
13:20

submit [2] - 61:13,
61:16

submitted [6] - 47:4,
47:6, 63:17, 63:24,
74:9, 80:5

subsequent [1] -
103:24

substance [4] - 22:21,
38:11, 60:15, 60:23

substantiate [9] -
41:6, 41:15, 42:5,
45:10, 46:23, 98:13,
98:21, 99:1, 99:6

substantiated [19] -
35:23, 41:25, 42:2,
51:4, 51:5, 51:11,
51:23, 51:24, 52:13,
115:15, 115:25,
117:3, 118:4, 118:8,
118:12, 118:20,
118:22, 119:10,
119:23

substantiation [1] -
116:1

successful [1] - 67:10

Suite [4] - 1:16, 2:5,
2:11, 124:22

Sujatha [16] - 1:8, 2:8,
68:22, 85:8, 86:21,
86:25, 87:3, 88:6,
89:14, 89:17, 89:24,
95:3, 95:4, 95:7,
95:8

summarized [1] -
84:18

supervision [1] - 14:8

supervisor [7] - 50:10,
50:22, 66:3, 100:12,
100:16, 101:8, 118:2

supervisor' [1] -
101:25

supervisors [3] -
15:24, 17:3, 106:25

supplied [1] - 91:8
supply [1] - 78:10
support [1] - 35:20
supported [1] - 42:4
supposed [1] - 81:1
switch [1] - 54:4
sworn [2] - 4:5, 125:5
system [21] - 27:13,
27:25, 56:4, 60:12,
64:9, 64:15, 67:4,
69:15, 69:18, 69:24,
70:8, 70:13, 70:23,
71:3, 71:7, 71:12,
72:2, 72:5, 72:16,
82:13, 105:8
talks [2] - 65:18, 65:23
TANYA [6] - 1:14, 4:2,
4:4, 123:1, 124:19,
125:4
Tanya [1] - 4:16, 10:5
task [3] - 94:6, 104:2,
104:5
task-related [1] -
104:5
tasks [2] - 104:13,
104:19
TDP [5] - 120:8,
121:14, 121:19,
121:25, 122:1
team [16] - 14:7,
26:21, 28:9, 28:12,
30:8, 56:24, 56:25,
78:13, 88:7, 90:3,
90:10, 90:11, 90:19,
92:6, 94:1, 113:14
teammates [3] - 88:9,
89:4, 90:9
technical [2] - 90:11,
120:15
technically [1] - 77:3
technological [1] -
104:14
technology [7] - 50:4,
101:21, 104:13,
120:3, 120:7,
120:20, 121:3
telecommuting [1] -
36:20
telephone [1] - 36:21
template [4] - 80:16,
80:20, 80:22, 80:23
terminate [4] - 66:24,
95:10, 95:18, 104:18
terminated [12] -
48:14, 48:24, 49:4,
49:13, 63:7, 63:25,
64:7, 68:3, 119:13,
119:19, 119:20,
120:1
termination [30] -

33:19, 47:22, 51:10,
51:25, 63:3, 65:14,
65:17, 65:20, 65:23,
66:6, 66:20, 66:23,
67:3, 67:6, 67:15,
76:10, 76:17, 76:20,
95:9, 96:17, 97:24,
97:25, 102:6, 102:9,
102:23, 104:19,
109:22, 113:5, 119:9
terminology [1] -
120:4
terms [4] - 34:20,
80:19, 111:7, 122:6
testify [47] - 6:23,
8:13, 10:2, 10:10,
10:20, 10:23, 11:13,
11:16, 11:19, 11:22,
12:7, 12:11, 12:20,
12:23, 13:13, 13:17,
13:23, 14:1, 14:10,
14:13, 14:19, 15:3,
15:6, 16:2, 16:6,
16:22, 17:6, 17:10,
17:25, 18:5, 18:9,
18:14, 19:5, 19:8,
20:11, 20:15, 21:2,
21:13, 21:16, 22:2,
22:7, 22:8, 23:2,
23:5, 107:4, 111:16,
125:5
testifying [4] - 8:10,
10:5, 24:7, 125:5
testimony [8] - 37:10,
37:21, 38:11, 39:14,
45:4, 46:18, 125:7,
125:10
testing [1] - 94:5
THE [46] - 4:16, 8:22,
31:10, 36:6, 37:15,
41:9, 43:6, 43:9,
44:17, 45:6, 45:18,
46:20, 49:1, 49:18,
50:24, 68:9, 68:13,
71:24, 72:22, 73:4,
76:15, 87:13, 92:16,
94:23, 98:24, 100:9,
104:9, 105:18,
105:24, 107:11,
107:14, 107:20,
108:11, 111:3,
111:23, 112:21,
113:23, 114:4,
115:2, 115:17,
115:24, 116:17,
117:5, 119:8,
120:23, 121:9
themselves [5] -
37:11, 38:23, 39:22,
39:23, 58:21

