**RECEIVED**

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

JAN 21 2021

CLERK U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Civil Case No. 18-cv-01454-MJD-KMM

Yufan Zhang,

       Plaintiff,

v.

UnitedHealth Group, Inc. and

Sujatha Duraimanickam,

       Defendants.

FIRST AMENDED BRIEF

IN SUPPORT OF MOTION TO

VACATE ARBITRATION

AWARDS

**APPELLANT'S BRIEF FOR VACATING ARBITRATION AWARDS**

SCANNED
JAN 22 2021
U.S. DISTRICT COURT MPLS

Civil Case No. 18-cv-01454-MJD-KMM

## Table of Contents

**TABLE OF AUTHORITIES** ................................................................................................................ **11**

**JURISDICTIONAL STATEMENT** ................................................................................................... **15**

**STATEMENT OF THE ISSUES** ...................................................................................................... **16**

1.  *How to determine the credibility and completeness of evidence in arbitration* ................................ *20*

2.  *Whether the employer's reasons for terminating the Complainant job:* ........................................... *20*

    (a).  *have no basis in fact, or* .................................................................................................. *20*

    (b).  *even if based in fact, the employer was not motivated by these reasons, or* .......................... *20*

    (c).  *the reasons are insufficient to motivate an adverse employment decision* ................................ *20*

3.  *Whether the arbitrator and Respondents knew "basecamp", "service-now", "codeHub"?* .............. *21*

4.  *Whether the arbitrator and Respondents knew the importance of "basecamp", "service-now", "codeHub"?* 21

5.  *What malpresentation had the Respondents done when non-disclosed information in "basecamp", "service-now", "codeHub"?* ......................................................................................................... *21*

6.  *Whether the Respondents made a false representation intentionally and knowingly* ...................... *21*

7.  *Whether the Respondents knew what they did would mislead the arbitrator* .................................. *21*

8.  *Whether there were other choices for the Complainant not depending on the records in "basecamp", "service-now", "codeHub" when he alleged the Respondents discriminated against him?* ............. *21*

9.  *Whether the Complainant could demonstrate Respondents' discrimination if the records were available to the Complainant* ................................................................................................... *21*

10. *Whether the Complainant can prove that the Respondents told lie, and such lie made him losing job.*     *21*

11. *And whether the "lie" meets privilege standard* ............................................................................ *21*

**STATEMENT OF THE CASE AND THE FACTS** ......................................................................... **22**

12.   *Complainant working environment overview and the related technical terms* ................................. 22

   (a).   The Complainant job duty and the work environments around him ...................................... 22

   (b).   Developing and operating under DevOpt environment ......................................................... 24

   (c).   What is AEM ..................................................................................................................... 25

   (d).   What is OpenShift ............................................................................................................. 25

   (e).   Overview OpenShift and AEM system service layout ........................................................... 26

   (f).   Environments for development, test, stage, and product in Linux/Unix system ........................ 27

   (g).   The similarities and differences for using the development environment between OpenShift

and Linux/Unix  28

   (h).   Why needed OpenShift development environment ............................................................... 28

   (i).   OpenShift development environment was in trial and evaluation in 2016 ................................. 29

   (j).   It is not a problem when a developer makes a mistake in development phase as long as no

impacts on others or issues can be fixed quickly. ............................................................................. 29

13.   *Respondents' reasons for terminating the Complainant's job* ........................................................ 30

14.   *More dispute statements can be found in the email's communication between Zhang and Tanya*

*Hughes (Ex. 19)* ................................................................................................................................. 51

15.   *Nature of the Case* ...................................................................................................................... 51

16.   *Procedural History* ...................................................................................................................... 52

   (a).   On January 12, 2015, Zhang started working with UHG ....................................................... 52

   (b).   On November 14, 2016, Zhang's job was terminated (Ex. 16) ............................................... 52

   (c).   On December 2, 2016, Zhang filed an Internal Dispute Resolution appeal to UHG HR (Ex. 17) .. 52

   (d).   On February 7, 2017, UHG HR sent a letter (Ex. 34) to Zhang to affirm their termination

decision was appropriate based on a thorough assessment of your performance stated on two CAPs (Exs. 4

and 14).       52

   (e).   On May 15, 2017, Zhang filed a charge of age discrimination against UHG with EEOC .......... 52

   (f).   On February 27, 2018, the EEOC issued a Notice of Right to Sue ................................................. 52

Civil Case No. 18-cv-01454-MJD-KMM

(g).   On May 25, 2018, Zhang filed this case in this court, alleging claims for discrimination under ADEA   52

(h).   On February 14, 2019, ORDER granting Motion to Compel Arbitration ................................ 53

(i).   On March 11, 2019, Zhang filed demand for arbitration with AAA....................................... 53

(j).   On October 6, 2020, AAA issued arbitration award ...................................................... 53

(k).   On January 06, 2021, Zhang filed initial Brief for vacating arbitration award ......................... 53

17.   Summary of the work tasks or issues found in respondents' complaining ......................................... 53

18.   Supplementary information ................................................................................. 56

19.   The reasons for UHG to fire the Complainant ................................................................. 58

20.   The records from BaseCamp.com for 2015 & 2016 ........................................................... 61

21.   The records from UHG service-now website for 2015 & 2016 ................................................. 62

22.   The summary reports and history log information from Optum "CodeHub" .................................... 62

23.   Sujatha's team was responsible for developing the components running on AEM environment ...... 63

24.   AEM project development cycle ............................................................................. 64

25.   AEM deployment phase ...................................................................................... 65

26.   Technology Development Program ............................................................................ 66

27.   The Complainant had argued with Ms. Sujatha for many times, to explain why he disagreed with Ms. Sujatha negative comments about him, especially those examples written on "CAP" (Ex. 4). But Ms. Sujatha did not want to listen any explanations. Sujatha told Zhang "I[Duraimanickam] say you're wrong, then you must be wrong. Don't argue, don't explain, only accept", "Any of your explanations will not be accepted". ................ 67

28.   In arbitration procedures, there was no any arrangement or opportunity for Claimant directly to ask any witnesses for more details on their testimony statements for the purpose of verifying those statements are accurate and have no fake. The lawyers are not IT professionals, so they might not be able to find out some false statements related to IT procedures. .............................................................. 68

SUMMARY OF THE ARGUMENT ................................................................ 68

4

29.    The Respondents refused to disclose the develop daily status logs and other service tracking records, such like the records from "basecamp", "service-now", and "codeHub", etc. Such resulted in arbitrator, who has no fundamental IT knowledge, unable to have a clear picture about how development was going within a Sprint or a development cycle. Plus Sujatha Duraimanickam and few other witness testified lying, or unwilling to provide some key information, or providing some misleading information. All of these lead to the arbitrator made an award by fraud. .................................................................................................................................. 69

30.    Without fundamental IT knowledge, the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced. There are many technical terms and IT procedures presented in evidences, testimonies, and arbitration briefs. Only based on common sense, the arbitrator is hard to understand what would be the right ways to perform IT development jobs. Thus made arbitrator ignore some key facts stated in Claimant's brief which could determine whether the Claimant had poor performance, or the Respondents told lie or treated the Claimant different from younger developers.  69

31.    If the Complainant has the records from "basecamp", "service-now", "codeHub", etc., how the Complainant demonstrates he had suffered from age discrimination .................................................................. 70

32.    The Complainant belonged to the protected age group and suffered an adverse employment action 72

33.    The Complainant performed his job satisfactorily or was qualified to perform his job .................... 72

(a).    The Complainant received the company wide award, "MAKE IT HAPPEN", in recognition of his excellent performance and achievement in year 2015. Only about 160 employees among more than two hundred thousand UHG employees received this award .............................................................. 72

(b).    The Complainant was recognized by his first manager for his excellence at documenting on what the team did in 2015. It is not possible for someone to perform excellent technical documentation without experience and all relevant knowledge and skills ............................................................................ 72

(c).    Many of Complainant's teammates gave him comment: "strong technical talent" ................... 73

(d).    All of the professional witnesses (developers) from UHG acknowledged the Complainant was smart and had the technical knowledge and skills required for performing his job..........................................73

(e).    Jennifer Viveros Aguilar, team member, said: "Frank[Zhang] was a really smart person and admired how easily he could complete a task. When he fully understands assignments, Frank[Zhang] is really focus and completes task fast and detailed. I noticed the detailed part when we notice that the event summary broke and he was able to target the session issue easily within hours, which would have taken us days to find." (Ex. 12 page 1 §2)....................................................................................................................73

(f).    Nancy Bullard, the only QA tester in SDSS division, said "Frank[Zhang] has a lot of technical knowledge and is always very professional and easy to work with." (Ex. 8 page 2)........................................73

34.    The Complainant had been treated differently from the younger team members. Substantially, the similarly situated employees, if younger, were treated more favorably ..................................................................74

(a).    There is insufficient reason for the Respondents to pursue an adverse employment decision regarding the Complainant because he did not feel confident of running a deployment tool developed by a younger developer, Kathy Brzeinski, for two reasons: (1) this tool had not been completed, so it had not been well tested yet. (2) This deployment tool created by Ms. Brzeinski had a failure rate of over 50% in the past.                74

(b).    The reason why the Respondent had pursued an adverse employment decision regarding the Complainant has no basis in fact when it was not him, but some else fault ..............................................75

(c).    The reason why the Respondents had pursued an adverse employment decision regarding the Complainant has no basis in fact because Sujatha Duraimanickam should not have blamed the Complainant when the Complainant did not work on a task which was not on a To-Do list .................................................75

(d).    The reasons for Respondents to pursue an adverse employment decision regarding the Complainant was not as Sujatha Duraimanickam had stated. It is common that the deadline might be changed if requirements were changed. ..........................................................................................................76

(e).    In "Pen test" assignments, Sujatha Duraimanickam requested the Complainant to complete the work in the time much less than youngers. And created hostile working environment to hinder the

6

Complainant to work on project. For example, not granting him to access to the development resources required for the job, and artificially delayed job completion. ........................................................76

(f).   When vHost project was assigned to the Complainant, Sujatha Duraimanickam did not grant him access to the..............................................................................................................................76

(g).   Linux development environment although it was required. The younger developers did have access. Such was not just to give hard time to the Complainant in work, but also to let other teammates feel different from the Complainant ...........................................................................................76

35.   With the records in "basecamp", "service-now", "codeHub", etc. the Complainant could also demonstrate the Respondents created hostile working environment against the Complainant, wrongfully terminated the Complainant's job by false or misleading facts, defamation........................................77

ARGUMENT........................................................................................................................ 81

36.   FAA Rules for vacating arbitration award.........................................................................81

1)   9 U.S. Code § 10 - Same; vacation; grounds; rehearing ...............................................81

37.   Motion to vacate an arbitration award ............................................................................82

(a).   Common elements for vacating an arbitration award ........................................82

(b).   Definition of fraud .............................................................................................84

(c).   Common elements of civil fraud.........................................................................84

(d).   Establish an age discrimination claim.................................................................84

(1)   The plaintiff was older than 40;.........................................................................85

(2)   The plaintiff was discharged;.............................................................................85

(3)   The plaintiff was qualified for the job and met the defendant's legitimate expectations; and ...85

(4)   The plaintiff position remained open or was filled by a similarly qualified individual who was substantially younger. ...................................................................................................85

(e).   Standard for proving pretext ...............................................................................88

38.    *The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced*............................................................................................89

39.    *The arbitrator had misbehavior by which the rights of the Complainant have been prejudiced*.......96

(a).    "basecamp" records: That were project management records entered in basecamp.com and backed up in the end of each development cycle. The website, basecamp.com, were used in Ms. Sujatha and Ms. Kimberly Myers teams to manage the work assignments, including detail requirements for each work task, and to keep track of everyday working status, including issues and blocks...........................................102

(b).    "service-now" records: that were the service requests submitted to UHG service-now website, and were requested by Mr. Zhang or assigned to Mr. Zhang. The service-now website was UHG service management online tool used to manage UHG cross-team service requests, each service execution procedure, service status, and service time frames, etc.................................................................102

(c).    "codeHub" records: "codeHub" was source codes management online system, which recorded each individual contribution with very detail information. The "codeHub" website could show each individual contribution on monthly, or even daily base (Exhibit: Sample_page_for_showing_individual_development_contribution_over_github). And it also shows what technical language or skills the individual used. ..............................................................102

(d).    So, without understanding or asking for, the records from above three resources, Arbitrator applied evidence rules incorrectly ..................................................................................................103

(e).    Arbitrator ignored the Complainant's documented evidence with bias ...............................104

40.    *Respondent engaged in fraudulent activity* ..................................................................................107

(a).    Based on what facts that UHG fired the Complainant .........................................................108

(b).    False Representation ............................................................................................................110

If the Respondents could provide the "service-now" evidence, the records on "service-now" would also show the deployment on 9/11/2016 failed. ....................................................................115

Civil Case No. 18-cv-01454-MJD-KMM

If the Respondents could provide "service-now" evidence, the records on "service-now" would also show the release task was for the Complainant to ensure the deployment engineer backup the files. It was not to validate those files................................................................................................117

(c).    Respondents knew "basecamp", service-now", "codeHub" functions (Ex. 47 Tr. 27:14-20, 95:19-21, 96:4-5, 119:22-120:18, 134:7-11, 135:2-23) ............................................................................124

(d).    Two CAPs and other evidences from Respondents must be presented in arbitration even although they contained lies or misleading information ................................................................124

41.    *The undisclosed evidences have effects on arbitration decisions* ....................................................125

(a).    How to prove UHG had age discrimination against Mr. Zhang ............................................125

(b).    There is no debating the fact that Mr. Zhang is qualified for above element (a)(1) and (a)(3) since Mr. Zhang was 56 years old when his job got terminated. ....................................................126

(c).    Regarding above element (a)(2), following facts demonstrate Mr. Zhang was qualified to perform his job:................................................................................................................................126

(d).    Regarding the above element (a)(4), the records from basecamp, service-now, codeHub, and other relevant work status documents as mentioned in section 19 must need to provide in arbitration in order to determine whether Mr. Zhang had been treated different from younger developers in his team or Mr. Zhang had performance problems as mentioned in the two "Corrective Action Form" issued by Ms. Sujatha to the Complainant. ................................................................................................................130

(e).    What material evidences shall be disclosed in arbitration....................................................132

(f).    UHG did not use the material evidences to verify or refute what complainant said or the Complainant's arguments. Instead, UHG just repeated Ms. Sujatha's averse or negative comments about Mr. Zhang without proving those comments by material evidence, or giving new detail examples or descriptions of Mr. Zhang's conduct. ........................................................................................................................132

(g).    The arbitration award was procured by corruption, fraud, or undue means ......................132

(h).    The Respondents knew "basecamp", "service-now", "codeHub" and what they were used for, but they did not present their records for arbitration ..........................................................................133

Civil Case No. 18-cv-01454-MJD-KMM

(i).     the Respondents knew the functions of knew "basecamp", "service-now", "codeHub" ..........133

(j).     the Respondents presented malpresentation in arbitration when non-disclosed information in "basecamp", "service-now", "codeHub". Thus, led to below opinion as arbitrator said below: ...................133

(k).     The Respondents made a false representation intentionally and knowingly .......................134

(l).     As mentioned in beginning, the Respondents controlled all of material evidence. They just disclosed the evidences good for them ....................................................................................................136

(m).     Aside from using the evidence provided by the Respondents, the Complainant had no evidence of his own aside from the "MAKE IT HAPPEN" award he had received...........................................137

(n).     The records from "basecamp", "service-now", "codeHub" could help Complainant to demonstrate the Complainant had no-fault on the projects of four examples, vhost and "pen test". Also, the records will show who made the issues. Once find out the root causes from which persons, then it will show Ms. Sujatha had no cause to blame the Complainant...................................................................................137

**ANALYSIS** ...............................................................................................................................**138**

**CONCLUSION** ........................................................................................................................**143**

Civil Case No. 18-cv-01454-MJD-KMM

## TABLE OF AUTHORITIES

### Cases

*Burrage v. United States, 134 S. Ct. 881, 888-89 (2014)* ....................................................... 86

*Dawson v. Entek International, 630 F.3d 928 (9th Cir. 2011)* ........................................... 89

*Dep't of Fair Employment & Housing v. Lucent Techs, Inc., 642 F.3d* ............................ 88

*Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1113 (9th Cir. 2011)* ................... 89

*Gross, 557 U. S., at 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119* ............................................. 86

*Karppinen, 187 F.2d at 34-35* ................................................................................................ 83

*Lewis v. City of Union City, Georgia, et al., No: 15-11362, (11th Cir. Mar. 21, 2019)* ... 88

*McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)* ................................................. 87

*Nassar, 570 U. S., at 346, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503* ................................. 86

*Odeon Capital Grp., 182 F. Supp. 3d at 128* ...................................................................... 83

*Renz v. Spokane Eye Clinic* ........................................................................................... 72, 88

*Sorghum Inv. Holdings Ltd. v China Commercial Credit, Inc. - 2019 NY Slip Op 31265*

*(U)* ............................................................................................................................................ 83

Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000) ............ 19, 72, 87, 126

*Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258–59 (1981)* ............................ 88

*Thompson v. Bacon, 245 Va. 107, 111 (1993.)* ...................................................................... 84

*Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993)* ............................................... 88

### Rules

9 U.S. Code § 10 - Same; vacation; grounds; rehearing ...................................................... 81

Civil Case No. 18-cv-01454-MJD-KMM

9 U.S.C. § 10(a)(1) .................................................................................................... 83

*Act, 9 U.S.C. §§ 10 & 11* ......................................................................................... 15

*Age Discrimination in Employment Act Of 1967* ............................................... 84

FAA Rules for vacating arbitration award ......................................................... 81

Minnesota Statutes 572B.23 Vacating Award................................................... 81

Rule 1002. Requirement of the Original ......................................................... 121

S.485 — 116th Congress (2019-2020)............................................................. 84

*Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. §*

*1981* ....................................................................................................................... 87

Civil Case No. 18-cv-01454-MJD-KMM

## PREFACE

Term and Definition:

The Complainant, **YUFAN ŻHANG**, will be referred to as ZHANG, or FRANK ZHANG, or FRANK, or Complainant, or Claimant.

The Respondent, **UNITEDHEALTH GROUP**, will be referred to as UHG, or OPTUM (UNITEDHEALTH GROUP has two divisions: UnitedHealthcare and Optum), or Respondents, or Defendants

And the Respondent, **SUJATHA DURAIMANICKAM**, was the Complainant's manager in UHG in year 2016. SUJATHA DURAIMANICKAM will be referred to as SUJATHA, or DURAIMANICKAM

**AEM** – Adobe Experience Manager

**CAF** – Corrective Action Form

**CAP** – Corrective Action Process or Corrective Action Plan. It is also referred to CAF file or the contents in CAF file.

**FAA** – Federal Arbitration Act

**IDR** – Internal Dispute Resolution

**IT** – Information Technology

**MAL** – Minnesota Arbitration Law

**QA** – Quality assurance

**SDSS** – Software Development and Support Services

13

Civil Case No. 18-cv-01454-MJD-KMM

**dev** – development

**Ex.** – Exhibit in Arbitration

**Exs**. – Exhibits in Arbitration

**Tr.** – Transcript in Arbitration, for example Tr. 200:12 meant transcript page 200, line 12

(**Ap.**) – Appendix

(P ) – page; for example (Ex. 53, P2), means Exhibit 53, page 2

§ – section or paragraph, example §2 means the section of number 2, or the second paragraph on a page


**basecamp** – basecamp.com website, a project management & team communication online system used to manage work requirement and daily work tasks, etc.

**codeHub** – codehub.optum.com website, an online source codes management system, which is similar to github.com and used in Optum for maintaining IT source codes and their processing in check-in, check-out, submit, review, history check, comparing, reports, etc.

**service-now** – UHG service-now website, a service management online system

"**pen test**" (or "**pen testing**") – short name for "penetration testing" issues, which are the security issues found by company security team when they did penetration testing on the servers supported by infrastructure team. "**pen test**" sometimes also means the task(s) for fixing "penetration testing" issues

14

Civil Case No. 18-cv-01454-MJD-KMM

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to *9 U.S.C. §§ 10 & 11* because it is an appeal of an order that vacate the arbitration awards[1], dated on October 5, 2020, issued by Hon. Jeffrey J. Keyes.