therefore [3] - 38:25,
86:7
they've [1] - 33:19
thinking [2] - 78:6,
95:12
thinks [1] - 70:6
third [4] - 33:12,
33:14, 77:9, 77:12
thorough [3] - 102:10,
102:14, 102:18
thoroughly [1] - 48:17
three [5] - 22:23,
86:15, 90:5, 91:2,
91:25
throughout [1] - 29:9
Thursday [2] - 9:21,
22:25
timeframe [1] - 79:12
timeframes [1] - 64:7
timeline [1] - 79:6
timing [2] - 64:1,
80:19
title [2] - 7:17, 30:14
titled [1] - 9:10
titles [3] - 7:25, 8:3,
113:16
today [27] - 4:23, 5:8,
6:24, 8:9, 8:12,
10:20, 11:13, 11:22,
12:8, 13:13, 13:17,
14:10, 15:3, 16:3,
16:6, 17:7, 18:15,
19:5, 19:9, 20:12,
21:13, 21:16, 22:7,
22:9, 23:2, 23:5,
107:3
today's [1] - 22:16
together [2] - 83:23,
103:9
took [2] - 60:22, 125:3
tool [6] - 31:23, 54:20,
56:5, 94:3, 94:9,
94:20
tools [1] - 83:24
top [3] - 9:10, 76:4,
93:7
topic [46] - 9:24, 10:2,
10:20, 10:23, 11:13,
11:17, 11:19, 11:22,
11:23, 12:5, 12:8,
12:11, 12:20, 12:23,
13:5, 13:14, 13:17,
13:23, 14:1, 14:4,
14:10, 14:13, 14:19,
14:24, 15:3, 15:6,
15:21, 16:3, 16:6,
16:23, 16:25, 17:7,
17:10, 17:21, 18:6,
18:14, 18:23, 19:5,
19:9, 20:12, 20:15,

20:24, 23:6, 106:8,
107:4, 107:8
Topic [11] - 10:5,
10:17, 11:9, 14:5,
18:9, 19:25, 20:5,
21:2, 21:13, 21:16,
22:3
Topics [7] - 9:11,
9:13, 9:15, 19:21,
20:2, 20:19, 21:18
topics [10] - 10:17,
17:25, 22:7, 22:9,
32:12, 32:15, 52:15,
52:22, 68:5, 106:8
topument [1] - 11:16
track [4] - 57:17,
80:19, 94:5, 120:13
tracks [2] - 34:4, 34:6
trainees [2] - 13:10,
14:8
training [11] - 25:11,
25:12, 26:11, 26:12,
31:2, 31:13, 31:16,
31:18, 31:21, 31:25,
32:15
trainings [1] - 30:24
transcribe [1] - 5:21
transcription [1] -
45:13
treated [1] - 25:3
treatment [1] - 13:8
true [2] - 123:3,
125:10
truly [1] - 83:14
truth [2] - 125:5, 125:6
truthfully [1] - 6:24
try [9] - 33:21, 34:24,
35:22, 43:7, 44:24,
46:6, 80:19, 117:12,
121:11
trying [5] - 9:21, 10:9,
88:18, 119:16, 121:9
turn [7] - 9:9, 18:22,
93:5, 98:2, 106:15,
109:7, 112:5
two [13] - 28:3, 32:23,
42:13, 59:1, 70:5,
77:8, 86:4, 86:7,
88:5, 89:20, 99:1,
114:23, 121:14
type [16] - 31:20,
33:20, 34:9, 41:5,
41:13, 44:13, 44:20,
45:15, 50:6, 53:13,
55:11, 71:2, 85:24,
116:23, 117:13,
119:25
types [6] - 31:17, 48:4,
57:7, 85:25, 116:4,
120:15