---

[1] EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 2-5

Civil Case No. 18-cv-01454-MJD-KMM

## STATEMENT OF THE ISSUES

This appeal raises questions regarding the application of probable cause in arbitration. The major issue is that the arbitrator made the arbitration award without complete evidences and fully understanding all the facts about Claimant development jobs. And the key questions are:

(1) Can Respondent legally refuse to disclose the evidence which is favorable to opposing party in arbitration?

(2) How to weigh evidence? especially when two evidences have different descriptions for the same event

(3) Whether need more material evidence to prove the contents of the statement evidence after a party demonstrated its statement was based on lie or partial facts

(4) Can employer legally terminate an employee with untrue reasons, or even the fact of wronging employee, in arbitration?

(5) Whether arbitrator(s) should ask claimant or respondents to clarify something that arbitrator(s) get confused, or feel unclear, or need more details, or do not understand

In arbitration, there are two explanations for why the Complainant was fired: Respondents' and Complainant's. The Respondents claims that it was because the Complainant had poor performance; while the Complainant claims that the

Respondents allegation is merely pretext; and actually, the Complainant was treated differently from his younger teammates and had suffered from age discrimination, hostile working environment, and defamation.

In order for the Complainant to prove that he did suffer from age discrimination, a hostile working environment, defamation and wrongful termination, the Complainant requested all relevant evidences, which included any writing and digital records, any publishing and company policy, employment records, job records, performance records from any resources and individual as long as they are relevant to the Complainant, etc. However, in the end of arbitration discovery, the Respondents did not provide any original or material evidence which are related to the works that the Complainant had worked on, such as the records from "basecamp", "service-now", "codeHub", requirements documents that are related to the Complainant's job, internal service policy (like the policy on using service-now and media policy), team member respect policy or guideline, company common review and interim review policy (including the employee rights on the reviews), and the policy or training that each employee need to review or take in each year, etc.

The Respondents did not provide the records from "basecamp", "service-now", "codeHub", such would lead to the difficulty in verifying each party statement's authenticity and completeness. A lack of such records would result in the Complainant having more trouble or spending more time explaining the events. It would also result in difficulties for the arbitrator, especially as the arbitrator lacks an

Civil Case No. 18-cv-01454-MJD-KMM

IT background, to make right determination without misled by lie or incomplete facts.

In UHG, any digital records obtained from company internal resources or generated by company devices are considered as company intellectual property. Copying or taking the company intellectual property without permit in advanced might be considered criminal. Thus, let the Complainant must use the evidence provided by the Respondents to prove the Respondents did something inappropriate. No rational individual would voluntarily provide evidence against herself or himself. Arbitrator(s) do not have enough power to compel a party to disclose material evidence which is need in the basis of the best evidence rule, but the courts have, for the pursuit of justice. That is why the Complainant wants the case to come back to trial.

According to UHG HR response, the Respondents terminated the Complainant's job on the basis of the reasons stated in two "Corrective Action Forms" (CAPs) issued by Sujatha Duraimanickam, especially on what stated on the "progress updates" section of the Final CAP. In the two CAPs, Sujatha Duraimanickam provided four examples, some short averse or negative comments, and some assertions. Because most of comments on the two CAPs are too general or lacking of details, this brief does not cover all the comments, but the items which are discussed more in arbitration. The argument issues are from: four examples, "penetration testing" ("pen test"), and virtual host configuration ("vhost").

Civil Case No. 18-cv-01454-MJD-KMM

Under the disparate treatment theory, in order to establish a prima facie case of age discrimination, Complainant must establish that:

(1)  Complainant belonged to the protected age group; and

(2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

(3)  Complainant suffered an adverse employment action; and

(4)  Similarly situated, substantially younger employees were treated more favorably.

*See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).*

There are no issues on the above elements (1) and (3) in the arbitration. The arbitrator made the arbitration decision saying the Complainant was terminated because of his poor job performance. In order to vacate the arbitration award on the basis of *9 U.S.C. §§ 10 (a)* and *Sec. 572B.23 MN Statutes*, the Complainant needs to demonstrate that the Respondents did not disclose the records from "basecamp", "service-now", "codeHub", and plus other actions, thus leading to an award procured by corruption, fraud, or undue means. If the records from "basecamp", "service-now", "codeHub", etc. were available, the Complainant could demonstrate the Respondents' age discrimination. Also, the arbitrator did not have the necessary IT knowledge to understand the Complainant working environment, thus made arbitrator ignored the job details which played important role in determining credibility of evidences and testimony. So, the Complainant also demonstrate that the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon

19

Civil Case No. 18-cv-01454-MJD-KMM

sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

1. How to determine the credibility and completeness of evidence in arbitration

2. Whether the employer's reasons for terminating the Complainant job:

    (a).   **have no basis in fact, or**

    (b).   **even if based in fact, the employer was not motivated by these reasons, or**

    (c).   **the reasons are insufficient to motivate an adverse employment decision**

3. Whether the arbitrator and Respondents knew "basecamp", "service-now", "codeHub"?

4. Whether the arbitrator and Respondents knew the importance of "basecamp", "service-now", "codeHub"?

5. What malpresentation had the Respondents done when non-disclosed information in "basecamp", "service-now", "codeHub"?

6. Whether the Respondents made a false representation intentionally and knowingly

7. Whether the Respondents knew what they did would mislead the arbitrator

8. Whether there were other choices for the Complainant not depending on the records in "basecamp", "service-now", "codeHub" when he alleged the Respondents discriminated against him?

9. Whether the Complainant could demonstrate Respondents' discrimination if the records were available to the Complainant

   The Complainant should demonstrate he qualified to perform his job. And the reasons for the Respondents to terminate his job are pretext.

10. Whether the Complainant can prove that the Respondents told lie, and such lie made him losing job.

11. And whether the "lie" meets privilege standard

Civil Case No. 18-cv-01454-MJD-KMM

## STATEMENT OF THE CASE AND THE FACTS

12. Complainant working environment overview and the related technical terms

It is found that the Complainant's job was incorrectly or inaccurately described in the respondents' brief. So, it is necessary for non-technical people to gain a basic understanding of the Complainant working environment in 2015 and 2016. Such information is very helpful for understanding the case and for weighing the adverse employment actions motivated by the issues.

### (a). The Complainant job duty and the work environments around him

Zhang, was hired by manager Kim Myers as an Application Consultant, also known as a Senior Java Developer, in January 2015 in UnitedHealth's SDSS ("Software Development and Support Services") division within Optum Technology, located in Eden Prairie, Minnesota. In his role, Mr. Zhang was responsible for developing and maintaining the customized AEM application components. AEM stands for Adobe Experience Manager, which is a web content management system. The components developed by Zhang and his teammates were embedded in AEM, and running together with AEM own common components in application servers. See the first picture in Ex. C, it is the AEM file layout, where "mywebsite" is the name of a folder under the "apps" folder. And "mywebsite" is also a project name, such as "OMC" or "OptumDeveloper". Under "mywebsite" folder, there is a "components" folder. The components created by developers are put inside the

22

Civil Case No. 18-cv-01454-MJD-KMM

"components" folder. The Complainant's mainly job was to develop various new components or modify the existing components in that "components" folder. The description here is just to provide high level view on what the Complainant worked on. Although it is not accurate, but very similar. *Understanding the layout shown in the picture (Ex. C) would be helpful for figuring out the point of issues discussed or argued in this case regarding to the examples 2 and 4 in initial CAP.*

The components developed by Duraimanickam's team can be categorized into two types of bundles based on where they were used for. One is called OMC ("Optum Marketing Cloud"), the other is called ODH ("Optum Developer Hub"), and also called "Optum Developer". In 2015, OMC contained the components for external use only, while "Optum Developer" contained the components for both external and internal use. In 2016, these two bundles were merged into one, called OMC.

In 2016, in SDSS division, led by John Zimmerman, there were three major teams: business team, development team, and infrastructure team. See the picture in Ex. D, (1). The business team worked closely with the clients who were responsible to presenting web contents to "visitors" (the left portion in the picture on Ex. D) with the layout they designed. So, the business team was responsible to gathering business requirements from clients, then converting the business requirements to the technical requirements, and then entered them to "basecamp" for developers to work

23

on. The business team was also responsible for consultant support. (2). The infrastructure team was an operation team, and was responsible for operating and maintaining all of servers (the middle portion in the picture on Ex. D) running on Linux/Unix computers and OpenShift cloud, and also responsible for anything directly related to servers, like server machine, cloud, server configuration, deployment, backup, server security, etc. The infrastructure team was also responsible for production support. (3). The development team was responsible for developing the components used in AEM (the right portion in the picture on Ex. D) which were running on the servers supported by the infrastructure team. *Understanding the relationship among the three portions shown in the picture (Ex. D) would be helpful for figuring out the point of issues discussed or argued in this case regarding "penetration testing" ("pen test"), "vhost", and the example 2 and 3 in initial CAP.*

**(b).   Developing and operating under DevOpt environment**

Under DevOpt environment, both development team and infrastructure team worked more closely, but this did not mean that their job responsibility was changed or combined together. *This point is a very import when discussing the Complainant job performance related to "Pen test" blamed by Respondents*.

Under DevOpt environment, developers from development team could ask the system engineers from infrastructure team to resolve the server

Civil Case No. 18-cv-01454-MJD-KMM

issues. And the system engineers could ask developers to help them with troubleshooting.

### (c).    What is AEM

AEM stands for **Adobe Experience Manager**, which is a web content management system. The clients could create website hosted on AEM application without writing codes[2]. In another word, AEM provide a tool for users to create web pages by themselves, similar to what can be seen on wix.com. The AEM file layout looks as shown on Ex. C.

### (d).    What is OpenShift

OpenShift is a family of containerization software products developed by Red Hat. OpenShift platform service was introduced to development team in year 2015. By using OpenShift platform service, developers could create as many AEM servers or environments as they want with just few clicks in minutes. ***Understanding this point is a very import when discussing the issue about "deleting [entire] development environment".***

---

[2] For more information , please refer to

https://www.adobe.com/markcting/experience-manager.html#demo

Civil Case No. 18-cv-01454-MJD-KMM

Such servers are called cloud [environment] or cloud servers. If an AEM server is used for developers to test their codes, we consider this server as "[cloud] Development Environment". OpenShift could be used by anyone to create its own servers, or says own "environments". Similar to real computer, the servers or environments creators could grant the read, write, or admin privilege to other developers. Without this privilege, no one can delete or event view the server (or say "environment") except administrator. **This point is a very import when discussing the Complainant job performance on "delete entire development environment".** Except the OpenShift administrator, anyone need specific privileges to access or delete a server environment on cloud or real computers.

### (e).   Overview OpenShift and AEM system service layout

If you don't have any IT knowledge, but know how to use online banking service to manage your money, then you can understand how OpenShift and AEM work like.

You can imagine OpenShift as a "local bank". To create a server (or say "environment") on OpenShift, you can imagine "*create a server on OpenShift*" as "*open an account in the bank*". Similarly, below shows how an OpenShift/AEM service action can be imagined as a banking action. For instance:

26

Civil Case No. 18-cv-01454-MJD-KMM

| OpenShift | Bank |
|---|---|
| Create a new server (environment) | *Open a new account* |
| Delete a server (environment) | *Close an account* |
| AEM components | *Financial services* |
| Web contents (text, button, etc.) | *Transactions data (money)* |
| Web page (one page as one report) | *Transaction view (financial report)* |
| Add AEM tenants (users) | *Join account* |
| Grant a user right to delete a server | *Allow other one to close account* |

On OpenShift environment, creating an environment is as simple as creating a new email account online. The creator can control who can view, process (for example: add or delete web content), or delete the environment. Also, the AEM build-in services enable copying and loading web contents from one server to another server very easily. In development phase, developers can create as many server environments as they want; then delete them when they do not need those server environments.

(f).   **Environments for development, test, stage, and product in Linux/Unix system**

In 2016, dev(development), test, stage, and product environments were mainly built on physical Linux/Unix computers, although some

27

environments were built on OpenShift. When AEM running environment on a computer was used for development purpose, that environment was called development environment. The server on which AEM was running was called AEM "host". In those AEM working environment, users do not access AEM server directly. Users were to access to a routing server (the middle one of the picture on Ex. D). And based on the request web address, the routing server would forward request to a physical or cloud AEM server. Thus, the hostname setup for request web address (in middleware) is called "vhost" (short name for "virtual host")

**(g).** **The similarities and differences for using the development environment between OpenShift and Linux/Unix**

From user viewpoint, there were no differences for the development environment between OpenShift and Linux/Unix. For developers, the development environment in OpenShift was easily to create and delete when they need. But when there were any issues occurred, troubleshooting on Linux/Unix might be easier.

**(h).** **Why needed OpenShift development environment**

OpenShift development environments are cost-efficient. Developers might create as many development environments as they want, so that

developers could test their codes in different scenarios without impact on the other.

(i).     **OpenShift development environment was in trial and evaluation in 2016**

In 2016, OpenShift development environments were mostly used by individual developers. The formal development environments used by the team, or for integration testing by developers, were still built in Linux/Unix computers, but it might be changed after 2016.

(j).     **It is not a problem when a developer makes a mistake in development phase as long as no impacts on others or issues can be fixed quickly.**

It is normal for developer to have some errors during development stage since development stage is for developers to try to implement their solutions. And trying means it might be failed or have errors or mistakes. So, that would be acceptable as long as those errors have been fixed and the assignments have been finished before deadline. For example, it is Ok for a document contains many grammar errors when someone is writing it. But that would not be issues if the document can be submitted with no errors before deadline. So, before complaining errors, it should be clear that the errors are found in development or in production.

Civil Case No. 18-cv-01454-MJD-KMM

In 2016, the developers in Duraimanickam's team worked on coding and initial testing on their local computer. Once they felt good with what they done, then they could create a development environment on OpenShift, and do integration testing there. Since that was in development phase, developers could try whatever testing they wanted. They could even delete the development environment and recreate new one. Once developers felt good with their coding, they could deploy their codes to the development environments built on Linux/Unix computer.

13. Respondents' reasons for terminating the Complainant's job

In this case, all of the evidences for alleging the Complainant's performances are not material evidence. They are the evidences in the basis of comments, statements, or hearsay. So, it is very necessary and important for the arbitrator to recognize whether those comments, statements, or hearsay are true, or false, or partial true and partial false before he makes any decision. In Tanya Hughes's email sent on 12/15/2016 (Ex. 23) regarding the reasons for terminating the Complainant's job, Tanya Hughes said:

*"I have attached copies of your Corrective Action Plans. I would like you to look at the "progress updates" section of your Final CAP which indicates performance concerns that existed after the final CAP was issued to you which is why the decision was made to terminate your employment. Managers are expected to set the performance expectations for the employees that report to them."*

30

Civil Case No. 18-cv-01454-MJD-KMM

The following is what Tanya Hughes said about the *"progress updates" section of your Final CAP*:

"Progress Updates:

10/31/2016    Frank is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion. Met with him on Oct 31st and discussed about the lack of meeting all the expectations in a satisfactory manner.

11/07/2016    I've been meeting with Frank every week and providing very candid feedback. He is still unable to carry out an assignment with thoroughness, accuracy or attention to detail to deliver any task without issues. Eg. vhost config file task was assigned to Frank and he caused issues in one server and before resolving and closing the issue here, he wanted to move on to the next server. Another team member in Infra team had to spend more time troubleshooting the problem created by Frank thereby leading to negative impact for the rest of the team unnecessarily. He is still not paying enough attention to his task in hand nor is he able to understand the impact of his change and is unable to perform his job independently without causing issues. This has consumed a lot of time and energy from other team members to

Civil Case No. 18-cv-01454-MJD-KMM

>           *always solve the problems and issues caused by Frank and is*
>
>           *causing negative impact to the team heavily.*
>
> 11/14/2016   *Had a discussion with HRDirect and as Frank has not met the*
>
>           *performance expectations of this position and as outlined in the*
>
>           *Corrective action plan, we've determined to terminate him today*
>
>           *11/14/16.* "

In other words, the reasons for Respondents for terminating the Complainant's job are mainly from two CAPs (**Exs**. 4 and 14), and the major parts are about Mr. Zhang's qualifications for his job, the four examples written in initial CAP, the performance issues on the assignments of "pen test" and "vhost", and communication skills. There were many arguments between two parties. The major argument points are:

1) Duraimanickam said "*Frank[Zhang] is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion*" (Ex. 14, page 3, "Progress Updates" on 10/31/2016)

   **Argument points**:

   > **Zhang** opinion: Duraimanickam told lies or had biases towards his job
   > skills and knowledge because: (1) Mr. Zhang won the company-wine award
   > in 2015 (Ex. 1). (2) Mr. Zhang was recognized by his first manager for his
   > excellent documentation on what team did in 2015(Ex. 2, page 1

32

Civil Case No. 18-cv-01454-MJD-KMM

"Comments" section). It is not possible for someone to perform excellent technical documentation without good experiences and all relevant knowledge and job skills (3) other developers testified Zhang was a technical talent (the details are shown later).

**Duraimanickam** opinion: (1) everyone's coding errors were always caused by Zhang (Ex. 50 Tr. 616:1-4); (2) Zhang's outcome was always flawed and Zhang always has issues (Ex. 50 Tr. 622:7-8); (3) "he[Zhang] has always run into repeated issues for not validating things thoroughly. He[Zhang] is always been very careless" (Ex. 50 Tr. 626:1-4); (4) "he[Zhang] was always giving some lame excuse or the other." (Ex. 50 Tr. 654:21-22).

However, in July 10, 2016, **Sujatha Duraimanickam** said: "Frank[Zhang] has been really good to work with and is diligent and sincere. He[Zhang] is technically a strong candidate" (Ex. 3, page 1, "Comments" section of Business Goals)

Duraimanickam had so many "always" adverse comments, but she was not able to provide any material evidence to prove her statements during this four-year lawsuit. Zhang had worked on many development assignments (Ex. Major-contribution). Duraimanickam complained only one task among them.

33

Civil Case No. 18-cv-01454-MJD-KMM

**Other team members opinions**:

**Kim Myers**, pre-manager, said: "*Frank is excellent at documentation, and his level of detail is very appreciated by me and by the QA tester for OMC. Frank is a strong technical talent and has an excellent background in Java*" (Ex. 2, page 1, "Comments" section of Business Goals)

The professional witnesses (developers) from UHG acknowledged the Complainant was smart and had the technical knowledge and skills required for performing his job.

**Jennifer Viveros Aguilar** said: "*Frank[Zhang] was a really smart person and admired how easily he could complete a task. When he fully understands assignments, Frank[Zhang] is really focus and completes task fast and detailed. I noticed the detailed part when we notice that the event summary broke and he was able to target the session issue easily within hours, which would have taken us days to find.*" (Ex. 12 page 1 §2).

**Nancy Bullard**, only QA tester in SDSS division, said "*Frank has a lot of technical knowledge and is always very professional and easy to work with.*" (Ex. 8 page 2)

34

Civil Case No. 18-cv-01454-MJD-KMM

**Analysis**:

Duraimanickam did not provided any material evidence to support her comments. She just used her one comment to prove another comment. Event after the Complainant told the Respondents what were wrong in the examples that the Respondents used to demonstrate their comments based on the records in "basecamp", "service-now", and "codeHub", the Respondents still did not want to use the evidences in "basecamp", "service-now", and "codeHub" to refute the basis of Complainant's arguments. Why?

**The crux of the issue**:

The records in "basecamp", "service-now", and "codeHub" contains the information for each developer day-to-day work tasks, work status, and the work errors or issues, etc. So, such records can be the material evidence. Without such evidences, the arbitrator might be misled. But why were the Respondents not willing to use the records in "basecamp", "service-now", and "codeHub" to support their statements or arguments in the Internal Dispute Resolution appeal, EEOC charge, and this arbitration? And even the witness, Shawn Woods, testified that he didn't know what is "basecamp" (Ex 47 Tr. 123:7-10), and that "basecamp" was the system he

must have used on every day in 2015, 2016, and might continue being used for certain years after 2016.