typewriting [1] - 125:8
typical [6] - 48:7,
55:22, 79:12, 87:1,
87:21, 114:24
typically [32] - 33:9,
36:7, 36:23, 38:19,
38:24, 39:17, 39:20,
47:18, 49:18, 49:21,
50:19, 50:22, 50:24,
51:6, 53:22, 55:5,
56:3, 58:22, 62:9,
63:1, 63:3, 63:4,
63:6, 64:1, 64:3,
66:21, 71:16, 80:5,
80:23, 81:4, 118:17,
119:8
typos [1] - 78:25
UHG [3] - 91:16,
91:18, 93:6
UHG-Zhang000917
[1] - 93:6
UHG-Zhang000092 [1]
- 91:18
UHG-Zhang000921
[1] - 91:16
ultimate [1] - 95:18
um-hmm [1] - 5:19
unable [2] - 98:13,
98:21, 98:25
unaware [1] - 113:1
unclear [1] - 72:3
under [8] - 4:6, 9:11,
9:12, 14:8, 15:13,
31:9, 50:22, 125:8
undergo [1] - 112:18
underneath [2] -
93:14, 93:22
understood [4] - 6:3,
68:8, 93:25, 94:6
undertaken [1] -
111:18
undertook [3] - 19:1,
20:8, 21:9
United [1] - 29:17
UnitedHealth [48] -
1:8, 2:8, 4:15, 4:17,
7:15, 7:20, 8:1, 8:4,
8:10, 9:6, 18:13,
18:16, 23:15, 24:4,
24:10, 25:1, 25:6,
25:9, 25:16, 26:3,
26:4, 26:19, 27:1,
29:10, 31:12, 31:13,
34:16, 50:11, 50:20,
52:12, 54:6, 54:7,
59:18, 60:2, 60:3,
64:19, 65:13, 68:2,
73:24, 74:1, 93:3,
97:23, 109:10,
112:17, 114:12,

114:15, 115:10, 122:1
**UnitedHealth's** [4] - 26:1, 31:3, 53:1, 64:17
**University** [1] - 7:9
**unless** [3] - 6:7, 69:15, 73:6
**unplanned** [1] - 65:19
**unsubstantiated** [1] - 41:23
**up** [21] - 26:7, 39:12, 39:16, 57:11, 59:11, 59:25, 73:6, 74:13, 75:3, 75:4, 75:12, 76:3, 90:1, 90:5, 90:15, 91:10, 102:16, 103:2, 105:3, 114:25
**update** [1] - 110:8
**updates** [1] - 53:6
**updating** [2] - 53:10, 53:13
**US** [1] - 29:11
**user** [2] - 101:20, 101:22
**utilize** [1] - 27:9
**utilized** [1] - 59:15
**vague** [2] - 104:3, 110:3
**validity** [1] - 34:25
**values** [3] - 88:7, 88:21, 98:12
**variety** [1] - 48:3
**various** [5] - 27:7, 53:12, 53:22, 61:24, 65:15
**venture** [1] - 101:1
**verbal** [1] - 5:22
**verbally** [1] - 80:3
**verbatim** [1] - 88:18
**verify** [8] - 19:1, 20:8, 21:10, 109:11, 109:25, 110:24, 111:20, 112:18
**versus** [2] - 28:7, 118:17
**vice** [1] - 77:20
**vice-president** [1] - 77:20
**view** [1] - 120:8
**violation** [4] - 59:14, 62:11, 62:17, 119:24
**violations** [1] - 62:23
**violence** [1] - 65:5
**Viveros** [3] - 93:7, 93:10, 93:14
**wait** [1] - 5:12
**WAIVED** [1] - 125:13
**walk** [3] - 6:14, 32:20,