Also, the records in "basecamp" and "codeHub" would show whether the Complainant could finish his assignments in time and what contributions he had made. So, it is very necessary to disclose those records in "baecamp", "service-now", and "codeHub".

2) Duraimanickam blamed that Zhang did not feel confident on a deployment tool in OMC 5.1 release on 9/11/2016 (from sample 1 in initial CAP, Ex. 4)

**Argument points**:

**Zhang** opinion: [Zhang] did not feel confident on the tool developed by Kathy because (1) at the time when Duraimanickam blamed him, that tool was not completed yet, (2) in past, the similar tool had been developed by Kathy had a failure rate greater than 50%. (Ex. 17, Page 5, §3)

**Duraimanickam** opinion: [Duraimanickam] did not feel anything wrong with her blaming. Duraimanickam said: (1) "Eventually we did release it successfully", "Somebody did it" (2) [Zhang] was not able to handle it. (Ex. 50 Tr. 603:16-604:1)

However, in the next example, Duraimanickam complained the restoration took a long time after the deployment failed. It means "Eventually the release was failed", so what Duraimanickam testified are not true.

**Analysis**:

Duraimanickam did not refute Zhang's argument, but presented her comments instead. Duraimanickam's comment implied that somebody eventually succeeded, so Zhang should not have used the past failure rate to explain why he was not able to handle it.

However, Duraimanickam lied here, because the release had failed, and therefore no one was able to handle it successfully (Ex. 4, page 2, example 2). In Example Two, Duraimanickam stated the release failed, and the rolling back the changes took 4 extra hours.

**The crux of the issue**:

Why didn't Duraimanickam check with Kathy to see whether she had completed the deployment tool before asking Zhang for his opinion about that tool? Why didn't Duraimanickam blame the younger developer, Kathy, for the quality of the deployment tool developed by Kathy? Instead, Duraimanickam did not accept Zhang's explanation and has been trying to state there was nothing wrong with her accusations. **All these examples**

37

**demonstrate that Duraimanickam treated Zhang differently from younger developers and that her reasoning was merely a pretext.**

Also, the records in "basecamp" and "service-now" would show the Complainant working status and release status. So, it is very necessary to disclose those records in "baecamp", "service-now", and "codeHub".

3)  Duraimanickam blamed [Zhang] for not validating the backup file in the OMC 5.1 release, so that when the OMC 5.1 release failed, it caused a restoration process had took four extra hours on 9/11/2016 (from sample 2 in initial CAP, Ex. 4).

**Argument points**:

**Zhang** opinion: [Zhang]'s job was not to do hands-on validating. He was asked to confirm with the deployment engineer to ensure the engineer had backed up the files which would be changed in the OMC 5.1 release before starting this production deployment, because (1) [Zhang] had no access to production computer so he was not able to do hand-on validating the files even if he had wanted to. (2) The task of backing-up files was always the infrastructure team's job, and they were the experts at it. Zhang's job was to confirm the infrastructure team had done said backup. (3) The reason that the restoration had taken so long was because Duraimanickam had asked Max to install AEM SP2 (service package 2). The OMC 5.1 was to release

components on AEM, while SP2 was a system level upgrade. See **Ex. C**,

the backup files for the components could not be used to restore the files

changed on the AEM system made by SP2. That is because "components"

folder is merely a sub-folder. Instead, Max should have backed up the

entire AEM package before installed SP2. (Ex. 17, Page 5, §4)

**Duraimanickam** opinion: *He[Zhang] did not validate that. He assumed*

*that the job ran successfully.* (Ex. 50 Tr. 604:2-18)

There are records in UHG "service-now" system to show what Zhang was

supposed to do. However, UHG did not provide arbitrator the material

evidence in "service-now" system.

**Analysis:**

Duraimanickam's assumption is wrong. The infrastructure team was

responsible for deployment and restoration. They were the experts on what

should be backed up and how to perform those backups. Therefore, it was

the infrastructure team's job to make sure that the correct files were backed

up. Also, what to backup were depended on what to install. The service

request told infrastructure team that was to release OMC 5.1 (AEM

components). But during deployment process, Duraimanickam let

infrastructure engineer install AEM Service Package 2 (SP2), which had

Civil Case No. 18-cv-01454-MJD-KMM

impacts on entire service environments, include web contents. In another word, installing SP2 caused more files got changed and these files were not supposed to change in OMC 5.1 release.

Also, without production access, Zhang could not read the production backup files nor validate the production backup files in-person. Zhang's job was to check with the infrastructure engineer, Max, to confirm that he had done the backup.

**The crux of the issue**:

According to company policy, once deployment failed, a rollback had to happen; however, Duraimanickam did not follow that rule. In addition, when Duraimanickam let Max install SP2, she should have checked with Max to confirm whether his earlier backup files were compatible for a system upgrade with SP2. In regards to this incident, it was Duraimanickam who had done something inappropriately. However, **Duraimanickam blamed Zhang based on her biases**.

Also, the records in "basecamp" and "service-now" would show the Complainant working status and release status. So, it is very necessary to disclose those records in "baecamp", "service-now", and "codeHub".

Civil Case No. 18-cv-01454-MJD-KMM

4) Duraimanickam blamed [Zhang] did not validate the "Optum Developer" website while launching BSL Center "vhost" on 8/16/2016 (from sample 3 in initial CAP, Ex. 4)

**Argument points**:

> **Zhang** opinion: [Zhang] had not been asked to validate the "Optum Developer" website. That could be verified by the service-now material evidence. (Ex. 17, Page 4 §2).

> **Duraimanickam** opinion: "That was also a developer's [Zhang] responsibility, to make sure they understand what they have to do" (Ex. 50 Tr. 606:18-607:15)

Sujatha Duraimanickam's opinion is incorrect. There were dozens of websites listed for validating. However, no one found that during team developers review and manager review. So, the "Optum Developer" website was missing in to-do list. If anyone could find out the missing or the younger system engineer, Max, did not make mistake, the issue would not happen. When the issue occurred, why didn't Duraimanickam blame any younger developers for not finding the missing website, or Max for making the issue.

41

Civil Case No. 18-cv-01454-MJD-KMM

The UHG service policy for deployment required pre-approval for each production deployment request, including deployment steps, the order of step processing, and deployment timeframe. The policy required the deployment steps to be clearly stated, and required each employee to follow the instruction steps to deploy services; no steps may be skipped or added without pre-approval, and no changes can be made to the order of deployment steps. The service policy forbids anyone from making change to deployment steps merely based on self-assertions, even if the assertion might be right. And the key point is: Duraimanickam thinks Mr. Zhang should find out the missing website, then validated it. But why Duraimanickam did not think the other younger developers should find out the missing website so that it could be in the to-do list.

**Analysis:**

The "Optum Developer" website was not listed on the to-do list (the list of websites to validate in post-deployment). The to-do list included dozens of websites, and had been reviewed by every developer, and Duraimanickam, and Kim Myers. That can be verified on service-now website. The root cause is that no one could find out the "Optum Developer" website was missing in the list of dozens of websites. Since no one could find out the "Optum Developer" website was missing, why Mr. Zhang should be fired when he could not find out the "Optum Developer" website was missing, while other younger teammates would be OK.

42

Civil Case No. 18-cv-01454-MJD-KMM

Also, the UHG service policy for deployment required that deployments be done during a pre-approved timeframe. The policy also required that the deployment steps to be clearly stat and everyone must follow the exact instructional steps to deploy services. No steps may be added or subtracted and there must not be any changes to the order of deployment steps. In addition, the service policy forbids anyone from making changes to any deployment steps based on self-assertions, even if the assertions may be correct.

**The crux of the issue**:

The deployment failed because Max did something incorrectly. Duraimanickam said "The infrastructure team does what we tell them to do. So, we give them two length of code, software code, to launch a specific website". This is a false statement. No code had been given. Only the technical requirement was provided. For whatever reason, Max changed something he was not supposed to change, resulting in an issue. Here, Duraimanickam did not blame Max and instead blamed Zhang for not doing something which he was not requested to do. In fact, company policy also forbids Zhang from performing such an action during such a situation. Also, Duraimanickam thinks it is Ok that everyone, except Mr. Zhang, could not find out the "Optum Developer" website was missing in the to-do

43

Civil Case No. 18-cv-01454-MJD-KMM

list, but Mr. Zhang should be fired when he could not find out the "Optum

Developer" website was missing in the to-do list. Therefore, **that also**

**proves that Duraimanickam treated Zhang differently from the**

**younger team members**.

Also, the records in "basecamp" and "service-now" would show the

Complainant working status and release status. So, it is very necessary to

disclose those records in "baecamp", "service-now", and "codeHub".

5) Duraimanickam blamed [Zhang] for missing the deadline on the Admin tool

development project (from sample 4 in initial CAP, Ex. 4)

**Argument points**:

**Zhang** opinion: [Zhang] did not pass the newest deadline (Ex. 17, Page 2

§1). The project requirements had been changed for many times.

Accordingly, the deadline had been changed as well. Also, the other

developer, Shawn Woods, could get the project done in few days because

all he had to do was to make changes to Zhang's code instead of developing

the code from scratch. Zhang said he also got the project done in the same

time as Shawn Woods.

Shawn Woods said Zhang's code was overengineered. Actually, that

overengineering was because the older functions had not been removed

Civil Case No. 18-cv-01454-MJD-KMM

after the requirements had change, in case such functions would be needed again. (Ex. 50 Tr. 710:17-711:12).

**Duraimanickam** opinion: It was delayed beyond an acceptable date and another team member had to pick it up and redo the whole functionality on a weekend to make the release date.

The material evidence in basecamp development logging records could show that the requirements got changed and the latest hours allocated to the project. However, UHG did not provide such evidence to the arbitrator.

**Analysis:**

Shawn Woods was to make some changes to Zhang's code, a process called refactoring. At that time, Zhang's code was almost done. In addition, the requirements had been changed for many times (Appendix 2). Therefore, the development time had been changed from a week to four weeks. Adding in the two-week testing cycle and one-week deployment cycle, and the total project time became 7 weeks. Duraimanickam did not mention that and misled the arbitrator into thinking that Zhang took a long time to do something that only took Shawn Woods a single week.

**The crux of the issue:**

45

Civil Case No. 18-cv-01454-MJD-KMM

The argument is based on whether the requirements got change for at least three times. The Complainant said it did get change for at least three times. The Respondents acknowledged the change. But the respondents still think the Complainant passed deadline. So, the evidences from "basecamp" and "codeHub" would be the material evidence for verifying whether missing deadline, and whether many younger developers had experienced missing deadlines. However, the respondents refuted disclosing the records in "basecamp" and "codeHub".

6)  Duraimanickam blamed [Zhang] for not fixing the "Pen test" issue in time (Progress Updates, 09/20/2016 [1] and 09/22/2016, in initial CAP, Ex. 4)

**Argument points**:

**Zhang** opinion: The task for fixing the "pen test" (penetration test) issues was first assigned to a younger developer, Josie, in July 2016 or early August 2016. In August 2016, because Josie did not know what had caused the issues, the task was then reassigned to Zhang. After analyzing the issue, Zhang found that the issues were mainly originating from the servers supported by infrastructure team, so Zhang reassigned the task to the infrastructure team in early August 2016 via the "service-now" system. One month later, Zhang found that the infrastructure team did not fix all of the issues, so, in September 2016, Zhang submitted another service request via

Civil Case No. 18-cv-01454-MJD-KMM

the "service-now" system to ask the infrastructure team to fix the remaining issues. Therefore, the infrastructure team is to blame for failing to fix the "pen test" in time, not Mr. "Zhang".

After an additional month, the infrastructure team still could not fix the issues. In October 2016, Duraimanickam requested that Zhang fix all the remaining issues in two weeks, other else she would terminate Zhang's job.

The key to fix the "pen test" issues is to find out where lead to the issues. Once knowing that, writing few lines of codes in minutes will fix the issues. So, the difficult part is the infrastructure engineers needed to have the knowledge on how the servers are working and where and what might lead to security issues.

The infrastructure team were the experts in servers and in fixing server issues. That is their job. So, they should be the experts in fixing the "Pen test" issues. Those younger experts could not fix the issues in two months, but Duraimanickam requested Zhang to fix them in two weeks. And the worse thing is that Duraimanickam did not let Zhang access the computers where the servers running, but she granted the access to younger developers. As a result, Zhang needed to relied on younger developers to test Zhang's code in the servers. Luckily, Zhang got the issues fixed in 8 working days, and then asked other younger teammates to help him with testing his code on a real system machine. However, no one helped Zhang

Civil Case No. 18-cv-01454-MJD-KMM

with the testing until three days before the due date, on Friday. On that date, Duraimanickam said the project due date was changed from the next Monday to this Friday, by noon. Zhang's code got tested almost at noon. A folder in the testing Linux computer did not match with the one Zhang wrote down, since Zhang wrote down the folder name based on what he saw on a Windows computer. As Zhang had no access to the Linux computer, he did not know that the folder name was incorrect. When Zhang figured out the root cause for the issues, he asked Duraimanickam to give him 10 minutes for fixing and re-testing. Duraimanickam did not agree, even though only half an hour had passed since the due time, and that due time was just changed from the next Monday to noon of this Friday just three hours before. Zhang could not perform any fixes until the next Monday. Then, Duraimanickam said it was Zhang who caused project testing to be delayed by two days. However, the deadline was then changed again, to next Wednesday, because other younger team members could not finish their tasks. If it was Zhang who had caused the delays, the deadline should have been changed to Monday because Zhang's code had already passed the test by noon of Monday. All of the information could be verified by the "basecamp" records, and the "service-now" system records.

**Duraimanickam** opinion: Duraimanickam said "this was Zhang's task, and he was working on this forever and never got it done. There was lots of

`Civil Case No. 18-cv-01454-MJD-KMM

issues. He would try to fix one thing and break something else, and it was just chaos." (Ex. 50 Tr. 612:9-14)

Duraimanickam told lie here. It was those younger system engineers first could fix the issues in two about months, then the task was reassigned to Zhang in October 2016. The records in "service-now" can show the task was assigned to infrastructure team by Zhang in August and September 2016. And the "basecamp" records can show the "pen test" task was taken by Zhang in October 2016. However, UHG did not provide those records to arbitrator, which led to the false news got spread.

**The crux of the issue**:

The records in "basecamp" and "service-now" would show when the tasks were assigned to infrastructure team and the team job updates. And these records could also show the Complainant working status. So, it is very necessary to disclose those records in "basecamp" and "service-now" in order to validate both parties' comments.

Civil Case No. 18-cv-01454-MJD-KMM

7) Duraimanickam blamed that Zhang entered "Incorrect end time" in "change ticket" of OMC 5.1 release (Progress Updates, 09/20/2016 [2], in initial CAP, Ex. 4)

**Argument points**:

**Zhang** opinion: Duraimanickam blamed that Zhang did not record the OMC 5.1 release ending in the approval time. However, in the example 2 of the same CAP, Duraimanickam blamed the OMC 5.1 release processing took four extra hours (Ex. 4, page 4, "Progress Updates", 09/20/2016 [2]).

**Duraimanickam** opinion: In Duraimanickam testimony, there is no answer the question: whether the OMC 5.1 release ended within the proved time or not. (Ex. 50, Tr. 612:15-614:24)

**The crux of the issue**:

The records in "service-now" would show when and what to do in the release, and whether the release was failed or not, and why the release failed. So, it is very necessary to disclose those records in "service-now" in order to validate both parties' comments.

8) No details examples or descriptions in the comments on 11/07/2016 in final CAP (Ex. 14 page 3)

50

Civil Case No. 18-cv-01454-MJD-KMM

In the comments, Duraimanickam summarized what she had said before on example 1 to 4 in initial CAP 4 (Ex. 4). But there are no new examples or detail descriptions on the comments of "11/07/2016". So, the comments on 11/07/2016 will be considered the same events as described in the four examples listed in initial CAP (Ex. 4 page 2).

14. More dispute statements can be found in the email's communication between Zhang and Tanya Hughes (Ex. 19)

There are many claimant's arguments and disputes, along with detail descriptions, in the email's communication between Zhang and Tanya Hughes in December 2016.

15. Nature of the Case

The case is a civic claim about employment issues. This appeal is for vacating the arbitration award. In arbitration, both parties were supposed to provide arbitrator(s) the true and complete facts so that the arbitrator(s) could make a fair and justice decision. But in practice, other than comments or statements, UHG did not provide any material evidence to support their adverse comments about the Complainant's job performance. There are so many dispute and arguments on the "FACTS" that the Respondents based on in supporting their reasons for terminating the Complainant's job. So, verifying the facts would be the key procedures in this case.

51

Civil Case No. 18-cv-01454-MJD-KMM

Also, the biggest issue in this case is to identify the authenticity and completeness of facts in order to find out the fraudulent or misleading statements or comments that might have had impacts on the arbitration decision. However, the arbitrator had chosen the statement evidences simply because those statements could be found in multiple places and disregarded the fact that those evidences had been proven to contain false or misleading information.

16. Procedural History

   (a).   **On January 12, 2015, Zhang started working with UHG**

   (b).   **On November 14, 2016, Zhang's job was terminated (Ex. 16)**

   (c).   **On December 2, 2016, Zhang filed an Internal Dispute Resolution appeal to UHG HR (Ex. 17)**

   (d).   **On February 7, 2017, UHG HR sent a letter (Ex. 34) to Zhang to affirm their termination decision was appropriate based on a thorough assessment of your performance stated on two CAPs (Exs. 4 and 14).**

   (e).   **On May 15, 2017, Zhang filed a charge of age discrimination against UHG with EEOC**

   (f).   **On February 27, 2018, the EEOC issued a Notice of Right to Sue**

   (g).   **On May 25, 2018, Zhang filed this case in this court, alleging claims for discrimination under ADEA**

Civil Case No. 18-cv-01454-MJD-KMM

    (h).    **On February 14, 2019, ORDER granting Motion to Compel Arbitration**

    (i).    **On March 11, 2019, Zhang filed demand for arbitration with AAA**

    (j).    **On October 6, 2020, AAA issued arbitration award**

    (k).    **On January 06, 2021, Zhang filed initial Brief for vacating arbitration award**

17. Summary of the work tasks or issues found in respondents' complaining

The respondents presented many evidences to demonstrate that they terminated the Complainant's job because of the Complainant's poor job performance. However, these evidences are not material evidence because they are the disputable comments. The Respondents used these as their evidences to show what tasks that the Complainant could not finish in time or did not do well on. These work tasks can be classified to below categories:

(a) The tasks for development (1 task)

*The example 4 in initial CAP (Ex. 4)*

(b) The tasks for deployment (4 tasks in two deployment release)

*The examples 1, 2, 3, and "end-time" entry on service-change ticket in initial CAP (Ex. 4)*

(c) The tasks for helping infrastructure team (2 tasks)

Civil Case No. 18-cv-01454-MJD-KMM

*"pen test", "vhost" (Exs. 4, 14)*

(d) All of the others (3 tasks)

*Job skills, Communication skills, production support*

The Complainant's major job duty was to develop and enhance AEM components and related development works; while deployment tasks were done once(one day) in about every two months. So, Claimant spent most of time in AEM components development. From above categories, only one task ("example 4") was related to the Complainant major job duty. And the "example 4" is about the admin tool development task which was done in the first half year 2016; while the other tasks are done in the second half year 2016. Duraimanickam testified Zhang had always run into repeated issues. Regardless Duraimanickam's comments true or false, there are no evidences showing any issues happened repeatedly.