66:2
**warning** [1] - 51:12
**warranted** [5] - 47:23, 67:16, 96:17, 104:18, 109:22
**WAS** [1] - 125:12
**water** [1] - 6:13
**ways** [4] - 25:17, 25:22, 26:25, 42:1
**week** [1] - 108:24
**weight** [2] - 46:9, 46:10
**whole** [1] - 125:5
**wide** [2] - 26:15, 48:3
**wiped** [1] - 49:22
**Wisconsin** [1] - 7:10
**Wisconsin-River** [1] - 7:10
**witness** [18] - 18:13, 31:6, 36:25, 37:3, 37:4, 37:5, 37:6, 37:10, 37:22, 38:3, 39:6, 71:6, 72:7, 125:5, 125:7, 125:10, 125:12, 125:13
**WITNESS** [47] - 4:16, 8:22, 31:10, 36:6, 37:15, 41:9, 43:6, 43:9, 44:17, 45:6, 45:18, 46:20, 49:1, 49:18, 50:24, 68:9, 68:13, 71:24, 72:22, 73:4, 76:15, 87:13, 92:16, 94:23, 98:24, 100:9, 104:9, 105:18, 105:24, 107:11, 107:14, 107:20, 108:11, 111:3, 111:23, 112:21, 113:23, 114:4, 115:2, 115:17, 115:24, 116:17, 117:5, 119:8, 120:23, 121:9, 125:20
**witnesses** [23] - 35:18, 35:25, 36:1, 36:7, 36:8, 36:10, 36:18, 36:23, 38:6, 38:12, 38:17, 38:24, 39:24, 40:7, 40:10, 40:11, 40:12, 42:3, 42:11, 42:15, 43:4, 44:1, 44:7
**words** [2] - 11:17, 42:9
**workers** [1] - 106:24
**workplace** [2] - 26:16, 65:5

**works** [4] - 27:4, 27:17, 69:18, 120:11
**worthy** [1] - 98:10
**write** [2] - 59:11, 60:11
**write-up** [1] - 59:11
**writing** [1] - 50:15
**written** [3] - 71:15, 71:20, 72:9
**wrote** [1] - 46:12
**year** [10] - 114:18, 114:21, 114:25, 115:18, 115:19, 116:14, 116:18, 116:20
**yearly** [3] - 32:5, 32:17, 55:3
**years** [8] - 52:4, 52:11, 53:25, 68:1, 68:17, 91:2, 114:16, 115:5
**young** [7] - 85:9, 88:9, 88:17, 88:21, 89:5, 98:9, 98:12
**younger** [1] - 92:6
**yourself** [2] - 17:24, 22:6
**Yufan** [6] - 1:7, 2:2, 4:10, 4:23, 73:25, 75:22
**Zhang** [21] - 1:7, 2:2, 4:11, 16:10, 16:14, 19:17, 73:25, 74:11, 75:22, 75:25, 76:16, 78:1, 91:17, 93:11, 95:15, 97:16, 104:23, 105:2, 105:12, 106:6, 113:14
**Zhang's** [21] - 4:23, 16:11, 16:14, 17:13, 19:13, 68:24, 73:23, 77:22, 83:18, 97:24, 98:22, 99:18, 99:25, 100:1, 103:9, 104:6, 104:10, 107:9, 108:1, 108:8, 109:4
**Zhang000917** [1] - 93:6
**Zhang00092** [1] - 91:18
**Zhang000921** [1] - 91:16
**Zuelke** [2] - 90:25, 91:3