Some of example projects done by Zhang in year 2016, but not limit to below

- Selenium automated testing suite (2016-11)

- Penetration fixed on httpd header (2016-08)

- Created Component servlet (used by reference component 2016-04)

- Enhanced image (Extended) component (2016-04)

- Simulator devices update (2016-04)

- Admin tools, back-end, front-end, UI components, restore missing items (2016-05, 2016-06) Fixed penetration issues (2016-09, 2016-10)

54

Civil Case No. 18-cv-01454-MJD-KMM

- Fixed webScan component issues (2016-09)

- UI-sitemap (2016-08)

- Penetration fixed (2016-08)

- Fixed https session issues on event-Summary component

- Enhanced AEM beans (2016-06)

- Reference-component (2016-06)

- UI component bundle (2016-06)

- Fixed bugger on RTE (Rich Text Editor) components (2016-06)

- Event Summary Bean (2016-04)

- Fixed issues on Text background Image (2016-04)

- Fixed issues on Text Image (2016-04)

- Implement template (2016-03, 2016-04)

- Enhanced Video component (2016-01)

- Enhanced hover Image (2016-03)

- Image background (2016-03)

- Fixed Animated GIF image issues (2016-03)

- Fixed Image cookie issues (2016-03)

- Fixed Column control component issues (2016-01, 2016-02)

- Implemented and Enhanced News Summary component (2015-07, 2015-11, 2016-04, 2016-08)

The respondents did not have any complaints on above development tasks.

Civil Case No. 18-cv-01454-MJD-KMM

Duraimanickam testified that "his[Zhang] outcome is always flawed, he[Zhang] always has issues". Below are some of the tasks that Zhang had worked in 2016, but no evidences showed there were any issues with those tasks.

From above examples, it is obvious that Duraimanickam had some kinds of prejudice on Zhang. And which led to Duraimanickam believed all the issues were originally from Zhang (Ex. 50 616:3-4)[3] no matter that was true or not, and finally motivated some adverse employment action against Zhang.

It is very important to determine whether the performance issues that Duraimanickam alleged are true or false. If that is true, it means Zhang had poor performance issues. If that is not true, it means Duraimanickam had discriminated against Zhang. So, we need to best evidence, like the original job logs from "basecamp", "service-now", and "codeHub", etc. to show whether Duraimanickam allegations were true or not.

18. Supplementary information

The detail information about this case and facts can be found on EXHIBIT 51[4]. Here, only facts need to discuss in this brief are written down.

---

[3] In EXHIBIT 50 page 616, line 1-4, Sujatha Duraimanickam testified that "it always leads to the goal[codes] that Frank[Zhang] was working on"

[4] EXHIBIT 51 - 2020-09-18 Zhang v. UHG - Claimant's Post-Hearing Brief

Civil Case No. 18-cv-01454-MJD-KMM

Since July 2016, The Respondent, Ms. Sujatha Duraimanickam, issued total two "Corrective Action Form" to the Complainant along with four examples to demonstrate the Complainant's performance issues; one document[5] issued on September 19, 2016, the other[6] issued on October 24, 2016. The Complainant disagreed with Ms. Sujatha's adverse comments on the two "Corrective Action Forms", especially these four examples, but Ms. Sujatha did not want to listen the Complainant's explanation and refuted to accept them. Ms. Sujatha's testimony in the arbitration hearing meeting dated on August 19, 2020, could explain what her reasoning.

The Complainant, Mr. Zhang, was hired as Application Consultant by UHG in December 2014, and he started working with UHG on January 09, 2015. At the end of 2015, Mr. Zhang was granted the "MAKE IT HAPPEN" award in recognition of his excellent performance and achievement in 2015.

On November 14, 2016, based on the information stated on these two "Corrective Action Forms", the Respondents terminated the Complainant's job with UHG by giving a reason saying "Unable to Meet Job Standards"[7]. And later, the Complainant's position was taken by a younger developer, Matthew Kinbaum (Ex. 64).

---

[5] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

[6] EXHIBIT 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant

[7] EXHIBIT 16 - 2016-11-28 UHG Employee Relations Letter to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

On December 02, 2016, the Complainant filed an Internal Dispute Resolution[8] appeal to UHG HR along with detail explanations to demonstrate all of Ms. Sujatha's examples stated in the "Corrective Action Forms" were based on her partiality and false or partial facts.

UHG HR scheduled a meeting with the Complainant on December 14, 2016. During the meeting, the Complainant told UHG HR that the statements of facts on dispute letter could be verified by the records in "basecamp", "service-now", "codeHub", etc[9]. The Complainant also asked UHG HR to request Ms. Sujatha to provide more examples or details to prove each of her adverse comments about the Complainant's job performance issues. On December 15, 2018, UHG HR replied an email to confirm that the Complainant was fired by the reasons stated on these two "Corrective Action Forms".

19. The reasons for UHG to fire the Complainant

When the Complainant asked UHG HR to provide the reasons as to why the Respondents terminated his job, Tanya Hughes from UHG HR replied on her email dated on 12/15/2016:

*"I have attached copies of your Corrective Action Plans. I would like you to look at the "progress updates" section of your Final CAP which indicates*

---

[8] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

[9] EXHIBIT 60 - C7 - 2016-12-14 Meeting Notes from Yufan Zhang -

Civil Case No. 18-cv-01454-MJD-KMM

*performance concerns that existed after the final CAP was issued to you which is*

*why the decision was made to terminate your employment. Managers are expected to*

*set the performance expectations for the employees that report to them."*

The following is what Tanya Hughes said about the *"progress updates" section*

*of your Final CAP*:

"Progress Updates:

10/31/2016    *Frank is unable to demonstrate all the competency skills*

*necessary to perform his job independently and timely in a*

*consistent fashion. Met with him on Oct 31st and discussed about*

*the lack of meeting all the expectations in a satisfactory manner.*

11/07/2016    *I've been meeting with Frank every week and providing very*

*candid feedback. He is still unable to carry out an assignment*

*with thoroughness, accuracy or attention to detail to deliver any*

*task without issues. Eg. vhost config file task was assigned to*

*Frank and he caused issues in one server and before resolving*

*and closing the issue here, he wanted to move on to the next*

*server. Another team member in Infra team had to spend more*

*time troubleshooting the problem created by Frank thereby*

*leading to negative impact for the rest of the team unnecessarily.*

*He is still not paying enough attention to his task in hand nor is*

*he able to understand the impact of his change and is unable to*

59

Civil Case No. 18-cv-01454-MJD-KMM

> *perform his job independently without causing issues. This has*
> *consumed a lot of time and energy from other team members to*
> *always solve the problems and issues caused by Frank and is*
> *causing negative impact to the team heavily.*

11/14/2016   *Had a discussion with HRDirect and as Frank has not met the*
> *performance expectations of this position and as outlined in the*
> *Corrective action plan, we've determined to terminate him today*
> *11/14/16.*"

Since UHG HR narrowed down the scope of the reasons for terminating the

Complainant job, the arguments here focus on the matter stated on these two

documents:

(1). Initial "Corrective Action Form" issued by Sujatha Duraimanickam on

09/19/2016

(2). Final "Corrective Action Form" issued by Sujatha Duraimanickam on

10/24/2016

After that email, the Complainant had sent several follow-up emails to UHG

HR with more explanations and his disputes regarding Ms. Sujatha's comments on

these two "Corrective Action Forms." However, the UHG HR did not investigate

Ms. Sujatha's adverse comments from different resources, especially material

evidence. Instead, in a response letter for the Complainant's dispute, Mr. David

60

Civil Case No. 18-cv-01454-MJD-KMM

from UHG HR used a circular reasoning fallacy to demonstrate that Ms. Sujatha's statements were true without verifying Ms. Sujatha's comments.

After the Complainant's Internal Dispute Request was denied by UHG HR, the Complainant filed a discrimination charge in EEOC. During EEOC investigation, the Respondents first sent back their response[10] brief, on June 14, 2017, with the same reasons as Mr. David had used in his response letter[11] regarding the Complainant's EEOC charge.

20. The records from **BaseCamp**.com for 2015 & 2016

https://basecamp.com is an online project management tool. The records from BaseCamp.com can be used to track Mr. Zhang and his team members' day-to-day work performance. During the days when Mr. Zhang worked with UHG, Ms. Sujatha and Ms. Kim Myers used this online management tool to manage their teams' project requirements, daily work tasks and development status, which included tracking requirement changes, each developer and tester's daily work status, development and testing updates, any issues or blocks found, etc. Ms. Sujatha asked each of her team's developers to update their work status daily. At the end of each development cycle,

---

[10] UHG-to-EEOC - 2017-06-14 zhang pos stmt & UHG-to-EEOC - 2017-06-14 zhang pos stmt exhibits

[11] EXHIBIT 34 - 2017-02-07 UHG Letter to Claimant re IDR -

Civil Case No. 18-cv-01454-MJD-KMM

Ms. Sujatha or Ms. Kim Myers would back up the project management data and store them on company machines.

21. The records from UHG **service-now** website for 2015 & 2016

UHG service-now website is an online service management tool. Many UHG project teams, included Ms. Sujatha's team and Ms. Kim Myers's team, used the service-now website to manage the services created by their team members, or assigned to their team members. UHG used the service-now online tool to manage all service request processing steps, which includes the "Submit", "Review", "Approve" or "Deny", and Work Status update, etc. The service-now website contained the details for each service request regarding what to do before performing requests, during performing requests, after performing request, and what to do if performing requests failed, and what impacts might have, which existing services might be affected and affected level, and the timeframe for performing the requests, etc. UHG service management team required that every service procedure must be done during the pre-approved timeframe, and starting the jobs before, or continuing the jobs after, the pre-approved time were not allowed. Once the jobs started before, or continued after, the pre-approved time, an alert would be trigged, and such conducts are considered as violating UHG policy.

22. The summary reports and history log information from Optum "**CodeHub**"

Optum "CodeHub" is an online resources management tool, which is a kind of GitHub product, working similar to https://github.com/, and was used by the

developers in Ms. Sujatha's team to manage their project source codes. Developers' contributions can be tracked on Optum "CodeHub". The "CodeHub" can be used to generate many reports such like individual contribution reports, project development language reports, etc. Also, Optum policies do not allow connecting web services application to automatically source codes that were changed on Optum "CodeHub".

23. Sujatha's team was responsible for developing the components running on AEM environment

In year 2016, Ms. Sujatha's team was response for developing and testing the components running on Adobe Experience Manager (AEM) environments and the development environments were initially built by Mr. Zhang in year 2015. Ms. Kim Myers's team was responsible for project requirements and were also owners of the AEM products developed by Ms. Sujatha's team. There was also an infrastructure team which response for maintaining the servers, which hosted the AEM applications developed by Ms. Sujatha's team. The infrastructure team was also response for deploying the AEM applications to servers, upgrading or migrating software on servers, managing the security and networking on server environments. In year 2016, there were five working environments for AEM servers: development environment, testing environment, stage environment, product environment, and OpenShift Cloud environment (which was instructed in year 2015, and continued enhancing and gradually used in developing and testing practice since year 2016). Before Mr. Zhang left UHG, The OpenShift Cloud environment was an alternate development and

Civil Case No. 18-cv-01454-MJD-KMM

testing environment where developers could dynamically generate as many AEM servers as developers wanted.

24. AEM project development cycle

AEM project development cycle, also called "Sprint", involved two weeks on project development, and one week on project testing in 2015 and 2016. Sprint is a time-boxed iteration of a continuous development cycle. Each Sprint started with requirement review and estimation of development time, and ended with testing. Sometimes, the Sprint time might be longer than three weeks if development or testing could not be completed in the given time. During development, developers would do unit testing. When a project task was moved from development stage to "Ready for QA" stage, it means QA tester could start test the components done by developers. If problems or buggers were found by testers, the project task would be moved from "Ready for QA" back to "Development process" stage along with messages to provide the information about the errors. And those marks or information could be found on https://basecamp.com. The "Testing" stage would start after development completed, and when testing started, the development jobs, not including bug-fixing, would be frozen until the next Sprint (development cycle) started. The "Testing" stage is for developers and testers to do "Crossing-Test" which means that developers would test the AEM application components developed by another developer (not by himself or herself). The testing done at the development stage was more focused on "Functional Testing", while the testing at the "Testing"

stage was more focused on "End-to-End" testing, or "integration testing". If any bugs were found during testing, the testing information would be entered to https://basecamp.com, and the work tasks associated with the errors would be moved to the "Issues Found" stage. The UAT testing (User Acceptance Testing) and Demo might take place in the end of "Testing" stage.

25. AEM deployment phase

There was another week of deployment phase for every two "Sprint". The main jobs for deployment phase were to fully test AEM application components in stage environment until no issues found, then to deploy the AEM application from stage environment to production environment. The testing on stage environment was called UAT testing (User Acceptance Testing). UAT testing was done by Ms. Sujatha's team, and demo to Ms. Kim Myers's team after pass UAT testing. The deployment phase might be longer that one week if more time was required to fix issues or do testing, or if something had blocked the UAT. Application components which passed the UAT testing would then be deployed to the production environment. In order to have the AEM application deployed to the production environment, the developer would take turn to document what and how to deploy with very details, then have all of team members from Ms. Sujatha's team, and some members from Ms. Kim Myers's team, to review the deployment steps, which might include pre-deployment, during-deployment, post-deployment, and rollback or restore if failed with any deployment steps. Once no concerning on deployment as described on documents,

that developer would submit a service request over UHG "Service-now" website. The service requests had to be accepted and approved before actually starting deployment. If the applications were deployed to non-production environment, or no impacts on production environment, then deployment instruction might be simple or concise.

26. Technology Development Program

In UnitedHealth Group, there is a career development program called Technology Development Program ("TDP"). UHG develops this program for the young people to get on-the-job training and build their hands-on experience by working on real projects. There are two types of "TDP" jobs, one is TDP interns; the other is TDP associate. TDP interns is for the students in college, while TDP associate is for the recent graduated people (graduated in less than 10 years). The on-the-job training for TDP associate is two years long (if participants were hired in year 2014 or earlier), or one year long (if participants were hired in year 2015 or later). Once TDP associates complete their one- or two-year on-the-job training, the TDP associates will be converted to normal employees if they get hired by the project teams. After they have worked in UHG for two years, from the date they start to work as TDP associate, those TDP participant would be promoted to senior level position, like the TDP associates working on project development will be promoted to Senior Developers.

Any UHG project teams can invite the TDP associates hired by UHG HR to work in their projects. The TDP associate salaries are not counted in the project teams' budget. The TDP associate salaries are paid from company specific funding. If a project team needs to hire new team members, the UHG HR will let the hiring managers first consider hiring the TDP associates, or internal transfers if required stronger experiences.

27. The Complainant had argued with Ms. Sujatha for many times, to explain why he disagreed with Ms. Sujatha negative comments about him, especially those examples written on "CAP" (Ex. 4)[12]. But Ms. Sujatha did not want to listen any explanations. Sujatha told Zhang "I[Duraimanickam] say you're wrong, then you must be wrong. Don't argue, don't explain, only accept", "Any of your explanations will not be accepted".

the Complainant told Ms. Sujatha that those examples were based on partial or untrue facts. the Complainant wrote down his comments on employee comments section. Due to the limit on word count, most of the comments could not be written down the Complainant wished UHG HR could contact him to talk about "Employee comments" on CAP because Ms. Sujatha told the Complainant that if employee comments written by the Complainant had conflict with her comments, HR would

---

[12] EXHIBIT 4 – the examples listed on page 2 of the Initial CAP 9-19-16

Civil Case No. 18-cv-01454-MJD-KMM

touch based with Complainant (Ex. 41 Tr. 13:5-13)[13]. But HR did not contact Complainant until Complainant got fired on November 14, 2016.

28. In arbitration procedures, there was no any arrangement or opportunity for Claimant directly to ask any witnesses for more details on their testimony statements for the purpose of verifying those statements are accurate and have no fake. The lawyers are not IT professionals, so they might not be able to find out some false statements related to IT procedures.

## SUMMARY OF THE ARGUMENT

There are two explanations for why the Complainant was fired: Respondents' and Complainant's. The Respondents claims that it was because the Complainant had poor performance; while the Complainant claims that the Respondents allegation is merely pretext; and in fact, the Complainant was treated different from the younger teammates and had suffered from age discrimination, hostile working environment, defamation, and finally get wrongfully terminated. In addition, the facts, in the basis of that the Respondents demonstrated the Complainant's poor performances, would be the facts to demonstrate Respondents' discrimination.

---

[13] **EXHIBIT 41** – Yufan (Frank) Zhang testimony page 13, line **5 ~ 13**

29. The Respondents refused to disclose the develop daily status logs and other service tracking records, such like the records from "basecamp", "service-now", and "codeHub", etc. Such resulted in arbitrator, who has no fundamental IT knowledge, unable to have a clear picture about how development was going within a Sprint or a development cycle. Plus Sujatha Duraimanickam and few other witness testified lying, or unwilling to provide some key information, or providing some misleading information. All of these lead to the arbitrator made an award by fraud.

30. Without fundamental IT knowledge, the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced. There are many technical terms and IT procedures presented in evidences, testimonies, and arbitration briefs. Only based on common sense, the arbitrator is hard to understand what would be the right ways to perform IT development jobs. Thus made arbitrator ignore some key facts stated in Claimant's brief which could determine whether the Claimant had poor performance, or the Respondents told lie or treated the Claimant different from younger developers.

Civil Case No. 18-cv-01454-MJD-KMM

31. If the Complainant has the records from "basecamp", "service-now", "codeHub", etc., how the Complainant demonstrates he had suffered from age discrimination

Age discrimination under the ADEA can be proven under two theories. One of these theories is called the **disparate treatment theory**. The other theory is called the **disparate impact theory**. These two theories may be applied in various legal claims, depending on the circumstances.

(A). The disparate impact theory under Title VII prohibits employers "*from using a facially neutral employment practice that has an unjustified adverse impact on members of a protected class. A facially neutral employment practice is one that does not appear to be discriminatory on its face; rather it is one that is discriminatory in its application or effect.*" UHG Technology Development Program (TDP) is the one of *such employment practices:*

(1) The major disadvantage of young developers in hiring processing is their poor work experiences. In order to overcome this disadvantage, UHG developed a program called Technology Development Program (TDP), which only allow the young developers (recent graduate) (Ex. 47 Tr. 18:5-6) to apply. UHG provided special funds (Ex. 50 Tr. 729:22-730:3) to hire these young developers and to have them trained in real projects. Then request all hiring managers first to consider hiring these TDP associates when there are openings (Ex. 48 Tr. 277:2-5). Since the TDP participants salary budget is from company funding (Ex. 50 Tr. 729:22-730:3), the hiring

70

managers have no cost to get TDP work onboard, and have no obligation to keep them after training them. But if the hiring manage feels good after one or half year, the hiring manager could officially convert TDP associate to normal full-time employee. At the meantime, the hiring process for older developers was usually more complex and gave less opportunities to old developers.

(2) In January 2016, several younger TDP associates were brought to Zhang's team, and got trained on doing the similar jobs as Zhang did, and then, after they had been well trained, Zhang became "optional resource" and finally got fired; while these younger developers were retained and took over Zhang's jobs. And later another young developer got hired.

(3) TDP environmental factors played promoting and encouraging roles in influencing UHG hiring and laid off behavior, thus, hiring managers are more likely to hire young developers or to lay off older developers.

(B). Under the disparate treatment theory, in order to establish a prima facie case of age discrimination, Complainant must establish that:

(1)  Complainant belonged to the protected age group; and

(2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

(3)  Complainant suffered an adverse employment action; and

Civil Case No. 18-cv-01454-MJD-KMM

(4)  Similarly situated, substantially younger employees were treated more favorably.

*See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).*

Under the disparate treatment theory, the Complainant established that:

32. The Complainant belonged to the protected age group and suffered an adverse employment action

The Complainant was 56 years old when his job got terminated.

33. The Complainant performed his job satisfactorily or was qualified to perform his job

Sujatha Duraimanickam said that *the Complainant is unable to demonstrate all the competency skills necessary to perform his job independently.* That is defamation. On July 22, 2016, Sujatha Duraimanickam still acknowledged that the Complainant was technically a strong candidate. Sujatha Duraimanickam made such comment to belittle the Complainant. That is merely to find a pretext from UHG. The respondents have no basis in fact (See *Renz v. Spokane Eye Clinic*), because:

(a).   **The Complainant received the company wide award, "MAKE IT HAPPEN", in recognition of his excellent performance and achievement in year 2015. Only about 160 employees among more than two hundred thousand UHG employees received this award**

(b).   **The Complainant was recognized by his first manager for his excellence at documenting on what the team did in 2015. It is not**

72

possible for someone to perform excellent technical documentation without experience and all relevant knowledge and skills

(c).   Many of Complainant's teammates gave him comment: "strong technical talent"

(d).   All of the professional witnesses (developers) from UHG acknowledged the Complainant was smart and had the technical knowledge and skills required for performing his job

(e).   Jennifer Viveros Aguilar, team member, said: "Frank[Zhang] was a really smart person and admired how easily he could complete a task. When he fully understands assignments, Frank[Zhang] is really focus and completes task fast and detailed. I noticed the detailed part when we notice that the event summary broke and he was able to target the session issue easily within hours, which would have taken us days to find." (Ex. 12 page 1 §2)

(f).   Nancy Bullard, the only QA tester in SDSS division, said "Frank[Zhang] has a lot of technical knowledge and is always very professional and easy to work with." (Ex. 8 page 2)

Civil Case No. 18-cv-01454-MJD-KMM

34. The Complainant had been treated differently from the younger team members. Substantially, the similarly situated employees, if younger, were treated more favorably

    (a).   **There is insufficient reason for the Respondents to pursue an adverse employment decision[14] regarding the Complainant because he did not feel confident of running a deployment tool developed by a younger developer, Kathy Brzeinski, for two reasons: (1) this tool had not been completed, so it had not been well tested yet. (2) This deployment tool created by Ms. Brzeinski had a failure rate of over 50% in the past.[15]**

    In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant different from younger teammate. If Sujatha Duraimanickam wanted to blame someone, she should blame the younger developer instead of the Complainant.

---

[14] See Renz v. Spokane Eye Clinic case proving pretext: 3) the reasons are insufficient to motivate an adverse employment decision.

[15] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant, page "ZHANG1003", §3 (the Example 1 on initial CAP)

74

Civil Case No. 18-cv-01454-MJD-KMM

(b).   **The reason[16] why the Respondent had pursued an adverse**

  **employment decision regarding the Complainant has no basis in fact**

  **when it was not him, but some else fault[17]**

In contrast, it demonstrates Sujatha Duraimanickam treated the

Complainant different from younger teammate. If Sujatha Duraimanickam

wanted to blame someone, she should blame herself because it was Sujatha

Duraimanickam let a younger engineer to install and uninstall AEM SP2 which

was not in To-Do list.


(c).   **The reason why the Respondents had pursued an adverse**

  **employment decision regarding the Complainant has no basis in fact**

  **because Sujatha Duraimanickam should not have blamed the**

  **Complainant when the Complainant did not work on a task which**

  **was not on a To-Do list**

In contrast, it demonstrates Sujatha Duraimanickam treated the

Complainant different from younger teammate. If Sujatha Duraimanickam

---

[16] See Renz v. Spokane Eye Clinic case proving pretext: 1) the employer's reasons have no basis in fact

[17] EXHIBIT 17 - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant, page

"ZHANG1003", §4 (the Example 2 on initial CAP)

Civil Case No. 18-cv-01454-MJD-KMM

wanted to blame someone, she should blame the younger engineer whose job lead to the issue.

**(d).   The reasons for Respondents to pursue an adverse employment decision regarding the Complainant was not as Sujatha Duraimanickam had stated. It is common that the deadline might be changed if requirements were changed.**

When the same thing happened to younger developers, Sujatha Duraimanickam had said nothing.

In contrast, it demonstrates Sujatha Duraimanickam treated the Complainant differently from younger teammates.

**(e).   In "Pen test" assignments, Sujatha Duraimanickam requested the Complainant to complete the work in the time much less than youngers. And created hostile working environment to hinder the Complainant to work on project. For example, not granting him to access to the development resources required for the job, and artificially delayed job completion.**

**(f).   When vHost project was assigned to the Complainant, Sujatha Duraimanickam did not grant him access to the**

**(g).   Linux development environment although it was required. The younger developers did have access. Such was not just to give hard**

Civil Case No. 18-cv-01454-MJD-KMM

> **time to the Complainant in work, but also to let other teammates feel different from the Complainant**

35. With the records in "basecamp", "service-now", "codeHub", etc. the Complainant could also demonstrate the Respondents created hostile working environment against the Complainant, wrongfully terminated the Complainant's job by false or misleading facts, defamation

(1). Considering Mr. Zhang had strong technical skills, in order to make Mr. Zhang have bad performances, Sujatha Duraimanickam had done follow:

(a) First, asked Mr. Zhang to work on assignments with less time than other younger professionals

In October 2016, Duraimanickam asked Mr. Zhang to work a task for fixing the remaining "Pen Test" issues[18] which the several experts in infrastructure team could not resolve for about two months. But Duraimanickam requested Mr. Zhang to fix them in two weeks. (this can be verified on "basecamp", "service-now", or in Internal Dispute Appeal letter (**Ex.** 17 page 6 §5). Although this work task only needed writing few lines of codes, the difficult is how you know what to write.

---

[18] "Pen test" or "pen testing" issues are the security issues found by company security team when they did penetration testing on the servers supported by infrastructure team

Civil Case No. 18-cv-01454-MJD-KMM

(b)  Secondly, Duraimanickam artificially made Mr. Zhang hard to complete

the task in time, which might result in poor performances

Sujatha Duraimanickam did not allow Mr. Zhang to use some

required development resources (for indirect evidence, please refer to:

initial "Corrective Action Form", dated: 09/19/2016, page 4 $09/22/2016

#1, which implies "other team member had access but Mr. Zhang did

not", or refer to Internal Dispute Appeal letter **Ex. 17** page 6 §5). Lacking

of required resources would absolutely give Mr. Zhang difficulty to

performance his jab duty.

(c)  Next, Duraimanickam did not give Mr. Zhang chances to test his codes,

such made him need to spend a lot of time to find out any issues (due to

lacking of testing on server computers), and also made him easier to get

coding problems due to no opportunity to test his codes (need other

developers help with testing)

When Mr. Zhang completed his work tasks one day before new due

date (the evidence can be found on "basecamp", or refer to Internal

Dispute Appeal letter **Ex. 17** page 6 §5). The new due day is three days

earlier than initial due day. Duraimanickam changed the due time from

"the end of due date" to "the noon of due date". Because Mr. Zhang did

78

not have access to Unix/Linux development resources, so he had to rely on other team members to test his codes which were developed on his PC. But no one to test Mr. Zhang's codes until half hour before the due time. Duraimanickam said everyone was busy, and did not want Mr. Zhang to bother others.

(d) Finally, artificially made Mr. Zhang unable to get his work done in time

Once done with testing, did not tell Mr. Zhang the test results immediately. And waited until half hour passed the due time. Such made Mr. Zhang had no time to fix a folder name error (because the folder name on server computer was different to the folder name in Zhang's laptop). Such error is very easy to find out if Zhang had access to server computer (**Ex.** 17 page 6 §5).

When Mr. Zhang got informed, he told Duraimanickam this error could be fixed and retested in 10 minutes. But Duraimanickam did not agree until after two days when Mr. Zhang argued with Sujatha on the team daily stand-up meeting.

(e) At the end, Sujatha spread "illusory truth" to John, Kim, and some of team members about Mr. Zhang's bad performance because he passed the due date.

Civil Case No. 18-cv-01454-MJD-KMM

There are many of similar "illusory truth" that can be found when comparing Duraimanickam's statements with the records in "basecamp", "service-now" and "codeHub".

(2). The Respondents claim the Complainant's poor communication skills made him have poor job performances. However:

(a) English is not Mr. Zhang's first language, but this did not have impacts on his daily jobs and Mr. Zhang still made excellent contribution. That can be proved by Mr. Zhang winning "MAKE IT HAPPEN" award in year 2015 (Ex. 1). Only about 160 among more than two hundred thousand of UHG employees, had received such award in year 2015.

(b) Also, in the two "Corrective Action Form", issued by Duraimanickam, Duraimanickam did not blame or comment Mr. Zhang communication skills, and did not provide any examples about his communication skills causing issues, and did not ask Mr. Zhang to improve his communication.

(c) In Duraimanickam's team, all developers except Mr. Zhang were speaking native English. In comparing with others, Mr. Zhang's verbal communication was his weakness. But Mr. Zhang's document skills were recognized by Kim (Ex. 2 page 2).

# ARGUMENT

36. FAA Rules for vacating arbitration award

**1)   9 U.S. Code § 10 - Same; vacation; grounds; rehearing**

*(a)   In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—*

*(1)   where the award was procured by corruption, fraud, or undue means;*

*(2)   where there was evident partiality or corruption in the arbitrators, or either of them;*

*(3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or*

*(4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.*

2) Minnesota Statutes 572B.23 Vacating Award

*(a) Upon motion of a party to the arbitration proceeding, the court shall vacate an award if:*

*(1) the award was procured by corruption, fraud, or other undue means;*

Civil Case No. 18-cv-01454-MJD-KMM

*(2) there was:*

    *(A) evident partiality by an arbitrator appointed as a neutral;*

    *(B) corruption by an arbitrator; or*

    *(C) misconduct by an arbitrator prejudicing the rights of a party to the arbitration*

    *proceeding;*

*(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause*

*for postponement, refused to consider evidence material to the controversy, or*

*otherwise conducted the hearing contrary to section 572B.15, so as to prejudice*

*substantially the rights of a party to the arbitration proceeding;*

*(4) an arbitrator exceeded the arbitrator's powers;*


*(5) there was no agreement to arbitrate, unless the person participated in the*

*arbitration proceeding without raising the objection under section 572B.15,*

*subsection (c), not later than the commencement of the arbitration hearing; or*

*(6) the arbitration was conducted without proper notice of the initiation of an*

*arbitration as required in section 572B.09 so as to prejudice substantially the rights*

*of a party to the arbitration proceeding.*


37. Motion to vacate an arbitration award

    **(a).   Common elements for vacating an arbitration award**

82

Civil Case No. 18-cv-01454-MJD-KMM

Under 9 U.S.C. § 10(a)(1), an arbitration award may be vacated where it was "procured by fraud, corruption, or undue means".

A petitioner seeking to vacate an award on the ground of fraud must adequately plead that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration.

*See Karppinen, 187 F.2d at 34-35.* The district court here did not address the first two factors, basing its denial on Odeon's failure to demonstrate that the fraud at issue—Ackerman's alleged perjury—was material to the arbitration award. *Odeon Capital Grp., 182 F. Supp. 3d at 128.* As we did in Karppinen, "[w]e will assume . . . that an arbitration award may be set aside in a case of material perjured evidence furnished [to] the arbitrators by a prevailing party." 187 F.2d at 34.

*See Odeon Capital Group LLC v. Ackerman, No. 16-1545 (2d.Cir. 2017)*


A petitioner seeking to vacate an arbitration award on the basis that it was procured by fraud must plead that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration.

*See Sorghum Inv. Holdings Ltd. v China Commercial Credit, Inc. - 2019 NY Slip Op 31265 (U)*

### (b).   Definition of fraud

*All multifarious means which human ingenuity can devise, and which are resorted to by one individual to get an advantage over another by false suggestions or suppression of the truth. It includes all surprises, tricks, cunning or dissembling, and any unfair way which another is cheated.*

*Source: Black's Law Dictionary, 5th ed., by Henry Campbell Black, West Publishing Co., St. Paul, Minnesota, 1979.*

### (c).   Common elements of civil fraud

A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a present, material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to him.

*See Thompson v. Bacon, 245 Va. 107, 111 (1993.)*

### (d).   Establish an age discrimination claim

S.485 — 116th Congress (2019-2020)

SEC. 3. STANDARDS OF PROOF.

*(a) Age Discrimination in Employment Act Of 1967 —*

*(1) CLARIFYING PROHIBITION AGAINST IMPERMISSIBLE CONSIDERATION OF AGE IN EMPLOYMENT PRACTICES. — Section 4 of the*

Civil Case No. 18-cv-01454-MJD-KMM

*Age Discrimination in Employment Act of 1967 (29 U.S.C. 623) is amended by inserting after subsection (f) the following:*

*"(g) (1) Except as otherwise provided in this Act, an unlawful practice is established under this Act when the complaining party demonstrates that age or an activity protected by subsection (d) was a motivating factor for any practice, even though other factors also motivated the practice.*

*"(2) In establishing an unlawful practice under this Act, including under paragraph (1) or by any other method of proof, a complaining party—*

*"(A) may rely on any type or form of admissible evidence and need only produce evidence sufficient for a reasonable trier of fact to find that an unlawful practice occurred under this Act; and*

*"(B) shall not be required to demonstrate that age or an activity protected by subsection (d) was the sole cause of a practice. ".*

To establish an age discrimination claim, the plaintiff must show that:

> **(1) The plaintiff was older than 40;**
>
> **(2) The plaintiff was discharged;**
>
> **(3) The plaintiff was qualified for the job and met the defendant's legitimate expectations; and**
>
> **(4) The plaintiff position remained open or was filled by a similarly qualified individual who was substantially younger.**

85

Civil Case No. 18-cv-01454-MJD-KMM

A plaintiff suing under the ADEA must show that "but for" age discrimination, the adverse employment action would not have occurred. "But for" caution is not tantamount to sole factor causation. See *Burrage v. United States, 134 S. Ct. 881, 888-89 (2014)* (an act is a "but-for" cause "[even if it] combines with other factors to produce the result, so long as the other factors alone would not have done so – if, so to speak, it was the straw that broke the camel's back."). In Bostock v. Clayton Cty., the Supreme Court clarified the burden of providing "but for" causation:

> *Title VII's "because of" test incorporates the "'simple'" and "traditional" standard of but-for causation. Nassar, 570 U. S., at 346, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See Gross, 557 U. S., at 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.*

In order to establish a prima facie case of age discrimination, Complainant must establish that:

(1)  Complainant belonged to the protected age group; and

(2)  Complainant performed his job satisfactorily or was qualified to perform his job; and

(3)  Complainant suffered an adverse employment action; and

86

Civil Case No. 18-cv-01454-MJD-KMM

(4)  Similarly situated, substantially younger employees were treated more favorably.

*See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).*

The context in which **"similarly situated employee"** analysis arises is that, as the U.S. Court of Appeals for the 11th Circuit found, discrimination is often framed as "the act of 'treating like cases differently.'"  The question then becomes how similar must two employees be to be considered "like cases"?  Put another way, how does the court ensure it is comparing apples to apples rather than apples to oranges?

The 11th Circuit's Decision In Lewis

To answer this question, the appellate court summed up the issue presented as:

*Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. § 1981  must make a sufficient factual showing to permit a reasonable jury to rule in her favor. She can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by proving, among other things, that she was treated differently from another "similarly situated" individual—in court-speak, a "comparator." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258–59*

87

Civil Case No. 18-cv-01454-MJD-KMM

> *(1981) (citing McDonnell Douglas, 411 U.S. at 804). The obvious question: Just how "similarly situated" must a plaintiff and her comparator(s) be?*

See *Lewis v. City of Union City, Georgia, et al., No: 15-11362, (11th Cir. Mar. 21, 2019).*

### (e).   Standard for proving pretext

The court in *Renz v. Spokane Eye Clinic* case outlined the following standard for proving pretext:

> *An employee can demonstrate that the reasons given by the employer are not worthy of belief with evidence that:*
>
> *(1) the reasons have no basis in fact, or*
>
> *(2) even if based in fact, the employer was not motivated by these reasons, or*
>
> *(3) the reasons are insufficient to motivate an adverse employment decision.*

The other common ways to prove pretext:

(i). False reason/implausible business justification

> See *Dep't of Fair Employment & Housing v. Lucent Techs, Inc., 642 F.3d 728, 746 (9th Cir. 2011)*

*(ii).* Shifting reasons

> See *Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993)*

(iii). Comparative evidence

88

Civil Case No. 18-cv-01454-MJD-KMM

See *Earl v. Nielsen Media Research, Inc.*, *658 F.3d 1108, 1113 (9th Cir. 2011)*

(iv). Timing

See *Dawson v. Entek International*, *630 F.3d 928 (9th Cir. 2011)*

38. The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced

The arbitrator said in his arbitrator award (Ex. 53)

"*Claimant says that he took handwritten notes at the one-on-one meetings with Duraimanickam and that these cotemporaneous notes prove that Duraimanickam made these comments about age. But Claimant's typed compilation of notes does not constitute reliable evidence supporting the claim. It was not clear when Claimant created the compilation of notes, and he did not come forward with the original documents that he relied upon in compiling the notes to prove that he recorded the content of the compilation at or near the time when Duraimanickam allegedly made the comments*" (Ex. 53 P3 last paragraph)

However, the arbitrator did not consider following facts when he made the arbitration award:

(1) Arbitrators under the rules of the AAA are not bound by the rules of evidence and may consider hearsay. So, the "Original Document" rule

89

should not apply unless arbitrator want to question the evidence contents. Even this rule applies, the arbitrator should not just ask the Complainant for original documents, and did not ask the Respondents to provide material evidence to support their allegation, especially when the Complainant argued those allegations were based on partial facts or lie. And even the arbitrator needed the original document, he should not make a final decision before check with Complainant or ask for evidences first. **The Complainant's rights have been prejudiced due to arbitrator's bias on believing a comment shall be true if it is from more than one person, without weighting its credibility.** However, does arbitrator believe *"Repeat a lie often enough and it becomes the truth"* (*Appendix 1*)?

(2) The arbitrator does not have IT knowledge. Some technology terms could make him feel confused or mislead him. For instance, in Ex. 50, Tr. 606:18-607:4)

**Question**: *Mr. Zhang testified that he didn't validate -- this is referring to Example Number 3 -- he didn't validate because it wasn't on the To Do list for the part --*

**Answer** [by Duraimanickam]: *That was also -- yeah, that was also a developer's responsibility, to make sure that they understand what they have to do, and that he documented all the details in that change ticket, put in*

Civil Case No. 18-cv-01454-MJD-KMM

*high-level validity, and use your brain at that time, and validate there's only hardly 10 Websites there.*


UHG policy requires (Ex. 49 Tr. 390:3-6): No additional action can be done without pre-approval, even although that is a wright action.

Also, the To-Do list had been reviewed by entire team and had been approved by Duraimanickam. If arbitrator had known these two facts, especially the "UHG policy requirement", he shall know the fact for "not validating" should be one of pretext for terminating the Complainant's job. Without remembering these two facts, the fact for "not validating" would demonstrate a poor performance. Somehow for unknown reasons, the arbitrator believed that is "bad performance" instance.

Another instance: In this instance, the company just need a report to tell when the deployment processing was ended. But when heard a long reply by Duraimanickam, the arbitrator and attorney got totally lost. See below conversation (Ex. 50 Tr. 612:15-614:24):

**Question**: *If you look at the first answer under Progress Updates, September 20, 2016, Mr. Zhang testified something to the effect that you forced him to incorrectly update a change ticket. Do you recall that situation described in Number 1?*

**Answer** [by Duraimanickam]: *I believe it must have been about the September release, which is the OMC 5.1 upgrade release. So typically change tickets have a change window. So we have begun [the] date and end date to change what's happening. And usually, we have a large window. Considering we might run into issues, we might take extra time to validate. We might put a 12-hour window, even though the actual change might take much smaller than that 12-hour window. Just -- and just because he was working on that, he would open a change ticket in his name, so the change ticket would have been assigned to himself, and it was his responsibility to make sure that he was [the] accurate beginning date and end date of the change window, and close it on time, right, making sure that the ticket is closed, right, after the testing is done. So here -- yeah, so he -- I think he submitted it after the ticket end time was done, so he should just say the actual end time, not when he's actually closing it, right? He has to put in the actual end time when the change was completed. So rather he put it outside the change window. So, in the system, it's flagged as out of compliance. So, after a few days, I got an email report from the change board saying, hey, your team has gone out of compliance because of this change. Why was the change done outside the window? Then I had to go talk to him and say, hey, Frank, you did not put the end time accurately, and because of that, it's flagging us out of compliance. It's flagging his own change ticket out of compliance, so I asked him to work with the change team in that report to go*

*and fix that. It was his mistake. I wanted him to go fix that. So this is to indicate that I had to follow up [on] every little thing. Just for one simple thing, to put the accurate end time and close it accurately, rather he was out of compliance, that he had to work, he had to follow up, and I had to follow up to make sure he was following up. It was just a waste of everybody's time.*

Duraimanickam's response in above did not directly tell "which time" should be reported although she knew the "end time" was the time when deployment change was end. That is an example of "misleading arbitrator". If see the example 2 on initial CAP (Ex. 4, page 2), Duraimanickam claimed the deployment took four extra hours. When Zhang reported the deployment had taken "four extra hours", then Duraimanickam told Zhang that "taking 4 extra hours" would be "Out of compliance", so Duraimanickam claimed Zhang should report the work done in time without "taking 4 extra hours". (Ex. 4 page 4, "09/20/2016" section). On one hand, Duraimanickam used that "taking 4 extra hours" as a reason to terminate Zhang's job. On another hand, Duraimanickam claimed there were no "taking 4 extra hours", but Zhang reported "taking 4 extra hours". So that became a reason to terminate Zhang's job. (In the argument on example 2, the Complainant demonstrated that "taking 4 extra hours" was due to the installing Service Package 2 requested by Duraimanickam, but due to lacking of IT knowledge, the arbitrator did not understand that)

Civil Case No. 18-cv-01454-MJD-KMM

In this case, there are many of similar instances. And such instances should damage the respondents' credibility. But actually, these instances had no impact on the respondents' credibility when arbitrator got confused by respondents' answers. These instances were not considered by arbitrator. Such evidences bring "illusion of truth" to arbitrator. All of those conducts led to arbitrator's misbehavior by which the rights of claimant have been prejudiced. So, some basic knowledge should be needed in order to understand what happened really.

(3) The arbitrator made the final arbitration decision without hearing evidence pertinent and material to the controversy

In addition to Sujatha's comments on age discrimination, the notes written by Complainant (Ex. 57) also contains some development logs which shows there are controversy between the statements in the Complainant's notes and the comments in the CAP issued by Sujatha Duraimanickam. In such situation, **arbitrators did not hear evidence pertinent and material to the controversy**, such as asking respondents for the records in "basecamp", "service-now", and "codeHub", event after arbitrator was informed by Complainant's letter (Ex. B). And the arbitrator made his final arbitration award in the basis of those disputed comments on CAP, even though the

Civil Case No. 18-cv-01454-MJD-KMM

Complainant has proved some of the comments are false. Before resolve the controversy on the evidences, arbitrator shall not determine which the evidence to take or exclude in his favor, without verifying them first.

(4) There are two respondents, UHG and Sujatha Duraimanickam. Arbitrator shall first understand whether the defamation claim is aimed at a single Respondent or both before applying qualified privilege standard in his arbitration decision. In this case, the Complainant alleged Sujatha Duraimanickam under Defamation law because she lied about the Complainant's knowledge and work items and announced her lies or misleading statements to team members and UHG HR. Even after the Complainant corrected her, Duraimanickam still passed those false or misleading statements to HR and her supervisor and announced that in the team meeting.

**Arbitrator applied qualified privilege in wrong place** (Ex 53, page 4)

At first, the Complainant alleged that Ms. Sujatha Duraimanickam lied, and did not allege that UHG lied.

The second, see *a 2012 case, the 4th Circuit Court of Appeals ruled against a plaintiff who said that qualified privilege didn't apply, in part, because of the alleged malice of the employer: (1) tell the truth, (2) No personal comments, (3) Best tip.* This case set a standard for qualified privilege. Based on the standard set by above case,

95

Civil Case No. 18-cv-01454-MJD-KMM

1. Tell the truth

   Complainant alleges that Ms. Sujatha Duraimanickam lied to UHG HR and her teammates.

2. No personal comments

   Sujatha Duraimanickam's comments are personal, and her comments lead to her supervisor and company making a decision to terminate the Complainant.

3. The comments should be fair, accurate, published without malice, or subject to the right of reply in the form of a letter that gives explanation or contradiction. But none of these apply to Ms. Sujatha Duraimanickam, especially Duraimanickam refused making any correction after the Complainant told her which parts of her comments or statements in CAP contained lie or inaccurate information.

39. The arbitrator had misbehavior by which the rights of the Complainant have been prejudiced

   The arbitrator said, in his arbitration decision (Ex. 53, page 4, second paragraph):

96

Civil Case No. 18-cv-01454-MJD-KMM

"*The issue here is not whether there was cause to terminate Claimant who was an at-will employee. Rather, the issue is whether Claimant has proven that intentional age discrimination was the cause of his termination. What matters is that Claimant's poor performance in his job was the true reason for the termination even if the decision to terminate Claimant was unwise, unfair, or based on mistakes of fact. Dorsey v. Pinnacle Automation Co. 278 F.3d 830,837 (8th Cir. 2002) ("The threshold question when considering pretext is whether [the employer's] reasons for its employment action are true, not if they are wise, fair or correct.") Claimant's claims under the ADEA.and MHRA failed be because he did not prove that age discrimination was the cause of his termination.*"

In above, the arbitrator believed that *Claimant's poor performance in his job was the true reason for the termination*. But actually, those reasons are not true because the facts that Duraimanickam based on to show Claimant's poor performance are not true. Duraimanickam gave the arbitrator a "Illusion of Truth" by circular reasoning, or "Repeat a lie often enough and it becomes the truth" (*Appendix 1*).

Claimant's brief had stated the major facts, based on which Duraimanickam demonstrated Claimant's poor performance were not true. And in another hand, those facts had proved Duraimanickam had discriminated against Claimant. These major facts are the four examples listed on the initial CAP (Ex. 4, page 2) and the "pen test" issues (Ex. 4 page 4 "Progress Updates" on 09/20/2016 and 09/22/2016).

Civil Case No. 18-cv-01454-MJD-KMM

In the section of "STATEMENT OF CASE AND FACTS" of this brief and in Claimant's brief submitted to AAA (Ex. 51), the Claimant had demonstrated:

(1) For the **example 1** in the initial CAP (Ex. 4 page 2)

This example is not able to demonstrate Claimant's poor performance because Duraimanickam thought Claimant should feel confident on a deployment tool on which, (1) the enhancement had not been completed by a younger developer, Kathy, yet; (2) the failure rate in past was more than 50%.

In another hand, that example demonstrated Duraimanickam's age discrimination. Why didn't Duraimanickam blame the younger developer, Kathy, did not finished her enhancement task, but blamed Claimant did not feel confident on an incomplete tool developed by Kathy. In fact, that tool was not working in the deployment, and eventually got throwed away.

(2) For the **example 2** in the initial CAP (Ex. 4 page 2)

This example is not able to demonstrate Claimant's poor performance because Duraimanickam let engineer install Service Package 2 ("SP2"), thus made change to additional files, and led to taking more time on rollback the change. Installing SP2 would have impact on entire system files, while installing OMC 5.1 ("Optum Marketing Cloud") components only had impact on functional files. It was the younger infrastructure engineer, Max, to decide what files to backup based on what files to install. If need to blame

98

Civil Case No. 18-cv-01454-MJD-KMM

someone, Duraimanickam should blame herself or Max, not the Complainant.

(3) For the **example 3** in the initial CAP (Ex. 4 page 2)

This example is not able to demonstrate Claimant's poor performance because Duraimanickam should not blame Zhang for him not validating an "Optum Developer" website which was not in validating list. The validating list contained dozens of websites. And this list had been reviewed by every developer and Duraimanickam, and the managers from related teams. No one found the "Optum Developer" website was missing in the validating list (to-do list). If the "Optum Developer" website were in to-do list, or the younger engineer, Max, did not make mistake, then the issue would not occur. Why didn't Duraimanickam blame herself, or blame younger developers, or younger engineer, Max, but only blame Claimant? That demonstrated Duraimanickam treated Claimant differently from younger developers or engineer.

(4) For the **example 4** in the initial CAP (Ex. 4 page 2)

This example is not able to demonstrate Claimant's poor performance because the project requirement change led to deadline changed. Duraimanickam should not blame Claimant for him unable to finish the task in initial deadline while Claimant finished the task in new deadline. Also,

Civil Case No. 18-cv-01454-MJD-KMM

When Shawn Woods made change to a program in a week, it doesn't mean Shawn Woods could develop the same program from scratch in a week.

In addition, the younger developer, Kathy, got a one-week task done in seven weeks with no requirement change. Why Duraimanickam did not blame her. That also demonstrated Duraimanickam treated Claimant differently from younger developer.

(5) For the **"pen test"** issues in the initial CAP (Ex. 4 page 4 "Progress Updates" on 09/20/2016 and 09/22/2016)

This example is not able to demonstrate Claimant's poor performance because Claimant only worked in **"pen test"** task in October 2016; in all the other time it was infrastructure engineers working on **"pen test"** task. So, the **"pen test"** issues were not fixed in September 2016 by infrastructure engineers, not by Claimant. Claimant did not work on the task of fixing **"pen test"** issues until October 2016. During the days before October 2016, what Claimant did was to contact the company security team to test the fixed by infrastructure engineers.

In October 2016, Duraimanickam: (1) asked Claimant to fix the remaining issues in two weeks that the younger engineers could not fix in about two months; (2) did not allow Claimant having access on server computers, even the computers used for development (just like ask you to repair a car but do not allow you touching the car); (3) did not test the

100

Civil Case No. 18-cv-01454-MJD-KMM

solution for fixing the issues util due time (artificially eliminated Claimant's time for fixing any issues found in testing); (4) suddenly moved the due day from the next Monday to Friday noon on the Friday. All of these demonstrated Duraimanickam treated Claimant differently from younger developers.

Above examples also show that the younger employees were not being held to the same performance standards as Zhang's, rigorous for the Complainant, but flexible for the youngers. Also, the younger co-worker performed the similar actions without getting written up, but the Complainant usually got targeting, such as the younger developer, Kathy, got due-date extended even though her work requirement had not been changed.

Somehow, the arbitrator does not think the Duraimanickam's behavior could prove Duraimanickam's discrimination based on above facts. The arbitrator thinks although Duraimanickam's statements contain some "mistakes", but he still thinks the Duraimanickam's statements are true facts and could be used as the true reasons for terminating Zhang's job. The "at-will" employment allows the employer to lay off employees with no reasons or true reasons. It doesn't mean the employer could wrongfully fire employees with wrong reasons.

Mr. Zhang attorney told Mr. Zhang that the arbitration did not allow both attorney and claimant (or respondent) from the same party together to ask witness questions. In such situation, when a witness tells lie or hides some important facts,

101

Civil Case No. 18-cv-01454-MJD-KMM

the attorney without fundamental professional knowledge, will not be able to understand whether the statement of fact is accurate, or can lead to misleading, when the details about these facts are not provided to the attorney by claimant (or respondent) in advanced. It is clearly evident that UHG did not make disclosures in the arbitration to provide the original evidences listed below, but not limit to below

(a). **"basecamp" records: That were project management records entered in basecamp.com and backed up in the end of each development cycle. The website, basecamp.com, were used in Ms. Sujatha and Ms. Kimberly Myers teams to manage the work assignments, including detail requirements for each work task, and to keep track of everyday working status, including issues and blocks.**

(b). **"service-now" records: that were the service requests submitted to UHG service-now website, and were requested by Mr. Zhang or assigned to Mr. Zhang. The service-now website was UHG service management online tool used to manage UHG cross-team service requests, each service execution procedure, service status, and service time frames, etc.**

(c). **"codeHub" records: "codeHub" was source codes management online system, which recorded each individual contribution with very detail information. The "codeHub" website could show each individual contribution on monthly, or even daily base (Exhibit:**

102

Civil Case No. 18-cv-01454-MJD-KMM

Sample_page_for_showing_individual_development_contribution_o ver_github). And it also shows what technical language or skills the individual used.

(d). So, without understanding or asking for, the records from above three resources, Arbitrator applied evidence rules incorrectly

In the award of arbitration, the arbitrator made following conclusion (Ex. 53)[19]:

"The statement that Claimant was not meeting the performance requirements of his position was made as part of a performance review and such subject to a qualified privilege and cannot lead to liability absent a finding of malice."

And based on such, the arbitrator denied the evidence in defamation.

However, See *W. Prosser, supra, § 15 at 786*. See also *Houston Belt Terminal Ry. v. Wherry, 548 S.W.2d 743 (Tex.Civ.App. 1976), appeal dismissed 434 U.S. 962, 98 S.Ct. 497, 54 L.Ed.2d 447 (1977)*. In the context of employment recommendations, the courts generally recognize a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose.

In this case, the privilege demonstrated by the arbitrator has been abused because:

---

[19] Refer to **EXHIBIT** 53 - 2020-10-05 - Final Arbitration Award, page 4, the last paragraph.

Civil Case No. 18-cv-01454-MJD-KMM

. (1). the false statements made by Ms. Sujatha were not in good faith but for a purpose for making up the reasons to terminate Claimant job.

(2). those false statements were not just provided to UHG HR, but also had been presented to some team members, such can be seen in some team members' review for the Claimant and testimony. And based on those false statements, the Defendants demonstrated the Claimant had performance issues (Ex. 52)[20].

(3). after Claimant refuted those false statements with detail information, The Defendants refused to admit those statements were false. And Defendants still used those statements as evidence to provide them to EEOC and arbitration, and in basis on them to prove the Claimant had performance issues.

In arbitration hearing meeting, the witnesses said they found Claimant

(e).   **Arbitrator ignored the Complainant's documented evidence with bias**

Before arbitrator made the arbitration award, the Complainant believed he could use the job logs (Ex. 57) he wrote down as one of his evidences. This document (Ex. 57) was created initially as the supplementary materials for the "employee

---

[20] Refer to **EXHIBIT** 52 - 2020-09-18 Zhang v. UHG Respondent's Post-Hearing Brief

Civil Case No. 18-cv-01454-MJD-KMM

comments"[21] in initial CAP (Ex. 4 page 7). And it was submitted to arbitration during the discovering phase. And it is for sure that the Respondents must saw it during hearing meeting. If there are any malpresentation, the respondents could be very easy to find them out because the respondents have all of the original records. But the arbitrator discarded it by the reason (Ex. 53 P3)[22]

"*Claimant's typed compilation of notes does not constitute reliable evidence supporting the claim. It was not clear when Claimant created the compilation of notes, and he did not come forward with the original documents that he relied upon in compiling the notes to prove that he recorded the content of the compilation at or near the time when Duraimanickam allegedly made the comments*"

However, when arbitrator was thinking of original document, he should also need to know the best evidence rule. From arbitration award, we can see there are a lot of conflict. The Complainant already warned (Ex. B)[23] the arbitrator on September 18, 2020. In the Complainant brief, the complainant already stated the lies were found in Sujatha Duraimanickam testimony, but the arbitrator still relies on the information originally from Sujatha Duraimanickam to make arbitration decision.

Let us first see below facts:

_____

[21] In CAP, employee can enter only 1500 characters, including space, in the employee comments section

[22] EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 3, last paragraph

[23] EXHIBIT B – 2020-09-18 letter to arbitrator

Civil Case No. 18-cv-01454-MJD-KMM

According to David's testimony, Mr. David just forwarded the Complainant letter and emails to Sujatha Duraimanickam (Ex. 30), and asked him to look at the peer review comments (Ex. 31). However, only according to these peer review comments, it cannot be concluded whether the Complainant alleging are not true or not.

Mr. David did not verify what Complainant asked in his submitted dispute letter and emails and did not talk to others except managers.

(Exhibit. 47, P3:9-12)

*Q. Did you talk to any other individuals other than Sujatha and Frank's former supervisor, Kim Myers?*

*A. No.*


Also, John Zimmerman, Sujatha Duraimanickam's former supervisor, testified that he relied on Sujatha Duraimanickam to know how the Complainant performed his job. (Ex. 48 P269:13-P270:7)

Shawn Woods testify that he wrote the review based on the information from system and emails. Normally, people writing review is based on what they saw and feel, and what are in their memory unless they want to write something special. From Woods behaviors, seems he tried to write something that manager asked for. (Ex. P119:3-21).

And Shawn testified that he knew "codeHub", but did not know "basecamp" (Ex. P122:21-123:10). And actually the "basecamp" was the tool used by all

106

developers and product owner for daily tracking developments process in 2015, 2016.

Kim Myers testified that the Complainant needed implement html, CSS, and Java Script (Ex. 50 P733:20-P734:3). But if anyone could check "codeHub", it should be seen the Complainant had more contribution on html, CSS, and Java Script than most developers in the team in year 2015 and 2016. Kim already testified html, CSS, and Java Script are required coding language in AEM development (Ex. 50 P733:20-24). Without being good at html, CSS, and Java Script, the Complainant should not receive the company award (Ex. K) for 2015.

40. Respondent engaged in fraudulent activity

Common elements of civil fraud

A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a present, material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to him.

See Thompson v. Bacon, 245 Va. 107, 111 (1993.)

Civil Case No. 18-cv-01454-MJD-KMM

### (a).   Based on what facts that UHG fired the Complainant[24]

On December 15, 2016 when the Complainant asked UHG HR for the reasons why the Respondents terminated his job, Tanya Hughes from UHG HR replied:

*"I have attached copies of your Corrective Action Plans. I would like you to look at the "progress updates" section of your Final CAP which indicates performance concerns that existed after the final CAP was issued to you which is why the decision was made to terminate your employment. Managers are expected to set the performance expectations for the employees that report to them."[25]*

The followings are what Tanya Hughes said about *the "progress updates" section of your Final CAP[26]*:

*"**Progress Updates**:*

*10/31/2016   Frank is unable to demonstrate all the competency skills*

*necessary to perform his job independently and timely in a*

---

[24] Refer to **"Respondent engaged in fraudulent activity"** section, Common elements of civil fraud: (1) a false representation. This brief demonstrates the facts and comments written down by Duraimanickam in two CAP contains lies and misleading information

[25] **EXHIBIT 23** - 2016-12-15 Email from Tanya Hughes to Frank Zhang regarding the Reasons for terminating Frank job -

[26] **EXHIBIT 14** - 2016-10-24 Final Corrective Action Form Issued to Claimant

Civil Case No. 18-cv-01454-MJD-KMM

consistent fashion. Met with him on Oct 31st and discussed about

the lack of meeting all the expectations in a satisfactory manner.

11/07/2016   I've been meeting with Frank every week and providing very

candid feedback. He is still unable to carry out an assignment

with thoroughness, accuracy or attention to detail to deliver any

task without issues. Eg. vhost config file task was assigned to

Frank and he caused issues in one server and before resolving

and closing the issue here, he wanted to move on to the next

server. Another team member in Infra team had to spend more

time troubleshooting the problem created by Frank thereby

leading to negative impact for the rest of the team unnecessarily.

He is still not paying enough attention to his task in hand nor is

he able to understand the impact of his change and is unable to

perform his job independently without causing issues. This has

consumed a lot of time and energy from other team members to

always solve the problems and issues caused by Frank and is

causing negative impact to the team heavily.

11/14/2016   Had a discussion with HRDirect and as Frank has not met the

performance expectations of this position and as outlined in the

Corrective action plan, we've determined to terminate him today

11/14/16. "

Civil Case No. 18-cv-01454-MJD-KMM

The two documents attached to Tanya Hughes's email are:

(1). Initial "Corrective Action Form" (Ex. 4)[27] issued by Sujatha Duraimanickam, dated on 09/19/2016, *Yufan (Frank) Zhang Initial CAP 9-19-16.pdf*

(2). Final "Corrective Action Form" (Ex. 14) [28] issued by Sujatha Duraimanickam, dated on 10/24/2016. *Yufan (Frank) Zhang final CAP 10-24-16.pdf*, or *Final CAP*

Since UHG HR narrowed down the scope of the reasons for terminating the Complainant job, in this brief, the discussion will mainly focus on the matters stated in these two documents.

### (b).   False Representation[29]

The Complainant alleges the Respondents had misrepresented the truth based on the following:

(1). Sujatha Duraimanickam used the examples with lie, partial facts, or misleading to show the Complainant's unexpected or poor performances.

---

[27] **EXHIBIT 4** - 2016-09-19 Corrective Action Form Issued to Claimant

[28] **EXHIBIT 14** - 2016-10-24 Final Corrective Action Form Issued to Claimant

[29] Refer to "Respondent engaged in fraudulent activity" section, Common elements of civil fraud: (1) a false representation, (2) of a present, material fact,

110

Civil Case No. 18-cv-01454-MJD-KMM

On 09/19/2016, Ms. Sujatha Duraimanickam issued the initial

"Corrective Action Form" (Initial CAP)[30] to the Complainant. In this CAP,

Ms. Sujatha Duraimanickam wrote:

***Description of Performance Problem*** (the section on page 2):

*"Frank (Yufan) Zhang has consistently not been meeting the basic*

*expectations of his role of developing and maintaining software*

*applications. He has been given constant coaching, written mid-year*

*review, timely candid feedback and regular weekly one on ones. He does*

*not seem to take complete ownership of tasks or follow through on his tasks*

*to meet the task deadline. All his deliverables seem to have issues and*

*someone else in the team has to always pick up his unfinished tasks. This is*

*highly disengaging for the rest of the team and is a big burden and is*

*impacting the rest of the team negatively.*

*Example 1:*

While working on OMC 5. 1 release, Frank was assigned the task to

deploy code in Production on Sept 11th; we discussed this 2 months before

and he agreed to do it. Up until 2 days before the planned release date, **he did**

**not demonstrate the knowledge necessary to perform independently in**

---

[30] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

111

**spite of multiple reminders about the time sensitivity**. So this had to be re-assigned to another team member to avoid risking Production.

Example 2:

After reassigning the OMC 5.1 deployment to another employee, Frank was assigned validation task in Production on Sept 11th to ensure that the backup jobs ran successfully. Issues were encountered where we had to restore, **found that the backup file was not actually there as he assumed that it ran and did NOT validate**. This assumption cost the team of 6 people, 4 extra hours on a week-end unnecessarily.

Example 3:

While launching BSL Center in Production on Aug 16th, **he did not validate properly in Optum Developer despite indicating that he fully understood the validation tasks**. A major problem was identified the next day and the rest of the team had to work on rolling back the changes in Production.

*Example 4:*

*With OMC Admin tool built in June and July, **Frank did not deliver within the deadline even after the original date was moved back**. It was*

Civil Case No. 18-cv-01454-MJD-KMM

*delayed beyond acceptable date; **another team member had to pick it up***

***and redo the whole functionality on a week-end to make the release.***"

..…...

(Note: there are more comments on the other dates are not included

here because those comments do not have detail explanations or additional

evidences are required to be disclosed by the respondents in order to refute

those comments)

The Complainant had refuted what Sujatha Duraimanickam said in his Internal

Dispute Resolution appeal letter (Ex. 17)[31] and emails (Ex. 19)[32] to UHG HR.

The Sujatha Duraimanickam testimony in arbitration hearing meeting can

demonstrate these four examples have following fraudulent misrepresentations

(i). On **Example 1**, Sujatha Duraimanickam wrote down following on initial

CAP about the Complainant's performance:

"***he did not demonstrate the knowledge necessary to perform***

***independently in spite of multiple reminders about the time sensitivity***"

---

[31] **EXHIBIT 17** - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

[32] **EXHIBIT 19** - 2016-12-14 ~ 2016-12-21 Email Chain between Claimant and Tanya Hughes re IDR

Meeting

113

Civil Case No. 18-cv-01454-MJD-KMM

Here, Sujatha Duraimanickam actually asked the Complainant to run a deployment tool on deployment date (9/11/2016). However, this tool was not completed yet on the date when Sujatha Duraimanickam check with the Complainant to see whether he felt confident to run that tool. The Complainant replied: "No" because (1). The enhancement for that tool was not completed yet. (2). That tool had more than 50% failed rate in past. So, Sujatha Duraimanickam's comment is inappropriate. And she shall not use this example to demonstrate the Complainant had poor performance. The Complainant had argued with Sujatha Duraimanickam about that issue in September 2016, but she still kept that example in CAP.

On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam testified with below conversation (Q: questioned by complainant's attorney. A: answered by Sujatha Duraimanickam, *Ex. 50 Tr. 603:16-604:8)[33]*:

*Q: Example 1, Mr. Zhang testified that he didn't do that because the failure rate of the program was 50 percent. What does that mean to you?*

*A: Let's just an excuse. Eventually we did release it successfully, right? So we did it. Somebody did it. He was not able to do it. Someone else*

---

[33] **EXHIBIT 50** - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 603, line 16 ~ page 604, line 8.

Civil Case No. 18-cv-01454-MJD-KMM

> *within the team picked it up and worked on it, and it was successful.*
>
> *We did upgrade to 5.1. So it's just that he was not able to handle it.*
>
> Q: *So when he failed to do the first task there under Example 1, you*
>
> *reassigned him the Example Number 2 where he was supposed to*
>
> *validate imperfections to make sure the backup job ran successfully; is*
>
> *that accurate?*
>
> A: *Right.*

The above conversation had demonstrated Sujatha Duraimanickam told lie because here Sujatha Duraimanickam testified that "*Eventually we did release it successfully*", but on example 2, she wrote down "*Issues were encountered where we had to restore*". These two statements conflict with one another.

If the Respondents could provide the "service-now" evidence, the records on "service-now" would also show the deployment on 9/11/2016 failed.

(ii). On **Example 2**, Sujatha Duraimanickam wrote down following on initial CAP about the Complainant's performance:

"*found that the backup file was not actually there as he assumed that it ran and did NOT validate*"

Civil Case No. 18-cv-01454-MJD-KMM

On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam testified with below conversation (Q: questioned by complainant's attorney. A: answered by Sujatha Duraimanickam, *Ex. 50 Tr. 604:9-18*)[34]

*Q: What did he do wrong with that example?*

**A. He did not validate that. He assumed that the job ran successfully.**

*Q. Mr. Zhang testified that he was not the one who was doing the backup.*

**A. Correct. It was an automated job. His job -- Frank's role there was to just validate to make sure that the automated job was run successfully, and he did not validate that.**

Following facts can demonstrate that Sujatha Duraimanickam provided misleading information to arbitration

(1). Sujatha blamed "**He did not validate that** …". However, it is not possible to validate whether a backup file is working or not before the change occurs. For example, you cannot affirm a stock price goes up or down before an event occurs.

(2). If the backup file were not created, the system would not be restored successfully.

---

[34] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 604, line 9 ~ 1 8.

116

Civil Case No. 18-cv-01454-MJD-KMM

The truth is that Sujatha Duraimanickam had system upgraded with additional software which had not been approved in advanced[35]. Thus, made restore take longer time.

Sujatha Duraimanickam's comment on Example 2 is inappropriate. And she shall not use this example to demonstrate the Complainant had poor performance. The Complainant had argued with Sujatha Duraimanickam about that issue in September 2016, but she still kept that example in CAP.

If the Respondents could provide "service-now" evidence, the records on "service-now" would also show the release task was for the Complainant to ensure the deployment engineer backup the files. It was not to validate those files.

(iii). On **Example 3**, Sujatha Duraimanickam wrote down following on initial
  CAP about the Complainant's performance:

"*he did not validate properly in Optum Developer despite indicating that he*
  *fully understood the validation tasks*"

Here, Sujatha Duraimanickam blamed the Complainant did not validate something. However, Sujatha Duraimanickam knew that the Complainant was not

---

[35] It violates UHG service police for Making change in product environment without getting approval in advanced

117

Civil Case No. 18-cv-01454-MJD-KMM

requested to do that job. This can be proved by Sujatha Duraimanickam's testimony
(Ex. 50 Tr. 604:9-18)[36] below:

> *On August 19, 2020, arbitration hearing meeting, Sujatha Duraimanickam*
> *testified with below conversation (Q: questioned by complainant's attorney.*
> *A: answered by Sujatha Duraimanickam)*

> *Q: Mr. Zhang testified that he didn't validate -- this is referring to Example*
> *Number 3 -- he didn't validate because it wasn't on the To Do list for the*
> *part --*

> *A: That was also -- yeah, that was also a developer's responsibility, to make*
> *sure that they understand what they have to do, and that he documented*
> *all the details in that change ticket, put in high-level validity, and use*
> *your brain at that time, and validate there's only hardly 10 Websites*
> *there. And as a developer, it's my responsibility to know what I'm*
> *supposed to validate. Those 10 Websites are key to make sure that the*
> *Websites are up and running. That's the basic requirement of any*
> *developer, basic expectation. So whether it's on the To Do list or not, it's*
> *the developer's responsibility. If the developer feels comfortable enough*
> *not to put it in the To Do list, that's up to that person.*

---

[36] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 604, line
9 ~ 1 8

Here, Sujatha Duraimanickam blamed the Complainant for not doing something which he was not requested to do.

Actually, the root cause for that issue is that no one could find out the "Optum Developer" website was missing in the list of dozens of websites, otherwise, this website would be validated. Since no one could find out the "Optum Developer" website was missing in to-do list, why Mr. Zhang should be fired when he could not find out the "Optum Developer" website was missing, while other younger teammates would be OK without any complaining.

(iv). On **Example 4,** Sujatha Duraimanickam wrote down following on initial
CAP about the Complainant's performance:

*"With OMC Admin tool built in June and July, **Frank did not deliver within the deadline even after the original date was moved back**. It was delayed beyond acceptable date; **another team member had to pick it up and redo the whole functionality on a week-end to make the release"**

For this example, Sujatha Duraimanickam's testimony (Ex. 50, Tr. 608:13-20)[37]
is

---

[37] EXHIBIT 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 608, line
13 ~ 20.

*"he delivered something which was not meeting the requirement, so there was constant delays and missing of deadlines. We had to push the release out, and we kept committing to our customers saying we'll deliver it in this release, and the next release, and the next release, and it. was going on forever.*

*And finally Shawn was like, I'll just do it. And he spent the weekend, and he had to do it, because we committed so many times and missed so many deadlines it was just reflecting very, very bad on the team. So he ended up doing it on the weekend, and that was the situation at the time."*

While the Complainant's testimony is

Q: Do you know what this example refers to?

**A: This tour is not a very complicated tour[tool]. It's not a very complicated tour[tool][38], but the problem here is that it went through a lot of changes. And so that is -- the changes make the method complicated. So it was initially scheduled for one week, but it ended up like due to multiple duration of changes, so that is extended for seven weeks. And during the release of the scheduling, actually, I end up complete the task before the revision deadline.**

---

[38] Misspelling. It should be **"tool"**, not **"tour"**

Civil Case No. 18-cv-01454-MJD-KMM

Here, there are two versions for example 4, one from Complainant, the other from Respondents. Respondents said the developed product did not meet the requirements, while Complainant said the requirements had been changed for many times. The diagram (Ap. 2)[39] for requirement change and some development notes provided by the Complainant was excluded from evidences.

The Complainant requested the Respondents to provide "**basecamp**" records in order to verify which version was true, but the Respondents refused to provide them. And finally, the arbitrator believed what Sujatha said although she told lie in her testimony.

As mentioned in the section of "STATEMENT OF THE CASE AND FACTS", "basecamp" was used for tracking the requirement change and daily work status. So, the records from it can be considered as the best evidence. In the basis of Rule 1002. Requirement of the Original, "basecamp" records should be presented to arbitration, but actually not.

(v). On initial CAP (Ex. 4)[40], Sujatha Duraimanickam wrote down following about the Complainant's performance:

*Progress Updates* (the section on page 4):

---

[39] Appendix 2- the changes on Tenant Admin Tool requirement

[40] EXHIBIT 4 - 2016-09-19 Corrective Action Form Issued to Claimant

121

Civil Case No. 18-cv-01454-MJD-KMM

"*09/20/2016*

*1. This week he was supposed to have finished Pen test issue (no sniff) but*

    *missed the deadline again and delivered with issues. Team member had to*

    *follow up with him to complete his task.*

*2. Frank updated a change ticket incorrectly to flag it as 'Out of compliance'.*

    *So I had to ask him to follow up with Change management team to fix the*

    *issue. He tried doing it but only partially and I had to follow up with Frank*

    *again multiple times up until·the task was completed to be back in*

    *compliance.*

       **To summarize, he did not perform his task independently and with**

**quality.**"

The Complainant testimony (Ex. 49 Tr. 463:24[41] in the hearing meeting dated

on August 18, 2020

Q. Would you turn to page 4 of this Exhibit 6. I'm looking at the Progress

    Updates notes on September 20, 2016. Do you see that?

*Q: Is it true you were supposed to have finished the pen test issue during the*

    *week of September 20?*

---

[41] EXHIBIT 49 - 2020-08-18 Transcripts from the Arbitration Hearing Vol3_Condensed, page 464 line

12 ~ 24

Civil Case No. 18-cv-01454-MJD-KMM

> THE WITNESS: So that thing is incorrect because I am supposed to be the one
>
> who assigns the task to the Infrastructure Team on September 20th. So the
>
> reason I joined into it is because they did not -- they did not accomplish the
>
> task so I have to jump in to help.

In here, the Complainant just wanted to tell the "Pen test" work assignment took long time (about two and half months). And this was the assignment for infrastructure team. It was that the infrastructure team did not finish it in time, was not that the Complainant could not finish it in time. Before October 2016, it was infrastructure team working on this assignment, but later it was reassigned to the Complainant in early October 2016 due to infrastructure team having some difficulty. Because "pen test" subject requires some IT knowledge to understand it, the Complainant did not know what to ask.

However, after Complainant done with his testimony, the witnesses from Respondents started their second testimony. And their testimonies on "pen test" subject are different from the Complainant's. The "pen test" work status can be found in records "basecamp" and "service-now". however, the respondents did not disclose "basecamp" and "service-now" work information. Thus, it is unable to verify which descriptions are true. But the arbitrator did not take the Complainant's notes (Ex. 57) with the reason of "no original evidence to support it" although the notes was the writing testimony. However, why doesn't arbitrator request original

123

evidences to Respondents' document evidences, and to the oral testimony which contained lies that were demonstrated by Complainant?

**(c).   Respondents knew "basecamp", service-now", "codeHub" functions[42] (Ex. 47 Tr. 27:14-20, 95:19-21, 96:4-5, 119:22-120:18, 134:7-11, 135:2-23)**

As what are described in PREFACE section, "basecamp", service-now", "codeHub" contained the daily development works and their daily development status, every service request created by, or assigned to, the team, and the contributes for each developer. But the records from these three resources were not disclosed in arbitration.

**(d).   Two CAPs and other evidences from Respondents must be presented in arbitration even although they contained lies or misleading information[43]**

The intellectual property law for bites the anyone taking any evidences from UHG without UHG permit. And UHG did not allow the Complainant taking

---

[42] Refer to "Respondent engaged in fraudulent activity" section, Common elements of civil fraud: (3) made intentionally and knowingly

[43] Refer to "Respondent engaged in fraudulent activity" section, Common elements of civil fraud: (4) with intent to mislead, (5) reasonable reliance by the party misled

Civil Case No. 18-cv-01454-MJD-KMM

anything out when terminated the Complainant's job. That means the Complainant have to use the evidences provided by the Respondents to allege Respondents.

The arguments demonstrated before already showed those evidences contained lies or misleading information (by partial facts). When the Complainant alleged the Respondents for discrimination or defamation, the two CAP and other evidences from the Respondents must be presented in arbitration at first. However, when the arbitration went to hearing stage, the last step before making award, the Complainant testified those evidences contained lies or misleading information. The arbitration award shows the arbitrator gave more weight to two Caps. However, in CAP, the employee only allows to write down his comments without exceeding 1500 characters (including space) (Ex. 4, page 7, "Employee Comments"), but manger could write down her comments with unlimited characters. So, the additional employee's comments needed to write down on a separate document (Ex. 57). But the arbitrator did not take this separate document as evidence.

41. The undisclosed evidences have effects on arbitration decisions

The Respondents did not disclose a series of correspondences, which the Complainant argues would have affected the arbitrator's decision.

(a).   **How to prove UHG had age discrimination against Mr. Zhang**

125

Civil Case No. 18-cv-01454-MJD-KMM

As UHG told EEOC[44], in order to establish a prima facie case of age discrimination, Mr. Zhang must establish that:

(1) Mr. Zhang belonged to the protected age group; and

(2) Mr. Zhang performed his job satisfactorily or was qualified to perform his job; and

(3) Mr. Zhang suffered an adverse employment action; and

(4) Similarly situated, substantially younger employees were treated more favorably.

See Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931 (8th Cir. 2000).

**(b).   There is no debating the fact that Mr. Zhang is qualified for above element (a)(1)[45] and (a)(3)[46] since Mr. Zhang was 56 years old when his job got terminated.**

**(c).   Regarding above element (a)(2)[47], following facts demonstrate Mr. Zhang was qualified to perform his job:**

---

[44] **EXHIBIT –** "*UHG-to-EEOC - 2017-06-14 zhang pos stmt*", page 8, A. 1.

[45] Refer to the same section (a)(1) "Mr. Zhang belonged to the protected age group"

[46] Refer to the same section (a)(3) "Mr. Zhang suffered an adverse employment action"

[47] Refer to the same section (a)(2) "Mr. Zhang performed his job satisfactorily or was qualified to perform his job"

126

Civil Case No. 18-cv-01454-MJD-KMM

(1). Mr. Zhang received the company wide award, "MAKE IT HAPPEN 2015"[48]. This award was in recognition of Mr. Zhang's excellent achievements in developing "Optum Developer Hub" application from scratch in year 2015, and such was also in recognition of Mr. Zhang skills qualified to perform his job. Only about 160 employees among more than two hundred thousand UHG employees received this award. Mr. Zhang, as development lead, received this award (Ex. 1), and not every of his team members received this award (Ex. 1). If Mr. Zhang could not perform his job satisfactorily, he should not be granted the award for company-wide recognized accomplishment.

(2). In Mr. Zhang performance review (Ex. 2) by his manager, Ms. Kim Myers said[49] that Mr. Zhang was excellent at documenting what he did and how to do further development on OMC[50] and Optum Developer[51]. If Mr. Zhang did not have the required knowledge and skills for performing his job, he would not be able to write down development documents with details.

---

[48] **EXHIBIT 1** - 2015 Optum year 2015 award for Excellent Achievement

[49] **EXHIBIT 2** - 2016-02-21 Common Review for Claimant by Kim Myers, page 1, the 1st paragraph on Comments section

[50] Note: OMC – stand for Optum Marketing Cloud which was a web content management system developed and maintained by Sujatha's team, and used by external members

[51] Note: "Optum Developer" was another web content management system developed and maintained by Sujatha's team. "Optum Developer" contained everything that OMC had, plus some internal components used only within company. In year 2016, "Optum Developer" was merged with OMC.

Civil Case No. 18-cv-01454-MJD-KMM

(3). In Mr. Zhang performance review dated on February 21, 2016, his manager, Ms. Kim Myers, said that Mr. Zhang was a strong technical talent[52], and the code that he produced tended to be high quality[53]. That means Mr. Zhang had strong knowledge and skills required for his job.

(4). In Ms. Jennifer's testimony, she acknowledged that Mr. Zhang was a really smart person and admired how easily he could complete a task[54]. If Mr. Zhang was not qualified for his job position, no one would think he could complete a task easily.

(5). In Mr. Shawn Woods's testimony, he stated that Mr. Zhang was a sharp, technically-minded person, and he didn't back away from deeply complex issues[55]. That means that Mr. Shawn Woods, as the technical lead, acknowledged Mr. Zhang was qualified for his job position from his viewpoint in year 2015.

(6). All of the technical witnesses from UHG acknowledged Mr. Zhang was smart and had the technical knowledge and skills required for performing his job in

---

[52] **EXHIBIT** 2 - 2016-02-21 Common Review for Claimant by Kim Myers, page 1, "Comments" section, paragraph 3.

[53] **EXHIBIT** 2 - 2016-02-21 Common Review for Claimant by Kim Myers, page 6, paragraph 7.

[54] **EXHIBIT** 12 - 2016-10-18 Interim Review for Claimant by Jennifer Viveros Aguilar, page 1, section 2

Also see **EXHIBIT** 48 - 2020-08-04 Transcripts from the Arbitration Hearing Vol1_Condensed, page 141 line 18~25, and page 145 line 25 ~ page 146 line 4

[55] **EXHIBIT** 50 - 2020-08-19 Transcripts from the Arbitration Hearing Vol4_Condensed, page 728, line 9~11

128

Civil Case No. 18-cv-01454-MJD-KMM

general. Those testimonies are opposed to what Ms. Sujatha said "Frank (Mr. Zhang) was unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion"[57]

(7). Although the Complainant's supervisor was changed to Ms. Sujatha in 2016, his primary job function was not changed, and still worked on developing and maintaining AEM (Adobe Experience Manager) components. Ms. Sujatha acknowledged that the Complainant was technically a strong candidate on July 22, 2016 (Ex. 3)[56]. However, on October 31, 2016, Mr. Sujatha's comment about the Complainant had become "*Frank was unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion*"[57]. And in the arbitration hearing meeting dated on August 19, Ms. Sujatha said "basically, he has always run into repeated issues for not validating things thoroughly. He's always been very careless". There are so many conflict statements between Ms. Sujatha's and the Complainant's. Based on Fed.R.Ev. Rule 1002, "basecamp" records[58] and "service-now" records[59] are the best evidences to prove

---

[56] **EXHIBIT** 3 - 2016-07-10 Internal Review for Claimant by Sujatha Duraimanickam, page 2, Comments on 7/22. This document was created on 5/19/2017

[57] **EXHIBIT** 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant, page 3, Progress Updates: 10/31/2016.

[58] The evidences from baseCamp records are described on section 12

[59] The evidences from service-now records are described on section 21

Civil Case No. 18-cv-01454-MJD-KMM

whether Ms. Sujatha or the Complainant told lie. "basecamp" records are daily development status records used to keep tracking each developer everyday work tasks include the requirements for works, and developers' work status[60]. However, UHG did not disclose the information from these two resources no matter who requested. Without disclosed complete information from basecamp records and service-now records, arbitrator certainly would get misleading and make wrong arbitration decisions.

    **(d).**    **Regarding the above element (a)(4)[61], the records from basecamp, service-now, codeHub, and other relevant work status documents as mentioned in section 0 must need to provide in arbitration in order to determine whether Mr. Zhang had been treated different from younger developers in his team or Mr. Zhang had performance problems as mentioned in the two "Corrective Action Form"[62] issued by Ms. Sujatha to the Complainant.**

––––––––––––––––––––

[60] **EXHIBIT 48** - 2020-08-04 Transcripts from the Arbitration Hearing Vol1_Condensed, from page 134 line 7 to page 135 line 4.

[61] Refer to the same section (a)(4) "Similarly situated, substantially younger employees were treated more favorably"

Civil Case No. 18-cv-01454-MJD-KMM

(1). During arbitration, except those examples already mentioned by Ms. Sujatha in her initial issued "Corrective Action Form"[62], but refuted by Mr. Zhang in his "Internal Dispute Resolution Appeal Form"[63] and his emails[64] to UHG HR, UHG did not provide any more examples to demonstrate that Mr. Zhang was not able to perform his job and to complete his works in time.

Above arguments also present the facts that contradicts what Ms. Sujatha said that "Frank is unable to demonstrate all the competency skills necessary to perform his job independently and timely in a consistent fashion"[65].

Sujatha Duraimanickam testified in hearing meeting that she thought Zhang always did something wrong (Ex. 50, Tr. 622:7-8); and if others did something wrong, Duraimanickam believed that was always because of Zhang's (Ex. 50 Tr. 616:3-4). On December 15, Zhang had asked UHG HR to provide the details or material evidence to demonstrate Duraimanickam's comments (Ex. 19, page 6 Zhang's email to Tanya Hughes dated on December 15, 2016). But four years

---

[62]   (1). **EXHIBIT** 4 - 2016-09-19 Corrective Action Form Issued to Claimant, and

   (2). **EXHIBIT** 14 - 2016-10-24 Final Corrective Action Form Issued to Claimant

[63] **EXHIBIT 17** - 2016-12-02 Internal Dispute Resolution Appeal Form Submitted by Claimant

[64] **EXHIBIT 19** - 2016-12-14 ~ 2016-12-21 Email Chain between Claimant and Tanya Hughes re IDR Meeting

[65] **EXHIBIT 14** - 2016-10-24 Final Corrective Action Form Issued to Claimant, Page 3, "Progress Updates" on 10/31/2016

Civil Case No. 18-cv-01454-MJD-KMM

passed, even asked the Respondents for many times, **no new examples or evidences could be presented** by the Respondents to demonstrate Zhang's poor performances.

### (e).   What material evidences shall be disclosed in arbitration

UHG had been asked to provide solid evidence to prove their averse or negative comments on Mr. Zhang. The major evidences are the records in "basecamp", "service-now", and "codeHub". As described in "PREFACE" section, the daily work status and development logs, etc. information could demonstrate the Complainant got treated different from the younger developers.

### (f).   UHG did not use the material evidences to verify or refute what complainant said or the Complainant's arguments. Instead, UHG just repeated Ms. Sujatha's averse or negative comments about Mr. Zhang without proving those comments by material evidence, or giving new detail examples or descriptions of Mr. Zhang's conduct.

Note: the material evidences are those records in "basecamp", "service-now", and "codeHub"

### (g).   The arbitration award was procured by corruption, fraud, or undue means

On Sep. 19, 2016, Ms. Sujatha issued the initial "Corrective Action Form" which contains

**(h).   The Respondents knew "basecamp", "service-now", "codeHub" and what they were used for, but they did not present their records for arbitration**

Sujatha Duraimanickam knew "basecamp" & "'service-now" (Ex. 50 P669:11-P670:19)

**(i).   the Respondents knew the functions of knew "basecamp", "service-now", "codeHub"**

Sujatha Duraimanickam knew "basecamp" & "'service-now" (Ex. 50 P669:11-P670:19)

Shawn testified that he knew "codeHub", but did not know "basecamp" (Ex. P122:21-123:10)

**(j).   the Respondents presented malpresentation in arbitration when non-disclosed information in "basecamp", "service-now", "codeHub".**
**Thus, led to below opinion as arbitrator said below:**

*"Claimant contends that, motivated by are bias, Sujatha Duraimanickam, team manager, targeted him for close scrutiny, unfair criticism, and deliberately set him up for failure. Claimant says that Duraimanickam created an inaccurate and*

Civil Case No. 18-cv-01454-MJD-KMM

*misleading record of his performance in order to build a case against him and to*

*ultimately terminate his employment. (Ex. 53, page 2, 3rd paragraph)*

*However, the record in this case shows that there were numerous instances of*

*poor performance on Claimant's part. That led to Claimant's co-workers having to*

*expend significant time correcting his mistakes and redoing assigned tasks. The*

*documented performance problems included: missing deadlines; failing to complete*

*tasks thus causing delays and reworks; failing to demonstrate an understanding of*

*the requirements of team projects; working on irrelevant tasks; and failing to*

*communicate with other team members." (EXHIBIT 53 - 2020-10-05 - Final*

*Arbitration Award, page 2, last paragraph)*

When take a close look, the Complainant finds none of those evidences are

material evidence. Because except the comments, no original logging records found.

This just like circular reasoning, or saying "Repeat a lie often enough and it becomes

the truth" (*Appendix 1*).


**(k).   The Respondents made a false representation intentionally and**

**knowingly**

These arguments occurred for many times: (1) Internal Dispute, (2) EEOC

charge, the arbitration, and even when the Complainant still worked in UHG. But

arbitrator did not know that. When he saw that comments, he just believed those

repeating more times.

134

Civil Case No. 18-cv-01454-MJD-KMM

*"Although Claimant contends that in each of these instances he was not at fault; there was sufficient evidence to support Duraimanickam's critique of Claimant's performance as fair and not simply a pretext for ago discrimination. This evidence included not only Duraimanickam's evaluation of Claimant's poor performance but also the evaluations of his cod-workers, including lead developer Shawn Woods who described how Claimant's delays and mistakes adversely affected the whole team."* (EXHIBIT 53 - 2020-10-05 - Final Arbitration Award, page 3, first paragraph)

As already proven above, Ms. Sujatha told lies, while Ms. Kim Myers and Mr. Shawn Woods said things with misleading information.

Ms. Sujatha said:

*"Right. He needed a lot of improvement because he was never telling the truth, he was always lying in his commitment. He was not keeping up with words. He was not trustworthy. He was not credible."* (Ex. 47 38:1-5)

*"When you say it's all done, specifically his outcome is always flawed, he always has issues."* (Ex. 50 P622:6-8)

But so far, she did not provide any material evidence. If the Complainant was always lying, she should very easily find many examples. The Complainant had argued with the Respondents about that for many times already knew saying so what result would be. Since "codeHub" was used to manage codes, Duraimanickam should find the coding issues from "codeHub" easily, or find the error or bugger reports on "basecamp" every easily.

135

Civil Case No. 18-cv-01454-MJD-KMM

Kim Myers is lacking of enough knowledge to assess Mr. Zhang's technical skills. Kim said "Frank[Zhang] had a hard time with html, CSS and java scripts. It wasn't part of his background" (Ex. 50 Tr. 747:18-20). That is not true. Kim told lie. Kim had mentioned the working skills of "HTML, JavaScript, and CSS" are required for developers (Ex. 50 Tr. 733:20-24). Kim also said Zhang was lacking of those skills which are must need skills for the jobs. If Zhang were lacking of those skills, how could Zhang win the award for excellent achievement on developing software. Refer to the attached document about an AEM simulation program that Zhang contributed to git hub in year 2016, where there are a lot of "HTML, JavaScript, and CSS" coding (Ex. Frank_zhang_AEM_simulation)[66].

**(l).   As mentioned in beginning, the Respondents controlled all of material evidence. They just disclosed the evidences good for them**

If there are any malpresentation in the Complainant claims, the Respondents should find out already because the Respondents controlled all the evidences and are able to disclose the evidences only good for them.

---

[66] Kim had told Zhang that the company needed to spend 5 million dollars every three years to pay the Adobe license fee for using AEM. So, Zhang wanted to develop an application simulated to AEM in 2016 to save the license fee. Due to Duraimanickam's behavior, the development effort was stopped in September 2016. This application was developed by Zhang with a lot of HTML, CSS and Java Script codlings. The contributor ID is the same ID as the one that UHG assigned to Zhang.

Civil Case No. 18-cv-01454-MJD-KMM

(m).   **Aside from using the evidence provided by the Respondents, the Complainant had no evidence of his own aside from the "MAKE IT HAPPEN" award he had received.**

The Complainant had to use the evidences from the Respondents to demonstrate his points, otherwise, nothing he could say. If the Complainant has on the records in "basecamp", "service-now", "codeHub", he would find out the material evidence to demonstrate he alleging discrimination with real examples. The notes show on EXHIBIT 57 – "C4 - 2016 Yufan Zhang's Notes" would be the good resources to help the Complainant with finding the material evidence from the disclosed records in "basecamp", "service-now", "codeHub", ect.

(n).   **The records from "basecamp", "service-now", "codeHub" could help Complainant to demonstrate the Complainant had no-fault on the projects of four examples, vhost and "pen test". Also, the records will show who made the issues. Once find out the root causes from which persons, then it will show Ms. Sujatha had no cause to blame the Complainant.**

Ms. Sujatha claims the Complainant should have done something, but that is not enough of a reason to pursue an adverse employment action against the Complainant when he has not done something which he has not been explicitly asked to do.

Civil Case No. 18-cv-01454-MJD-KMM

The complainant's notes show many developers had missed deadline, and Ms. Sujatha had still said that they were all good. Thus, it could be demonstrated that only the older developer had been treated different.

**Conclusion**:

After disclosing the records in "basecamp", "service-now", and "codeHub", etc., the Complainant with those records would be able to demonstrate that the reasons for terminating his job: (1) have no basis in fact, or (2) even if based in fact, the employer was not motivated by these reasons, or (3) the reasons are insufficient to motivate an adverse employment decision.

According to the discussion above, after disclosing the records in "basecamp", "service-now" and "codeHub", the Complainant will be able to demonstrate, with material evidence, the reasons for the Respondents to terminate the Complainant's job are pretext, and the Respondents did have age discrimination against him.

**ANALYSIS**

The records in "basecamp", "service-now", and "codeHub" contains the information for each developer day-to-day work tasks, work status, and the work errors or issues, etc. So, such records can be the material evidence. Without such evidences, the arbitrator might be misled. But the Respondents were not willing to use the records in "basecamp", "service-now", and "codeHub" to support their

Civil Case No. 18-cv-01454-MJD-KMM

statements or arguments in the Internal Dispute Resolution appeal, EEOC charge, and this arbitration? And even the witness, Shawn Woods, testified that he didn't know what is "basecamp" (Ex 47 Tr. 123:7-10), and that "basecamp" was the system he must have used on every day in 2015, 2016, and might continue being used for certain years after 2016.

In the Internal Dispute Resolution appeal, the Zhang told UHG HR that his dispute statements in **Exs. 17 and 18** can be verified by the records in "basecamp", "service-now", and "codeHub" (**Ex. 60**). But David Drysdale, UHG HR investigator, made his judgement (Ex. 34) only based on the Duraimanickam's comments (Ex. 30), mangers' common review (Exs. 2 and 3), and peer reviews (Ex. 31), and even did not talk to any colleagues other than two managers (Sujath Duraimanickam and Kim Myers) (Ex. 47 Tr: 213:17-20). Kim Myers' common review was done before the events Zhang talked in his dispute. And Zhang claimed that Duraimanickam's comments were based on partial facts. The peer review did not have relevant information, or did not provide detail information, about those events. Mr. Drysdale should talk to Zhang's colleagues to gather the complete facts, and better to verify what Zhang said by the records in "basecamp", "service-now", and "codeHub". But Mr. Drysdale did not do so. UHG's response (Ex. 34) seemed telling that the Duraimanickam's statements were true because Duraimanickam said they were true.

Let's see another example. EEOC asked UHG to provide the documents to show Zhang and his teammates performances and what reviews Duraimanickam had on Zhang and his teammates (**Ex. 36** page 2, "REQUEST NO. 3" and its

RESPONSE). But UHG refused to provide the job logs, and only provided Duraimanickam's reviews ("Exhibit B" in file "Zhang 2017-12-12 Exhibits to Response to Request for Information"). Zhang and his teammates performances are the working records in "basecamp", "service-now", and "codeHub". EEOC asked UHG for that information it was because Zhang told EEOC what Zhang's said could be verified on "basecamp", "service-now" (Ex file "Letter to EEOC - 2017-11-22", page 9). While Zhang and his teammates' contributions can be found in "codeHub". Also, without knowing what and how Mr. Zhang and his teammates were doing, how EEOC could determine whether Duraimanickam had treated everyone equally. Duraimanickam only provided her reviews for Zhang and his teammates to EEOC, thus just like telling EEOC that Duraimanickam said someone good, then that one must be good; if Duraimanickam said someone bad, then that one must be bad; no evidence needs.

Also, in this arbitration, the Respondents still did not provide the records from "basecamp", "service-now", and "codeHub" even they knew that jobs and performances information could be found in them. Respondents wanted to prove what they said, but there are lies and misleading information in their testimony. Especially when many irrelated technical terms were presented in witnesses answers, the attorneys and arbitrator got confused. And they might not determine what information were false, or true, or partial true and partial false. In arbitration award, it shows the arbitrator did not recognize the records in "basecamp", "service-now" and

"codeHub" were the key to determine which party's statements had more probative value and reliability.

The arbitrator should seek to use the best evidentiary rule to determine the ultimate facts and truth of the claims presented. In applying the rules to the admission of evidence, the arbitrator should seek to find the evidence that will reach the merits and truth of the claims, and defenses to those claims, in a way that will require the parties to be precise in their offers of proof.

As both the fact-finder and law-giver, the arbitrator has accepted broad powers in the consideration, admission of or exclusion of evidence. However, the arbitrator has no power to compel a party to present the evidences which are not in favor of itself, but courts have. This court should make a motion order to compel respondents to disclose the records in "basecamp", "service-now", "codeHub", and all relevant development logs in order to make justice equal for all parties.

In this case, the employer tried to hide the unfavorable evidences, while at the meantime

(1) If the Complainant possesses the evidence, he could be charged for stealing intellectual property

(2) If the Complainant does not possess the evidence, the Respondent could lie since there is no penalty if arbitrator(s) are unable to identify lies

The records in "basecamp". "service-now", and "codeHub" are the material evidence. But those records are controlled by UHG. The intellectual property law

prohibited the Complainant to obtain these evidences without UHG permit. And

UHG did refuse Zhang to have them. As what EEOC and MNHR officers told

Zhang, unless in courts, UHG would not provide those adverse evidences, especially

when there is no cost to lies.

In arbitration hearing meeting, Sujatha Duraimanickam testified: (1) everyone's

coding errors were always caused by Zhang (Ex. 50 Tr. 616:1-4); (2) Zhang's

outcome was always flawed and Zhang always has issues (Ex. 50 Tr. 622:7-8); (3)

"he[Zhang] has always run into repeated issues for not validating things thoroughly.

He[Zhang] is always been very careless" (Ex. 50 Tr. 626:1-4); (4) "he[Zhang] was

always giving some lame excuse or the other." (Ex. 50 Tr. 654:21-22).

As a developer, Zhang had completed a lot of development tasks, part of which

are listed in Exhibit file: "Major-contribution". If what Duraimanickam said are all

true, the respondents should be very easy to find many examples in "basecamp",

"service-now", and "codeHub" to demonstrate Duraimanickam's comments. If the

Respondents are not able to demonstrate Duraimanickam's comments, then it would

prove Duraimanickam had prejudice against Zhang. And such prejudice lead to she

considered Zhang should be accountable for failures as long as they were related to

Zhang, and no matter whether they were caused by Zhang. And the records in

"basecamp", "service-now" and "codeHub" could prove whether Duraimanickam

had prejudice or Duraimanickam told truth. However, the Respondents dis not want

to disclose "basecamp", "service-now" and "codeHub" although there are no

business secrets. Without disclosing the records in "basecamp", "service-now" and

Civil Case No. 18-cv-01454-MJD-KMM

"codeHub", the arbitrator was misled by lies and incomplete facts, and thus lead to an arbitration award procured by corruption, fraud, or undue means.

## CONCLUSION

Based on the facts and evidences, it could be concluded that (1) the arbitration award was procured by fraud and (2) *"the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced"*.

Pursuant to 9 U.S.C. §§ 10 (a) and Sec. 572B.23 MN Statutes, this Court should vacate the Award which is rendered in favor of respondents on all claims in arbitration, *Case Number: 01-19-0001-0069*. This Court should grant new trial motions when the Arbitration Award is vacated.

Date:  January 15, 2021                                  Respectfully submitted,


                                                         /s/ Yufan Zhang    *Zhang*

                                                         **Yufan Zhang**

                                                         Plaintiff

Civil Case No. 18-cv-01454-MJD-KMM

# Index

**A**

AEM ..................... 13, 25, 26, 63, 64, 65, 75, 107, 129

**B**

basecamp ....14, 17, 19, 21, 23, 35, 36, 38, 40, 44, 45, 46, 48, 49, 56, 58, 61, 64, 69, 70, 77, 78, 94, 102, 106, 121, 123, 124, 130, 132, 133, 135, 137, 138, 139, 140, 141, 142

**C**

codeHub 14, 17, 19, 21, 35, 36, 38, 40, 44, 46, 56, 58, 69, 70, 77, 94, 102, 106, 107, 124, 130, 132, 133, 135, 137, 138, 139, 140, 141, 142

**D**

development .... 27, 28, 29, 61, 63, 64, 66, 69, 76, 94, 102, 107, 121, 127, 130, 141

**L**

lie 21, 90, 96, 97, 101, 110, 115, 121, 130, 134, 135

lies.................................................................105, 141

**O**

OpenShift.................................... 26, 27, 28, 29, 30, 63

**P**

pen testing ........................................................14, 77

**S**

service-now .14, 17, 19, 21, 35, 36, 38, 39, 40, 41, 42, 44, 46, 48, 49, 50, 56, 58, 62, 69, 70, 77, 94, 102, 115, 117, 123, 124, 129, 130, 132, 133, 137, 138, 139, 140, 141, 142